**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RECEIVERSHIP MANAGEMENT, INC. | ) | |
| IN ITS CAPACITY AS INDEPENDENT | ) | |
| FIDUCIARY OF THE AEU HOLDINGS, | ) | |
| LLC EMPLOYEE BENEFIT PLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| LOCKE LORD, LLP, | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

This case is about the negligent actions and inactions by the Defendant law firm related to a failed health benefits plan named the AEU Holdings, LLC Employee Benefit Plan ("AEU Plan"). Plaintiff Receivership Management, Inc. is the court-appointed Independent Fiduciary of the AEU Plan ("Independent Fiduciary") and brings the following claims against Locke Lord LLP in that capacity. In support thereof, Independent Fiduciary alleges as follows.

## PARTIES

1. Independent Fiduciary is a Tennessee corporation with its principal place of business in Nashville, Tennessee. Independent Fiduciary was appointed as such by the court in the related pending case *Acosta v. AEU Benefits, LLC, et al.*, U.S. District Court for the Northern District of Illinois Case Number 1:17-cv-07931-JHL-SMF ("DOL Action").

2. Defendant Locke Lord LLP ("Locke Lord") is a Texas limited liability partnership with its principal place of business in Dallas, Texas. Upon information and belief, none of Locke Lord's partners is a citizen of Tennessee.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this Complaint under 28 U.S.C. section 1332 because the parties are diverse since they are citizens of different states and the amount in controversy requirement is satisfied, i.e., the damages sought by the Independent Fiduciary exclusive of interest and costs are in excess of $75,000.00.

4.      This Court has jurisdiction over Defendant because Defendant has the requisite minimum contacts to subject itself to jurisdiction in this Court including an office in Chicago located at 111 South Wacker Drive, Suite 4100, Chicago, Illinois.

5.      Venue is appropriate in the Northern District of Illinois pursuant to 28 U.S.C. section 1391(b)(2) because a substantial part of the events, acts, transactions and occurrences giving rise to the claims alleged in this Complaint occurred within the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

### *Appointment and Authority of Independent Fiduciary*

6.      On November 2, 2017, the Secretary of Labor filed suit against the AEU Plan and various entities in the DOL Action.

7.      On November 3, 2017, the Court in the DOL Action entered an Ex Parte Temporary Restraining Order ("TRO").

8.      The TRO defined the AEU Holdings, LLC Employee Benefit Plan as the "AEU Plan" and further defined all employee welfare plans covered by ERISA that are part of or participate in the AEU Plan to be "Participating Plans."  The TRO ordered, in part, that Receivership Management, Inc., be appointed as the Independent Fiduciary to the AEU Plan and Participating Plans.

9. On December 13, 2017, the court in the DOL Action entered a Preliminary Injunction ("Preliminary Injunction"). The Preliminary Injunction ordered, in part, that the Independent Fiduciary shall serve as the successor Trustee and Plan Administrator of the AEU Plan and Participating Plans and shall have final and exclusive fiduciary authority over the AEU Plan's administration, management, and control of the AEU Plan's assets. Preliminary Injunction ¶ 4.

10. The Preliminary Injunction gives the Independent Fiduciary, among other authorities, the "[a]uthority to identify and pursue claims on behalf of the Participating Plans and the AEU Plan[.]" Preliminary Injunction ¶ 14(j).

11. The DOL Action remains pending before the U.S. District Court for the Northern District of Illinois.

***General Overview***

12. Given the increasing cost of health insurance, small and mid-size employers frequently seek more affordable group health care benefits for their employees. One such option is self-funded health benefit plans with stop loss insurance that covers claims above a certain dollar amount. Using such plans, employers seek to provide affordable group health benefits for their employees.

13. Employer sponsored group health plans generally are governed by the Employee Retirement Income Security Act (ERISA). In situations where multiple employers participate in welfare benefit arrangements, such arrangements are called a Multiple Employer Welfare Arrangement (MEWA). MEWAs are subject to regulation under ERISA and state insurance laws by reason of 29 USC §1144(b)(6). Compliance with ERISA and state insurance laws can be costly and time consuming. For example, state regulations usually require that health benefit

3

plans maintain reserves that can be in the hundreds of thousands of dollars. However, if an employer forms a qualifying tax-exempt trust as a funding mechanism for its group health plan, with such trust known as a voluntary employees' beneficiary association (VEBA) under Section 501(c)(9) of the Internal Revenue Code (IRC), 26 U.S.C. Section 501(c)(9), and receives approval of such VEBA trust from the Internal Revenue Service, the employer's VEBA trust is not required to comply with state insurance regulations, thereby saving substantial costs and time while providing lower cost health benefits for its employees.

14. These plans are intended to function as follows:

    a. employers and employee-participants make periodic monetary contributions to the plan;

    b. the plan obtains stop-loss insurance to cover large claims over a certain dollar amount; and

    c. the plan is considered "self-funded" (*i.e.*, not insurance subject to regulation) by virtue of the fact that the employer remains obligated to pay claims incurred in excess of the premium equivalents and stop-loss payments.

15. Given the self-funded nature of such plans, obtaining stop-loss coverage that limits the employer's exposure to large claims is critical to their viability.

***General Features and Structure of the AEU Program***

16. Prior to 2015, a company named ALLInsurance Solutions Management, LLC ("AISM"), sponsored, managed, and administered a self-funded health benefits program for small- and medium-sized employers.

17. In July 2015, AISM engaged AEU Holdings, LLC ("AEUH"), through its wholly-owned subsidiary AEU Benefits, LLC ("AEUB"), to manage the AISM program. AEUB managed that program from July 2015 to late-April 2016.

18.     In late-April 2016, AEUH acquired the AISM program pursuant to an Asset Purchase Agreement dated April 26, 2016.   Via the Asset Purchase Agreement, AEUH purchased the assets associated with the AISM program and took over the sales, marketing, underwriting, rating, claims handling, and program advisory functions.   This self-funded health benefits program is referred to herein as the "AEU Program."   From the time of that purchase, AEUH and AEUB sponsored, managed, and administered the AEU Program.

19.     The AEU Program was comprised of the AEU Plan and all Participating Plans which used the AEU Plan as their health benefits plan.

20.     The AEU Program was marketed and sold to small- and medium-size employers and others by entities called "aggregators."   AEUH and AEUB tasked aggregators and their respective sub-aggregators, i.e., the brokers who sold the program, with finding new Participant Plans.   Aggregators collected employer and employee contributions from Participating Plan employers, deducted their aggregator fees and the commissions for their brokers, and transferred the remaining contributions to the AEU Program's designated administrative representatives. The designated administrative representatives provided administrative services to the AEU Program such as transferring funds to third party administrators for the payment of claims.

21.     From mid-2015 to late December 2016, the AEU Program's designated administrative representative was Wilson Benefit Services, LLC.   From late December 2016 to June 30, 2017, the designated administrative representative was S.D. Trust Advisors, LLC. Starting July 1, 2017, the designated administrative representative was Assurance Plan Administrators, LLC dba Assurance Collecting & Distributing.

