**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RECEIVERSHIP MANAGEMENT, INC.** | ) | |
| **IN ITS CAPACITY AS INDEPENDENT** | ) | |
| **FIDUCIARY OF THE AEU HOLDINGS,** | ) | |
| **LLC EMPLOYEE BENEFIT PLAN AND** | ) | |
| **PARTICIPATING PLANS,** | ) | |
| | ) | **Case No. 1:18-cv-08158** |
| **Plaintiff,** | ) | |
| | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **LOCKE LORD, LLP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**FIRST AMENDED COMPLAINT**

Alan F. Curley (6190685)          J. Graham Matherne
Samuel G. Royko (6325838)          Andrew J. Pulliam
Robinson Curley P.C.          Wyatt, Tarrant & Combs, LLP
300 South Wacker Drive, Suite 1700          333 Commerce Street, Suite 1400
Chicago, Illinois 60606          Nashville, Tennessee 37201
(312) 663-3100          (615) 244-0020
acurley@robinsoncurley.com          gmatherne@wyattfirm.com
sroyko@robinsoncurley.com          apulliam@wyattfirm.com

*Counsel for Receivership Management, Inc. in its Capacity
as the Independent Fiduciary of the AEU Holdings, LLC
Employee Benefit Plan and Participating Plans*

**TABLE OF CONTENTS**

PARTIES AND OTHER RELEVANT PERSONS AND ENTITIES ........................................1

The AEU Plan ..........................................................................................................................1

Plaintiff ...................................................................................................................................3

Defendant ................................................................................................................................4

Brian T. Casey ........................................................................................................................4

Laurence A. Hansen ...............................................................................................................4

The AEU Companies ..............................................................................................................5

SD Trust Advisors and Thomas Stoughton .........................................................................5

JURISDICTION AND VENUE ..............................................................................................6

FACTS .....................................................................................................................................7

I.      Introduction .................................................................................................................7

II.     Background of the AEU Plan .....................................................................................10

III.    Locke Lord's Attorney-Client Relationship with the AEU Plan
        and its Employer Plans ..............................................................................................14

IV.     Locke Lord's Legal Services for the AEU Plan and Employer Plans in 2016 ...............18

V.      Locke Lord's AEU Comfort Letters ...........................................................................22

        A.      Drafting of the AEU Letter ...............................................................................22

        B.      Locke Lord's 12/15/16 Opinion Letter .............................................................24

        C.      The AEU Letter...................................................................................................26

VI.     Locke Lord's Legal Services for the AEU Plan and the Employer Plans
        After Issuing the AEU Letter .....................................................................................31

        A.      AEUB's Management Agreement .....................................................................31

        B.      The Federal Excise Tax .....................................................................................32

C. Concerns Raised by a TPA ..................................................................................34

D. Failure of the AEU Plan ....................................................................................37

VII. Locke Lord Breached Its Duties in Issuing the AEU Comfort Letters ...........................37

A. The Employer Plans Were a MEWA ................................................................38

B. The Employers Plans and BPT were Transacting Insurance in the U.S. .............41

C. The BPT Structure Violated ERISA .................................................................48

D. Locke Lord Failed to Properly Advise Its Clients ..............................................50

1. Stop-Loss Coverage .................................................................................50

2. Knowledge of Deviation from Assumed Facts .......................................51

3. Knowledge that the BPT Was Transacting Insurance in the U.S. ...........53

Count I: Negligence ..............................................................................................................54

Count II: Negligent Misrepresentation ................................................................................56

PRAYER FOR RELIEF ........................................................................................................59

This case is about the failure of a highly complex workplace health benefits plan artfully (but unsuccessfully) structured to avoid the consumer protections and attendant costs of multi-state insurance regulation. The Defendant, a pre-eminent global law firm that holds itself out as having extensive experience in insurance transactions and regulation, negligently and incorrectly opined that the plan as structured would comply with federal law and be exempt from state insurance regulation. Defendant's negligence proximately caused harm to the plan and its constituent employee benefit plans ("Plan") for which Plaintiff, the Independent Fiduciary appointed to liquidate the Plan, seeks damages.

## PARTIES AND OTHER RELEVANT PERSONS AND ENTITIES

**<u>The AEU Plan</u>**

1. The AEU Holdings, LLC Employee Benefit Plan ("AEU Plan" or "Plan") is and at all relevant times has been a Multiple Employer Welfare Arrangement ("MEWA") as defined under Section 3(40) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(40). The AEU Plan is referred to as the "Transaction" in several opinion letters authored by Defendant discussed herein.

2. A MEWA is "an employee welfare benefit plan or any other arrangement . . . which is established or maintained for the purpose of offering or providing [welfare plan benefits including health benefits] to the employees of two or more employers. . . ." 29 U.S.C. § 1002(40). Any structure that involves risk sharing across multiple employee benefit plans is a MEWA.

3. The AEU Plan is comprised of hundreds of individual employer-sponsored employee benefit plans created pursuant to ERISA § 3(1), 29 U.S.C. § 1002(1) (collectively, the "Employer Plans"). Employers created the Employer Plans to provide health benefits to

employee-participants and their dependents.  The Employer Plans pooled insurance risks, resulting in the MEWA referred to herein as the AEU Plan.

4.      The term "Employer Plans" as used herein is synonymous with the term "Participating Plans" used in the original Complaint in this matter and in related cases pending before this Court.  Plaintiff is using the term "Employer Plans" here because Defendant uses that term (and sometimes the term "Employer Customer Plans," which also means the same thing) in its opinion letters discussed herein.

5.      At all relevant times the AEU Plan and the Employer Plans were transacting insurance in each of the states where the Employer Plans were located, and therefore were subject to the insurance laws and regulations in each of those states.  Because the Employer Plans comprising the AEU Plan were a MEWA as defined under ERISA, state insurance laws and regulations applicable to them were not pre-empted by ERISA.  *See* ERISA § 514(b)(6), 29 U.S.C. 1144(b)(6).

6.      The AEU Plan was marketed and sold through "aggregators" who recruited employers to the Plan.  Aggregators included Professional Employer Organizations ("PEOs") that marketed and sold the AEU Plan to employers and their Employer Plans.  Non-party Veritas Benefits, LLC ("Veritas"), of Saratoga Springs, New York, was a PEO that was responsible for enlisting a significant number of Employer Plans in 2015 and 2016.

7.      Aggregators also included entities that recruited brokers and insurance agencies to market and sell the AEU Plan to employers and their Employer Plans.  Non-party Black Wolf Consulting, Inc. ("BWC"), of Monee and later Frankfort, Illinois, was an aggregator that recruited multiple brokers and their Employer Plan clients into the AEU Plan.  BWC was by far the highest volume aggregator for the AEU Plan in 2017.  As of mid-2017, 76 percent of the

Employer Plans in the AEU Plan had been enrolled through BWC, many of them in Illinois. Illinois was the state with the largest number of Employer Plans.

8.      The AEU Plan and the Employer Plans are insolvent and unable to pay an estimated $60 million of health insurance obligations rightfully owed pursuant to the Employer Plans' coverage terms.  Claimants include hundreds of doctors, hospitals and other medical providers, as well as thousands of individual employee-participants and their dependents, many of whom had their medical care interrupted or terminated as a result of the AEU Plan's failure.

**Plaintiff**

9.      Plaintiff Receivership Management, Inc. ("Independent Fiduciary") is and has been since the filing of the initial complaint in this case a Tennessee corporation with its principal place of business in Tennessee.  As such, it is a citizen of Tennessee.

10.     On November 2, 2017, the Secretary of Labor filed suit against the AEU Plan and various entities in the case *Acosta (now Pizzelle) v. AEU Benefits, LLC, et al.*, U.S. District Court for the Northern District of Illinois, Case Number 1:17-cv-07931-JHL-SMF ("DOL Action").

11.     On November 3, 2017, the Court in the DOL Action entered an *ex parte* Temporary Restraining Order ("TRO").  The TRO ordered, in part, that Plaintiff Receivership Management, Inc., be appointed as the Independent Fiduciary of the AEU Plan and Employer Plans.

12.     On December 13, 2017, the Court in the DOL Action entered a Preliminary Injunction ordering, *inter alia*, that the Independent Fiduciary shall serve as the successor Trustee and Plan Administrator of the AEU Plan and Employer Plans, and shall have final and exclusive fiduciary authority over the AEU Plan's administration, management, and assets. Preliminary Injunction ¶ 4.

13.     The Preliminary Injunction gave the Independent Fiduciary the "[a]uthority to identify and pursue claims on behalf of the [Employer] Plans and the AEU Plan[.]" *Id.* ¶ 14(j). Pursuant to that authority, the Independent Fiduciary brings this action.

**Defendant**

14.     Defendant Locke Lord, LLP ("Locke Lord") is a Delaware limited liability partnership of hundreds of attorneys practicing worldwide. Locke Lord has multiple United States offices, none of which is in Tennessee.  Locke Lord has represented in this case that none of its partners is a citizen of Tennessee. (Dkt. 33, p. 10, n. 4).

15.     On its website, Locke Lord holds itself out as among *The American Lawyer's* top U.S. law firms, and that its "insurance and reinsurance practices are consistently recognized in national and international publications, earning the distinction of being named '2016 Law Firm of the Year in Insurance Law'" by *U.S. News/Best Lawyers.*

**Brian T. Casey**

16.     Non-party Brain T. Casey ("Casey") is an attorney licensed to practice law solely in the State of Georgia.  Casey is and at all relevant times has been a partner of Locke Lord in its Atlanta, Georgia office.  At all relevant times, Casey was the agent of Locke Lord.  Casey is the Co-Chair of Locke Lord's Regulatory and Transactional Insurance Practice Group.  On his Locke Lord web page, Casey holds himself out as among "*The Best Lawyers in America* for Insurance."  Casey's email signature displays the logo of the "Federation of Regulatory Counsel," of which he is a member.

**Laurence A. Hansen**

17.     Non-party Laurence A. Hansen ("Hansen") is an attorney licensed to practice law solely in the State of Illinois.  Hansen is and at all relevant times has been a partner or of counsel

in Locke Lord's Chicago, Illinois office. At all relevant times, Hansen was the agent of Locke Lord. Hansen practices in the area of taxation, with an emphasis on employee benefits.

**The AEU Companies**

18.     Non-party AEU Holdings, LLC ("AEUH") is a Delaware holding company which at all relevant times had offices in Dallas, Texas and New York, New York. Non-party AEU Benefits, LLC ("AEUB") is a wholly-owned operating subsidiary of AEUH. AEUH and AEUB shared officers and offices. The names AEU Holdings, AEUH, AEU Benefits, and AEUB are used interchangeably on various AEU Plan-related documents, with the shortened form "AEU" also being used frequently in such documents and by Locke Lord as well as officers and employees of AEUH and AEUB. Therefore, the term "AEU" as used herein refers to both AEUH and AEUB.

19.     AEUH and AEUB provided sales, marketing, underwriting, rating, claims handling, program administration, and advisory services to the AEU Plan and its Employer Plans. At all relevant times, both AEUH and AEUB were agents and authorized representatives of the AEU Plan. At all relevant times, AEUH and AEUB exercised authority or control over management or disposition of Employer Plan assets, and were therefore fiduciaries of the Employer Plans. At all relevant times, AEUH and AEUB also exercised discretionary authority as a fiduciary over administration of the Employer Plans.

**SD Trust Advisors and Thomas Stoughton**

20.     Non-party S.D. Trust Advisors, LLC ("SD Trust Advisors") had its offices in Atlanta, Georgia at the relevant time. SD Trust Advisors was formed in December 2016 to serve as plan administrator for the Employer Plans. In December 2016, SD Trust Advisors created

custodial and escrow accounts, in its name and over which it had control, to receive participant contributions from the Employer Plans.

21.     At the direction of AEU, SD Trust Advisors disbursed those funds to bank accounts in Bermuda and to pay service providers and administrative fees incurred by the Employer Plans.  As a result, beginning no later than December 2016, SD Trust Advisors exercised authority or control over management or disposition of Employer Plan assets, and was therefore a fiduciary of the Employer Plans.  SD Trust also undertook to exercise discretionary authority as a fiduciary over administration of the Employer Plans.