22.     AEUB is a wholly-owned subsidiary of AEUH.   The names AEU Holdings and AEU Benefits are used interchangeably on various AEU Plan documents, with the shortened

5

form "AEU" also being used frequently in documents and by the Defendants themselves as well as other officers and employees of AEUH and AEUB. Accordingly, the term "AEU" used in this Complaint refers to AEUH and AEUB collectively.

### The Locke Lord Opinion Letter

23. Locke Lord provided AEU with an opinion letter on December 20, 2016 ("Opinion Letter"). Locke Lord partner Brian Casey ("Casey") issued the Opinion Letter, which addressed compliance of the AEU Program with ERISA and its exemption from state insurance regulations. The Opinion Letter was addressed to Steven [sic] Satler as President of AEUH in its capacity as Plan Administrator of the AEU Plan and Participating Plans. A true and correct copy of the Opinion Letter is attached as **Exhibit A**. As a result of the Preliminary Injunction, the Independent Fiduciary is the successor to AEUH as Plan Administrator.

24. The Opinion Letter set forth, among other things, what Locke Lord understood to be the intended structure of the AEU Program.

25. The Opinion Letter opined that the AEU Program would comply with ERISA and be exempt from state insurance regulations if the conditions in the letter were met and the assumptions in the letter were true.

26. According to the Opinion Letter, each participating employer was to establish an employee welfare benefit plan governed by ERISA, defined above as a Participating Plan, to provide health benefits solely for its respective eligible employees and, if any, their respective spouses and dependents, thereby establishing its own ERISA employee welfare benefit plan.

27. According to the Opinion Letter, each participating employer was to establish a VEBA trust for its specific Participating Plan, into which contributions only from that employer and its employees would be deposited, as well as any stop-loss payments, and from which claims

only of that employer and its employee participants would be paid. Thus, each participating employers' VEBA trust was to serve as the funding vehicle for that employer's health benefits program. The employer was to be the sole grantor of its VEBA trust, which was to be formed under the laws of the District of Columbia.

28. According to the Opinion Letter, each participating employer was to name a trustee for its VEBA trust, engage a designated administrative representative as fiduciary of its Participating Plan, and engage AEU as its program advisor and manager. As program advisor and manager, AEU was to manage program functions, provide underwriting, and provide overall plan advice and management.

29. Contrary to the assumptions Locke Lord made in its Opinion Letter, many employers never even established such trusts, and some who did failed to properly document them under applicable regulations. Of those who did establish trusts, none applied for or obtained tax-exempt status as a VEBA as required under IRC Section 501(c)(9). As such, from its inception, the AEU Program failed to meet fundamental requirements necessary to comply with ERISA and be exempt from state insurance regulation.

30. According to the Opinion Letter, each Participating Plan's VEBA trust was to join a Bermuda purchasing trust located in and formed under the laws of Bermuda, which Bermuda trust was to indemnify and stand behind each VEBA trust's claims obligations. According to the Opinion Letter, the Bermuda trust was to produce a certificate to each VEBA trust evidencing such indemnity obligation. The Bermuda trust was to purchase stop-loss insurance coverage to back its indemnity obligations to each Participating Plan's VEBA trust.

31. Under the AEU Program's structure, as expressly assumed by the Opinion Letter, all of the Participating Plans would be co-settlors and co-beneficiaries of a single Bermuda trust,

and all the contributions to the Bermuda trust from all Participating Plans would be placed into a single Bermuda trust.

32.     Under the AEU Program's structure, the Bermuda trust, in turn, was to use such funds to purchase a primary insurance policy and a stop-loss insurance policy with the Bermuda trust listed as the named insured for the benefit of all of its beneficiaries.  This arrangement was to give each VEBA trust the right to receive payments from the Bermuda trust for claims the Bermuda trust made against the primary and stop-loss policies for health care costs of the Participating Plans' covered individuals.

33.     The AEU Program's designated administrative representatives transferred a portion of the contributions collected from the Participating Plans to the Bermuda purchasing trust to fund the purchase of insurance.

34.     From July 2015 until December 1, 2016, the AEU Program used a Bermuda trust called the "Bermuda Purchasing Trust" or "BPT1" as the single and sole Bermuda trust for all Participating Plans in the AEU Program.

35.     Starting December 1, 2016, the AEU Program used a Bermuda trust called the "Second Bermuda Purchasing Trust" or "BPT2" as the Bermuda trust for Participating Plans placed in BPT2, although many Participating Plans remained associated with BPT1 after that date such that BPT1 remained as an active trust in the AEU Program along with the Participating Plans placed in BPT2.

36.     The BPT1 trust was associated with a captive cell in Bermuda called the Uberrimae Fidei Insurance Company (UFIC) captive cell which was to provide the so-called "primary insurance" as well as purchase stop loss insurance coverage through Lloyds of London. Participating Plans' contributions, i.e., Participating Plans' assets under the ERISA Plan Asset

Rules, were sent to BPT1 by the designated administrative representative. Those funds were then sent to the UFIC captive cell. UFIC used such funds to purchase stop loss insurance and to pay claims by sending funds that remained after payment of BPT1 and UFIC's fees and Lloyds' stop loss insurance premiums back to BPT1 to be sent back to the designated administrative representative (who then sent the funds to the AEU Program's third party administrators (TPAs) for paying claims).

37.     The UFIC captive cell did not actually provide any primary insurance but merely sent back to BPT1 some of the funds it had received from BPT1 as the so-called "insurance" funds to pay claims for BPT1 Participating Plans.

38.     The BPT2 trust was associated with a captive cell in Bermuda called the AEUB#1 captive cell operated by R&Q Quest Insurance Company (R&Q) which was to provide the so-called "primary insurance" as well as purchase stop loss insurance coverage through Hannover RE. Participating Plans' contributions, i.e., Plan assets, were sent to BPT2 by the designated administrative representative. Those funds were then sent to the AEUB#1 captive cell. AEUB#1 used such funds to purchase stop loss insurance and to pay claims by sending funds that remained after payment of BPT2 and R&Q's fees and Hannover Re's stop loss insurance premiums back to BPT2 to be sent back to the designated administrative representative (who then sent the funds to the TPAs for paying claims).

39.     R&Q did not actually provide any primary insurance via the AEUB#1 captive cell but merely sent back to BPT2 some of the funds it had received from BPT2 as the so-called "insurance" funds to pay claims for BPT2 Participating Plans.

*Locke Lord's Negligent Acts and Omissions Caused the Failure of the AEU Plan*

40.     Locke Lord represented and did work for the AEU Program between mid-2016 and late 2017 for which it was paid.  Locke Lord owed a duty of care to the AEU Program for such work.

41.     As part of its work, Locke Lord issued the Opinion Letter to AEU on December 20, 2016.  Locke Lord sent the Opinion Letter to AEU as the plan administrator and manager of the AEU Program.  The AEU Program relied to its detriment on that Opinion Letter in setting up and operating the AEU Program.  Specifically, AEU relied on the Opinion Letter's conclusions that (1) neither the AEU Program nor any Participating Plan was part of a "multiple employer welfare arrangement," as defined in ERISA section 3(40), 29 U.S.C. §1002(40); and (2) the AEU Program complied with ERISA's "indicia of ownership" regulations, as stated in ERISA section 404(b), 29 U.S.C. § 1104(b) and 29 CFR § 2550.404b-1.