22.     Non-party Thomas B. Stoughton ("Stoughton") is and was at all relevant times a resident of Atlanta, Georgia.  Stoughton is an attorney licensed to practice law in Georgia. Stoughton was an officer and owner of the predecessor of AEU.  Stoughton never served as an officer or employee of, or in any other capacity with, AEU.  Stoughton was one of two members and owners of SD Trust Advisors.  At all relevant times after its formation, Stoughton was an agent of SD Trust Advisors.  Beginning no later than December 2016, Stoughton was a fiduciary of the Employer Plans.

### JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Locke Lord are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     This Court has general personal jurisdiction over Locke Lord under 735 ILCS 5/2-209(b)(4) because Locke Lord does business and maintains an office of over 100 attorneys in Chicago, Illinois, and therefore continuously and systematically maintains contacts with Illinois.

25.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because

Locke Lord is subject to this Court's personal jurisdiction with respect to this lawsuit and is therefore considered to reside in this judicial district under 28 U.S.C. § 1391(c)(2). Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Independent Fiduciary's claims occurred in this judicial district.

**FACTS**

## I. Introduction

26.     From 2013 to 2016, Locke Lord issued a series of at least five opinion letters – which it styled as "comfort letters" – attesting to the legality of the AEU Plan and its immediate predecessor. Each letter concludes, under materially similar assumed facts, that the "Transaction," as Locke Lord referred to it, would comply with ERISA, not result in the formation of a MEWA subject to state insurance laws and regulations, and not constitute the transaction of insurance in any state.

27.     The "Transaction" Locke Lord describes in the assumed facts is highly complex and relies on perceived legal loopholes in the nature of a tax shelter. The comfort letters are impenetrably dense and internally contradictory, redundant and disorganized. Locke Lord's major conclusions as to the legality of the "Transaction" are erroneous in ways that should have been obvious to self-proclaimed top lawyers in the field.

28.     Locke Lord had an attorney-client relationship with the AEU Plan and its Employer Plans. As such, it owed them a duty to provide its legal services with the same level of competence, reasonable care, good faith, and ordinary diligence that similarly experienced lawyers in the highly specialized field of insurance transactions and regulation would exercise.

29.     Locke Lord had a duty to inform the AEU Plan and the Employer Plans of all material facts within its knowledge that could affect the transactions within the scope of its

7

representation or the subject matter of the attorney-client relationship.

30.     Locke Lord's duty of care and diligence to the AEU Plan and the Employer Plans included exercising an appropriate level of competence and understanding of the complex "Transaction" being marketed as the AEU Plan and the legal environment in which is operated.

31.     Because it knew its comfort letters were used in marketing the AEU Plan, Locke Lord had an obligation to investigate the legal standing of the AEU Plan and the Employer Plans if it knew, or in the exercise of reasonable diligence should have known, that they were not in compliance with legal requirements.

32.     Locke Lord had a duty to advise its clients upon gaining information that the AEU Plan and/or the Employer Plans may not be in compliance with legal requirements.

33.     As more fully alleged below, Locke Lord breached these duties in multiple ways. First, it erroneously opined that the AEU Plan "Transaction" as structured under Locke Lord's assumed facts would not result in the Employer Plans being a MEWA subject to state law.

34.     Second, it erroneously opined under the assumed facts that the Employer Plans would not be engaged in the transaction of insurance in any state by their participation in the AEU Plan "Transaction."

35.     Third, it erroneously opined that the AEU Plan "Transaction" as structured under Locke Lord's assumed facts would comply with ERISA's indicia-of-ownership and plan-asset laws and regulations.

36.     Fourth, it failed to act and advise the AEU Plan and the Employer Plans in the face of known facts indicating a duty to act, including but not limited to (a) advising the Employer Plans to obtain individual domestic stop-loss policies instead of a single, pooled policy from an offshore insurer, (b) withdrawing or correcting its comfort letters, (3) advising the

8

Employer Plans and the AEU Plan that they were required to submit to state insurance regulation, and (4) advising the Employer Plans and the AEU Plan that they were not in compliance with federal and state laws and regulations and should cease accepting participant contributions and terminate the Plans.

37.    As a result of Locke Lord's erroneous opinions and conclusions and the Employer Plans' reasonable and justifiable reliance thereon, the Employer Plans and the AEU Plan they comprised were not subject to regulatory oversight or statutory restraints normally applicable to domestic and offshore insurance operations of their size and scope.

38.    As a direct and proximate result of Locke Lord's breaches of duty, the unregulated Employer Plans joined or renewed enrollment in the AEU Plan, and their employee-participants and medical providers have incurred claims for which the Employer Plans and the AEU Plan (as the MEWA it actually was) are obligated but unable to pay.

39.    In addition, the Independent Fiduciary is unable to collect millions of dollars of stop-loss proceeds under foreign stop-loss policies.

40.    Without Locke Lord's comfort letters as the AEU Plan's legal foundation and operational roadmap, the AEU Plan would not have been viable.  Locke Lord played a central role in the creation, development, marketing, and continued existence of the AEU Plan.  Locke Lord was well aware that its comfort letters were used to promote and market the AEU Plan to hundreds of Employer Plans in at least 35 states.

41.    The losses alleged here are exactly what highly experienced insurance regulatory attorneys such as Locke Lord should know and expect would result when health insurance is transacted as it was here: on a national scale by an operation with inadequate resources to undertake such an endeavor, with no financial or market conduct regulatory oversight, and no

9

financial reserves. Locke Lord should be held to account for the debacle it was instrumental in creating and facilitating.

## II.     Background of the AEU Plan

42.     Founded in 2011, a company known as ALLInsurance Solutions Management, LLC ("AISM") provided self-insured benefit and workers compensation programs to small and medium-size employers primarily through PEO aggregators of such employers.  AISM was a Georgia limited liability company with its sole office in Atlanta, Georgia.

43.     In 2013, AISM approached Casey in Locke Lord's Atlanta office seeking advice in connection with a proposed employee health benefit plan intended to comply with ERISA and avoid state insurance regulation ("AISM Plan").  AISM and Locke Lord, through Casey, agreed to terms and Locke Lord began providing legal services related to the AISM Plan.  Those services included substantial advice concerning its structure and drafting most of the legal documents significant to the Plan.

44.     The AISM Plan was the predecessor of the AEU Plan.

45.     On December 12, 2013, Locke Lord issued an opinion letter to AISM relating to the AISM Plan.

46.     On March 3, 2014, Locke Lord issued a second opinion letter to AISM. (Exhibit A hereto).  This second opinion letter ("AISM Letter") appears to be identical to the first except it is addressed to a different officer at AISM's office in Georgia.

47.     The AISM Letter was issued on Casey's personal Locke Lord Atlanta office letterhead and bears a network file path indicating it was prepared in that office.  The AISM Letter is addressed to an officer of AISM at its office in Georgia.  Casey signed the AISM Letter "For the Firm."  The AISM Letter was cc'ed to Hansen.

10

48.     The AISM Letter concludes that, under the assumed facts in the letter, the AISM

Plan would comply with ERISA, would not result in the formation of a MEWA subject to state

insurance laws and regulations, and would not constitute the transaction of insurance in any state.

(Exhibit A, pp. 6-7).

49.     Locke Lord knew that the purpose of the AISM Letter was to assure those

marketing the AISM Plan and their employer customers that the AISM Plan complied with all

applicable laws and regulations, including ERISA and state insurance laws and regulations.

50.     Under the facts assumed in the AISM Letter, individual employers would each

establish separate employee benefit plans under ERISA for the purpose of providing health

benefits solely to the employer's employees and their dependents (referred to as "Employer

Customer Plans" in the letter and "Employer Plans" here and in later Locke Lord comfort

letters).  (*Id.* at 1-2).

51.     Under the facts assumed in the AISM Letter, each Employer Plan was to establish

a trust to receive contributions and act as a funding source for the Employer Plan.  (*Id.* at  2).

(The trusts are referred to in the AISM Letter as the "Employer Customer Trusts," and herein

and in later Locke Lord comfort letters as the "Employer Trusts."  For simplicity, hereafter both

the Employer Plans and the Employer Trusts shall be referred to as the "Employer Plans" unless

the context requires otherwise).

52.     As further contemplated by the assumed facts in the AISM Letter, the AISM Plan

was to involve the establishment of a single offshore trust domiciled in Bermuda, the

beneficiaries of which would be the Employer Plans.  The Bermuda trust would be funded with

participant (*i.e.*, employer and employee) contributions made to the Employer Plans.  (*Id.* at 3-5).

53.     The Bermuda trust was to use those participant contributions to purchase primary

11

and stop-loss insurance coverage for the benefit of the Employer Plans. (*Id.* at 3-4). Sometime in 2015, AISM abandoned the "primary coverage" element of the Bermuda trust referred to in the AISM Letter. Thereafter, the Bermuda trust was utilized solely for the purchase of stop-loss coverage.

54.     In general, stop-loss coverage provides reimbursement for catastrophic claims exceeding a predetermined level ("attachment point"). For example, stop-loss coverage may reimburse for a loss above a certain dollar amount paid to cover an extremely high medical claim. The stop-loss policies utilized here were "reimbursement" policies. Under the facts assumed in the AISM Letter, the attachment point for stop-loss coverage was any claim in excess of $100,000. (*Id.* at 4). This meant that once an Employer Plan incurred and paid a claim in excess of $100,000, the stop-loss carrier would reimburse the amount of the claim in excess of $100,000.

55.     On April 1, 2014, shortly after Locke Lord issued the AISM Letter, AISM caused a trust known as the Bermuda Purchasing Trust ("BPT") to be established to purchase a stop-loss policy ("Stop-Loss Policy") for the benefit of the Employer Plans associated with the AISM Plan.

56.     Locke Lord created or was involved in creating the "Bermuda Purchasing Trust Formation Agreement" utilized to establish the BPT. Locke Lord also created or was involved in creating numerous other form documents fundamental to the structure of the AISM Plan. These included (a) other documents relating to the BPT and the Bermuda insurance coverage; (b) the Employer Trust agreement; and (c) agreements between the Employer Plans and those providing management, administrative, and third-party administrator ("TPA") services. Each of these form documents bears a Locke Lord network file path.

12

57.     AISM and the Employer Plans caused the BPT to be established and operated in reliance on Locke Lord's advice in the AISM Letter that the establishment and operation of the BPT in a manner consistent with the facts assumed in the AISM Letter would comply with ERISA, would not result in the formation of a MEWA subject to state insurance laws and regulations, and would not constitute the transaction of insurance in any State.

58.     On March 11, 2015, an officer of AISM sent AEU's President, Stephen Satler ("Satler") a copy of the AISM Letter.

59.     In July 2015, AISM contracted with AEU to manage the AISM Plan.  Pursuant to that contract, AEU took over the sales, marketing, underwriting, rating, claims handling, and program advisory functions of the AISM Plan.

60.     In or about January 2016, Veritas, one of the principal PEO aggregators for the AISM Plan, engaged Locke Lord, through Casey, to provide legal services in connection with the AISM Plan.  Locke Lord knew that Veritas was marketing the AISM Plan to a substantial trade association in California that had questions about the AISM Plan's legality under the California Insurance Code's stop-loss insurance statute.  The engagement included Locke Lord drafting an opinion letter on that issue.  Although Veritas engaged Locke Lord, Casey addressed the letter to AISM.  The letter assumes substantially the same facts set forth in the AISM Letter and concludes that the AISM Plan did not violate the California statute.  Locke Lord's attorney-client relationship with Veritas continued through at least July 2016.

61.     On April 26, 2016 AEUH and AISM entered into an Asset Purchase Agreement whereby AEUH acquired all of the assets of AISM, including the AISM Plan.

62. AEU officers relied on the legality of the AISM Plan as confirmed in the Locke Lord AISM Letter in deciding to acquire the Plan. Those officers also understood that one of the assets acquired was the AISM Letter.

63. As a result of the Asset Purchase Agreement, AEU became the successor of AISM, including with respect to the AISM Plan. Locke Lord knew and understood this and referred to AEU as the successor to AISM.

64. As a result of the Asset Purchase Agreement, the AISM Plan became the AEU Plan. AEU became the sponsor of the Plan and continued in its role as manager and administrator of the Plan.