42.     Under the Preliminary Injunction entered in the DOL Action, the Independent Fiduciary was appointed as the successor Plan Administrator for the AEU Program.  Thus, the Independent Fiduciary may bring direct claims against Locke Lord for work that Locke Lord did for AEU as Plan Administrator including, without limitation, claims related to the Opinion Letter.

43.     Alternatively, the AEU Program was an intended third party beneficiary of Locke Lord's representation and work.  Locke Lord intended to directly benefit the AEU Program by its work done for AEU.  Locke Lord's Opinion Letter specifically opined about, and addressed the validity of, the AEU Program and its compliance with ERISA while stating that the AEU Program was not subject to state insurance regulations.  The plan-related documents Locke Lord prepared for AEU and the advice Locke Lord gave to AEU were specifically and directly

intended to benefit the AEU Program. Locke Lord issued multiple invoices directly to AEU between 2016 and late 2017 for work Locke Lord did for the AEU Program and was paid by AEU related to that work.

44.     As described below, Locke Lord's negligent actions and inactions enabled the operation of the AEU Program. Locke Lord's actions and inactions led to, contributed to, and/or caused the failure of the AEU Program because such actions and inactions enabled and allowed the AEU Program to operate and incur numerous claims which the AEU Program is unable to pay, which led to the Court-ordered takeover of the AEU Program in the DOL Action.

A.     **The December 20, 2016 Locke Lord Opinion Letter is Incorrect On Its Face**

45.     Locke Lord stated in its Opinion Letter that, based on the assumed facts, the AEU Program would comply with ERISA and be exempt from state insurance regulation.

46.     The Opinion Letter negligently opined that the AEU Program could lawfully send the Participating Plans' assets to the offshore Bermuda trust which is clearly a United States transaction that sends Plan assets offshore and gives each Participating Plan a beneficial interest in the offshore Bermuda trust. Specifically, Locke Lord's Opinion Letter erroneously and negligently concluded that "[t]he purchase by the BPT of the Stop-Loss Policy from the Bermuda Insurer should not cause an Employer or its Employer's Trust to violate ERISA; provided, that the indicia of ownership by each Employer's Trust of all its assets, including, without limitation, the BPT Beneficiary Trust Certificate and, following the solicitation, negotiation, procurement, purchase, sale, issuance or delivery of the Stop-Loss Policy occurring in Bermuda, the original written contract embodying the Stop-Loss Policy, at all times must be maintained within the jurisdiction of a district court in the United States in accordance with 29 C.F.R. §2550.404b-1." In rendering that opinion, Locke Lorde negligently failed to include in its

analysis the impact of 29 CFR 2510.3-101 (the "Plan Asset Regulation") on the AEU Program. The Plan Asset Regulation deems the underlying assets of BPT1 and BPT2 to be assets of the AEU Program and/or its Participating Plans. Further, because the underlying assets of BPT1 and BPT2 are "plan assets," those assets must at all times be located in the United States or fall within an exception stated in 29 C.F.R. §2550.404b-1. No such exception exists with respect to the AEU Program: merely providing a "trust certificate" to a Participating Plan does not circumvent that result. Locke Lord's Opinion Letter, therefore, expressly advised the AEU Program that it was allowed to do an action that violated ERISA.

47.     The Opinion Letter negligently opined that the AEU Program could lawfully (1) pool Participating Plan assets in a Bermuda trust to be used to purchase stop loss insurance, the proceeds of which the Bermuda trust then would be obligated to use to make payment to the Participating Plans in accordance with participants' claims for benefits under those Plans, and (2) purchase and transact insurance offshore for the Participating Plans. By doing so, the Opinion Letter negligently approved the establishment and operation of a MEWA. MEWAs are subject to regulation under ERISA and state insurance laws under 29 USC § 1144(b)(6). The AEU Program, as such, was subject to regulation by the U.S. Department of Labor and the states where the AEU Program operated. The Opinion Letter negligently failed to advise the AEU Program that it had to comply with insurance regulations in those states.

48.     The Opinion Letter negligently approved the pooling of the Participating Plans' funds within the Bermuda trusts and the pooling of those funds within a captive cell and to purchase insurance by the Bermuda trusts for the benefit of the Participating Plan trusts. Such advice was negligent because by approving such pooling of risk and the purchase of insurance at

the Bermuda trust, Locke Lord advised AEU to set up a MEWA while stating that such arrangement would not be a MEWA.

49.     The Opinion Letter negligently states that the AEU Program did not have to comply with state insurance regulations because the Participating Plans' assets would not be commingled and would not be used to pay claims of other Participating Plans.  Based on the structure as described in the Opinion Letter, however, Participating Plan assets would be commingled in Bermuda by (a) the Bermuda trusts and (b) UFIC and R&Q.  Further, once the Bermuda purchasing trusts received funds from UFIC or R&Q, such funds were pooled to pay claims of persons in all Participating Plans.

50.     Relying on the Opinion Letter, which approved the pooling of Participating Plan contributions in the Bermuda purchasing trusts, the plan model for the AEU Program was to use pooled contributions from all employer trusts/Participating Plans in a Bermuda trust to pay and cover all claims.  AEU established the AEU Program such that a Participating Plan's contributions were not only used to pay the claims for that separate Participating Plan's own trust, but also were used to pay claims of all Participating Plans from the commingled and pooled funds in the Bermuda trusts, which funds were used as the so-called "insurance" funds to pay such claims.  This was not only a MEWA, but a Ponzi scheme as well.

51.     The Opinion Letter further negligently states that the AEU Program did not have to comply with state insurance regulations because the purchase and delivery of the stop loss policy would not occur within the United States.  The Bermuda purchasing trusts, however, would not have had funds to purchase stop loss insurance had it not had Plan assets sent to it from the United States.  Moreover, the Bermuda trusts delivered stop loss payments to the United States via transfers of funds to the AEU Program's designated administrative

representatives' bank accounts. Thus, the purchase and delivery of the stop loss policy proceeds did occur within the United States. Accordingly, the AEU Program was required to comply with state insurance regulations, and Locke Lord was negligent in stating that it did not have to do so.

52. The AEU Program relied on the Opinion Letter in establishing and operating the AEU Program, including the set-up of BPT1 and BPT2 and their captive cells. By relying on and following the Opinion Letter, the AEU Program violated ERISA statutes and regulations, including, without limitation, the "indicia of ownership" regulations as well as state insurance regulations governing insurance plans operated as MEWAs.

**B.    Locke Lord Failed to Reasonably Investigate Facts and Assumptions**

53. Locke Lord had a duty to act with due care in writing the Opinion Letter which duty included a duty to investigate the facts and assumptions set forth in it. Had Locke Lord done that investigation, it would have learned that the facts and assumptions in the letter were wrong and were not how the AEU Program was actually operated. Had Locke Lord learned that, it would have been required to advise AEU that it was operating a MEWA and to cease doing so, which would have avoided the millions of dollars of unpaid claims incurred after that time. Locke Lord was negligent in the preparation of its Opinion Letter because it failed to exercise a reasonable degree of care and skill to properly investigate the matters contained in the Opinion Letter.