65. As part of the Asset Purchase Agreement, AEU agreed to assume AISM's liability for Locke Lord's legal fees incurred for AISM but not yet paid.

66. After AEUH's acquisition of the AISM Plan, the BPT remained in existence and all of the Employer Plans that were beneficiaries of the BPT became part of the AEU Plan.

## III. Locke Lord's Attorney-Client Relationship with the AEU Plan and its Employer Plans.

67. Locke Lord had an attorney-client relationship with the AEU Plan and the Employer Plans beginning no later than May 10, 2016. As alleged below, the AEU Plan and the Employer Plans entered into that relationship with Locke Lord:

      (a)    Through AEUH as a fiduciary, agent, and authorized representative of the AEU Plan and the Employer Plans;

      (b)    As direct, intended, third-party beneficiaries of an engagement agreement between Locke Lord and AEUH; and/or

      (c)    Pursuant to an oral or implied-in-fact agreement.

68. At or around the time of the acquisition, officers of AEU and Locke Lord discussed Locke Lord continuing in its role as legal counsel to what would now be the AEU

14

Plan.  Locke Lord continued to seamlessly provide such advice and counsel.

69.     On May 10, 2016, two weeks after the acquisition, Casey had a conference call with Stoughton and AEU and AISM officers regarding "a professional employer organization's wrongful influence over the funds flow for the Bermuda program interfacing with the trustee of the [Employer Plans]."  This related to the fact that Veritas, a PEO aggregator for what was now the AEU Plan (and a Locke Lord client), was exercising improper control over Employer Plan assets.  Locke Lord performed these legal services for the benefit of the AEU Plan and the Employer Plans.  Locke Lord's initial invoice to AEUH billed for this conference call.

70.     As a result of the conference call, Locke Lord was on notice that significant aspects of the assumed facts set forth in the AISM Letter were not being adhered to in practice.

71.     On May 18, 2016, Locke Lord and AEUH executed an engagement letter with the subject line "Agreement and Instructions for Legal Services" (Exhibit B hereto) ("Engagement Letter").  The Engagement Letter was issued on Casey's personal Locke Lord Atlanta office letterhead and bears a network file path indicating it was prepared in that office.  Casey signed the Engagement Letter "For the Firm."  The Engagement Letter contains a "Rate Sheet" listing the attorneys that would likely be working on the engagement as Casey, Hansen, and an associate in Locke Lord's Chicago office whose practice includes regulatory and health care matters.

72.     The Engagement Letter defines the scope of the representation as "to advise [AEUH] in connection with state insurance regulatory, [Affordable Care Act], and [ERISA] compliance matters in connection with employee health benefits plans and products developed by [AEUH]."  (Exhibit B, ¶ 1).

73.     The reference to "employee health benefits plans and products" in the

15

Engagement Letter was intended to and did refer to the Employer Plans and the so-called "Transaction" constituting the AEU Plan, which Locke Lord knew was continuing to operate as a result of AEU's acquisition of AISM's assets, including the AISM Plan.

74.     Locke Lord knew that AEUH, as its name suggested, was a holding company with no operations of its own.  It could therefore benefit only indirectly from the services Locke Lord would provide.  Locke Lord knew the direct beneficiaries would be the Employer Plans and the AEU Plan they comprised, and that AEUH's intent in entering the Engagement Agreement was to benefit them.

75.     Thus, the AEU Plan and its Employer Plans were the primary, intended, direct third-party beneficiaries of the Engagement Letter, and an attorney-client relationship was created between Locke Lord and the AEU Plan and Employer Plans by the Engagement Letter.

76.     When Casey executed the Engagement Letter, Locke Lord also knew that AEU was already sponsoring and administering the AEU Plan as the successor to the AISM Plan, on which Locke Lord had advised extensively.  Locke Lord further knew that the AEU Plan and its Employer Plans were AEU's only business at the time for which issues related to compliance with state insurance regulation, Affordable Care Act, and ERISA would be presented to Locke Lord.

77.     When Casey executed the Engagement Letter, Locke Lord knew and understood that AEUH was the sponsor, manager, administrator, and advisor, of the AEU Plan and the Employer Plans, and that, with respect to the subject matter of the engagement, AEUH had no purpose other than to serve the Employer Plans and the AEU Plan, including by engaging Locke Lord.  Locke Lord knew and understood that AEUH was entering into the Engagement Letter as

16

a fiduciary, agent, and/or authorized representative of the Employer Plans and the AEU Plan they comprised.

78.     The Engagement Letter created an attorney-client relationship between Locke Lord and the AEU Plan and Employer Plans through AEUH as their fiduciary, agent, and/or authorized representative.

79.     The Engagement Letter identifies only AEUH as the client, and states that *it* "does not encompass any other individual or entity."  (Exhibit B, ¶ 1).  Regardless of that statement in the Engagement Letter, Locke Lord routinely provided legal services for the benefit of the AEU Plan, the Employer Plans, AEUB, and others related to the Employer Plans and the AEU Plan they comprised.

80.     Casey created a single billing matter for all things related to the AEU Plan "Transaction" and the Employer Plans, which he aptly named the "Insurance Regulatory Compliance" matter.  Casey chose that name because he knew the primary purpose of the engagement was to advise and opine on matters related to the AEU Plan "Transaction" and its compliance with ERISA and state insurance laws and regulations.

81.     Locke Lord billed all of its time that was in any way related to the AEU Plan "Transaction" to the Insurance Regulatory Compliance matter, regardless of who requested the services – whether AEUB, a Plan fiduciary, or even an aggregator, and regardless of whether those services related to administration of the AEU Plan (or its constituents plans), fiduciary activities, or plan design.

82.     For example, even though Locke Lord had no written engagement agreement with AEUB (and AEUB as an affiliate was purportedly excluded from the Engagement Letter), it provided legal services in connection with a draft Management Agreement between AEUB and

17

the individual Employer Plans. Casey listed himself as counsel for AEUB in the Notice

provision of the draft Agreement. (Exhibit C hereto, Art. 12.1(b)). Casey billed this time to the

Insurance Regulatory Compliance matter, even though the work was done for AEUB, not

AEUH.

83. In addition, Locke Lord's bills were paid by AEUB, not AEUH, further

demonstrating that AEUH was never intended to be, nor in practice was it, Locke Lord's only

client.

84. AEUB's income consisted of fees paid by the Employer Plans. Locke Lord,

therefore, knew that it was being compensated indirectly by the Employer Plans.

85. As further alleged below, Locke Lord frequently provided legal services at

Stoughton's or AEU's request for the benefit of the Employer Plans and the AEU Plan they

comprised.

86. As a result, the Engagement Letter created an attorney client relationship, and/or

there was an oral or implied-in-fact agreement that created an attorney-client relationship,

between Locke Lord and the Employer Plans and the AEU Plan they comprised.

**IV.     Locke Lord's Legal Services for the AEU Plan and Employer Plans in 2016.**

87. Five days after the Engagement Letter was executed, Stoughton forwarded several

Locke Lord invoices to AEU. The invoices were for legal services Locke Lord had provided to

AISM before the acquisition. Pursuant to the Asset Purchase Agreement, Stoughton requested

that AEU as successor pay the invoices in a timely manner.

88. On May 26, 2016, an officer of AEU sent a large brokerage firm the AISM Letter

to support the legality of what was now the AEU Plan.

89. After execution of the Engagement Letter, Locke Lord continued in its role

providing legal advice and services for the benefit of what was now the AEU Plan.

90.     On May 26, 2016, Casey sent AEU's general counsel, Billie Wray ("Wray") "Bermuda Transaction Documents" that Casey characterized as "the stash from my document system." That same day, Wray requested that Casey "send us a list naming the documents to be signed by each [Employer Plan]," because "[w]e want to ensure as we begin the management of the program previously known as AISM, we are gathering the proper documentation."

91.     Casey responded by sending Wray a document entitled "20140516 LEGAL Document Checklist – BC – LL," the name of which appears to indicate the document was first created on May 16, 2014 by Brian Casey of Locke Lord ("Checklist").

92.     The Checklist lists all the documents necessary to the structure of the AISM Plan, which was now being sponsored, managed and administered by AEU as the AEU Plan. The majority of the documents on the Checklist are identified by their "Locke Lord Document Number," *i.e.*, their Locke Lord network file path.

93.     The "Locke Lord Legal Opinion," *i.e.*, the AISM Letter, is one of the documents listed on the Checklist. The checklist indicates the AISM Letter was to be included in "Packet 1," which was to be provided to "PEO and Association Producers." Thus, Locke Lord knew that, as was permitted under the AISM Letter, (*see* Exhibit A, p. 8), the AISM Letter and its conclusions regarding compliance with ERISA and state insurance laws was being provided to "producers" to market and sell the AISM Plan to Employer Plans.

94.     Casey also provided Wray a funds flow chart indicating that all participant contributions would first be collected by a PEO aggregator, then transferred to a TPA from which numerous fees would be deducted, including for the PEO, an actuary, the TPA, network providers, the plan administrator, and the plan manager (which was AEU beginning in July 2015

and at all relevant times thereafter). Thus, Casey and Locke Lord were aware of the number of fees being extracted from participant contributions. Only after the TPA deducted and paid all such fees were the net contributions then sent to the BPT.

95.    In June 2016, Casey met with Chris Festa ("Festa"), a business analyst in AEU's New York office, and two other AEU officers to discuss "the Bermuda purchasing stop loss insurance transaction structure."

96.    In July 2016, Casey and Hansen assisted in the drafting of enrollment forms for employee-participants in the Employer Plans. Their communications regarding the forms are with officers of both AEU and Veritas, so it is unclear at whose direction these services were performed, although they were clearly intended to benefit the Employer Plans.

97.    Veritas's attorney commented that the term "home office" should be avoided in the form as it "makes it [the AEU Plan] sound like an insurance company," to which Casey replied: "Agreed." (Emphasis omitted).

98.    In June 2016, Stoughton received multiple inquiries from the DOL and a Market Conduct Investigator with the Florida Office of Insurance Regulation. The investigator was inquiring about a "group" plan being marketed in Florida as the "AEU Benefits" plan by Locke Lord's client Veritas.

99.    Stoughton forwarded the investigator's emails to Satler, Casey and Hansen, along with a PDF document Veritas was apparently using to market the plan in Florida. The PDF consisted of a 2015 "AEU Benefits" marketing brochure. The brochure explained the medical benefit offerings available and contained contact information for salespeople at AEU. Locke Lord's AISM Letter was included as part of the PDF, as well as a form of "Joinder Agreement"

for the BPT and a related Limited Power of Attorney, each bearing a Locke Lord Atlanta network file path.

100.    Casey and Hansen had several teleconferences with Stoughton and were involved in drafting the response to the Florida Office of Insurance Regulation, which stated that AEU was unaware of any "group" coverage being sold.

101.    The next month, Festa emailed Casey that AEU was "very concerned that Veritas is acting as a MEWA." Festa was referring to Veritas once again exercising improper control over Employer Plan assets and dictating when and how they could be utilized. Festa copied other AEU officers and Stoughton on the email.

102.    Festa's email included a draft letter to be sent to Wilson Benefit Services ("WBS"), the AEU Plan Administrator at the time, directing WBS to terminate Veritas as a PEO aggregator for the AEU Plan. Festa suggested Casey or Stoughton send the letter to WBS. The draft letter states that Veritas had been "acting as a multiple employer welfare arrangement, or MEWA, which are illegal in the states Veritas operates." The letter states that this was the result of "Veritas' refusal to allow [WBS] to transfer the necessary funds."

103.    Based on this correspondence, Casey knew or should have known that AEU was monitoring, supervising, and enforcing the flow of Employer Plan assets, and was therefore exercising control or authority over plan management or assets as a fiduciary of the Employer Plans.

104.    This was also at least the third time Casey learned that the AEU Plan was not operating in accordance with the assumed facts in the AISM Letter.

105.    Casey replied that because Veritas was a Locke Lord client, he could not send the letter on behalf of "AEU (as successor to AISM)."

21

106.     Casey also asked, "do we really want a letter from AEU floating around stating that it thinks a MEWA exists as I am afraid that if such a letter get sin [*sic*] the hands of thee [*sic*] DOL or any [Department of Insurance] it will do more damage than good to AEU."  Thus, Casey suggested that AEU conceal its concern that the AEU Plan was operating as a MEWA.