54. Locke Lord knew or should have known through a duty to investigate that the facts and assumptions set forth in the Opinion Letter were not how the AEU Program was operated. Locke Lord knew or should have known that the AEU Program was operated in a way such that the AEU Program was a MEWA and was required to register with state insurance regulators and meet regulatory requirements. Through a duty to investigate, Locke Lord knew or

should have known that the AEU Program was not in compliance with ERISA or state insurance regulations. Although Locke Lord was aware of the 'indicia of ownership" regulation under ERISA, it failed to analyze how that regulation applied to the AEU Program. Further, Locke Lord failed to analyze how ERISA's Plan Asset Regulation deemed the underlying assets of BPT1 and BPT2 to be assets of the Participating Plans.

55.     The Opinion Letter states at page 2 that "We further assume that no assets of any Employer Plan or Employer's Trust . . . will be co-mingled [with] the assets of any other Employer Plan or Employer's Trust." That assumption was wrong. Participating Plan assets were commingled at various places from when they were initially collected by the aggregators up to when they were transferred to the Bermuda trusts and then placed in the respective captive cells, UFIC and AEUB#1. The commingled assets were also improperly used to pay claims of other Participating Plans. Locke Lord would have discovered the actual facts and that its assumption was wrong by performing a reasonable investigation. Locke Lord had a duty to investigate how the BPT's purchased insurance would be administered (e.g., whether commingling would occur), but it did not do so

56.     The Opinion Letter states at page 6 that "We assume that all the activities of each Employer's Trust, the BPT Trustee, AEU, the TPA, and each Employer Aggregator in connection with the BPT Trust Agreement and the Stop-Loss Policy will at all times comply with ERISA's fiduciary and prohibited transaction requirements." That assumption was wrong and Locke Lord should have known it was wrong. Locke Lord should have known that sending the Participating Plans' assets to the offshore Bermuda trust was barred by ERISA's Plan Asset Regulation and that the arrangement violated ERISA's "indicia of ownership" regulation.

57.     Through appropriate due diligence, Locke Lord should have known that:

- The employer trusts were not properly established as VEBAs and proper documentation was not completed. This included no submission of IRS Form 1024 to the IRS (which is required by IRS regulations) and no determination by the IRS that each VEBA trust was qualified as such.

- Employer trust contributions were not all deposited into a separate bank account in the United States for each trust, but were commingled and pooled with funds from all other employer trusts participating in BPT1 or BPT2, including funds from other aggregators, the entities which brought in employer groups as purported VEBA trusts. This commingling occurred at several places: (1) the aggregator's bank account, (2) the designated administrative representative's premium equivalent bank account, (3) the BPT1 or BPT2, account as premiums, (4) the captive cell which was the UFIC account for BPT1 or the AEUB#1 account for BPT2, (5) the BPT1 or BPT2 account as insurance proceeds, and (6) the designated administrative representative's claims payment account. The AEU Program failed to segregate VEBA trust assets and their claims as Locke Lord assumed and this was common knowledge that Locke Lord knew or should have known.

- Employer trust contributions were not deposited in separate bank accounts, and aggregators took their fees prior to deposit of funds to the designated administrative representative's account.

- The AEU Program never sought funding from the employer trusts to pay claims for the trusts' own covered individuals other than monthly contributions or stop-loss proceeds. Instead, claims in excess of those amounts were improperly paid from other employer trusts, which is one hallmark of a MEWA.

- Neither BPT1 nor BPT2 ever issued certificates to the employer trusts as expressly required in the Opinion Letter.

- No bonds were obtained by VEBA trustees or other fiduciaries as required by ERISA.

58. Locke Lord also had a duty to investigate the actual facts related to the AEU Program because Locke Lord did work directly for the AEU Program other than issuing the Opinion Letter. Casey and others at Locke Lord did work for AEU related to the AEU Program. In fact, Casey was involved in the details of setting up the AEU Program. Through such work, Locke Lord learned sufficient facts such that it knew or should have known that the facts and assumptions about the AEU Program as set forth in its Opinion Letter were not true and, based

on such knowledge, should have advised the AEU Program to stop its activities until it complied with ERISA and applicable state insurance regulations.

59.     In January 2017, Casey reviewed and revised a new Health Benefits Program Management Agreement for the AEU Program which was to be between AEUB and the Participating Plans and which set forth the services AEUB would provide to the Participating Plans (each defined therein as a "Trust").  The Health Benefits Program Management Agreement expressly stated in Section 4.1.8 that AEUB would "[a]ssist[] the Trust joining and co-settling a Bermuda-domiciled purchasing trust (the "Purchasing Trust") for the purpose of buying primary and excess insurance for the Purchasing Trust (the "PT Insurance Policies") such that the Trust is a beneficiary of the Purchasing Trust and entitled to the distribution from the Purchasing Trust from time to time of the proceeds of the PT Insurance Policies[.]"  Also, Section 4.1.6 says that AEU would assist a Participating Plan's trustees in analyzing insurance bids and proposals, and negotiating agreements and/or insurance policies with designated insurers.  This confirms that a purchase of insurance was to occur within the United States under these conditions.

60.     Also in January 2017, Casey advised AEU officers Stephen Satler and Steven Goldberg that IRS Form 1095 or Form 1094 must be filed by the self-insured employer groups in the AEU Program, indicating that Locke Lord knew or should have known that those critical IRS forms should have been filed with the IRS in 2016 and were not being filed.  That same email advised Satler and Goldberg about the application of IRC § 4371 regarding a federal excise tax issue related to the AEU Program, indicating that Locke Lord was advising the AEU Program on general IRC issues.  Locke Lord was asked to do more research on the issue, and Locke Lord agreed to do the additional research.  Locke Lord provided that additional research to AEU on February 7, 2017.

61. On January 25, 2017, Casey made a recommendation to Satler and Goldberg of an issuer for a crime bond under ERISA Section 412 related to the AEU Plan, which, given the Opinion Letter, indicates Locke Lord knew or should have known that the AEU Program was operating outside of ERISA requirements because it did not yet have a crime bond.

62. Locke Lord also had a duty to investigate the actual structure of the AEU Program because it was representing facts about the AEU Program to others. In April 2017, AEU and an aggregator named Focus Health Solutions were seeking to engage the University of Utah (UoU) as a third party administrator for employer groups aggregated under Focus Health Solutions. UoU sought the opinion of the law firm Foley & Lardner as to the risks posed by the AEU Program under Colorado insurance law including whether the AEU Program was subject to state insurance regulations. After analyzing the structure of the AEU Program, an attorney from the law firm Foley & Lardner stated as follows in its email to UoU:

> We continue to view the Bermuda trust and Bermuda insurance portion of the agreement as likely constituting unauthorized insurance, as we have discussed and described in writing. Specifically, we view the Bermuda Purchasing Trust (BPT) as likely being an unauthorized insurer, ***because it pools risks and collects payments for such risk pooling***. We have not been convinced otherwise by the arguments [Locke Lord] has advanced; while the BPT may be an insurance company with little or no capital, it is nevertheless engaged in the business of insurance in the US (i.e., it sells insurance to the VEBA trusts). (emphasis added)

The attorney from Foley & Lardner found that this arrangement constituted the unauthorized transaction of insurance under state insurance laws. In response to this email, Brian Casey at Locke Lord stated as follows:

> While we appreciate the views of Foley & Lardner, ***we disagree that the BPT pools risk*** and that the VEBAs buy insurance from the BPT. The VEBAs do not make any application for insurance to the BPT or the issuer of the stop-loss insurance policy, and the VEBAs are not policyholders of the stop-loss insurance policy that the BPT buys nor are the VEBAs named insureds and additional named insureds under that stop-loss insurance policy. In short, there is no privity of contract between any VEBA and the issuer of the stop-loss insurance policy.