107.     The next day, Festa and the other AEU officers followed Casey's advice and decided to send the letter without mentioning any MEWA.

108.     In early August 2016, at Festa's request, Casey and Hansen drafted a form of rescission letter for the Employer Plans to send to participants who had misrepresented their medical history in applications to join the Plans.  This legal work was performed for the benefit and administration of the Employer Plans but like all similar work Locke Lord billed it through the AEUH "Insurance Regulatory Compliance" matter.

## V.     Locke Lord's AEU Comfort Letters.

### A.     Drafting of the AEU Letter.

109.     In June 2016, AEU and Stoughton decided that for marketing purposes they needed Locke Lord to reissue its AISM Letter so it would be addressed directly to AEU.  Shortly thereafter, Stoughton spoke to Casey about reissuing the AISM Letter to AEU (hereafter, the "AEU Letter").

110.     Casey started with the AISM Letter and edited it as appropriate for the AEU Plan. The AEU Letter went through several drafts, all prepared in Locke Lord's Atlanta office and bearing a Locke Lord Atlanta network file path.

111.     The version entitled "Locke Lord Draft 07-08-2016," included a footnote stating that "[t]he BPT Trustee is probably an ERISA fiduciary."  This was an acknowledgement by

22

Casey that the BPT would hold and have discretionary control over Employer Plan assets. This footnote was deleted from later drafts of the letter.

112.    Another footnote recites that AEU had asked whether each Employer Plan should buy "its own medical stop-loss insurance policy from a U.S. insurer," rather than pooling funds in Bermuda to acquire a single policy. Casey responded in the footnote that so long as each individual Employer Plan met its home-state statutory minimum stop-loss insurance attachment point, "I don't see any issue with this structure." At significant expense, Casey then had an associate do a 50-state survey of minimum attachment points that he provided to Stoughton and AEU. However, Casey failed to advise that individual domestic stop-loss policies should be used and therefore the pooled BPT structure was retained throughout the relevant time.

113.    In a version of the draft AEU Letter entitled "Locke Lord Draft 10-24-16" (emphasis omitted), Casey interlineated the following comment immediately after a sentence describing the transfer of cash by the Employer Plans to the BPT: "**[inapplicability of IRC 4371 excise tax to be confirmed]**"(Emphasis in original).

114.    Casey's reference was to 26 U.S.C. § 4371 ("Excise Tax"), which imposes a one percent tax on premiums paid for any "policy of insurance … or policy of reinsurance issued by any foreign insurer or reinsurer."

115.    Thus, Casey recognized that he needed to determine whether the BPT would be a foreign insurer or reinsurer such that the Excise Tax would be owed on the amounts the Employer Plans paid to the BPT for stop-loss premiums.

116.    At that time, Casey concluded the Excise Tax would not apply, and the interlineation was deleted from the final version of the AEU Letter.

117.    In late 2016 or early 2017, a second Bermuda trust was formed ("BPT2") for use

23

in connection with certain new Employer Plans. (The BPT and BPT2 are hereafter collectively referred to as the "BPT.")

### B. Locke Lord's 12/15/16 Opinion Letter.

118.    While it was in the process of drafting the AEU Letter, Locke Lord was asked to draft a second, more targeted opinion letter. Stoughton was involved in requesting the letter in response to specific questions that had been raised about the AEU Plan. AEU and Stoughton intended to benefit the Employer Plans and the AEU Plan in requesting the letter. Locke Lord knew the purpose of the letter was to answer the questions that had been raised, and that the letter would be used to market and promote the "Transaction" to prospective Employer Plans and to provide comfort to existing Employer Plans.

119.    On December 15, 2016, Locke Lord issued a formal opinion letter addressing the questions. ("12/15/16 Letter") (Exhibit D hereto). (The AEU Letter and the 12/15/16 letter are collectively referred to hereafter as the "Comfort Letters").

120.    The 12/15/16 Letter was issued on Casey's personal Locke Lord Atlanta office letterhead and bears a network file path indicating it was prepared in that office. Casey signed the AEU Letter "For the Firm." Upon its completion, Casey emailed the 12/15/16 Letter to Stoughton and cc'ed it to AEU officers.

121.    Locke Lord issued the 12/15/16 Letter to AEUH in its capacity as fiduciary, agent, and/or authorized representative of the Employer Plans and the AEU Plan they comprised. Locke Lord knew the 12/15/16 Letter was being issued for the benefit of the Employer Plans and the AEU Plan.

122.    The subject line of the 12/15/16 Letter is "Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchasing Trust and Stop-Loss

Insurance Policy." This is a reference to the Employer Plans and the AEU Plan, or the "transaction" as Locke Lord referred to it in this letter. Thus, the subject of the 12/15/16 Letter is the AEU Plan and the Employer Plans, and the purpose and intent of the letter was to influence prospective and existing Employer Plans and the AEU Plan by advising that they could operate under the assumed facts in compliance with ERISA and state insurance laws.

123.    The 12/15/16 Letter recites that it is intended "to address the following questions that AEU has encountered regarding the above-referenced transaction…." The letter further recites that it is "qualified in its entirety by our [AISM Letter] to the predecessor" of AEU. Thus, Locke Lord was aware that the AEU Plan had been operating as the successor to the AISM Plan since the time of the acquisition, and that a number of questions had arisen concerning those operations.

124.    The first question in the 12/15/16 letter addresses the issue of what types of employers may participate in the AEU Plan or "transaction." Locke Lord's response was that "[a]ny employer *approved by AEU*" that meets the other listed criteria may participate. (Exhibit D, p. 1, ¶ 1) (emphasis added). Thus, Locke Lord knew AEU had the power to decide who could and could not join the AEU Plan.

125.    One of the questions posed in Locke Lord's 12/15/16 Letter is: "Does the transaction create a multiple employer welfare arrangement?" (Emphasis in original). Locke Lord's response was that "[t]he transaction is intended not to create a multiple employer welfare arrangement because *no [Employer Plan] agrees to bear any risks of*, or indemnify, *any other [Employer Plan]*" for claims of the other Employer Plan's employees, and "no [Employer Plan] provides any health benefits to the employees of any other participating employer." (Exhibit D, p. 2, ¶ 3) (emphasis added).

126. Locke Lord's response in substance incorrectly opined that the "transaction" as structured would not result in the formation of a MEWA.

127. Locke Lord's factual assertion that the "transaction" did not involve any Employer Plan agreeing to "bear any risks" of any other Employer Plan is incorrect, and Locke Lord was negligent in representing that such was the case.

128. In fact, the Employer Plans shared risk at least in connection with the BPT structure, resulting in a MEWA. *See infra* Part VII A.

129. Locke Lord was asked to issue the letter in response to questions raised by prospective and/or existing Employer Plans or their aggregators or fiduciaries, and knew that prospective and/or existing Employer Plans would rely on the 12/15/16 Letter in deciding whether to participate or continue participating in the "transaction" (*i.e.,* the AEU Plan).

130. The Employer Plans and their administrators and fiduciaries relied on the 12/15/16 Letter.

131. Locke Lord was negligent in issuing the 12/15/16 Letter and allowing it to be disseminated, and should not have done so. Instead, it should have issued an accurate letter stating that risk was being shared under the BPT structure, and concluding that this resulted in the formation of a MEWA subject to state insurance laws.

132. Had it done so, the Employer Plans would not have enrolled or continued participating in the AEU Plan, or would have been forced to comply with state regulation, including, *inter alia*, the posting of adequate reserves. Either way, the losses sought herein would have been avoided.

**C.    The AEU Letter.**

133. In the final process of drafting the AEU Letter, Stoughton and Casey

26

communicated about the form of the letter, and Stoughton provided edits and comments in his capacity as fiduciary.

134.    One of the aggregators was anxious to get a final version of the letter for marketing purposes, and asked Festa several times about the status of the letter.  On several occasions, Festa inquired of Casey about the status of the letter.

135.    On December 20, 2016, Locke Lord issued the final AEU Letter.  (Exhibit E hereto).  The AEU Letter was issued on Casey's personal Locke Lord Atlanta office letterhead and bears a network file path indicating it was prepared in that office.  Casey signed the AEU Letter "For the Firm."  Casey emailed the letter to Festa of AEU's New York office and cc'ed Satler.

136.    Locke Lord issued the AEU Letter to AEUH in its capacity as fiduciary, agent, and/or authorized representative of the Employer Plans and the AEU Plan they comprised. Locke Lord knew the letter was being issued for the benefit of the Employer Plans and the AEU Plan.

137.    Casey named the document the "AEU ERISA comfort letter" and issued it in PDF format.

138.    In an effort to simplify citation to the AEU Letter, the Independent Fiduciary has created an alternative form of the letter attached as Exhibit F hereto.  Exhibit F recreates the content of the AEU Letter and adds paragraph and line numbers for ease of citation.  In Exhibit F, each paragraph of the AEU Letter is assigned a paragraph number denoted as "¶ __." Within each paragraph, each sentence is broken out by adding a hard return to create a space between each sentence and bring the beginning of each sentence to the left margin.  Within each sentence, each item in a list is broken out by a similar hard return. Only these changes to format,

27

indications of typographical errors in the original by the designation "[*sic*]," and the paragraph and line numbers, have been added to the AEU Letter in Exhibit F. The content of the letter is intended and believed to be identical.

139. Hereafter, references in this First Amended Complaint to "¶ __" or "¶ __, lines __," are to the paragraph and line numbers of Exhibit F.

140. Like the 12/15/16 Letter, the subject line of the AEU Letter is "Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchasing Trust and Stop-Loss Insurance Policy." This is a reference to the Employer Plans and the AEU Plan, which Locke Lord defines as the "Transaction." Thus, like the 12/15/16 Letter, the subject of the AEU Letter is the AEU Plan and the Employer Plans.

141. The AEU Letter states that Locke Lord was asked to "review and comment on the Transaction in respect of certain matters related to" ERISA, the IRC, and state insurance codes. (¶ 1, lines 20-30).

142. AEU and Stoughton intended to benefit the Employer Plans and the AEU Plan in requesting the letter.

143. The purpose and intent of the AEU Letter was to opine on the legality of the "Transaction" and thereby influence prospective and existing Employer Plans and the AEU Plan by advising that they could operate under the assumed facts in compliance with ERISA and state insurance laws.

144. The AEU Letter refers to AEU as "the successor owner of certain assets previously owned by [AISM] as of April 2016." (¶ 1, lines 16-17).

145.     The AEU Letter concludes that, under a set of assumed facts recited in the letter, engaging in the "Transaction" would not cause the Employer Plans to become a MEWA or violate ERISA or state insurance laws.  (¶¶ 14-16).

146.     Locke Lord's assumed facts to support its conclusions pertinent here were as follows:

(a)     Each employer would establish an Employer Plan governed by ERISA solely for its own employees and their dependents.  (¶ 2).

(b)     Each employer would be the sole grantor of and form an Employer Trust to accept contributions and serve as a funding source solely for its own Employer Plan.  (¶ 3).  (For simplicity, hereafter both the Employer Plans and the Employer Trusts shall be referred to as the "Employer Plans" unless the context requires otherwise.)

(c)     Each Employer Plan would enter an agreement with AEU to provide "certain advisory, administrative, underwriting, large case management and such other services as to which they may agree."  (¶ 8(a)).  Providing advice or exercising discretion with respect to "large case management" is a fiduciary activity.

(d)     AEU would be paid periodic fees from the Employer Trusts.  (¶ 8(b)).

(e)     Each Employer Plan would enter an agreement with a TPA to provide a health care provider network and claims services.  (¶ 5).

(f)     Each Employer Plan would enter an agreement with an aggregator to collect contributions from the employer and employee-participants and deposit such funds in an Employer Plan bank account, over which the TPA or other fiduciary would have authority to withdraw funds.  (¶ 6, lines 119-47).  (This provision is contradicted in the next paragraph, which assumes that no "[a]ggregator will … receive any funds from [any Employer Plan]…."  (¶ 7, lines 172-74)).