*While the BPT purchases the stop-loss insurance policy for the benefit of each VEBA, similar to a risk purchasing group, the BPT does not agree to bear any risk of or promise to indemnify any VEBA, and thus no VEBA shifts any of its risk to the BPT.*  We also disagree that the phrase "procurement of insurance" is synonymous with the phrase "transacting insurance".  Further, the BPT does not engage in (a) the solicitation in the U.S. of the purchase of stop-loss insurance by a VEBA since, as stated above, no VEBA makes any application for insurance to the BPT or the issuer of the stop-loss policy, and no VEBA is a policyholder or a named insured and additional named insured under the stop-loss insurance policy or (b) any other activities within the U.S.  Finally, *as a factual correction, the trust contributions that a VEBA makes to the BPT are made directly by a VEBA to the BPT and no third party handles those trust contributions*.  (emphasis added)

63.     Locke Lord's email was not stating mere assumptions about the structure of the AEU Program.  The email expressly stated factual matters, including when it said that the facts it was setting forth were done "as a factual correction."  But Locke Lord was stating erroneous facts related to the AEU Program since all contributed funds were pooled at BPT1 and BPT2 (as well as pooled in accounts within the United States even before the funds reached the Bermuda trusts) and a number of third parties (aggregator, plan administrator, banks, AEU) did handle and control the trust contributions prior to funds being sent to the BPTs.  At each level, fees for each service provider were deducted from the Participating Plan assets, which in many instances was not disclosed to the Participating Plans.  Locke Lord had a duty to investigate such facts and failed to do so.

64.     The allegations above indicate that Locke Lord was sufficiently involved with the AEU Program, i.e., did enough work for the AEU Program, that it knew or should have known that the AEU Program did not meet the requirements in Locke Lord's Opinion Letter.  It had a duty to perform due diligence with respect to facts it stated in its letters, but failed to perform such required due diligence.  Had it done so, it would have been required to advise the AEU Program to shut down, thereby avoiding millions of dollars of losses.

65.     Locke Lord should have issued a warning to the AEU Program that, as operated, it was not in compliance with ERISA and that it was operating as a MEWA subject to ERISA and state insurance regulations, but Locke Lord negligently failed to do so.  Had Locke Lord properly advised the AEU Program, including revision or cancellation of its Opinion Letter, the AEU Program would have been subject to governmental oversight (e.g., financial reserve requirements, as applicable, in the states where the AEU Program was operated) and would not have suffered the millions of dollars of unpaid claims incurred after that time.  Locke Lord, therefore, proximately caused the damages the AEU Program has suffered related to its unpaid claims.

66.     On August 28, 2017, Windsor Strategy Partners, Inc., an actuary for the AEU Program, issued an Actuarial Opinion to AEU regarding the outstanding claims associated with the BPT1 trust as of December 31, 2016 that had not been paid as of June 30, 2017.  That opinion found that as of the end of 2016, the AEU Program had Outstanding Claims in the amount of $15,364,233 from on and before December 31, 2016 that had not been paid as of June 30, 2017.

67.     Based on claims information available to the Independent Fiduciary, the unpaid claims associated with BPT1 are actually far in excess of $15,364,233, and total approximately $40 million or more.

68.     As of May 12, 2017, claims registers for BPT2 showed that BPT2 had a shortfall of $2,084,375.77 in unpaid claims as of that date.

69.     On June 29, 2017, AEU Program third party administrator Benefit Plan Administrators reported that the latest unpaid claim report for BPT2 showed $3,196,940.66 in

unpaid claims as of that date. Thus, unpaid claims related to BPT2 had increased by over $1.1 million between mid-May and late-June 2017.

70.     Based on claims information available to the Independent Fiduciary, the unpaid claims associated with BPT2 are actually far in excess of $3,196,940.66, and total approximately $10 million or more.

71.     Because the pooled and commingled funds within BPT1 and BPT2 were insufficient to pay claims associated with the AEU Program, many covered individuals' health insurance claims were not paid.

72.     As time passed and more and more claims were not paid (due to insufficient funding), Participating Plans' employers and employees made numerous communications to their brokers and aggregators, as well as to AEU and the TPAs involved, that claims were not being paid.

73.     The financial failure of the AEU Program was so bad that complaints were being made to the Department of Labor, state insurance regulators, and state attorneys general. The Secretary of Labor filed suit against the AEU Program and various entities in the DOL Action on November 2, 2017.

## COUNTS

### Count I:  Negligence

74.     Independent Fiduciary realleges and incorporates all of the allegations set forth above as if set forth fully herein.

75.     Locke Lord owed duties to the AEU Program to render competent advice related to the compliance of the AEU Program with ERISA and state insurance laws and regulations. Despite having sufficient knowledge showing that its Opinion Letter was inaccurate and required

correction, Locke Lord failed to do so. Locke Lord also had sufficient knowledge such that it had a duty to perform due diligence to determine if the facts and assumptions in its Opinion Letter were accurate, but failed to do so.

76. Locke Lord breached its duties by failing to do those required actions.

77. Had Locke Lord properly fulfilled its duties and advised the AEU Program, the AEU Program would not have continued to operate in violation of ERISA and state insurance laws and regulations. The continued operation of the AEU Program caused the program to incur damages. The actions and inactions of Locke Lord are the proximate and actual cause of the damages suffered by the AEU Program.

78. Locke Lord is liable for all damages to the AEU Program caused by its negligence.

### Count II: Negligent Misrepresentation

79. Independent Fiduciary realleges and incorporates all of the allegations set forth above as if set forth fully herein.

80. Locke Lord negligently misrepresented to the AEU Program that it was in compliance with ERISA laws and regulations when the AEU Program was, in fact, a MEWA subject to state insurance regulation which would have required, among other things, financial reserves.

81. Locke Lord further negligently misrepresented to the AEU Program that it was in compliance with ERISA laws and regulations when the AEU Program was, in fact, a MEWA that was subject to ERISA reporting and disclosure requirements, including, without limitation, the requirement to file Forms 5500 and M-1 with the U.S. Department of Labor annually.

82.     In fact, no Form M-1 was ever filed with the U.S. Department of Labor for the AEU Program or any Participating Plans therein.  Prior to the DOL Action and the appointment of the Independent Fiduciary, only one Form 5500 had been filed and it was filed only regarding the "AEU Holdings, LLC Employee Benefit Plan."  No Form 5500s were filed regarding the Participating Plans.  Had the AEU Program timely filed Forms 5500 and M-1 with the U.S. Department of Labor, the U.S. Department of Labor would have known about the AEU Program's illegal purchase of offshore insurance years in advance of the AEU Program's subsequent insolvency and could have taken action to ensure benefit security sooner.