(g)     Each Employer Plan would be co-settlor and co-beneficiary of a single BPT.  The BPT would issue a written certificate to each Employer Plan evidencing its beneficial interest in the BPT.  The sole purpose of the BPT would be to purchase a single Stop-Loss Policy, solely in its name, for the benefit of all of its Employer Plan-beneficiaries collectively.  (¶ 9, lines 188-202).

(h)     The Stop-Loss Policy would be issued by a Bermuda insurer.  (¶ 11, lines

29

259-61). The Stop-Loss Policy would pay claims above specified attachment points for each qualifying employee-participant claim and his or her qualifying aggregate claims. (¶ 10, lines 236-42).

(i)     Each Employer Plan, through the TPA, would transfer funds to the BPT to pay its "pro rata portion of the total insurance premiums due" from the BPT to the Bermuda insurer. (¶ 12, lines 267-72).

(j)     The Bermuda insurer would pay any stop-loss proceeds to the BPT, which would in turn pay them to the TPA, which would in turn use them to pay claims. (¶ 13, lines 292-97; ¶ 6, lines 149-166).

147.    The AEU Letter states the "[t]he author of this letter [Casey] is licensed to practice law only in the State of Georgia. . . ." (¶ 17, line 398).

148.    The AEU Letter states that it "is being rendered only to our client, AEU, and may not be used or relied upon by, or distributed to, any other person or entity for any purpose whatsoever without the written permission of Locke Lord LLP." (¶ 17, lines 406-09). AEUH was a known fiduciary, agent, and/or authorized representative of the Employer Plans, which collectively comprised the AEU Plan. Locke Lord knew that in seeking the letter AEUH was acting on behalf of the Employer Plans and the AEU Plan they comprised. As a result, the AEU Plan and the Employer Plans were Locke Lord's clients to whom, or for the benefit of whom, the AEU Letter was rendered as well.

149.    The AEU Letter further provides that "AEU may provide a copy of this letter (but without any reliance hereon) to" aggregators, employers, the TPA, the Bermuda insurer and related entities, the BPT, and insurance agents. (¶ 17, lines 409-29). The Employer Plans are omitted from this list, which includes virtually every other entity significant to the "Transaction."

150.    In fact, as Locke Lord knew and understood, the Employer Plans and their administrators and fiduciaries relied on the AEU Letter.

151.    Locke Lord was negligent in reaching its conclusions in the AEU Letter, and

should not have issued it or allowed it to be disseminated. Instead, it should have issued an accurate letter concluding that the "Transaction" would result in a MEWA and continued operation would violate ERISA and state insurance laws.

152.    Had it done so, the Employer Plans, either would have not enrolled or would have ceased participating in the AEU Plan, or would have been forced to comply with state regulation, including, *inter alia*, the posting of adequate reserves. Either way, the losses sought herein would have been avoided.

153.    As Locke Lord knew and approved in the AEU Letter, (*see* ¶ 17, lines 408-15), just minutes after receiving the AEU Letter from Casey, Festa forwarded it to the principal aggregator for the AEU Plan (BWC), and to a TPA and one of the more substantial brokers marketing the Plan.

## VI.    Locke Lord's Legal Services for the AEU Plan and the Employer Plans After Issuing the AEU Letter.

### A.    AEUB's Management Agreement.

154.    On January 6, 2017, Locke Lord created a draft "Health Benefits Program Management Agreement" ("Management Agreement") (Exhibit C) for AEU to govern its relationship with each Employer Plan. The draft Management Agreement was derived from a similar agreement Locke Lord had created for AISM.

155.    AEUB, not AEUH, was the contracting party with the Employer Plans in the draft Management Agreement.

156.    Locke Lord billed its time related to the draft Management Agreement to the sole matter Casey had created relating to the "Transaction":  "Insurance Regulatory Compliance." Locke Lord did so even though this work relating to plan administration was done for AEUB, not AEUH.

157.    The draft Management Agreement provides that AEUB shall invoice and be paid by each Employer Trust.  (Exhibit C, Art. 8.1).  The Employer Trusts' assets consisted of participant contributions.  Upon information and belief, AEUB had no other source of income other than fees paid by the Employer Trusts.  In addition, as Locke Lord knew, AEUB, not the holding company AEUH, paid Locke Lord's bills.  Thus, Locke Lord knew that its fees incurred on the Insurance Regulatory Compliance matter would be paid indirectly from funds paid to AEUB by the Employer Plans.

158.    Casey sent the draft Management Agreement to Stoughton and AEU officers.  It includes a provision that the Employer Plan "irrevocably authorizes AEUB to take any and all appropriate action on behalf of the [Employer Plan]."  (*Id.*, Art. 2.1).  Thus, Locke Lord knew AEUB, the operating subsidiary of AEUH, was an authorized representative of each Employer Plan.

159.    AEUB's advisory services included "[a]dvising the [Employer Plan] and others in the engagement of the services of such persons as may be deemed necessary by [the Employer Plan] or AEUB…."  (*Id.* Art. 4.1.9).  Thus, Locke Lord knew that the scope of the authorization included engaging necessary service providers such as Locke Lord, which AEUH did through the Engagement Letter.

160.    Casey's redline of the document from a prior draft deletes a provision that stated AEUB was not an agent or ERISA fiduciary of the Employer Plans.  (*Id.*, Art. 2; Redline p. 2). Thus, Casey recognized that AEUB, the operating subsidiary of AEUH, was, in fact, an agent and fiduciary of the Employer Plans.

**B.    The Federal Excise Tax.**

161.    On January 4, 2017, Stoughton, acting on behalf of the AEU Plan and the

Employer Plans, emailed Casey and asked him to revisit the issue of whether the Employer Plans owed the Excise Tax on premiums paid to the BPT.

162.    Casey responded that the Excise Tax issue was "a bit murky." He stated that Locke Lord's position was that funds the Employer Plans paid to the BPT were not premiums because the Employer Plans were not parties to or insureds under the Stop-Loss Policy.

163.    Despite his question about the issue noted in a draft of the AEU Letter (as alleged previously), Casey apparently had not researched or analyzed it too deeply before issuing the letter. He told Stoughton "I don't think there is much relevant law, IRS pronouncements, etc." and offered to "go deeper on the issue if you'd like." Stoughton asked him to do so.

164.    Casey consulted with Christopher Flanagan ("Flanagan"), a partner in Locke Lord's Boston office with extensive experience in taxation of insurance companies and insurance products. On information and belief, Casey had not consulted regarding this issue with Flanagan before issuing the AEU Letter.

165.    Flanagan apparently did not find the issue murky because after only a 36-minute telephone call with Casey he concluded the Excise Tax was owed. Flanagan concluded the BPT was acting as a "nominee" for the Employer Plans in their relationship with the Bermuda insurer.

166.    Casey told Stoughton he thought "we can still have the BPT pay the IRC 4371 tax, rather than having the [Employer Plans] do that." Thus, he suggested the BPT pay the tax collectively for all of the Employer Plans, rather than have each Employer Plan pay individually.

167.    All of the Locke Lord lawyers' time relating to the Excise Tax matter, which was incurred for the benefit of the Employer Plans at Stoughton's request, was billed to the "Insurance Regulatory Compliance" matter.

C.    **Concerns Raised by a TPA.**

168.    In March 2017, questions about the legality of the AEU Plan "Transaction" were raised by a TPA. The University of Utah Health Plans ("UUHP"), which was considering serving as a TPA for certain Employer Plans, became concerned that the AEU Plan might constitute unauthorized insurance under state law.

169.    UUHP retained Foley & Lardner ("Foley") to review the AEU Plan and advise it.

170.    Kevin Fitzgerald ("Fitzgerald") of Foley communicated with Casey about UUHP's concerns. Fitzgerald viewed the BPT as an unauthorized insurer providing stop-loss coverage to the Employer Plans in the United States, which was then reinsured by the Bermuda insurer.

171.    Fitzgerald was concerned that if the BPT was an unauthorized insurer, then under state law UUHP as the TPA could be liable for any claims that ultimately went unpaid.

172.    Fitzgerald told Casey that if the BPT was an unauthorized insurer, "[t]his creates an immediate compliance risk for the BPT and its promoters in the US."

173.    Casey's responded that "[t]he BPT does not indemnify any person and this [*sic*] is not an insurer."

174.    A few days later, Casey and Hansen had a conference call with Stoughton, Fitzgerald, and a UUHP representative about "state insurance regulatory compliance issues." Casey continued to insist the BPT was not an unauthorized insurer.

175.    After the call, Stoughton reported to Satler that "Brian [Casey] is the only, and best, third-party big-firm voice that we have to advocate legally for us. He did a phenomenal job with U of Utah in a call this week, for example, and constantly comes to our assistance in such a

fashion." Stoughton was speaking in his capacity as a fiduciary of the AEU Plan and Employer Plans in making these comments.

176.     Stoughton was sent and reviewed several Colorado Insurance Department advisory opinions concerning MEWAs that had been provided by UUHP. Again demonstrating his reliance on Locke Lord's opinions, Stoughton responded to AEU officers and an aggregator that "[w]e have repeatedly said that our counsel opines that we are NOT a MEWA…." (Emphasis in original).

177.     Fitzgerald prepared a more detailed analysis of the unauthorized insurance issue, which was sent to Stoughton and AEU officers. Fitzgerald stated:

> We continue to view the Bermuda trust and Bermuda insurance portion of the agreement as likely constituting unauthorized insurance, as we have discussed and described in writing. Specifically, we view the Bermuda Purchasing Trust (BPT) as likely being an unauthorized insurer, because it pools risks and collects payments for such risk pooling. We have not been convinced otherwise by the arguments Brian Casey has advanced; while the BPT may be an insurance company with little or no capital, it is nevertheless engaged in the business of insurance in the US (i.e., it sells insurance to the [Employer Plans]).

178.     If, as Fitzgerald stated (and as was the case), the BPT was pooling risk, then the Employer Plans were a MEWA in addition to the BPT being an unauthorized insurer.

179.     Stoughton forwarded Fitzgerald's analysis to Casey and voiced his own concerns about the issue. Stoughton told Casey: "I think that we should discuss whether it is time to tweak this structure to meet these objections? Maybe there are structural alternatives to this?" Casey's response was to deny there was risk pooling by the BPT or that it was selling insurance to the Employer Plans.

180. Casey drafted a response to Foley that continued to deny the BPT pooled risk or sold insurance to the Employer Plans, which he sent to Stoughton, Satler, and an aggregator. It is unclear whether the response was sent to Foley.

181. Casey was negligent in refusing to concede that the BPT pooled risk and acted as an unauthorized insurer. Locke Lord had an ongoing duty to withdraw or amend its Comfort Letters to correct them if information came to the firm's attention indicating the Letters were inaccurate. Even when confronted with Foley's (correct) conclusions alleged above, Locke Lord failed to do so and therefore breached its duty.

182. Upon seeing Casey's response to Foley, Steven Goldberg, AEU's Chief Risk and Operating Officer, commented to Satler that, while they had to write off UUHP as "totally skeptical now… For our general program [*i.e.,* the AEU Plan as a whole], Brian's response is a good one." Thereafter, they continued to rely on the Comfort Letters in their capacity as fiduciaries of the AEU Plan and Employer Plans.

183. Fitzgerald also expressed concern about how "Premium Equivalents" were collected from the Employer Plans:

> It is unclear who is responsible for collecting the Premium Equivalent from the [Employer Plans] and paying it to the BPT; if University of Utah is involved, then it will almost certainly be deemed to have been "transacting" unauthorized insurance.

184. In response, Casey stated that, "as a factual correction, the trust contributions that [an Employer Plan] makes to the BPT are made directly by [an Employer Plan] and no third party handles those trust contributions." This supposed "correction" was directly contradicted by the assumed facts in the AEU Letter, which state that the aggregators and TPAs would handle Employer Plan funds and send them to the BPT. (¶ 6, lines 119-47; ¶ 12, lines 267-72).

185. All of Locke Lord's attorney time relating to the unauthorized insurance issue,

36

which was incurred for the benefit of the Employer Plans, was billed to the "Insurance Regulatory Compliance" matter.