83.     Locke Lord's negligent misrepresentations to the AEU Program led directly to the illegal operation of the AEU Program as a MEWA without proper regulation which led to its failure due to its incurring of millions of dollars of unpaid claims.  The negligent misrepresentations of Locke Lord, therefore, are the proximate and actual cause of the damages suffered by the AEU Program.

84.     Locke Lord is liable for all damages to the AEU Program caused by its negligent misrepresentations.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Independent Fiduciary respectfully prays:

1.     That the Court award the Independent Fiduciary a judgment against Defendant in an amount to be proven at trial that includes the amount of all claims that cannot be paid by the AEU Program because of insufficient funds, which damages are in the tens of millions of dollars, plus pre- and post-judgment interest;

2.     That the Court award the Independent Fiduciary its costs and expenses;

3.      That the Court award the Independent Fiduciary such other, further, and general relief, to which it may be entitled and to which this Court shall deem to be just and equitable; and

4.      That a jury be empaneled to hear all issues triable to a jury in this case.

Respectfully Submitted,

**Receivership Management, Inc. In Its Capacity As the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan**

By:     /s/ Alan F. Curley
                One of Its Attorneys

Alan F. Curley (6190685)
Sam G. Royko (6325838)
Robinson Curley P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
acurley@robinsoncurley.com
sroyco@robinsoncurley.com

J. Graham Matherne
Andrew J. Pulliam
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1400
Nashville, Tennessee 37201
(615) 244-0020
gmatherne@wyattfirm.com
apulliam@wyattfirm.com

61772284.9

# EXHIBIT A



Attorneys & Counselors

Terminus II, 3333 Piedmont Road NE
Suite 1200
Atlanta, GA 30305
Telephone: 404-870-4600
Fax: 404-872-5547
www.lockelord.com

**BRIAN T. CASEY**
Direct Telephone: 404.870.4638
Direct Fax: 404.806.5638
E-Mail: bcasey@lockelord.com

December 20, 2016

Mr. Steven Satler
President
AEU Holdings, LLC
8131 LBJ Freeway
Suite 750
Dallas, TX 75251

> Re: Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans
> with Offshore Purchasing Trust and Stop-Loss Insurance Policy

Dear Mr. Satler:

You have advised us that AEU Holdings, LLC ("AEU"), as the successor owner of certain assets previously owned by ALLInsurance Solutions Management, LLC and/or certain of its affiliates as of April 2016, contemplates providing certain services in connection with, and as part of, the following transactions more particularly described below (collectively, the "Transaction") and asked that we review and comment on the Transaction in respect of certain matters related to (1) the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (2) the Internal Revenue Code of 1986, as amended (the "IRC"), and (3) state insurance codes relevant to the Transaction regarding the transaction of insurance by unauthorized insurance companies, all as more particularly described below.

A.  Description of Transaction, Including Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchase of Stop-Loss Insurance Transaction Description.

Under the proposed Transaction, an individual employer (an "Employer") which is (1) an employer customer of a professional employer association ("PEO"), (2) an employer member of a bona fide affinity group or (3) an employer customer of an insurance agency (each, an "Employer Aggregator") and receives certain services or products from such Employer Aggregator, would establish (or will have already established) an employee welfare benefit plan governed by ERISA to provide health benefits solely for such Employer's employees and, if any, their respective spouses and dependents (an "Employer Plan"). Thus, each Employer establishes for purposes of the Transaction (or will have already established) its own employee welfare benefit plan.

ATL 527533v.10

LockeLord LLP

Mr. Stephen Satler
President
AEU Holdings, LLC
December 20, 2016
Page 2

We assume that the benefits to be provided by each Employer under its Employer Plan to its employees and, if any, their respective spouses and dependents (collectively, the "Covered Individuals") will comply with all the applicable requirements of the Patient Protection and Affordable Care Act and the regulations promulgated pursuant thereto ("PPACA"), satisfy all the requirements for a "qualified health plan" as defined under the PPACA, including without limitation, the permitted maximum amount of deductible amounts, co-pay amounts and exclusions of coverage permitted under PPACA as well as the prohibitions under PPACA against annual and lifetime limitations on health benefits. We assume that a Covered Individual under an Employer Plan will not have any rights or remedies against (a) the Employer Aggregator of which the Employer sponsor of such Employer Plan is a customer or (b) any other Employer of such Employer Aggregator or their respective Employer Plans for any of the health benefits provided to such Covered Individual under such Employer Plan. Conversely, we also assume that no Employer or its Employer Plan will have any financial or other obligation or liability to any other Employer or its Employer Plan, including without limitation, any financial or other obligation or liability in respect of the provision of health benefits or funding the costs thereof by other Employer or its Employer Plan. We further assume that no assets of any Employer Plan or Employer's Trust (as defined below) will be co-mingled the assets of any other Employer Plan or Employer's Trust.

Each Employer would be the sole grantor of and form a trust under the laws of the District of Columbia to serve as the self-insured funding mechanism for the health benefits provided by its Employer Plan (an "Employer's Trust"). Each trustee of each Trust would reside in a state of the United States, or the District of Columbia, the jurisdiction from which each Trust would be administered by its trustee or trustees. Each Trust would become a tax-exempt organization as a "voluntary employees' beneficiary association" under Section 501(c)(9) of the IRC, and we assume each Trust will qualify as such, including compliance with the notification requirements of Section 508(a) of the Internal Revenue Code.

Each Employer and its Trust would enter into an agreement to engage a third party administrator (the "TPA") licensed by the state insurance regulatory authority of (i) the state in which the Employer's principal place of business is located and (ii), if required under applicable state law, (a) the District of Columbia, the jurisdiction from which Trust would be administered by its trustee or trustees, and (b) the states in which the Covered Individuals of an Employer reside, to provide certain third party administrator services to the Trust, namely (a) providing the Covered Individuals under the Employer Plan access to one or more health care provider networks of a health insurance company or health maintenance organization and (b) providing claim services to the Trust for claims for benefits made by the Covered Individuals under the Employer Plan.

ATL 527533v.10

LockeLord.LLP

Mr. Stephen Satler
President
AEU Holdings, LLC
December 20, 2016
Page 3

Each Employer and its Trust would enter into a written services agreement with the applicable Employer Aggregator (each, an "Employer Aggregator Services Agreement"), pursuant to which the Employer Aggregator would periodically:

(a) collect from the Employer the contributions made by the Employer to the Employer's Trust for funding the costs of the benefits provided to its Covered Individuals under the Employer Plan, if such Employer provides any employer contributions to fund its Employer Plan's obligation to provide health benefits to its Covered Individuals, (b), as a payroll services processor, the amounts due from the employees of the Employer who are Covered Individuals for their pre-income tax contributions made to the Employer's Trust for funding the costs of the health benefits provided to the Covered Individuals under the Employer Plan, and (c) deposit on behalf of the Employer's Trust all such contributions into a bank account established at a bank located within the United States by the Employer's Trust for which the TPA, or an ERISA fiduciary identified and authorized by the Employer's Trust (a "Plan Fiduciary") would have the authority to withdraw funds for the purpose of paying on behalf of the Employer's Trust (I) certain fees and expenses incurred by the Employer's Plan and Trust and (II) amounts to be contributed by the Employer's Trust to the BPT (as defined below) in such Employer's Trust's capacity as a co-grantor of the BPT; and

(b) the TPA or Plan Fiduciary would withdraw, from a bank account established at a bank located within the United States by the Employer's Trust for the purposes of receiving funds distributed by the BPT to the Employer's Trust in its capacity as a co-beneficiary of the BPT sourced from payments made by the Bermuda Insurer (as defined below) under the Stop-Loss Policy (as defined below) issued to the BPT for claims made under the Stop-Loss Policy by the BPT, funds for the purpose of paying on behalf of the Employer's Trust amounts due from the Employer's Trust to (1) the TPA which it owes to the Healthcare Network Provider for healthcare services rendered through the Healthcare Network Provider to Covered Individuals for their covered claims for health benefits made under the Employer Plan and (2) any other amounts due from the Employer's Trust to any healthcare services provider for services rendered to Covered Individuals that are covered claims for benefits under the applicable Employer Plan (the "Trust Benefits Claim Account").