### D. Failure of the AEU Plan.

186.     In July 2017, the DOL was investigating the AEU Plan.  As part of that investigation, the DOL communicated with counsel for BWC.  BWC requested that Wray provide its counsel a copy of the Locke Lord AISM Letter "ASAP."  Wray provided it a few minutes later.  Upon information and belief, BWC relied on the Locke Lord Comfort Letters to defend the legality of the AEU Plan to the DOL.

187.     A few days later, Casey emailed Satler with the subject line: "You alive? How is business?"  Casey's email then asked: "Is Chicago DOL inquiry still persisting?"  It was.

188.     In 2017, after Locke Lord issued its Comfort Letters, the Employer Plans paid millions of dollars in stop-loss premiums to the BPT, and their employee-participants made millions of dollars of contributions and incurred millions of dollars of claims for which the Employer Plans and the AEU Plan are obligated but have insufficient funds to pay.  But for Locke Lord's negligence, this would not have occurred.

189.     In November 2017, the DOL moved to appoint the Independent Fiduciary and the AEU Plan and its Employer Plans were terminated shortly thereafter.

### VII.   Locke Lord Breached Its Duties in Issuing the AEU Comfort Letters.

190.     Locke Lord owed duties of care and competence regarding the accuracy of the opinions expressed and the advice given in the Comfort Letters.  Locke Lord's duties of competence and ordinary diligence also required that it know and understand the federal and state laws and regulations implicated by and referred to in the Comfort Letters.  Locke Lord breached these duties because the conclusions reached in both letters were erroneous.

37

A.    The Employer Plans Were a MEWA.

191.    Locke Lord incorrectly represented in the 12/15/16 Letter that no Employer Plan

agreed to "bear any risks" of the other Employer Plans, and that the "transaction" would not

result in the formation of a MEWA.

192.    Locke Lord's conclusion was incorrect because, as demonstrated below, the

Employer Plans shared risk in connection with the BPT.

193.    In the AEU Letter, Locke Lord concluded that, under the assumed facts, the

Employer Plans would not be a MEWA because:

> [T]he Transaction does not include any agreement under which any
> Employer or its Employer's Trust will agree to be liable to any or all of
> the other Employers or their respective Employer's Trusts for its or their
> obligations to provide health benefits under its or their respective
> Employer Plans, and thus, in the Transaction, there would not be multiple
> employers sponsoring any single Employer Plan.

(¶ 15, lines 348-53).

194.    Locke Lord was negligent in reaching this conclusion because the Employer Plans

could become a MEWA in many ways other than by having an agreement to be liable for each

other's obligations to provide health benefits under their respective Plans.

195.    For example, a MEWA is created where risk is shared (a) by paying the health

claims of multiple plans out of an undifferentiated pool of assets, or (b) by the purchase of

insurance that covers the health claims of employees of multiple employers, or (c) by the

purchase of insurance that reimburses employee benefit plans of multiple employers for the

health claims filed against each of them.  Any arrangement that includes such attributes or

otherwise involves risk sharing across multiple employee benefit plans is a MEWA.

196.    Under Locke Lord's assumed facts, the BPT structure involved just such an arrangement. Locke Lord was negligent in not recognizing and opining that the BPT structure resulted in the Employer Plans becoming a MEWA.

197.    Locke Lord assumed the BPT structure would operate (and it did, in fact, operate), in pertinent part, as follows:

> (a)    A single BPT would be established.  (¶ 9, lines 188-89 (Employer Plans co-settlors and co-beneficiaries of "a single Bermuda Purchasing Trust")).

> (b)    All Employer Plans would send plan assets in the form of cash to a single bank account of the BPT.  (¶ 6, lines 135-36, 145-47; ¶ 12, lines 267-69 (Employer Plans' accounts containing "contributions," *i.e.*, plan assets, used to fund "*a* bank account of the BPT") (emphasis added)).

> (c)    The BPT would purchase a single Stop-Loss Policy to cover all of its Employer Plan beneficiaries "collectively."  (¶ 9, lines 197-202; ¶ 10, lines 236-42 ("The Stop-Loss Policy that would be procured … would be *an* insurance policy" covering all the Employer Plans) (emphasis added)).

> (d)    Each Employer Plan would pay a "pro rata portion of the total insurance premiums due" from the BPT to the Bermuda insurers.  (¶ 12, lines 267-72).

198.    Under Locke Lord's assumed facts, therefore, plan assets would be commingled and pooled in a single Bermuda bank account of a single BPT, which would purchase a single Stop-Loss Policy covering all the Employer Plans, for which the Employer Plans would pay premiums on a *pro rata* basis.

199.    In reliance on and in accordance with the Comfort Letters, the Employer Plans transacted with the BPT as follows:

> (a)    Plan assets in the form of contributions were sent to the BPT's bank account in Bermuda to fund the premiums for a single Stop-Loss Policy.

> (b)    The BPT procured a single Stop-Loss Policy from a Bermuda insurer for the benefit of the Employer Plans.

> (c)    The Employer Plans were assessed the stop-loss premiums on a *pro rata*

basis according to the number of employees and dependents in each Employer Plan.

200.    This pooling and commingling of plan assets for the purpose of buying a single Stop-Loss Policy was a form of risk sharing by the Employer Plans.

201.    An internal inconsistency in the AEU Letter highlights this point.  One of Locke Lord's assumed facts is that "no assets of any Employer Plan … will be co-mingled [with] the assets of any other Employer Plan," (¶ 3, lines 80-82), presumably because such commingling often leads to risk sharing and the creation of a MEWA.  Yet the BPT structure in Locke Lord's assumed facts clearly involves such commingling.

202.    Casey had also been provided a draft Plan Administrator Agreement to be executed by S.D. Trust Advisors and each Employer Trust. Casey commented on the draft at Stoughton's request just a few weeks after issuing the AEU Letter.  Article 1(A)(1) of the draft characterizes the BPT as having been formed "for the purpose of the [BPT] purchasing insurance collectively for the risks of the [Employer] Trust under the [Employer] Plan and the risks of similar trusts … under their respective [Employer Plans]."

203.    In addition, under Locke Lord's assumed facts, and in practice, there was no separate underwriting of individual Employer Plans with respect to the Stop-Loss Policy.  Each Employer Plan paid the same amount of premium per employee-participant and dependent, regardless of age or health status.

204.    As a result, for example, a hypothetical Employer Plan sponsored by a law firm comprised solely of senior attorneys and staff over age 60 would pay the same amount *per capita* for stop-loss insurance as a technology firm comprised entirely of twenty-something millennials.

205.    This is risk sharing on fundamental level.  As a result of the BPT structure Locke Lord approved, each Employer Plan became part of a MEWA (referred to herein as the AEU

40

Plan and in Locke Lord's Comfort Letters as the "Transaction," although Casey repeatedly, and negligently, refused to recognize it as the MEWA it was).

206.    By definition, this type of risk sharing automatically resulted in some Employer Plans paying more for stop-loss coverage than they would have paid had individual stop-loss policies been obtained.  It also resulted in risk-sharing related to payment of the Excise Tax to the extent Stoughton and the Employer Plans followed Casey's advice to have the BPT pay the tax collectively, presumably on the same *pro rata* basis as the stop-loss premiums were paid.

207.    Locke Lord was negligent in concluding in its Comfort Letters that, under its assumed facts, the Employer Plans would not be a MEWA.

208.    Because the Employer Plans were a MEWA, they were required but failed to comply with state insurance laws and regulations in each of the states where the Employer Plans were located.

209.    Instead of pooling their funds and collectively purchasing a single Stop-Loss Policy, Locke Lord should have advised the Employer Plans to purchase individual stop-loss policies in the United States, as AEU had inquired about during the drafting process of the AEU Letter.  Locke Lord's failure to so advise was a breach of duty.

210.    Alternatively, Locke Lord's Comfort Letters should have concluded that the BPT structure that it knew had been implemented was in fact a MEWA.

211.    Locke Lord should also have advised the Employer Plans and other recipients of its Comfort Letters that the Employer Plans were operating as a MEWA and needed to comply with state insurance laws or terminate operations.

**B.      The Employers Plans and BPT were Transacting Insurance in the U.S.**

212.    Locke Lord concludes in the AEU Letter that, under the facts assumed therein, the

41

BPT should be able to obtain stop-loss coverage in Bermuda, "without any Employer, its

Employer's Trust, or the BPT being an insurance company transacting business in any state or

the District of Columbia as an unauthorized insurance company…." (¶ 16, lines 372-74).

213.    Locke Lord reached this conclusion based primarily on the following assumed

facts set forth in the AEU Letter:

> (a)    "the Stop-Loss Policy would be delivered by the Bermuda Broker to the
>        BPT in Bermuda;"
>
> (b)    "no part of the solicitation negotiation, procurement, purchase, sale,
>        issuance or delivery of the Stop-Loss Policy would occur in the United
>        States;" and
>
> (c)    the Employer Plans would not agree to be liable for each other's
>        obligations.

(¶ 16, lines 366-81).

214.    In reaching this conclusion, Locke Lord negligently took too narrow a view of

what constitutes "transacting insurance" under state law, and ignored other assumed facts in its

letter that were followed by the BPT and the Employer Plans and that resulted in them illegally

transacting insurance business in each of the states where the Employer Plans were located.

215.    Having undertaken to opine on the insurance codes in all of the states where the

Employer Plans were located, (*see* ¶ 14, n. 1; ¶ 16, lines 372-74), Locke Lord had an obligation

to know and understand what each of those state codes provides, including in Illinois, where the

largest number of Employer Plans was located, and to have a reasonable level of competence in

construing and applying them.

216.    The concept of "transacting insurance" is broad under state law.  Generally, if an

insurer in any manner transacts any aspect of the business of insurance in any state, it must be

licensed by that state and submit to the full panoply of state regulation. *See, e.g.,* 215 ILCS

5/121-2. One of the Illinois Legislature's stated purposes in codifying such a broad definition of "transacting insurance" is to "protect[] against the evasion of the insurance regulatory laws of this State." 215 ILCS 5/212-1.

217.    In Illinois, any of the following acts (and others not listed here) "by or on behalf of an unauthorized insurer, constitutes the transaction of an insurance business in this State." 215 ILCS 5/121-3.

    (a)    "The making of or proposing to make, as an insurer, an insurance contract." *Id.* § 121-3(a).

    (b)    "The taking or receiving of any application for insurance." *Id.* § 121-3(c).

    (c)    "The receiving or collection of any premium…." *Id*. § 121-3(d).

    (d)    "The issuance or delivery of contracts of insurance to residents of this State…." *Id*. § 121-3(e).

    (e)    "Directly or indirectly acting as an agent for or otherwise representing or aiding on behalf of another any person or insurer

        [i]    in the solicitation, negotiation, procurement, or effectuation of insurance or renewals thereof or

        [ii]    in the dissemination of information as to coverage or rates, or … delivery of policies or contracts, or …

        [iii]    in the transaction of matters subsequent to effectuation of the contract and arising out of that contract, or

        [iv]    in any other manner representing or assisting a person or insurer in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this State." *Id*. § 121-3(f).

    (e)    "The transacting or proposing to transact any insurance business in substance equivalent to any of the foregoing in a manner designed to evade this Act." *Id*. § 121-3(h).

218.    Other states where Employer Plans were located have similar laws.

219.    The unlicensed Employer Plans were providing health insurance coverage to

employee-participants, and were transacting many aspects of the insurance business as defined in the above-quoted statute and similar statutes in other states.

220.    Because each Employer Plan offered coverage through an ERISA health benefit plan, such state laws would be federally pre-empted, but only if the plan was not a MEWA.  *See* ERISA § 514(a), 29 U.S.C. § 1144(a) (ERISA generally pre-empts state insurance laws), *and* ERISA § 514(b)(6), 29 U.S.C. § 1144(b)(6) (exception to pre-emption for MEWAs – state law applies).  Under the assumed facts discussed in Part VII A above, the Employer Plans would be a MEWA, and the Employer Plans did, in fact, operate according to those assumed facts.  Therefore, state insurance laws applied to them and because they were not licensed, they were operating as unauthorized insurers.  Locke Lord was negligent in concluding otherwise.

221.    Whether or not the Employer Plans were a MEWA, Locke Lord was also negligent in concluding under the assumed facts that the BPT would not be an insurer transacting insurance in any state.