Each Employer Aggregator's activities in connection with the Transaction would be limited solely to generally informing its Employers about the Transactions and entering into the Employer Aggregator Services Agreement. We assume that no Employer Aggregator will solicit, negotiate, procure the purchase of, sell, issue or deliver the Stop-Loss Policy or receive any funds from Employer's Trust or from an Employer on behalf of its Employer's Trust.

AEU and each Employer's Trust would enter into a written agreement under which (a) AEU would provide (either directly or through one or more related or unrelated parties) to the

LockeLord.LLP

Mr. Stephen Satler
President
AEU Holdings, LLC
December 20, 2016
Page 4

Employer's Trust certain advisory, administrative, underwriting, large case management and such other services as to which the parties may agree in connection with the health benefits provided under the Employer Plan and (b) such Employer's Trust would pay a periodic fee in an amount negotiated in an arm's length basis to AEU in exchange for its such services.

Each Employer's Trust would be a co-settlor and co-beneficiary of a single Bermuda Purchasing Trust, a trust formed under the laws of Bermuda ("BPT") and the sole trustee of which would be resident in Bermuda (the "BPT Trustee"). The BPT would issue a written certificate to each Employer's Trust evidencing its beneficial interest in the BPT, which the trustee of the Employer's Trust would hold at the trustee's place of business in the United States (the "BPT Beneficiary Trust Certificate"). The trust agreement for the BPT (the "BPT Trust Agreement") would provide, among other things, that the sole purpose of the BPT is to purchase the Stop-Loss Policy (as described and defined below), which would be issued to the BPT and name the BPT as the sole insured for the benefit of each of its beneficiaries, being all the Employers' Trusts collectively, for the claims of health benefits to be paid by each Employer's Trust owed to its respective Covered Individuals under the related Employer Plan. As such, the Employers' Trusts would, based on their status as the beneficiaries of the BPT, obtain the right to receive distributions from the BPT of the claims payments made to the BPT under the Stop-Loss Policy for the benefit of its beneficiaries related to their provision of health benefits to their respective Covered Individuals under their respective related Employer Plans. The BPT Trust Agreement also would expressly provide that (a) the BPT is not obligated to indemnify, and does not assume any liabilities of, any of its beneficiaries, the Employers' Trusts or the Employers, (b) no Employer or Employer's Trust, in its capacity as a co-settlor or co-beneficiary of the BPT or otherwise, is, or will become, obligated to indemnify or assume any liabilities of, any of the other Employers or their respective Employer's Trusts. Further, under the BPT Trust Agreement, only the BPT Trustee, for the benefit of its beneficiaries, the Employers' Trusts, would have the right to make claims against the Bermuda Insurer (as that term is defined below) under the Stop-Loss Policy and the BPT is not formed or maintained for the purpose of providing health benefits to the Covered Individuals. Except for its BPT Beneficiary Distribution Rights (defined below), an Employer's Trust would not have any right to receive the payment of any funds or other property from the BPT. The BPT Trust Agreement would also provide that a beneficiary of the BPT, each Employer's Trust, would be entitled to receive from the BPT the proceeds of the Stop-Loss Policy paid to the BPT in any amount equal to the covered claims of such Employer's Covered Individuals paid for benefits provided under such Employer's Plan (as to each Employer's Trust, its "BPT Beneficiary Distribution Rights").

The Stop-Loss Policy that would be procured through a Bermuda-domiciled and licensed insurance broker (a "Bermuda Broker") issued to the BPT would be an insurance policy providing unlimited liability for claims made for health benefits to the Employers' respective Covered Individuals under the respective Employer Plans for the claims amounts attributable to

LockeLord LLP

Mr. Stephen Satler
President
AEU Holdings, LLC
December 20, 2016
Page 5

each such Covered Individual incurred during such calendar year (or such other policy period) above a specified annual per claim limit and annual aggregate claims limit (the "Stop-Loss Policy"). The Bermuda Insurer would reinsure some portion of its risks under the Stop-Loss Policy to a reinsurance company which may be domiciled either within or without the United States.

Each Employer would be solely liable for all the covered claims made by its Covered Individuals under its Employer Plan, including any covered claims not reimbursed to its Employer Plan through distributions made by the BPT to the Employer's Trust of insurance payments made under the Stop-Loss Policy to the BPT, but such Employer would not be liable for any of the covered claims made by the Covered Individuals under the Employer Plan established by any of the other Employers, including any covered claims not reimbursed to the Employer Plans established by any of the other Employers through distributions made by the BPT to the Employers' Trusts of such other Employers of insurance payments made under the Stop-Loss Policy to the BPT. The Stop-Loss Policy would be issued by a Bermuda domiciled insurance company which does not transact any business within the United States (the "Bermuda Insurer") and would be delivered by the Bermuda Broker to the BPT in Bermuda. No part of the solicitation, negotiation, procurement, purchase, sale, issuance or delivery of the Stop-Loss Policy or any certificate or other written evidence of the insurance provided thereunder would occur within the United States.

Each Employer's Trust, in its capacity as a co-settlor of the BPT, would, through the TPA, contribute funds to the BPT, which would be deposited into a bank account of the BPT maintained at a bank located in Bermuda, pursuant to the BPT Trust Agreement to allow the BPT to pay such Employer's Trust's pro rata portion of the total insurance premiums due from time to time from the BPT to the Bermuda Insurer for the Stop-Loss Policy. Under the BPT Trust Agreement, no Employer's Trust, in its capacity as a co-settlor of the BPT, would be required to contribute any funds or other assets to the BPT other than such trust's pro rata portion of the total insurance premiums due from time to time from the BPT for the Stop-Loss Policy. Covered Individuals will not be insureds, and will not have any contractual rights or remedies, under or otherwise be a party to the Stop-Loss Policy or the BPT Trust Agreement.