222.    In his response to UUHP's concern that the BPT was transacting insurance without a license, Casey stated that "[t]he BPT does not indemnify any person and this [*sic*] is not an insurer."

223.    This takes too narrow a view of the undefined term "insurer" as used in the unauthorized insurer statute, at least in Illinois, the state with the largest number of Employer Plans.

224.    Casey's tax partner concluded the BPT was a "nominee" for the Employer Plans.  Casey knew or should have known Flanagan's conclusion was a dagger to the very heart of the "Transaction" and its entire purpose – avoidance of state insurance laws and regulation.  If

subject to the Excise Tax, the funds transferred from the Employer Plans to the BPT could only have been for the purchase of insurance in the United States.

225.    Liability for the Excise Tax was an objective indication that insurance was being transacted in the United States.  Upon obtaining Flanagan's opinion that the BPT was a nominee and the tax was owed, Casey should have immediately concluded the "Transaction" involved an unauthorized insurer selling insurance in the United States, and taken appropriate steps to advise his clients of the consequences.  Instead, he simply told Stoughton the tax was owed but the BPT could pay it.

226.    The BPT operated in a similar manner with respect to the Bermuda insurer.  The BPT was a "front" for the Bermuda insurer -- collecting premiums, distributing stop-loss proceeds, and generally administering the Stop-Loss Policy.  The only thing the BPT offloaded was the indemnity aspect of the arrangement, in the nature of a 100 percent reinsurance contract.

227.    As already demonstrated, the BPT collected premiums, compensated itself, pooled risk, and distributed claims payments.  This looks suspiciously like an insurer, or at least an entity impersonating an insurer while attempting to evade state unauthorized insurer statutes.

228.    Casey reflected his understanding that the BPT was an insurer in his time records, where in relating a discussion with Hansen, Stoughton, and an aggregator about whether the "transaction structure" was a MEWA, he referred to "the stop loss insurance policy issued by the Bermuda Purchasing Trust."

229.    Under the assumed facts in the AEU Letter, the BPT would, and in fact did, engage in at least the following acts from the statutory categories set out above:

> (a)    The BPT collected premiums on behalf of the unauthorized Bermuda stop-loss insurer.  215 ILCS 5/121-3(d); (¶ 6, lines 135-40, 145-47; ¶ 12, lines 267-72).

(b)   (i)   Aggregators, including PEOs and insurance agencies, directly or Indirectly acted as agents for or otherwise aided the BPT in soliciting the Employer Plans, or the TPAs on behalf of the Employers Plans, to procure and effectuate stop-loss coverage through the BPT. 215 ILCS 5/121-3(f); (¶ 6, lines 119-47; ¶ 12, lines 267-72).

(ii)   Aggregators, including PEOs and insurance agencies, directly or indirectly acted as agents for or otherwise aided the BPT in disseminating information as to coverage and rates. 215 ILCS 5/121-3(f) (¶ 12, lines 267-72).

(iii)   The TPAs directly or indirectly acted as agents for or aided the BPT in the transaction of matters subsequent to the effectuation and arising out of the Bermuda Stop-Loss Policies by receiving proceeds from those policies from the BPT for the Employer Plans. 215 ILCS 5/121-3(f); (¶ 6, lines 149-66; ¶ 9, lines 204-08).

230.   As such, the BPT was unlawfully transacting insurance business without a license in the states where the Employer Plans were located.

231.   That the BPT was transacting insurance in the United States is evidenced by another inconsistency in the AEU Letter: In the paragraph immediately preceding Locke Lord's conclusion that the BPT would not be transacting insurance in any state, it concluded that the BPT structure would not violate ERISA, in part because "the original written contract embodying the Stop-Loss Policy at all times must be maintained within the [U.S.] in accordance with 29 C.F.R. § 2550.404b-1." (¶ 15, lines 360-62).

232.   For the original Stop-Loss Policy to be "maintained" in the U.S. in compliance with ERISA, however, the BPT would obviously have to deliver it there. Thus, Locke Lord was wrong to conclude that, under the assumed facts, "no part of the … *delivery* of the Stop-loss Policy would occur in the United States…." (¶ 16, lines 368-69, emphasis added).

233.   Delivery of an insurance policy is transacting insurance business. *See, e.g.,* 215 ILCS 5/121-3(e). Under the assumed facts the BPT would have to deliver the Stop-Loss Policy

to the United States.  In doing so, the BPT would be transacting insurance business in the United States, and Locke Lord was negligent in concluding otherwise.

234.    It is also clear that the Bermuda insurer was acting as an unauthorized insurer in the United States, utilizing the BPT as its agent, *inter alia*, to disseminate rate information, collect premiums, and handle the distribution of stop-loss proceeds.  *See, e.g.,* 215 ILCS 5/121-3(f).

235.    The Bermuda insurer's status as an unauthorized insurer would also be established once the BPT, as its agent, delivered the original Stop-Loss Policy to the United States "in accordance with 29 C.F.R. § 2550.404b-1," as required under Locke Lord's assumed facts.  *See, e.g.,* 215 ILCS 5/121-3(e), (f).

236.    Locke Lord's opinion was limited to whether the BPT and the Employer Plans were unauthorized insurers.  (¶ 16, lines 372-74).  It did not opine on whether the Bermuda insurer would be an unauthorized insurer under the assumed facts.  Nevertheless, the status of the Bermuda insurer as an unauthorized insurer is another significant legal flaw in the "Transaction" and renders the conclusions reached in the AEU Letter inaccurate or at best misleading.

237.    Locke Lord's failure to advise that under the assumed facts the Bermuda insurer would be an unauthorized insurer was a violation of its duty to disclose all facts material to the "Transaction" in rendering its opinions in the AEU Letter.

238.    Finally, in Illinois and other states, the unlawful transaction of insurance business is deemed to occur by, without a license, "transacting or proposing to transact any insurance business in substance equivalent to any of the foregoing [activities in § 121-3(a)-(g)] in a manner designed to evade this Act."  *See, e.g., id*. § 121-3(h).  It simply cannot be denied that the entire intent and purpose of the convoluted, seven-page, single-spaced "Transaction" described in

Locke Lord's AEU Letter, and particularly its offshore elements, was to evade the unauthorized insurer statutes and insurance laws generally in each of the states where the Employer Plans were located. In fact, it would be difficult to imagine a plan more explicitly "designed to evade" such laws.

239.    As a result, the BPT and Employer Plans were transacting insurance without authority in each of the states where the Employer Plans were located, and Locke Lord was negligent in concluding otherwise.

240.    The Employer Plans and the AEU Plan could not have met the requirements of state insurance laws and regulations in the 35 states in which they operated. Had Locke Lord not issued its inaccurate Comfort Letters, the Employer Plans and the AEU Plan would have been obligated to cease operations, or the Employer Plans would have been obligated to purchase individual stop-loss policies in the U.S. In either case, substantial losses would have been avoided. Alternatively, had the Plans been properly advised and submitted to state regulation, one of these outcomes, and other regulatory requirements, would have been expeditiously imposed upon them by state regulators, also avoiding the losses.

### C.    The BPT Structure Violated ERISA.

241.    Under the assumed facts in the AEU Letter, Locke Lord concluded that "[t]he purchase by the BPT of the Stop-Loss Policy from the Bermuda Insurer should not cause an Employer or its Employer's Trust to violate ERISA…." (¶ 15, lines 355-56).

242.    Locke Lord opined that this would be the case provided that, *inter alia*, "the indicia of ownership by each Employer's Trust of all its assets, including without limitation, the BPT Beneficiary Trust Certificate ["BPT Certificate"] … at all times must be maintained within the … United States in accordance with 29 C.F.R. § 2550.404b-1." (¶ 15, lines 356-62).

48

243. Under Locke Lord's assumed facts, and in practice, plan assets in the form of participant contributions would be transferred to the BPT. (¶ 6, lines 135-40, 145-47; ¶ 12, lines 267-72). The BPT would also hold plan assets in the form of the Stop-Loss Policy and all proceeds received thereunder. The Employer Plans were to receive no documentation from the BPT except the BPT Certificate. (*See* ¶ 9, lines 192-93).

244. Locke Lord was negligent in concluding that, under these assumed facts, there would be no violation of ERISA.

245. Under such assumed facts and pursuant to ERISA's Plan Asset Regulation, the underlying (cash) assets of the BPT (as well as the Stop-Loss Policy and its proceeds) remained plan assets of the Employer Plans. *See* 29 C.F.R. § 2510.3-101(a)(2).

246. Casey himself recognized that the BPT would be holding plan assets as evidenced by his admission in the footnotes of a draft of the AEU Letter that "[t]he BPT Trustee is probably an ERISA fiduciary."

247. Because the underlying assets at the BPT were plan assets, the indicia of ownership of those assets must at all times have been located in the United States, *see* 29 U.S.C. § 1104(b), unless an exception in 29 C.F.R. § 2550.404b-1 applies. No such exception applies here.

248. The BPT Certificate was not a compliant indicia of ownership of the cash assets held by the BPT.

249. Under Locke Lord's assumed facts, the BPT Certificate was to be nothing more than "a written certificate to each Employer's Trust evidencing its beneficial interest in the BPT." (¶ 9, lines 192-93).

250. Considering that under Locke Lord's assumed facts plan assets of multiple

49

Employer Plans were to be pooled in the BPT, a mere certificate evidencing ownership of an unspecified beneficial interest in the BPT could not satisfy ERISA's indicia-of-ownership requirements for each Employer Plan's individual cash assets the BPT held.

251.    The Employer Plans' cash was held in the bank account of the BPT in Bermuda, and there was no indicia of the Employer Plans' ownership of such assets contemplated by the assumed facts (nor in practice) to be held in the United States.

252.    No reasonably competent attorney would have concluded that, under the assumed facts in Locke Lord's AEU Letter, a violation of ERISA would not result.

### D.    Locke Lord Failed to Properly Advise Its Clients.

#### 1.    Stop-Loss Coverage.

253.    Locke Lord knew or should have known that, under the assumed facts in the AEU Letter, (a) the pooling of funds and sharing of risks in the BPT created a MEWA; (b) the BPT was acting as an unauthorized insurer in the United States; and (c) holding plan assets offshore in the BPT violated ERISA.

254.    While Locke Lord was in the process of drafting the AEU Letter, AEU, as plan fiduciary, sponsor, administrator, and advisor, and on behalf of the Employer Plans, asked Locke Lord for advice on whether each individual Employer Plan should obtain its own stop loss policy from a domestic carrier in the United States, rather than a pooled policy in Bermuda.

255.    Casey concluded that such a plan was viable and Locke Lord conducted a 50-state survey of minimum attachment points for domestic stop-loss policies, at significant expense.

256.    Locke Lord should have advised that the use of individual domestic stop-loss policies would be superior to the BPT because (a) it would not result in pooling funds or sharing risk; (b) coverage could be obtained from licensed insurers in the United States; and (c) all plan assets would remain in the United States so no indicia-of-ownership issues would arise. Such an

50

approach would also have been far simpler and cheaper for the Employer Plans.

257.    Locke Lord breached its duties of care, competence, and diligence in failing to so advise the Employer Plans and the AEU Plan they comprised.

258.    In reliance on Locke Lord's erroneous conclusions in the AEU Letter, the Employer Plans retained the BPT structure and sent millions of dollars of plan assets in the form of participant contributions to Bermuda for stop-loss premiums.

259.    The Independent Fiduciary is unable to collect stop loss proceeds in Bermuda because to do so would require transferring plan assets to the BPT in Bermuda in violation of ERISA.

260.    In addition, state law generally requires domestic stop-loss policies to contain what is known as an "insolvency clause." *See, e.g.,* 215 ILCS 5/173.2. Under the insolvency clause, when the primary insurer becomes insolvent and is unable to meet its retention (as has occurred here), a reinsurer must nevertheless pay adjudicated claims above the attachment point.

261.    One of the Bermuda Stop-Loss Policies here does not contain an insolvency clause. This has prevented the Independent Fiduciary from collecting under the Stop-Loss Policy because paying the large individual claims necessary to trigger the reimbursement obligation would, among other things, create preferences inconsistent with the Court-approved Liquidation Plan.

## 2.    Knowledge of Deviation from Assumed Facts.

262.    On at least three occasions prior to releasing the Comfort Letters, Casey became aware that essential facts assumed in those Letters were not being adhered to in practice.