All claims for health benefits made under an Employer Plan by the Covered Individuals of the related Employer (each, a "Trust Benefits Claim") would be administered by the TPA under a written third party administrator services agreement between such Employer's Trust and the TPA. The TPA would submit each Trust Benefits Claim to the BPT, which would, in turn, submit such Trust Benefits Claim to the Bermuda Insurer for its payment thereof under and pursuant to the Stop-Loss Policy. Under, and pursuant to the terms of, the BPT Trust Agreement, the Bermuda Insurer would remit its insurance claim payment under the Stop-Loss Policy for the Trust Benefits Claim (the "Stop-Loss Insurance Claim Payment") to the BPT,

ATL 527533v.10

LockeLord llp

Mr. Stephen Satler
President
AEU Holdings, LLC
December 20, 2016
Page 6

which would, in turn, remit, the amount of the Stop-Loss Insurance Claim Payment to the TPA, on behalf of the Employer's Trust, which amount the TPA would deposit into the Trust Benefits Claim Account of such Employer's Trust. We assume that all the activities of each Employer's Trust, the BPT Trustee, AEU, the TPA, and each Employer Aggregator in connection with the BPT Trust Agreement and the Stop-Loss Policy will at all times comply with ERISA's fiduciary and prohibited transaction requirements.

B.    Review of the Transaction.

You have asked us to review the Transaction from an ERISA, and generally from states' insurance codes,[1] perspectives and confirm to you that (1) an Employer Plan can constitute an "employee welfare benefit plan" under ERISA and should not be a "multiple employer welfare arrangement" under ERISA and (2) the purchase by the BPT of the Stop-Loss Policy in Bermuda for the benefit of each of its beneficiaries, being all the Employers, will not cause the Employers to be engaged in transacting business as an unauthorized insurance company under applicable states' insurance codes.

1.    ERISA.

Under ERISA, an "employee welfare benefit plan" is defined as follows:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter **established or maintained by an employer** or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise,

(A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services....

29 U.SC. §1002(1)(A) (emphasis added).

---

[1] Generally, in respect of an Employer, the relevant state insurance codes are the insurance codes of (a) the state in which the Employer's principal place of business is located and (b), potentially, the District of Columbia, the jurisdiction in which such Employer will form its Trust and from which the trustees of the Trust will administer the Trust. We assume that the TPA is either not required to be licensed as a third party administrator in the states in which the Covered Individuals of an Employer reside or that the TPA is so licensed in such states.

LockeLord LLP

Mr. Stephen Satler
President
AEU Holdings, LLC
December 20, 2016
Page 7

As we have assumed above, each Employer will be the sole employer of its employees for all purposes other than in the case of an Employer that is a customer of a PEO the Employer's status solely for worker's compensation law purposes as a co-employer of its employees along with the applicable PEO. Accordingly, the Employer is an employer, and can be the sponsor of an "employee welfare benefit plan," under ERISA. Assuming that the Employer and its Employer Plan comply with all provisions of ERISA, including without limitation, ERISA's fiduciary and prohibited transaction requirements, and all the provisions of the IRC applicable to the Employer's Plan, the Employer's Plan will be an "employee welfare benefit plan" under ERISA and will not be a "multiple employer welfare arrangement" under Section 3(40) of ERISA because the Transaction does not include any agreement under which any Employer or its Employer's Trust will agree to be liable to any or all of the other Employers or their respective Employer's Trusts for its or their obligations to provide health benefits under its or their respective Employer Plans, and thus, in the Transaction, there would not be multiple employers sponsoring any single Employer Plan. The purchase by the BPT of the Stop-Loss Policy from the Bermuda Insurer should not cause an Employer or its Employer's Trust to violate ERISA; provided, that the indicia of ownership by each Employer's Trust of all its assets, including without limitation, the BPT Beneficiary Trust Certificate and, following the solicitation, negotiation, procurement, purchase, sale, issuance or delivery of the Stop-Loss Policy occurring in Bermuda, the original written contract embodying the Stop-Loss Policy, at all times must be maintained within the jurisdiction of a district court of the United States in accordance with 29 C.F.R. §2550.404b-1.

2. Relevant State Insurance Codes.

Based on the assumptions stated above, and in particular, the assumptions that the Stop-Loss Policy would be delivered by the Bermuda Broker to the BPT in Bermuda and no part of the solicitation, negotiation, procurement, purchase, sale, issuance or delivery of the Stop-Loss Policy would occur within the United States, then the BPT should be able to purchase (i) the Stop-Loss Policy from the Bermuda Insurer in Bermuda without any Employer, its Employer's Trust, or the BPT being an insurance company transacting business in any state or the District of Columbia as an unauthorized insurance company because the Transaction does not include any agreement under which any Employer or its Employer's Trust will agree to be liable to any or all of the other Employers or their respective Employers' Trusts for their obligations to provide health benefits or the costs thereof under their respective Employer Plans, and in any event, the purchase, sale, issuance and delivery of the Stop-Loss Policy would not occur within the United States.

\*    \*    \*    \*    \*

# LockeLord LLP

Mr. Stephen Satler
President
AEU Holdings, LLC
December 20, 2016
Page 8

## IRS CIRCULAR 230 DISCLOSURE

**As required by United States Treasury Regulations, you should be aware that this communication is not intended or written by the sender to be used, and it cannot be used, by any recipient for the purpose of avoiding penalties that may be imposed on the recipient under United States federal tax laws.**

\*   \*   \*   \*   \*

The conclusions, statements and views expressed in this letter are based upon statutory, regulatory and judicial authority existing on the date hereof any of which may be changed at any time. The author of this letter is licensed to practice law only in the state of Georgia, while other lawyers that the firm employs are licensed in a number of jurisdictions in the United States, including California, District of Columbia, Florida, Illinois, Louisiana, New York and Texas. Any views contained in this letter are limited to our review and analysis of ERISA, the IRC and any other laws specifically referenced herein. This letter is being rendered only to our client, AEU, and may not be used or relied upon by, or distributed to, any other person or entity for any purpose whatsoever without the written permission of Locke Lord LLP; provided, that AEU may provide a copy of this letter (but without any reliance hereon) to (i) any Employer Aggregator, (ii) any Employer, (iii) the TPA, (iv) the issuer of the Stop-Loss Policy, (v) the BPT, (vii) any captive or other insurance company management services company that may provide services to the Bermuda Insurer in connection with the Stop-Loss Policy; provided, that each such person signs and delivers to Locke Lord LLP a non-reliance letter in a form required by Locke Lord LLP, and (viii) any duly licensed and qualified health insurance agent, broker or producer introducing an Employer Aggregator to the Transaction. This letter only expresses our conclusions as to how a court or regulator may view the issues presented herein in a properly argued case or proceeding. We undertake no obligation and hereby disclaim any such obligation to update or otherwise revise this letter if any applicable statutory, regulatory or judicial authority changes after the date hereof. In addition, this letter is based solely on the accuracy of the facts and assumptions expressly stated herein, and the conclusions, statements and views expressed herein cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect. The scope of this letter is limited to those subject matters expressly addressed herein; any other subject matter, including without limitation, any insurance statutes and regulations, privacy statutes and regulations and income or other tax statutes and regulations not discussed herein, is outside the scope of the issues evaluated and the conclusions reached by Locke Lord LLP herein.

ATL 527533v.10

# LockeLord LLP

Mr. Stephen Satler
President
AEU Holdings, LLC
December 20, 2016
Page 9

      If you have any questions, please do not hesitate to contact me by phone at 404.870.4638
or via email at bcasey@lockelord.com.

                        Sincerely,

                        Brian T. Casey
                        For the Firm

ATL 527533v.10