263.    On May 10, 2016, as its first act representing AEU, Casey had a conference call in which it was disclosed that Veritas, a Locke Lord client and one of the principal PEO aggregators for the AEU Plan, was improperly exercising control over Employer Plan assets.

264.    In June 2016, Stoughton received an inquiry from a Florida Department of Insurance Regulation investigator relating to Veritas's activities in Florida, including whether it was marketing the AEU Plan as "group" coverage.

265.    In July 2016, after he had already begun working on the AEU Letter, AEU told Casey that it was "very concerned that Veritas is acting as a MEWA" based on how it was handling and directing Employer Plan assets.  Casey's response was to ask whether "we really want a letter from AEU floating around stating that it thinks a MEWA exists."

266.    In the face of these known facts, Casey had a duty to confirm that the AEU Plan was not being operated in violation of ERISA and state insurance laws before issuing the AEU Letter and concluding that the plan was legal under a set of assumed facts Casey knew, or had reason to know, deviated from reality.

267.    Casey knew or should have known that, if the AEU Plan was operating as a MEWA, then each new Employer Plan that enrolled in the AEU Plan for its health benefit coverage, and each existing Employer Plan, would be in violation of the law from the moment it collected any participant contributions.

268.    In the exercise of reasonable diligence, Locke Lord should have confirmed that the AEU Plan was being operated in accordance with the assumed facts in the AEU Letter before issuing it.

269.    Had it sought to do so, it would have determined that the AEU Plan was not operating in accordance with the assumed facts, and Locke Lord would have been obligated not to release the AEU Letter and/or issue an adverse opinion, and the Employer Plans would not have joined the AEU Plan, paid contributions, transferred funds to Bermuda, or incurred claims obligations.

52

270.    Locke Lord made no attempt to so confirm and as a result breached its duty of ordinary diligence it owed to the Employer Plans.

### 3.    Knowledge that the BPT Was Transacting Insurance in the U.S.

271.    As already alleged, Casey failed to properly advise his clients after determining based on Flanagan's analysis that the BPT was a nominee for the Employer Plans such that the Excise Tax was owed.

272.    In addition, just one month later, Casey was again put on notice that Locke Lord's assumed facts in the AEU Letter would result in the transaction of unauthorized insurance in the United States.

273.    In March 2017, counsel to UUHP, an experienced insurance regulatory attorney and Casey's peer, raised concerns that put Casey on notice that the BPT was pooling risk and acting as an unauthorized insurer.

274.    Stoughton, an attorney experienced in ERISA matters, in his capacity as plan fiduciary, voiced similar concerns about Locke Lord's "Transaction" structure to Casey.

275.    Stoughton suggested fixing the AEU Plan to eliminate the issues, but Casey persisted in contending the BPT did not pool risk or act as an unauthorized insurer, and no action was taken.

276.    Rather than doubling and tripling down in the face of valid concerns raised by UUHP and Stoughton, Casey should have recognized he was wrong and that the BPT pooled risk and was an unauthorized insurer.

277.    Casey knew that Stoughton, as a fiduciary of the Employer Plans, was relying on the representations in the Comfort Letters as to the legality of the Plans.

278.    Locke Lord had an attorney-client relationship with the Employer Plans either

through the AEUH Engagement Letter or implied-in-fact from, *inter alia*, the course of conduct involving Casey and Stoughton as plan fiduciary.

279.    Casey should have immediately advised Stoughton, the Employer Plans and the AEU Plan they comprised to submit to state insurance regulation, cease relying on the Comfort Letters, cease accepting participant contributions, cease sending money to Bermuda for stop-loss premiums, and terminate the Employer Plans.

280.    Casey breached his duties of competence, care, and diligence in failing to so advise, and as a result the Employer Plans and the AEU Plan continued to rely on the inaccurate Comfort Letters.

### Count I:  Negligence

281.    Independent Fiduciary realleges and incorporates all of the allegations set forth above.

282.    Locke Lord owed duties of competence, reasonable care, good faith, and ordinary diligence, as alleged above, to the AEU Plan and to the Employer Plans.

283.    Locke Lord breached those duties by its improper actions and inactions alleged herein.

284.    Locke Lord's breaches of duty were the proximate cause of the losses the Independent Fiduciary alleges, including the claims obligations of the Employer Plans and the AEU Plan that they are unable to pay, and losses associated with the Stop-Loss Policies in Bermuda, including stop-loss proceeds that the Independent Fiduciary has been unable to collect.

285.    Had Locke Lord properly fulfilled its duties and properly advised the AEU Plan and Employer Plans, they would not have operated or continued to operate in violation of ERISA

and state insurance laws and would not have been caused to incur claims obligations and related expenses for which they have insufficient assets to pay.

286.   Had Locke Lord properly fulfilled its duties and properly advised the Employer Plans, they would have ceased accepting participant contributions, would not have transferred millions of dollars offshore to purchase stop-loss coverage, and would not have incurred the increased costs and expenses associated with an offshore stop-loss structure.

287.   The Employer Plans and the AEU Plan they comprised were insurance entities operating in at least 35 states utilizing a structure with both domestic and offshore components. Locke Lord's Comfort Letters advised that, under the assumed facts, this highly complex insurance company structure was not subject to regulatory oversight or statutory constraints that, for sound policy and prophylactic reasons, would normally apply to such insurance company structures.  It was foreseeable to Locke Lord as attorneys experienced in the field of insurance transactions and regulation that, without such oversight or constraints, losses such as the Independent Fiduciary alleges here, including unpaid claims and the inability to collect stop-loss proceeds from offshore insurers, would result.

288.   Locke Lord also advised under the assumed facts in its AEU Letter that no indicia of ownership of each Employer Plan's assets held in Bermuda other than the BPT Certificate would be necessary.  It was foreseeable to Locke Lord that, without any indicia of ownership of each Employer Plan's individual assets held in the BPT's Bermuda bank account, the Employer Plans would be unable to recover funds from the BPT.

289.   Locke Lord is liable for all damages to the AEU Plan and Employer Plans caused by its negligence.

## Count II: Negligent Misrepresentation

290.    Independent Fiduciary realleges and incorporates the allegations set forth above.

291.    Locke Lord negligently misrepresented that an employer-sponsored health benefit plan operated in accordance with Locke Lord's assumed facts would comply with ERISA and state insurance laws and would not be a MEWA.

292.    Locke Lord, in the course of its business and profession, and Casey, in the course of his employment at Locke Lord, supplied inaccurate information in the 12/15/16 Letter for the guidance of the AEU Plan and Employer Plans, namely, that no Employer Plan agreed to "bear any risks" of any other Employer Plan, and that the "transaction" referred to in the 12/15/16 Letter would not result in the creation of a MEWA.

293.    Locke Lord, in the course of its business and profession, and Casey, in the course of his employment at Locke Lord, supplied inaccurate information in the AEU Letter for the guidance of the AEU Plan and Employer Plans, namely, that the "Transaction" as set forth under the assumed facts in the AEU Letter would not result in risk sharing by the Employer Plans, would not result in the Employer Plans becoming a MEWA, would not result in the BPT or the Employer Plans transacting insurance in the United States, and that the BPT Certificate would be sufficient indicia of ownership of assets held by the BPT.

294.    The Employer Plans were entities Locke Lord knew existed because they were referred to in its Comfort Letters.  Locke Lord further knew the Employer Plans were contemplating a specific commercial transaction about which Locke Lord was aware, *i.e.*, the "Transaction" as described in the AEU Letter and referred to in the 12/15/16 Letter.  Locke Lord intended to influence the Employer Plans and the AEU Plan to engage in the "Transaction" based on the information in those Comfort Letters.

295.     The Employer Plans and the AEU Plan they comprised, as well as their administrators and fiduciaries, were known and intended recipients of the Comfort Letters, and Locke Lord knew they would rely on the contents of those letters.

296.     The AEU Plan and the Employer Plans justifiably relied on the contents of the Comfort Letters, *inter alia*, based on Locke Lord's representations that they are top lawyers in the field of insurance transactions and regulation.  The AEU Plan and the Employer Plans operated in accordance with the assumed facts in the Comfort Letters as alleged herein.

297.     In reliance on the Comfort Letters, the Employer Plans continued to operate, make contributions, incur claims and related expenses, and send millions of dollars offshore to purchase stop-loss insurance coverage.

298.     When doubts were raised about the legality of the "Transaction" discussed in Locke Lord's AEU Letter, rather than withdraw the letter or properly advise the Employer Plans to terminate the Plans, Locke Lord, through Casey, urged further reliance by insisting (incorrectly) that the Employer Plans were operating lawfully.  The Employer Plans and the AEU Plan continued to rely on Locke Lord's advice, to their detriment, until this Court terminated the AEU Plan and the Employer Plans.

299.     Had Locke Lord properly advised the AEU Plan and the Employer Plans, AEU would not have continued sponsoring the AEU Plan, and the Employer Plans would not have joined or continued enrollment in the AEU Plan, would have ceased accepting employee-participant and employer contributions, would not have transferred millions of dollars offshore to purchase stop-loss coverage, would not have incurred the increased costs and expenses associated with offshore stop-loss coverage, and the employee-participants would not have incurred claims.

300.     Had Locke Lord properly fulfilled its duties and properly advised the AEU Plan and Employer Plans, they would not have continued to operate in violation of ERISA and state insurance laws and would have terminated the Plans, and would not have been caused to incur claims obligations and related expenses for which they have insufficient assets to pay.

301.     The AEU Plan's and the Employer Plans' justifiable reliance on the erroneous conclusions reached in the Comfort Letters was the proximate cause of the losses the Independent Fiduciary alleges, including the claims obligations of the Employer Plans and the AEU Plan that they are unable to pay, and losses associated with the Stop-Loss Policies in Bermuda, including stop-loss proceeds that the Independent Fiduciary has been unable to collect.

302.     The Employer Plans and the AEU Plan they comprised were insurance entities operating in at least 35 states utilizing a structure with both domestic and offshore components. Locke Lord's Comfort Letters negligently misrepresented that, under the assumed facts, this highly complex insurance company structure was not subject to regulatory oversight or statutory constraints that, for sound policy and prophylactic reasons, would normally apply to such insurance company structures.  It was foreseeable to Locke Lord as attorneys experienced in the field of insurance transactions and regulation that, without such oversight or constraints, losses such as the Independent Fiduciary alleges here, including unpaid claims and the inability to collect stop-loss proceeds from offshore insurers, would result.

303.     Locke Lord also advised under the assumed facts in its AEU Letter that no indicia of ownership of each Employer Plan's assets held in Bermuda other than the BPT Certificate would be necessary.  It was foreseeable to Locke Lord that, without any indicia of ownership of each Employer Plan's individual assets held in the BPT's Bermuda bank account, the Employer Plans would be unable to recover funds from the BPT.

304. Locke Lord is liable for all damages to the AEU Plan and Employer Plans caused by its negligent misrepresentations.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Independent Fiduciary respectfully prays:

1. That the Court award the Independent Fiduciary a judgment against Defendant in an amount to be proven at trial, plus pre- and post-judgment interest;

2. That the Court award the Independent Fiduciary its costs and expenses;

3. That the Court award the Independent Fiduciary such other, further, and general relief to which it may be entitled and to which this Court shall deem to be just and equitable; and

4. That a jury be empaneled to hear all issues triable to a jury in this case.

Respectfully Submitted,

**Receivership Management, Inc. in its Capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans**

By:     s/ Alan F. Curley
One of Its Attorneys

Alan F. Curley (6190685)
Samuel G. Royko (6325838)
Robinson Curley P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
acurley@robinsoncurley.com
sroyko@robinsoncurley.com

J. Graham Matherne
Andrew J. Pulliam
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1400
Nashville, Tennessee 37201
(615) 244-0020
gmatherne@wyattfirm.com
apulliam@wyattfirm.com

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney certifies that on August 16, 2019, he caused the foregoing

**FIRST AMENDED COMPLAINT** to be filed with the Clerk of the Court for the Northern

District of Illinois, using the Court's CM/ECF system, which shall send notification of such

filing to all counsel of record.


    /s/ Alan F. Curley
    Alan F. Curley

61