**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RECEIVERSHIP MANAGEMENT, INC. IN ITS CAPACITY AS INDEPENDENT FIDUCIARY OF THE AEU HOLDINGS, LLC EMPLOYEE BENEFIT PLAN AND PARTICIPATING PLANS, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 18-cv-08158 Hon. Joan H. Lefkow |
| LOCKE LORD, LLP, | ) ) | |
| Defendant. | ) ) | |

**LOCKE LORD, LLP'S MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION TO DISMISS IF'S FIRST AMENDED COMPLAINT</u>**

Edward W. Feldman (6187541) (efeldman@millershakman.com)
Diane F. Klotnia (6202609) (dklotnia@millershakman.com)
Kay L. Dawson (6312631) (kdawson@millershman.com)
Miller Shakman Levine & Feldman LLP
180 N. LaSalle Street, Suite 3600
Chicago, Illinois 60601
Tel. (312) 263-3700

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   *Caveat Lector.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.   AISM Engaged Locke Lord. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.   AEUH Acquired the Assets of AISM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    E.   AEUH Engaged Locke Lord. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    F.   The AEUH Letter of December 20, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.   Scope of the Engagement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.   Summary of the "Transaction" Based on Locke Lord's Assumptions. . . . . . . . . . . 11

        3.   The Legal Conclusions Rendered in the Locke Lord Letter at Pages 6-7. . . . . . . 12

        4.   Locke Lord's Disclaimers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    G.   Actual Operations v. Locke Lord's Assumptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

RULE 12(b)(6) STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CHOICE OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    I.   THE CLAIMS ARE TIME-BARRED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.   Inquiry Notice Starts the Limitations Period. . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.   The AEU Plans Were on Inquiry Notice Before December 12, 2016. . . . . . . . . . 16

        C.   The Plans Incurred Damages Before December 12, 2016. . . . . . . . . . . . . . . . . . 18

        D.   The December 2016 Letters Do Not Render IF's Claims Timely. . . . . . . . . . . . . . 19

i

II.  COUNT I FAILS TO STATE A CLAIM FOR
PROFESSIONAL NEGLIGENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A.  Locke Lord Owed No Duty to the "AEU Plan" or Any Employer Plan. . . . . . . . . . . . 21

1.  No attorney-client relationship existed between Locke Lord and any Plan. . . . . . 21

2.  Locke Lord owed no third-party beneficiary duty to any Plan. . . . . . . . . . . . . . . 24

3.  The "AEU Plan" was not to have existed under the Letters' assumptions.  . . . . . . 27

B.  IF Fails to Plausibly Allege Causation.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1.  IF does not allege that any Plan relied on the LL Letter.. . . . . . . . . . . . . . . . . . . 28

2.  Neither the Transaction's assumed structure nor Locke Lord's alleged
failure to investigate and advise AEUH  to cease operation proximately
caused the Plans' alleged damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.  Locke Lord Did Not Breach Any Duty of Care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1.  Locke Lord's legal advice was correct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i.   The MEWA advice was correct.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ii.  The non-transaction of insurance advice was correct. . . . . . . . . . . . . . . . . 38

iii. The "indicia of ownership" advice was correct.. . . . . . . . . . . . . . . . . . . . . . 41

2.  Locke Lord had no duty to investigate the assumed facts in the LL Letter. . . . . . 42

III.  COUNT II FAILS TO STATE A CLAIM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

A.  No Duty Was Owed Under *Pelham*'s 'Primary Intent to Benefit' Test. . . . . . . . . . 46

B.  Locke Lord Made No Misrepresentation of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

C.  The Complaint Does Not Allege the Necessary Element of Reliance. . . . . . . . . . . 47

D.  The Plans' Alleged Damages Were Not Caused by Locke Lord. . . . . . . . . . . . . . 48

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

**Cases**

*American Medical Security, Inc. v. Bartlett*, 111 F.3d 358 (4th Cir. 1997). . . . . . . . . . . . . . 35, 38

*Auto-Owners Ins. Co. v. Konow*, 2016 IL App (2d) 150823. . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Bell v. City of Chicago*, 835 F.3d 736 (7th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Blankinship v. Brown*, 399 S.W.3d 303 (Tex. App. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Blue Water Partners, Inc. v. Edwin D. Mason, Foley & Lardner*, 2012 IL App (1st) 102165. . . 16

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012). . . . . . . . . . . . . . . . 5

*Brumley v. Touche, Ross & Co.*, 139 Ill. App. 3d 831 (2d Dist. 1985). . . . . . . . . . . . . . . . . . . . 43

*Brummel v. Grossman*, 2018 IL App (1st) 162540. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Cahill v. E. Ben. Sys., Inc.*, 236 Ill. App. 3d 517 (1st Dist. 1992). . . . . . . . . . . . . . . . . . . . . . . . 48

*Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671 (7th Cir. 2009). . . . . . . . . . 14, 15

*Carlson v. Fish*, 2015 IL App (1st) 140526. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*City Nat. Bank v. Checkers, Simon & Rosner*, 32 F.3d 277 (7th Cir. 1994). . . . . . . . . . . . . . . . . 17

*Ennenga v. Starns*, 677 F.3d 766 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Evanston Ins. Co. v. Riseborough*, 2014 IL 114271. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*First Interstate Bank of Nevada, N.A., v. Chapman & Cutler*,
   837 F.2d 775 (7th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Fortson v. Winstead, et al.,* 961 F.2d 469 (4th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Geaslen v. Berkson, Gorov & Levin, Ltd.*, 220 Ill. App. 3d 600 (1st Dist. 1991). . . . . . . . . . 26, 43

iii

*Glickman v. Vill. of Morton Grove*, No. 18-cv-4931,
2019 WL 1754091 (N.D. Ill. April 19, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gold v. Vasileff*, 160 Ill. App. 3d 125 (5th Dist. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Goran v. Glieberman*, 276 Ill. App. 3d 590 (1st Dist. 1995). . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Great Lakes Higher Educ. Corp. v. Austin Bank*, 837 F. Supp. 892 (N.D. Ill. 1993). . . . . . . . . . . 7

*Green v. Fund Asset Mgmt., L.P.*, 19 F. Supp. 2d 227 (D.N.J. 1998). . . . . . . . . . . . . . . . . . . . . 20

*Greycas, Inc. v. Proud*, 826 F.2d 1560 (7th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Gunther v. Commonwealth Edison Co.*, 126 Ill. App. 3d 595 (1st Dist. 1984). . . . . . . . . . . . . . . 39

*Hater v. Gradison Div. of McDonald & Co Sec.*,
    655 N. E. 2d 189 (Ohio Ct. App. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hobley v. Burge*, 2004 WL 2658075 (N.D. Ill. Oct. 13, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Home Life & Acc. Co. v. Compton*, 222 S. W. 1063 (Ark. 1920). . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Greater Southeast Community Hosp. Corp. I*, 353 B.R. 324 (Bky D.C. 2006). . . . . . . . . . 42

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
    815 F. Supp. 620 (S.D.N.Y. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
    850 F. Supp. 1105 (S.D.N.Y. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Iron Workers Local 25 Pension Fund v. Watson Wyatt & Co.*,
    No. 04-CV-40243, 2009 WL 3698562 (E.D. Mich. Nov. 4, 2009). . . . . . . . . . . . . . . . . 22, 25

*Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989. . . . . . . . . . . . . . . . . . . 16

*Kirkland & Ellis v. CMI Corp.*, 1996 WL 559951 (N.D. Ill. 1996). . . . . . . . . . . . . . . . . . . . . . . 48

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487  (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kuska v. Folkes*, 73 Ill. App. 3d 540 (2d Dist. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33 (1994). . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 48

iv

*Mason Tenders Dist. Council Pension Fund v. Messera*,
    4 F. Supp. 2d 293 (S.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Massey v. Merrill Lynch & Co.*, 464 F.3d 642 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 5, 22

*Maxwell v. KPMG, LLP*, No. 03-cv-3524, 2007 WL 2091184 (N.D. Ill. July 19, 2007). . . . . . . 32

*McCamish, et al v. F.E. Appling Interests*, 991 S.W.2d 787 (Tex. 1999). . . . . . . . . . . . . . . . . . 42

*National Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123 (Tex. 1996). . . . . . . . . . . . . . . . . . . . . 23

*N. Ill. Emergency Physicians v Landau, Omahana & Kopka, Ltd.*,
    216 Ill. 2d. 294 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Northern Kare Facilities v. Benefirst, LLC*, 344 F. Supp. 2d 283 (D. Mass. 2004). . . . . . . . . . 35

*Oakland Police & Fire Retirement Sys. v. Mayer Brown, LLP*,
    861 F.3d 644 (7th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 46

*Owens v. Lac D'Amiante Du Quebec, Ltee.*, 656 F. Supp. 981 (E.D. Pa.). . . . . . . . . . . . . . . . . . 18

*Palmros v. Barcelona*, 284 Ill. App. 3d 642 (2d Dist. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pelham v. Griesheimer*, 92 Ill. 2d 13 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 46

*People v. Simms*, 192 Ill. 2d 348 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Quinn v. McGraw-Hill Cos. Inc.*,168 F. 3d. 331 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . 48

*Reddick v. Suits*, 2011 IL App (2d) 100480. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568 (7th Cir. 2017). . . . . . . . . . . . . . . . . 25, 30

*Saad v. Vill. of Orland Park*,
    No. 11 C 7419, 2012 WL 2721942, (N.D. Ill. July 9, 2012). . . . . . . . . . . . . . . . . . . . . . 5, 23

*SC&E Admin. Svcs., Inc. v. Deloitte*,
    No. A-05-CA-929-SS, 2006 WL 6747974 (W.D. Tex. July 25, 2006). . . . . . . . . . . . . . . 48

*Schechter v. Blank*, 254 Ill. App. 3d 560 (1st Dist. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Serafin v. Seith*, 284 Ill. App. 3d 577 (1st Dist. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Shrock v. Ungaretti & Harris Ltd.*, 2019 IL App (1st) 181698. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 15

*State Farm Mut. Auto. Ins. Co. v. Burke*, 2016 IL App (2d) 150462.. . . . . . . . . . . . . . . . . . . . . 15

*Stramaglia v. Conservative Life Ins. Co. of Wheeling, W. Va.*,
    319 Ill. App. 20 (1st District 1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Tanner v. Jupiter Realty Corp.*, 433 F.3d 913 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). . . . . . . . . . . . . . . . . . . . . . . 14

*Torres v. Divis*, 144 Ill. App. 3d 958 (2d Dist. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*West Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670 (7th Cir. 2016). . . . . . . . . . . . . . . . . . . 14

*White v. Martin*, 286 F. Supp. 2d 1029 (D. Minn. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Whitehead v. Rainey, Ross, Rice & Binns*, 997 P.2d 177 (Okla. Civ. App. 1999).. . . . . . 22, 25, 26

*Witt v. Jones & Jones Law Offices, P.C.*, 269 Ill. App. 3d 540 (4th Dist. 1995). . . . . . . . . . . . . 20

*Yeftich v. Navistar, Inc.*, 722 F.3d 911 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## **Treatises**

Franklin L. Best, Jr., 1 *Life & Health Insurance Law* §5:5 (2d ed.). . . . . . . . . . . . . . . . . . . . . . 40

Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* §7.2 at 837-38 (2019 ed.). . . . . . . . . 24

## **Other Authorities**

Dept. of Labor Adv. Op. No 75-80 (E.R.I.S.A), available at 1975 WL 4526. . . . . . . . . . . . . . . . 41

Restatement (Second) of Torts §552 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Restatement (Second) of Agency § 15 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

29. U.S.C. § 1104(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## INTRODUCTION

This is one of several related lawsuits about allegedly underfunded and mismanaged employer health benefit plans. In this case, the "Independent Fiduciary" ("**IF**") in No. 17-cv-07931 ("***DOL Action***"), seeks to hold Locke Lord, LLP ("**Locke Lord**") liable for rendering written advice to its clients – non-parties AEU Holdings, LLC ("**AEUH**"), a defendant in the related cases, and its predecessor, ALL Insurance Solutions Management, LLC ("**AISM**") – based on assumed facts that the clients allegedly caused (or allowed) not to occur.[1] IF sues on behalf of nonclients of Locke Lord: the so-called AEU Holdings, LLC Employee Benefit Plan ("**AEU Plan**"),[2] and "Participating Plans" (referred to in the LL Letters and First Amended Complaint (Dkt. 44, "**FAC**") as "**Employer Plans**").

This Court is well familiar with the collapse of the AEUH health benefits program. As the Department of Labor ("**DOL**") alleged in the *DOL Action* and as IF alleged here and in No. 18-cv-8167 ("***IF v. AEUH***"), the program failed because, among other things, (i) the "Aggregators" that sold the program to employers pocketed exorbitant fees, and (ii) the administrators underwrote it improperly, under-funded it, misapplied funds from each employer's plan to pay claims against other employers' plans, and otherwise grossly mismanaged the program. IF tries to pin additional blame on Locke Lord, which had issued a series of substantially similar letters (the "**LL Letters**"

---

[1]  Unless otherwise stated, capitalized terms mirror those in FAC (cited as "¶__"), and italics in quotations are added.

[2]  IF defines the "AEU Plan" as a "multiple employer welfare arrangement" under ERISA ("**MEWA**"), and equates the "AEU Plan" with the "Transaction" described in the "LL Letters" described below. *See* §§B, G below. This is wrong for at least two reasons. First, IF assumes the ultimate legal conclusion: whether the Transaction as contemplated in the LL Letters was a MEWA. Second, IF conflates assumption with implementation: it conflates the Transaction structure assumed in the LL Letters with how AEUH implemented and operated the program. When we use the term "AEU Plan" herein, we do so without conceding that the AEU Plan and the Transaction were equivalent or that the structure of the Transaction assumed in the LL Letters would have constituted a MEWA if correctly implemented.

or "**Letters**") in 2014 (to AISM) and late 2016 (to AEUH), about the assumed structure of the program.

The following is alleged by IF and undisputed:

- Each LL Letter stated that its conclusions were premised on the accuracy of the material assumptions contained within it, and, *e.g.*, "cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect." FAC Ex. E ("**AEUH Letter**") at 8; Ex. A ("**AISM Letter**") at 7-8; and Ex. D ("**12/15/16 Letter**" to AEUH, incorporating qualifications of AISM Letter) at 1.

- The LL Letters stated that only Locke Lord's clients, AEUH or its predecessor AISM, could rely on the Letters. AISM Letter at 7; AEUH Letter at 8;

- IF does not sue on behalf of Locke Lord's former clients, AEUH or AISM. IF was appointed "Independent Fiduciary" for the "AEU Plan" and Participating Plans (Employer Plans), but not for AISM, AEUH or their affiliates.

- IF identifies no Employer Plan that claims it actually relied upon any LL Letter.

Despite these undisputed facts, IF asserts two claims: negligence and negligent misrepresentation. IF alleges that Locke Lord breached its supposed duties to non-clients "the AEU Plan and its Employer Plans." ¶¶28-36. IF alleges that Locke Lord (i) negligently advised that the "**Transaction**" (as defined in the LL Letters) would not result in the Employer Plans becoming a MEWA under ERISA or cause any Employer, Employer Trust, or the BPT (discussed below) to be an insurance company transacting business in any state as an unauthorized insurance company; and (ii) failed to investigate whether the factual assumptions set forth in the LL Letters were accurate or to withdraw its opinions. ¶¶33-36, 283, 291-93. IF contends that the Letters were a kind of original sin from which the later losses flowed. ¶299.

Both Counts should be dismissed because (i) each is time-barred; (ii) the Plans were not clients or intended third-party beneficiaries, so Locke Lord owed no duty to them, and (iii) Locke Lord's advice to its clients in the Letters was correct as a matter of law based on the assumptions concerning the Transaction expressly stated in the Letters. In addition, IF has pleaded itself out of

2

court on the dispositive elements of reliance and causation because, as its allegations make clear, the Transaction was not implemented as Locke Lord had assumed: the program collapsed due to systematic and massive mismanagement contrary to the assumptions in the LL Letters, not the advice expressed therein or any reliance by any Employer Plan.

## FACTUAL SUMMARY

### A. <u>Overview</u>

In brief, the LL Letters describe an assumed structure for a "Transaction" that would enable "Employers" that self-fund employee benefit plans (*i.e.*, "Employer Plans") to obtain, at a lower cost, reimbursement from a stop-loss insurance policy in the event claims exceed an "attachment point" ("**Stop-Loss Policy**"). An off-shore "Bermuda Purchasing Trust" ("**BPT**"), of which individual Employer Trusts would become beneficiaries, would purchase the Stop-Loss Policy from a "Bermuda Insurer." The Stop-Loss Policy would indirectly backstop each Employer's liability to its own self-funded Employer Plan. ¶¶52-54. The BPT would be the sole named insured and owner of the Stop-Loss Policy. The BPT would (i) receive insurance proceeds from the Bermuda Insurer for claims that the BPT would make under the Stop-Loss Policy for the benefit of each Employer Trust beneficiary, and (ii) distribute the proceeds to its Employer Trust beneficiaries (via the Trust's Third-Party Administrator ("**TPA**")) to enable them to pay claims pursuant to their respective Employer Plans. *E.g.*, AEUH Letter at 4-6.

Based on facts assumed in the Letters, Locke Lord concluded, *inter alia*, that (i) the proposed Transaction should not cause individual Employers or their respective Employer Trusts to violate ERISA or create a MEWA, and (ii) the BPT should be able to purchase the Stop-Loss Policy without causing any Employer, its respective Employer Trust, or the BPT to be deemed to be acting as an unauthorized insurance company within the United States. ¶¶33-36. IF alleges that the Locke Lord Letters were facially wrong based on their assumptions. IF also alleges that

3

AEUH operated the Plans both consistently and inconsistently with those assumptions. ¶¶33-34, 70, 104, 197 262-69, 296. The DOL sued AEUH and others; the Court appointed IF; and this lawsuit and related actions ensued.

**B.** ***Caveat Lector***

Before summarizing the "Transaction" and the allegations in further detail, a caveat is required regarding the FAC: it takes liberties with the documents it attaches and quotes.

The facts and law underlying the "proposed Transaction" discussed in the LL Letters and the FAC are complex. *E.g.*, AEUH Letter at 1-6. Unfortunately, in the guise of "simplicity," ¶¶51, 146(b), IF has complicated these already difficult matters by misstating the LL Letters and quoting unattached documents out-of-context.

For example, IF expressly conflates the "Employer Plans" with the "Employer Trusts," often substituting "Employer Plan" for "Employer Trust" when it quotes from or describes a Letter or other documents. *E.g.*, ¶146(c)-(i) (substituting "Plan" for "Trust" nine times). But "Employers," "Employer Trusts" and "Employer Plans" are distinct defined terms and played distinct roles in the assumed structure of the Transaction, as the LL Letters make clear. As described below, each Employer was to establish an Employer Plan *and* an Employer Trust. The Employer Trust was to serve as the "self-insured funding mechanism" for the Employer Plan – that is, a mechanism to fund the *Employer's* obligations under its self-funded Employer Plan. AEUH Letter at 2. The *Trust*, not the Employer Plan, was to become a beneficiary of the BPT that was to procure the Stop-Loss Policy. *Id.* at 3. Any insurance proceeds received by the BPT from the Stop-Loss Insurer for claims related to a particular Employer Plan were to be deposited into a bank account for the respective Employer Trust (not its Plan) for the purpose of reimbursing sums that the Employer Trust (*i.e.,* the Employer) owed under its self-funded Employer Plan. *Id.* at 4. The funds flow was assumed to be:



In turn, as a self-funded plan, the Employer's liability to the Plan existed for all covered claims, regardless of whether the claims were below the "attachment point" that could trigger reimbursement to the Employer from the proceeds of the Stop-Loss Policy:



*Id.* at 5. Yet the FAC reads as if each Employer Plan was to send and receive funds, including Stop-Loss premiums and payments. Not so. Where the language in the LL Letters (or other documents referenced in the FAC) conflicts with the allegations of the FAC, the law is clear that the content of the source documents controls, and we will refer to the source documents.[3]

    An additional and important example of IF's misleading conflation and misdescription of documents was noted in n.2 above. IF alleges in ¶1 the conclusion that the "AEU Plan" was a "MEWA" and that "[t]he AEU Plan is referred to as the 'Transaction' in several opinion letters authored by [Locke Lord] discussed herein." But the LL Letters say no such thing. They nowhere refer to the "AEU Plan" at all, let alone as the "Transaction." Rather, the Letters describe an assumed Transaction structure that was in many ways the very opposite of the way the AEU Plan

---

[3] A document's actual content trumps a complaint's inconsistent description of it. *See, e.g., Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645, 650 (7th Cir. 2006) (dismissing claims based on alleged misrepresentations in defendant's fairness opinion where opinion attached to complaint stated that it was issued solely for benefit of corporate board and not investors). Moreover, in deciding a Rule 12(b)(6) motion, a court "may take judicial notice of public records as well as 'documents that are critical to the complaint and referred to in it.'" *Saad v. Vill. of Orland Park*, No. 11 C 7419, 2012 WL 2721942, at *2 n.4 (N.D. Ill. July 9, 2012) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). The "incorporation-by-reference doctrine" "prevents a plaintiff from 'evad[ing] dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that prove[s] his claim has no merit.'" *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)).

actually operated, as IF itself has admitted. ¶¶262-69.

Indeed, IF has pleaded detailed *factual* allegations showing the many differences between Locke Lord's factual assumptions about the structure of the Transaction and how the actual "AEU Plan" operated, differences that *IF alleges* caused the program to collapse. ¶¶262-69. In *IF v. AEUH*, IF alleges: "[t]here are numerous instances documented in emails where [AEUH] admitted knowing that the Participating [Employer] Plans *were not in compliance with the AEU Program's structural requirements*." *IF v. AEUH*, Am. Cpt., ¶47, Ex. 1. The "structural requirements" refers to the structure that Locke Lord assumed and on which it based its advice. For example:

- The LL Letters assumed that each Employer would establish an Employer Trust that would qualify as a voluntary employees' beneficiary association ("VEBA"). IF alleges that did not occur and AEUH knew it.

- The LL Letters assumed that each Employer Trust or its TPA would obtain and hold in the United States certificates from the BPT, evidencing the VEBA Trust's beneficiary interest in the BPT. IF alleges that did not occur and AEUH knew it.

- The LL Letters assumed that each Employer Plan and Employer Trust would be accounted for separately, such that no assets of any Employer Plan or Trust would be used to pay claims against any other Employer Plan or Trust. IF alleges that such commingling occurred commonly, and AEUH knew it.

*Id.* ¶¶42-68. This Court described these alleged failings in its September 4, 2019 opinion denying AEUH Defendants' motion to dismiss IF's amended complaint in *IF v. AEUH*. *See IF v. AEUH*, Dkt. 53 at 5-6 ("**9/4/19 Opinion**") (listing "multiple failings in the implementation of the Program that ultimately led to there being insufficient funds to play all claims").

The FAC is schizophrenic about the discrepancies between the assumptions in the LL Letters and how the AEU Plan actually operated. IF avers the general conclusion that "[t]he AEU Plan and the Employer Plans operated in accordance with the assumed facts in the Comfort Letters as alleged herein." ¶296; *see also* ¶¶33-34, 197. But it also alleges that "the AEU Plan was *not* operating in accordance with the assumed facts," and Brian Casey (who signed the Letters) knew

or should have known that.  ¶269; *see also* ¶¶70, 104, 262-68.  And IF pleads detailed facts in the *IF v. AEUH* Amended Complaint affirming the many substantial discrepancies, as summarized in the previous paragraph.  Notably, IF previously described numerous discrepancies between Locke Lord's assumed facts and the actual operations of the AEU Plan in its initial Complaint in this action, but deleted some from the FAC, presumably in response to Locke Lord's prior motion to dismiss showing that those allegations defeat causation.  *See* Dkt. 1, ¶¶29, 55, 57.[4]

This is not an example of permissible alternative pleading of the kind this Court recognized in the 9/4/19 Opinion at 31.  "It is a violation of Rule 11 to withhold relevant factual evidence within the knowledge of the pleading party in order to gain the advantage of being able to plead more causes of action than are appropriate." *Great Lakes Higher Educ. Corp. v. Austin Bank*, 837 F. Supp. 892, 894-95 (N.D. Ill. 1993) (plaintiff may plead contradictory statements in the alternative only when it is "legitimately in doubt about the fact in question"; it may not do so when the fact is "clearly within their own knowledge").[5]  Moreover, the Court need not assume the truth of conclusory allegations like ¶296, particularly when contradicted by specific allegations of fact. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013) ("we need not accept as true statements of law or unsupported conclusory factual allegations.").  And, as noted above at n.3, the Court may

---

[4]  For example, IF alleged in its initial complaint that, contrary to Locke Lord's assumptions, Employers failed to establish required Employer Trusts or qualify those Trusts as VEBAs, and funds intended to pay claims related to various Employer Plans were used to pay claims of other Plans.  Dkt. 1 at ¶¶29, 55, 57.  Indeed, the Transaction was so mismanaged that IF alleged:  "This was not only a MEWA, but a Ponzi scheme as well." *Id.* ¶50.  IF apparently made a tactical decision to omit these factual allegations from the FAC, while simultaneously detailing those facts in other pleadings against other parties. *See* §II.B.  That deliberate omission should not be allowed to avoid dismissal.

[5]  *See also Hobley v. Burge*, No 03 C 3678, 2004 WL 2658075, at *4 & n.3 (N.D. Ill. Oct. 13, 2004) (dismissing claim on limitations grounds where plaintiff "plead[ed] himself out of court" by alleging both that his confession was coerced and that he never confessed, and was not permitted to "rest the survival of his claim upon a contradicting statement of fact").  Here, IF clearly has knowledge that the AEU Plan was operating in numerous respects contrary to the assumptions of the LL Letters, as it pleads in the FAC, its prior Complaint in this action, and in *IF v. AEUH*.

consider IF's factual allegations in its original complaint and in *IF v. AEUH* in assessing whether a plausible claim has been stated.

A final example of IF's mischaracterization concerns underwriting. It alleges (¶¶199-203):

(a) "in accordance with the [LL] Letters, the Employer Plans transacted with the BPT as follows: . . . the Employer Plans were assessed the stop-loss premiums on a *pro rata* basis in accordance with the number of employees and dependents in each Employer Plan," and

(b) "under Locke Lord's assumed facts, and in practice, there was no separate underwriting of individual Employer Plans with respect to the Stop-Loss Policy."

First, the predicate of the allegations is false. As noted above, no Employer Plan was assumed to transact with the BPT. The co-beneficiaries of the BPT were to be the Employer Trusts, not the Employer Plans. *See* AEUH Letter at 3. Second, the LL Letters nowhere assumed how underwriting was to be performed by the offshore Stop-Loss Insurer, nor was Locke Lord engaged to opine about the adequacy of underwriting, a non-legal matter. To the extent underwriting was mentioned at all, the Letters assumed that each Employer Trust would enter into an agreement with AEUH for certain advisory services that would include "underwriting." *E.g., id.* at 3-4. As for premiums that the BPT paid to the Bermuda Insurer, the LL Letters stated that each Employer Trust would contribute to the BPT funds equal to its *pro rata* portion, but did not state how that share would be determined, let alone "in accordance with the number of employees and dependents." *Id.* at 5. Moreover, the Letters assumed nothing regarding how the Stop-Loss *Insurer* would underwrite the Stop-Loss Policy or how AEUH would cause the separate underwriting to be done for each Employer Plan. Finally, these underwriting problems – non-legal matters on which the LL Letters did not assume or opine – were extreme, as IF alleges in the *IF v. AEUH* amended complaint, summarized in the Court's 9/4/19 Opinion at 5-7.

## C. **AISM Engaged Locke Lord**

With those mischaracterizations addressed, we turn to the alleged facts. In 2013 AISM

8

engaged Locke Lord to advise it regarding the so-called "AISM Plan," a self-funded plan intended to comply with ERISA and avoid state insurance regulation. The advice concerned the Plan's structure and form documents. The AISM Plan was the predecessor to the AEU Plan. ¶¶43-44, 56. On March 3, 2014, Locke Lord issued the AISM Letter (FAC Ex. A) setting forth detailed assumed facts and concluding that, under those assumptions, the "Transaction" described therein would comply with ERISA and would not result in the formation of a MEWA by the Employers subject to state insurance regulation or constitute the transaction of insurance by the BPT, the Employers, or the Employer Trusts in any state. ¶48. It stated that its advice was "rendered on behalf of our client, AISM, . . . and may not be used or relied upon" by any other person or entity. AISM Letter at 7-8. This Letter was substantially the same as the later AEUH and 12/15/16 Letters. ¶¶26, 123. We will describe this reliance point, as well as the assumed structure of the Transaction, below in the context of the similar AEUH Letter.

**D.** **AEUH Acquired the Assets of AISM**

AISM initially managed and administered the AISM Plan. In July 2015, AISM engaged AEUH to do so. ¶59. In late April 2016, AEUH acquired all of AISM's assets, including the AISM Plan, and AEUH's officers allegedly relied on Locke Lord's advice as described in the AISM Letter. ¶¶61-62. Via that acquisition, AEUH became the successor to and sponsor of the AISM Plan, which became the "AEU Plan." ¶¶63-64. (Locke Lord had no alleged involvement in the AISM-AEUH transaction.)

**E.** **AEUH Engaged Locke Lord**

AEUH is a Delaware LLC with its principal place of business in Dallas, Texas, and offices in New York. ¶18; *IF v. AEUH*, Am. Cpt., ¶2, Ex. 1. It signed an engagement letter with Locke Lord on May 18, 2016 (the "**Engagement Letter**"). ¶71 & FAC Ex. B. IF alleges the conclusion that Locke Lord also entered into an attorney-client relationship with the AEU Plan and the

9

Employer Plans indirectly via (a) AEUH's status as a fiduciary to those Plans, (b) as an intended third-party beneficiary, and/or (c) "an oral or implied-in-fact agreement." ¶¶67, 78. IF's attempts to create an attorney-client relationship are discussed further in Argument §II.A below. IF does not allege that the AEU Plan or any Employer Plan ever directly engaged Locke Lord.

> The Engagement Letter (FAC Ex. B at 1) described Locke Lord's scope of representation:

> Our client in this matter will be the Company [defined earlier as AEUH]. *Our representation does not encompass any other individual or entity, including affiliates, officers, directors, employees, shareholders, or other stakeholders of the Company.* We will be engaged to advise the Company in connection with state insurance regulatory, Patient Protection and Affordable Care Act (PPACA), and Employee Retirement Income Security Act (ERISA) compliance matters in connection with employee health benefits plans and products developed by the Company, as may be requested by the Company. The Company may limit or expand the scope of our representation from time to time, provided that any substantial expansion must be agreed to by us.

The "employee health benefits plans and products" referred to the Employer Plans to be described in the anticipated letter. ¶73. When he signed the Engagement Letter, Casey allegedly knew that AEUH was sponsoring the "AEU Plan" as successor to the AISM Plan and that AEUH was a fiduciary to the AEU Plan and the Employer Plans. ¶¶76-77.

### F. The AEUH Letter of December 20, 2016

The AEUH Letter, FAC Ex. E, consists, broadly, of four parts, summarized below: (1) what AEUH asked Locke Lord to do (*i.e.*, scope of the engagement); (2) the stated assumptions and description of how the "Transaction" would be structured and operated as represented by AEUH to Locke Lord; (3) Locke Lord's legal conclusions concerning certain aspects of ERISA law and state insurance codes based on those assumptions; and (4) Locke Lord's broad disclaimers.

#### 1. Scope of the Engagement

The LL Letter states that AEUH had advised Locke Lord that AEUH had acquired certain assets from AISM and that AEUH "contemplates providing certain services" in connection with

10

the "Transaction" described below. AEUH Letter at 1. Consistent with the Engagement Letter, the LL Letter confirmed that AEUH had asked Locke Lord to "review and comment on the Transaction in respect of certain matters" described therein. *Id.*

After stating its assumptions, Locke Lord re-stated that the purpose of the Letter was to confirm that "(1) an Employer Plan can constitute an 'employee welfare benefit plan' under ERISA and should not be a 'multiple employer welfare arrangement' ['MEWA'] under ERISA," and (2) the purchase by the BPT of the Stop-Loss Policy in Bermuda . . . will not cause the Employers to be engaged in transacting business as an unauthorized insurance company under applicable states' insurance codes." *Id.* at 6.

### 2. Summary of the "Transaction" Based on Locke Lord's Assumptions

The "Transaction" described in the AEUH Letter is detailed and dense. The next paragraphs summarize the assumptions set forth in the Letter with a reduction of jargon.

The basic concept of the assumed "Transaction" was that small employers would self-fund health claims of their respective plans' participants through a two-tiered system: all covered claims would be self-funded by the Employer, but the Employer would receive reimbursement from stop-loss insurance funds for larger covered claims. *Id.* at 2-4; ¶146.[6]

Each Employer would establish its own health benefits plan for its employees. AEUH Letter at 1. Each Employer would also form a tax-exempt Employer Trust, through which the Employer would pay the benefits claims of its Employer Plan participants. AEUH Letter at 2-3. Each Employer's Plan and Employer Trust would be independent of other Employers' Plans and Trusts. *Id.* at 2, 5. Each Employer would engage a third-party Aggregator to charge and collect contributions from the Employer and/or its employees and deposit them into a bank account

---

[6] ¶146 is one of many examples, described earlier, of IF's substitution of "Employer Plan" for "Employer Trust" when describing the AEUH Letter. We use the terms set forth in the Letter.

established by that Employer's tax-exempt Employer Trust in a U.S. Bank, whose funds would be managed by a TPA authorized by the Employer Trust as an ERISA fiduciary. *Id*. at 3. Each Employer would be solely liable for all covered claims under its Employer Plan, including those not reimbursed through distributions from the BPT to the Employer Trust of proceeds from the Stop-Loss Policy. *Id*. at 2-3, 5. No Employer would collect contributions from another Employer's Plan or Trust or pay or be liable to pay any claim made by a participant in any other Employer Plan. *Id*. Each Employer could obtain unlimited reimbursement for large claims above a specified attachment point. AEUH Letter at 4-6. This would be effectuated through the BPT. *See* §§A & B above.

No claim, large or small, of any covered individual of any Employer Plan was intended to be paid by (i) contributions collected by or for any other Employer Plan or Trust, (ii) funds paid by any Employer Trust to the BPT, or (iii) proceeds paid under the Stop-Loss Policy as a result of a claim by any other Employer Trust. *Id.* at 2-3, 5.

### 3. Legal Conclusions Rendered in the Locke Lord Letter at Pages 6-7

First, the AEUH Letter concluded that, under its assumptions, each Employer Plan would be an individual "employee welfare benefit plan," but not a MEWA, under ERISA. *Id*. at 7. Critical to that conclusion was the assumption that "the Transaction does not include any agreement under which any Employer or its Employer's Trust will agree to be liable to any or all of the other Employers or their respective Employer's Trusts for its or their obligations to provide health benefits under its or their respective Employer Plans, and thus, in the Transaction, there would not be multiple employers sponsoring any single Employer Plan." *Id*.

Second, the LL Letter concluded that "[t]he purchase by the BPT of the Stop-Loss Policy from the Bermuda Insurer should not cause an Employer or its Employer's Trust to violate ERISA; provided that the indicia of ownership by each Employer's Trust of all its assets," including the

written certificate evidencing the individual Employer Trust's beneficiary interest in the BPT (the "**BPT Beneficiary Trust Certificate**") and the original written contract embodying the Stop-Loss Policy, at all times be maintained within the jurisdiction of a United States district court. *Id*.

Third, the Letter concluded that purchase by and delivery to the BPT of the Stop-Loss Policy in Bermuda for the benefit of each Employer Trust would not cause the Employers, their Trusts, or the BPT to be transacting business in any state or D.C. as an unauthorized insurance company under applicable state insurance codes, because the insurance policy transaction would occur entirely in Bermuda and because no Employer, Employer Plan or Employer Trust would agree to be liable for obligations of any other Employer, Employer Plan or Employer Trust. *Id*.

### 4. Locke Lord's Disclaimers

The AEUH Letter lists several disclaimers. Those disclaimers expressly state who Locke Lord's client was (only AEUH), who may rely on the AEUH Letter (also, only AEUH), and who may not (any individual or entity other than AEUH). *Id*. at 8. It provided that the Letter could be distributed to Employers, TPAs, Aggregators, the BPT or the Bermuda Insurer, "but without any reliance hereon," and provided that each such person signs and delivers to Locke Lord "a non-reliance letter in a form required by Locke Lord." *Id*. Locke Lord also stated (i) the limited scope of its engagement and the AEUH Letter; (ii) its legal conclusions assume the accuracy of the facts stated and may change if assumptions were wrong or facts changed; and (iii) it was undertaking no obligation to revise or update its Letter if the relevant laws subsequently changed. *Id*.

### G. Actual Operations v. Locke Lord's Assumptions

As discussed in §B above, IF alleges that AEUH both did (¶¶33-34, 197, 296) and did not (¶¶70, 104, 262-69) operate the AEU Plan consistent with Locke Lord's assumptions. However, as also discussed in §B above, IF alleges both in the FAC and in related cases facts establishing that AEUH administered the Plans in critical respects contrary to Locke Lord's assumptions.

According to IF, as a result the Plans were operating as part of a MEWA because they effectively pooled risk among multiple employers, subjecting them to certain provision of ERISA. ¶208.

IF also alleges various respects in which Casey was supposedly aware that the AEU Plan was operating in a manner inconsistent with the assumptions of the LL Letters, which they allege triggered certain duties. We discuss those allegations in §II.C below.

## RULE 12(b)(6) STANDARD

The Court accepts as true all well-pleaded facts in the FAC, disregards conclusions, and draws reasonable inferences from the well-pleaded facts in IF's favor. *West Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). A complaint should be dismissed when it does not "contain[] sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). "Detailed" facts are not required, but "to survive a motion to dismiss, [plaintiff] still must provide more than mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action.'" *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In addition, "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions" include "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts may take judicial notice of pleadings filed in other cases. *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 676 & n.2 (7th Cir. 2009); *Glickman v. Vill. of Morton Grove*, No. 18-cv-4931, 2019 WL 1754091, *3-4 (N.D. Ill. April 19, 2019).

## CHOICE OF LAW

A federal court sitting in diversity applies the choice-of-law rules of the forum. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Tanner v. Jupiter Realty Corp.*, 433 F.3d

913, 915 (7th Cir. 2006). Under Illinois choice-of-law rules, the statutes of limitations of the forum (Illinois) govern, *State Farm Mut. Auto. Ins. Co. v. Burke*, 2016 IL App (2d) 150462, ¶71; *Ennenga v. Starns,* 677 F.3d 766, 774-75 (7th Cir. 2012), and here require dismissal. *See* §I below. As for the merits of IF's claims, discussed in §§II-III below, Illinois applies the most-significant relationship test. *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844 (7th Cir. 1999). Under that test, the candidates are Illinois, Texas, and Georgia. IF's claims arise out of legal services provided by Locke Lord, through Casey (Georgia) and Larry Hansen (Illinois), to its clients, AISM, a Georgia entity, and AEUH, a Delaware entity with its principal place of business in Texas. ¶¶16-18, 42; *IF v. AEUH*, Am. Cpt., ¶2, Ex. 1. The AISM and AEUH Letters were sent from Georgia to AISM and AEUH in Georgia and Texas, respectively. The Employer Plans are located in numerous states. Locke Lord is a Delaware LLP with offices in Texas and other states. ¶14. (That does not destroy diversity jurisdiction because IF is a citizen of Tennessee, and Locke Lord is not incorporated in, and does not have offices or partners domiciled in, Tennessee. ¶¶9, 14.) Illinois has the "largest number" of Employer Plans that incurred injury. ¶7. We will principally cite Illinois law, but the claims fail under any of the states' laws.

## ARGUMENT

### I. THE CLAIMS ARE TIME-BARRED.

#### A. Inquiry Notice Starts the Limitations Period.

The Court may dismiss a complaint as time-barred where its alleged facts establish untimeliness. *See Cancer Found., Inc.*, 559 F.3d at 674-75. The applicable statute of limitations is two years: a damages action "against an attorney arising out of an act or omission in the performance of professional services . . . must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b). This applies to both the legal malpractice and negligent misrepresenta-

15

tion claims alleged here. *See Evanston Ins. Co. v. Riseborough*, 2014 IL 114271, ¶¶19-23;
*Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, ¶12.

The limitations clock begins "[o]nce a party knows, or reasonably should know, both of
his injury and that the injury was wrongfully caused," at which point "the injured person has the
burden to inquire further as to the existence of a cause of action." *Brummel v. Grossman*, 2018 IL
App (1st) 162540, ¶26. The plaintiff need not know that an attorney caused the injury; the action
accrues when the plaintiff reasonably should know that it suffered an injury that was wrongfully
caused, placing it on inquiry notice to investigate. *See Blue Water Partners, Inc. v. Edwin D.
Mason, Foley & Lardner*, 2012 IL App (1st) 102165, ¶¶51-53, 71 (plaintiff had "obligation to
inquire further on possible wrongful conduct following the demise of" a business venture, even
where plaintiff did not know of the attorney's involvement). A plaintiff's "identification of one
wrongful cause of his injuries initiates his limitations period as to all other causes. . . ." *Carlson
v. Fish*, 2015 IL App (1st) 140526, ¶¶32-39; *accord Janousek*, 2015 IL App (1st) 142989, at ¶21.

Inquiry notice is objective. *See Janousek*, 2015 IL App (1st) 142989, at ¶13. The court
may decide inquiry notice on a motion to dismiss. *See, e.g., Shrock v. Ungaretti & Harris Ltd.*,
2019 IL App (1st) 181698, ¶86.

**B. The AEU Plans Were on Inquiry Notice Before December 12, 2016.**

IF sued Locke Lord on December 12, 2018. Its claims are untimely because the AEU Plan
and Employer Plans were on inquiry notice before December 12, 2016.

First, IF's principal theory is that each LL Letter, including the AISM Letter of 2014, was
wrong on its face, based on the assumptions within it. Thus, any recipient was on notice of its
supposed errors as soon as it incurred an injury. The FAC also makes clear that AEUH and
Employer Plans knew of injuries well before December 12, 2016. Locke Lord was asked to
prepare the 12/15/16 Letter "in response to specific questions that had been raised about the AEU

Plan," and "to provide comfort to existing Employer Plans." ¶118; *see also* ¶129 (12/15/16 Letter was "in response to questions raised by prospective and/or existing Employer Plans"). For instance, "[i]n or about January 2016," a trade association "had questions about the AISM Plan's legality" under the California Insurance Code. ¶60. And in June 2016, DOL and Florida's Office of Insurance Regulation had started to investigate issues with the AEU Plan. ¶98. Questions about the legality of the "AEU Plan" were thus being asked by early 2016, and continued through the fall of 2016. ¶¶60, 69-70, 95-108, 118, 123, 129. These allegations establish that the Plans, both directly and indirectly through AEUH, knew or reasonably should have known of their injury and its wrongful cause, and thus had an obligation to inquire, before December 12, 2016.

IF's allegations against AEUH further support this conclusion. For example, AEUH reported the "Accumulated Program Deficit for the AEU Program as of the end of 2016 was $20,257,208." *IF v. AEUH*, Am. Cpt., ¶110, Ex. 1; *see also id.* at ¶111 (August 2017 report found BPT1 "had unpaid claims in the amount of $15,364,233 as of December 31, 2016").[7] Although these reports were prepared in 2017, they show that a large shortfall had developed by the end of 2016, which must have been apparent to the unpaid Employer Plans before the end of that year. Moreover, there were other red flags in early 2016. *Id.* at ¶48 (alleging no trust certificates "had been provided to any purported VEBA trust since ***January 2016***" (emphasis in original)).

These allegations demonstrate that unpaid claims were a known problem *before* December 2016, placing the Plans on inquiry notice. *See City Nat. Bank v. Checkers, Simon & Rosner*, 32 F.3d 277, 283-84 (7th Cir. 1994) (limitations began when borrower was declared in default, placing bank on notice of need to investigate whether it had cause of action against accountants).

---

[7] "BPT1" was the first Bermuda trust. In late 2016 or early 2017 a second Bermuda trust was formed, which is referred to as "BPT2." ¶117.

Second, as discussed in §II.A below, IF alleges that Locke Lord supposedly owed duties to the Plans through AEUH, either because AEUH was a fiduciary to the Plans or because the Plans were third-party beneficiaries of the Locke Lord/AEUH lawyer-client relationship. Taking those conclusions at face value, the Plans were on inquiry notice when AEUH was on notice.[8] And AEUH had inquiry notice in spades before December 12, 2016. As discussed, IF alleges numerous instances showing that AEUH was aware both of issues concerning the Letters and that it or others were operating the Plans contrary to the assumptions in the Letters, and of problems paying claims.

### C. The Plans Incurred Damages Before December 12, 2016.

In addition to inquiry notice, a plaintiff must have suffered actual damages to start the limitations period. *See Palmros v. Barcelona*, 284 Ill. App. 3d 642, 646 (2d Dist. 1996) (malpractice claim accrued when plaintiff incurred attorneys' fees in defending challenge to allegedly defective will). Any damages suffice to start the clock; knowledge of the amount is not required. *See Goran v. Glieberman*, 276 Ill. App. 3d 590, 595 (1st Dist. 1995).

The Plans incurred alleged damages before early December 2016. IF alleges they incurred losses related to "unpaid claims and the inability to collect stop-loss proceeds from offshore insurers." ¶287; *see also* ¶302. IF also alleges that "fees [were] being extracted from participant contributions" by May 2016. ¶94; *see also* ¶157. IF claims that those fees were improper and excessive. ¶94; *see also IF v. AEUH*, Am. Cpt., ¶¶65, 68, Ex. 1; *Receivership Mgt., Inc. v. A.J.*

---

[8]  AEUH's notice is imputed to the Plans because AEUH allegedly was a "fiduciary, agent, and/or authorized representative of the Employer Plans and the AEU Plan." ¶136. *See* Restatement (Second) of Agency, §272 (1958); *Kuska v. Folkes*, 73 Ill. App. 3d 540, 544 (2d Dist. 1979) (principal has "knowledge of all material facts of which his agent receives notice or acquires knowledge, while acting in the course of his employment and the scope of his authority"); *Owens v. Lac D'Amiante Du Quebec, Ltee.*, 656 F. Supp. 981, 983 (E.D. Pa 1987.), *aff'd*, 833 F.2d 306 (3d Cir. 1987) (holding claims time-barred, and imputing knowledge of plaintiff's attorney to plaintiff ).

*Corso & Assoc., Inc., et al. ("IF v. Corso Brokers"),* No. 19-cv-01385, Dkt. No. 224 at ¶¶175, 177, 189, 202-03. Employer Plans incurred those damages before December 2016. *See* §I.B; ¶¶69-70; *IF v. Corso Brokers,* at ¶¶195-96 (alleging (i) "[d]uring the relevant time, employers and participants made numerous communications . . . that claims were not being paid," and (ii) "failure to pay claims was so bad that complaints were being made to the DOL, state insurance regulators, and state attorneys general").

That some Plans enrolled after December 2016, and may have incurred additional damages, does not alter the fact that the AEU Plan and Employer Plans had already incurred damages.[9] *See Goran,* 276 Ill. App. 3d at 595.

### D. The December 2016 Letters Do Not Render IF's Claims Timely.

That Locke Lord issued two additional letters shortly after December 12, 2016 does not change the limitations analysis. The AEUH Letter and the AISM Letter contain substantially the same content, and the AEU Plan's operations did not change after Locke Lord's 2016 letters. *See* ¶123 (alleging that "the AEU Plan had been operating as the successor to the AISM Plan since the time of the acquisition," and that the 12/15/16 Letter was intended to address "a number of questions had arisen concerning those operations"). The 12/15/16 Letter was expressly "qualified in its entirety by our [AISM Letter] to the predecessor" of AEUH, written in 2014. ¶123; *see also* AISM Letter. The AEUH Letter of 12/20/16 was simply "*reissuing* the AISM Letter to AEU," so that "it would be addressed directly to AEU." ¶109.

Locke Lord's 2016 letters therefore did not restart the limitations clock. There is no

---

[9] If the Court declines to dismiss IF's complaint in its entirety on limitations grounds, it should at a minimum dismiss as untimely any claims on behalf of Employer Plans that enrolled in the AEUH program before December 12, 2016. As discussed in §II.B.1 below, all claims on behalf of Employer Plans fail on the merits because IF fails to identify *any* Employer Plan that received or relied on *any* LL Letter, and, of course, the Employer Plans enrolled before Locke Lord's 2016 Letters could not have relied on those Letters.

continuous representation rule in Illinois; thus, the statute of limitations on malpractice claims runs even though the attorney continues to represent the client. *See Witt v. Jones & Jones Law Offices, P.C.*, 269 Ill. App. 3d 540, 544 (4th Dist. 1995) (will executor's claim against lawyer who prepared the will was time-barred, irrespective of continued representation, because "there is no continuous representation rule in Illinois"); *see also Serafin v. Seith*, 284 Ill. App. 3d 577, 585-86 (1st Dist. 1996). IF's claims are premised on Locke Lord's legal services in 2014, which led to the creation of the predecessor to the AEU Plan. *See, e.g.*, ¶88 ("On May 26, 2016, an officer of AEU sent a large brokerage firm the AISM Letter to support the legality of what was now the AEU Plan.").[10] Locke Lord's reissuance of the same allegedly incorrect advice did not restart the limitations clock, because, as shown, damages had *already* been incurred, and the AEU Plan and Employer Plans were *already* on inquiry notice before the 2016 representations.[11] IF's claims are time-barred.

## II.   COUNT I FAILS TO STATE A CLAIM FOR PROFESSIONAL NEGLIGENCE.

Count I is a claim for legal malpractice. IF must plead facts plausibly showing that Locke Lord owed the AEU Plan "a duty of due care arising from the attorney-client relationship, that the

---

[10] If, as IF claims, Locke Lord incorrectly concluded that the transaction would not result in the formation of a MEWA, ¶¶126-127, a "MEWA" was already formed before December 2016, as IF admits. ¶210. This shows that IF's claims are predicated on Locke Lord's alleged negligence in 2014.

[11] *See Green v. Fund Asset Mgmt., L.P.*, 19 F. Supp. 2d 227, 233 (D.N.J. 1998) (dismissing securities claims as time-barred where "true nature of [ ] claims" concerned disclosures in prospectuses and registration statements outside limitations period; "fail[ure] to correct prior misleading statements in subsequent reports is unavailing to toll the statute of limitations"); *Hater v. Gradison Div. of McDonald & Co. Sec.*, 655 N.E.2d 189, 197 (Ohio. Ct. App. 1995) (holding in accountants' malpractice case that "issuance of subsequent audits, which repeat or perpetuate the alleged misrepresentations of earlier audits, do not constitute separate acts of negligence, with different limitations periods. Rather, the time 'when the allegedly negligent act was committed,' . . . is the time when the original misrepresentations were made."); *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1123 (S.D.N.Y. 1993) ("Once Plaintiffs are placed on inquiry notice of their RICO claims, alleged subsequent reassurances cannot be invoked to further toll the limitations period."); *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 640 (S.D.N.Y. 1993) (securities fraud claims time-barred because "once placed on inquiry notice, a limited partner cannot avoid the duty to inquire by relying on reassurances and optimistic statements made by the partnership").

defendants breached that duty, and that as a proximate result, the client suffered injury." *N. Ill. Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005); *accord Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989). IF fails on all elements.

### A. Locke Lord Owed No Duty to the "AEU Plan" or Any Employer Plan.

Locke Lord's sole relevant clients were AISM and AEUH. It owed no duty of care to the AEU Plan or the Employer Plans, who were neither clients of Locke Lord nor intended third-party beneficiaries of Locke Lord's services for AEUH or AISM.

### 1. No attorney-client relationship existed between Locke Lord and any Plan.

Any legal malpractice claim must first answer "who was the client?" Try as it might, IF cannot avoid the fact that Locke Lord's only client was AEUH (and before it, AISM), in connection with the LL Letters. IF fails to plausibly allege that Locke Lord had an attorney-client relationship with the AEU Plan or any Employer Plan. Nowhere does it, or can it, allege in good faith that the AEU Plan or any Employer Plan engaged Locke Lord. IF's conclusory allegations that Locke Lord "intended" to benefit any entity other than AEUH, that its engagement encompassed any entity other than AEUH or that the AEU Plan and the Employer Plans engaged Locke Lord "through" AEUH are directly contradicted and defeated by the express terms of the Engagement Letter. ¶¶67, 83. As IF concedes, (i) the Engagement Letter in 2016 was between only AEUH and Locke Lord, (ii) the letter expressly provided that the engagement "does not encompass any other individual or entity," (including "affiliates, officers, directors, employees, shareholders, or other stakeholders of the Company"), and (iii) the scope of the engagement was limited solely "to advise [AEUH]" concerning compliance with insurance regulatory matters and ERISA. FAC Ex. B at 1; *see also* ¶¶71-72. In language omitted from IF's selective quotation, the Engagement Letter limited its scope to services "as may be requested *by [AEUH]*," which services may be limited or expanded by AEUH "*provided that any substantial expansion must be agreed to by*

*[Locke Lord]*."  FAC Ex. B at ¶1.  The LL Letters (FAC Exs. A, D, E) similarly made clear that Locke Lord's only clients in connection with the Letters were AISM and AEUH.

IF misstates the AEUH Letter when it alleges that the AEUH Letter was "addressed to AEUH *in its capacity as fiduciary, agent and/or authorized representative of the Employer Plans and the AEU Plan they comprised*."  ¶121.  The italicized words do not appear anywhere in any LL Letter.  They are argument, not an alleged fact.  The AEUH Letter was addressed solely to Mr. Satler as President of AEUH.  AEUH Letter at 1.  (The 12/15/16 Letter was also addressed to Mr. Satler, as CEO of AEUH.  The AISM Letter was addressed solely to AISM.)  These exhibits control over IF's conflicting allegation.  *See Massey*, 464 F.3d at 645, 650; *see also* n.3 above.

Moreover, that AEUH was effectively the settlor or creator of the alleged "AEU Plan" does not make its attorney, Locke Lord, an attorney for the AEU Plan or the Employer Plans.  Under their theory, because AEUH held a fiduciary role, any counsel it retained was necessarily counsel for the beneficiaries and only indirectly for AEUH.  ¶¶67, 77-78, 136.  But an attorney for a plan's fiduciary is not presumed to have an attorney-client relationship with the plan itself or its beneficiaries.  *See Iron Workers Local 25 Pension Fund v. Watson Wyatt & Co.*, No. 04-CV-40243, 2009 WL 3698562, *7-8 (E.D. Mich. Nov. 4, 2009) (no attorney-client relationship between law firm that represented pension fund and plan beneficiaries; explaining problems that would arise if law firm "owed a duty to three of the 5,000 plus participants and beneficiaries"); *Mason Tenders Dist. Council Pension Fund v. Messera*, 4 F. Supp. 2d 293, 302-03 (S.D.N.Y. 1998) (finding no attorney-client relationship between pension plan and lawyers for plan's trustees); *Whitehead v. Rainey, Ross, Rice & Binns*, 997 P.2d 177, 179 (Okla. Civ. App. 1999) (attorney who advised employer about retirement plan did not have attorney-client relationship with employee-beneficiaries).

The existence of an attorney-client relationship depends on whether Locke Lord and the

AEU Plan (or any Employer Plan) agreed to form an attorney-client relationship. *People v. Simms*, 192 Ill. 2d 348, 382 (2000) ("The attorney-client relationship is a voluntary, contractual relationship that requires the consent of both the attorney and client."); *accord National Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 147 (Tex. 1996).[12]

IF's assertion that the Plans engaged Locke Lord pursuant to an "oral or implied-in-fact agreement," ¶¶67(c), 86, is also conclusory and insufficient. *Saad*, 2012 WL 2721942, at *6 ("Under *Twombly* and *Iqbal*, 'legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to [a] presumption of truth.'") (quoting *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)). IF alleges no facts to support its assertion. The Letters establish that Locke Lord did not intend to represent the "AEU Plan" or Employer Plans.

The FAC is equally bereft of allegations establishing that the AEU Plan (or any Employer Plan) agreed to engage Locke Lord. IF does not allege any facts suggesting that the AEU Plan or any Employer Plan believed it was represented by or ever communicated with Locke Lord. Nor is there any alleged connection or communication between Locke Lord and any Employer forming its own Employer Plan. IF also does not allege that AEUH intended to engage Locke Lord on behalf of the AEU Plan or Employer Plans. Thus, IF does not and cannot allege that any Plan ever communicated with Locke Lord to engage the firm.

Finally, IF alleges the Plans should be deemed Locke Lord's clients because AEUH used revenue that AEUH received from the Employer Plans to pay Locke Lord's fees. ¶84. The fact

---

[12] IF argues that AEUH is a "holding company" with no operations of its own and "therefore could benefit only indirectly from Locke Lord's services," necessarily (according to IF) making the Employer Plans and the AEU Plan "direct beneficiaries." ¶74. We are aware of no case barring a holding company from retaining counsel to advise it and no case converting the company's customers into clients of its lawyer, particularly where, as here, the lawyer's engagement letter makes clear that its only client is the company and no one else. Further, whether Locke Lord provided legal services to AEUH's subsidiary, AEUB, concerning other matters does not mean that the Employer Plans and the AEU Plan became clients or beneficiaries of Locke Lord's legal services.

that a client uses revenue generated by its services to third parties does not create an attorney-client relationship between the client's lawyer and the client's customers. Otherwise, Target's lawyers would be deemed lawyers for Target's customers, who pay Target money that Target pays its lawyers. That result is absurd. *Cf.* Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* §7.2 at 837-38 (2019 ed.) ("[T]he mere payment of legal fees by another does not create an attorney-client relationship with that person. The issue is whether the attorney expressly has agreed to such an undertaking."); *accord Mason Tenders*, 4 F. Supp. at 300.

### 2. Locke Lord owed no third-party beneficiary duty to any Plan.

The Plans also were not intended third-party beneficiaries of Locke Lord's attorney-client relationships with AISM and AEUH. (As shown at §III.A, Count II fails for the same reason.)

"The traditional, general rule has been that the attorney is liable only to his client, not to third persons." *Pelham v. Griesheimer*, 92 Ill. 2d 13, 19 (1982). This "general rule" has a narrow exception: "[T]o establish a duty owed by the defendant attorney to the nonclient the nonclient must allege and prove that the intent of the client to benefit the nonclient third party was the primary or direct purpose of the transaction or relationship." *Id.* at 20-21. The key consideration is whether the lawyer was acting at the direction of or on behalf of the client to benefit or influence a third party. *Id.* IF cannot plausibly show that its claim fits within this "narrow exception." *See Schechter v. Blank*, 254 Ill. App. 3d 560, 564 (1st Dist. 1993). That a non-client may benefit, or bear significant risk, as a result of a lawyer's representation of a client does not create a duty to that non-client. *Id.* at 566-67 (corporations' bankruptcy lawyer had no duty to their creditors or owners, even if they benefited from the representation); *Reddick v. Suits*, 2011 IL App (2d) 100480, ¶¶37, 44, 47, 51 (directors/officers who were liable to dissolved corporation's creditors as a result of corporation's attorney's failure to reinstate corporation were not intended third-party beneficiaries; plaintiff's "risk of personal liability does not transform the incidental benefits of

24

[lawyer's] representation of [corporation] into direct and intended benefits for plaintiffs."); *Torres v. Divis*, 144 Ill. App. 3d 958, 963-64 (2d Dist. 1986) (affirming dismissal of malpractice claim because lawyer who represented a incorporator and corporation did not owe duty to other incorporator); *Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 593 (7th Cir. 2017) (affirming dismissal where lawyer's "primary duty was to protect the interests of his client"). Moreover, a non-client's alleged reliance on the attorney's statements does not make the non-client a third-party beneficiary. *See Reddick*, 2011 IL App (2d) 100480, at ¶¶47, 51 (rejecting contention that defendant "knew or should have known that plaintiffs would rely on him to protect their interests," and also noting that attorney was retained to represent "only the corporate entity" and not the plaintiffs as individuals).

IF tries to meet *Pelham* by regurgitating its standard, alleging that AEUH intended to benefit the Plans in requesting the 12/15/16 and AEUH Letters and "Locke Lord knew" the Letters were "being issued for the benefit of the Employer Plans and the AEU Plan." ¶¶118, 121, 136, 142. But it pleads no supporting facts, and does not allege anywhere, even in a conclusory fashion, that AEUH's supposed intent to benefit the Plans "was the *primary or direct purpose* of the transaction or relationship." *Pelham*, 92 Ill. 2d at 21 (emphasis added). Moreover, repeating a conclusion does not make it a fact, particularly where the conclusions are so clearly and completely contradicted by the Engagement Letter and the Letters that IF attaches as exhibits. *See* §§E, F.1, II.A.1 & n.3 above; *see also Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644, 654 (7th Cir. 2017) (affirming dismissal under *Pelham*, where plaintiff made only "conclusory allegation[s]" about the primary purpose of the attorney-client relationship).

Even if AISM and AEUH were fiduciaries of the Plans, that does not convert the Employer Plans into intended third-party beneficiaries of Locke Lord's attorney-client relationship with those fiduciaries. *See Iron Workers Local*, 2009 WL 3698562, at *6-7, 9 (holding pension fund

25

beneficiaries are not third-party beneficiaries of relationship between lawyer and fund); *Whitehead*, 997 P.2d at 180-81 (holding employees/plan beneficiaries are not third party beneficiaries of attorney-client relationship between lawyer and plan administrator).

Although the LL Letters provided that they could be shared with certain others, including Employers, the LL Letters make equally clear that no person or entity, other than AEUH (and AISM before it) could rely on the LL Letters. For example, the AEUH Letter stated:

> This letter is being rendered only to our client, AEU[H], and may not be used or relied upon by, or distributed to, any other person or entity for any purpose whatsoever without the written permission of Locke Lord LLP; provided, that AEU[H] may provide a copy of this letter (**but without any reliance hereon**) to [certain third parties, including "the TPA," and "any Employer Aggregator"].

AEUH Letter at 8 (emphasis added). *See also* AISM Letter at 7-8. Moreover, there is no allegation that Locke Lord delivered the LL Letters to any Employer Plan (or to the AEU Plan).

These deficiencies, as well as the express disclaimers in the LL Letters, distinguish this case from *Geaslen v. Berkson, Gorov & Levin, Ltd.*, 220 Ill. App. 3d 600 (1st Dist. 1991), *aff'd in part and rev'd in part on other grounds*, 155 Ill.2d 223 (1993). In contrast to *Geaslen*, where the court held that *Pelham*'s requirements were satisfied, IF does not here allege that: (i) the client, AEUH, had any contractual obligation to provide an LL Letter to nonclient plaintiffs in order to close a transaction; (ii) Locke Lord addressed and delivered its Letters to nonclient plaintiffs; or (iii) AEUH's primary or sole purpose in causing Locke Lord to issue its Letters was to assure nonclients of matters set forth in the letter and persuade them to close their transaction with the attorney's client. *Id.* at 602-05. Rather, the LL Letters merely provided guidance to AEUH/AISM, and only AEUH/AISM. Nothing in the Letters suggests that Locke Lord undertook a duty to any individuals, entities, or benefit plans that might ultimately decide to participate in the Transaction, any of whom was free to retain counsel to review Locke Lord's analysis, as University of Utah Health Plans did. ¶¶168-69. And the Letters clearly notified any other recipient that it could not

rely on the conclusions in them. Moreover, unlike in *Geaslen*, Locke Lord was unaware of – and IF has still not identified – any Employer Plan that relied on the LL Letters. It would be absurd to impose a duty on Locke Lord to hundreds of unknown, unidentified Employer Plans.[13]

### 3. The "AEU Plan" was not to have existed under the Letters' assumptions.

That the "AEU Plan" was neither a client nor an intended third-party beneficiary is clear for another reason: The LL Letters assumed that no such plan would be created. Locke Lord assumed that the Transaction would be structured so that Employer Plans would not pool risk. The "Transaction," as described in the LL Letters, did not include a single "Plan" in which multiple employers would participate. AISM Letter at 2, 4-5; AEUH Letter at 2, 4-5. Quite the opposite: the assumed structure involved separate self-funded trusts for each individual Employer's Plan with no risk-pooling among the different Plans. AISM Letter at 4. By segregating each Employer's contributions and claims, the Plans would avoid creating any MEWA or "AEU Plan." If AEUH operated the program in a manner that pooled risk among Employers, it did so contrary to the structure that Locke Lord was directed by its clients (AISM and AEUH) to assume would exist. In short, Locke Lord could not have understood that AEUH intended to create the so-called "AEU Plan," a MEWA, in the first place. It is illogical to allege that Locke Lord agreed to represent, or assumed a duty of care to, a "plan" that it assumed would never come to be.

### B. IF Fails to Plausibly Allege Causation.

For the reasons discussed in §II.C below, Locke Lord did not breach any duty because its

---

[13]  Absent supporting facts, IF instead leaps to conclusions. It argues that the subject of the 12/15/16 Letter – "Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchasing Trust and Stop-Loss Insurance Policy" – necessarily means that "the purpose and intent" of the Letter "was to influence prospective and existing Employer Plans and the AEU Plan by advising that they could operate under the assumed facts in compliance with ERISA and state insurance laws." ¶122. But the Letter contains no such language. To the contrary, it incorporates all of the qualifications in the AISM Letter, including that no individual or entity other than Locke Lord's clients (AISM/AEUH) could rely on Locke Lord's advice. ¶123; AISM Letter at 7-8; 12/15/16 Letter at 1.

conclusions were correct. But the Court need not reach that complex ERISA issue because IF cannot establish another critical element of its negligence claim: that any alleged breach of duty proximately caused the Plans' alleged damages. IF's allegations here and in related cases make clear that (1) no Plan relied on the Locke Lord Letters; and (2) any alleged losses by the Plans proximately resulted from their operation in derogation of the facts that Locke Lord assumed, and not from Locke Lord's allegedly erroneous advice.

**1. IF does not allege that any Plan relied on the LL Letters.**

To state a claim, IF must allege that someone it represents did (or failed to do) something in reliance on the LL Letters. The Complaint is devoid of such allegations.

The FAC lacks *factual* allegations plausibly showing that any Plan relied on the LL Letters. IF alleges reliance in an entirely conclusory fashion.[14] IF alleges identifies no Employer Plan that received or relied on any Letter, even though Locke Lord noted this deficiency in its first motion to dismiss. Dkt. 33 at 23-25. IF alleges the AISM Letter was included in a "checklist" of documents to be provided to "PEO and Association Producers," ¶93, but does not allege that any specific Employer Plan received any LL Letter, let alone relied on one. IF also alleges that the 12/15/16 Letter was issued "in response to questions raised by prospective and/or existing Employer Plans or their aggregators or fiduciaries," ¶129, but does not identify such Employer Plan or that any Plan requested or received that Letter.

Because IF does not allege facts showing that the Employer Plans received or relied on the

---

[14] *See, e.g.,* ¶37 ("As a result of Locke Lord's erroneous opinions and conclusions and the Employer Plans' reasonable and justifiable reliance thereon, the Employer Plans and the AEU Plan they comprised were not subject to regulatory oversight or statutory restraints normally applicable to domestic and offshore insurance operations of their size and scope."); ¶130 ("The Employer Plans and their administrators and fiduciaries relied on the 12/15/16 Letter."); ¶150 ("In fact, as Locke Lord knew and understood, the Employer Plans and their administrators and fiduciaries relied on the AEU Letter."); ¶297 ("In reliance on the Comfort Letters, the Employer Plans continued to operate. . . .").

LL Letters, its conclusory allegations that, but for the LL Letters "the Employer Plans would not have joined the AEU Plan" or incurred losses, *e.g.*, ¶269, 297, 299, are insufficient to allege loss causation. In other words, because IF cannot plausibly allege that the LL Letter induced any Employer Plan to join the AEU program, it cannot show that the LL Letter caused the Employer Plans' alleged damages. Moreover, as discussed in §III.C below, the Letters themselves included express disclaimers that only AEUH and AISM were entitled to rely on them. *See* AEUH Letter at 8; AISM Letter at 7-8; 12/15/16 Letter at 1.

IF also has "pleaded [it]self out of court" because its allegations clearly show AEUH knew Locke Lord's factual assumptions were wrong. *Roppo*, 869 F.3d at 591-92 (dismissing fraudulent and negligent misrepresentation claims where allegations showed that plaintiff did not believe alleged misrepresentation). IF alleges, for example, that "the AEU Plan was not operating in accordance with the assumed facts . . . ." ¶269. IF also alleges that Thomas Stoughton and "AEU" told Casey that Veritas might be acting as a MEWA, and that Casey "knew, or had reason to know," based on this information, that the assumptions in the LL Letter did not match the "reality" of AEUH's operations. ¶¶262-67.

Indeed, IF has sued both AEUH and the individuals who operated AEUH (collectively, the "**AEUH Defendants**") in *IF v. AEUH* precisely because they allegedly operated in a manner contrary to Locke Lord's assumptions. *IF v. AEUH*, Am. Cpt., ¶¶42-68, Ex. 1. If the assumptions in the LL Letters were inaccurate, the AEUH Defendants knew it and knew they could not rely on Locke Lord's advice based on those incorrect assumptions.

This was also true regarding the alleged criticisms by counsel for the University of Utah Health Plans (a potential TPA). ¶¶168-85. IF alleges that AEUH liked Casey's response to "UofU's" counsel. ¶182. But even if that is construed as reliance by AEUH regarding the advice on the face of the AEUH Letter, AEUH officials knew by early 2017 (if not in 2016) that its

program was operating contrary to numerous assumptions in that Letter.  Thus, IF has not plausibly alleged that AEUH reasonably relied on the AEUH Letter (or other Letters) or that such reliance caused the Plans' alleged damages.  *Roppo*, 869 F.3d at 591-92 ("A plaintiff must believe the alleged misrepresentation to be true in order to state reliance.").  Moreover, these allegations confirm that, contrary to relying on Locke Lord and its Letters, third parties, like UofU, retained counsel to reach their own conclusions about the Transaction and whether to participate.

> ### 2. Neither the Transaction's assumed structure nor Locke Lord's alleged failure to investigate and advise AEUH to cease operations proximately caused the Plans' alleged damages.

The FAC alleges two main causation theories.  First, it alleges, in essence, that the Plans were doomed to fail, *i.e.*, that the absence of state insurance regulation guaranteed their underfunding and collapse.  *E.g.*, ¶37.  Second, IF alleges that if only Locke Lord had investigated and learned that AEUH was administering the Plans contrary to the assumptions in the Letters, it could have advised it to stop, which would have avoided or mitigated losses.  *E.g.*, ¶269. Taken together, IF is alleging that the Plans failed because the assumptions in the Letters were both followed and not followed.  Its internally inconsistent causation analysis is fundamentally flawed.

The first causation theory again misunderstands the Transaction structure, involving self-funded plans and stop-loss coverage reimbursing an employer above an attachment point.  IF does not and cannot allege that such a structure is unlawful or inherently unstable.  No such Employer Plan can incur any injury and have any claim unless and until its Employer breaches its sole obligation to provide funds.  (The FAC does not expressly allege such a failure by Employers to honor their obligations to self-fund, but we treat it as a plausible inference; IF is choosing to sue Locke Lord rather than the Employers, who are the only entities with obligations to fund the Plans.)  Such insolvency could occur if the Plan was not adequately underwritten and funded by the Employer (perhaps with employee payroll deductions) to pay claims below the attachment

30

point, and/or if the Employer does not receive payments from the Stop-Loss Insurer above the attachment point and cannot otherwise fund the Plan. The FAC alleges such failings, ¶¶284, 287, 301-02, but those failings are due not to any assumption in the Letters, but contrary to them.

First, there was allegedly a systemic failure to properly underwrite the Plans below the attachment point, as IF details in its *IF v. AEUH* complaint. *See IF v. AEUH*, Am. Cpt., ¶¶85-89, Ex. 1. Second, AEUH was robbing Peter to pay Paul, using assets of Plans to pay claims of other Plans, in violation of the separateness requirements of the Letters. *Id.* at ¶¶60, 63. Third, the Employer Trusts were generally never formed, leaving the BPT without beneficiaries, which may have contributed to the privity problem IF has asserted led the Stop-Loss Insurer to deny claims.[15] *Id.* at ¶¶26, 42-48, 57. But each such failure was not caused by LL's Letters.

IF's causation position, in essence, is that if Locke Lord had "properly fulfilled its duties and properly advised the AEU Plan and Employer Plans, they would not have operated or continued to operate in violation of ERISA and state insurance laws and would not have been caused to incur claims obligations and related expense for which they have insufficient assets to pay." ¶285. This is an allegation of "but for" causation that is implausible for the reasons discussed in the previous section. Moreover, it is contradicted by the allegations in *IF v. AEUH* that AEUH knowingly continued to operate the "AEU Program" in a manner contrary to the

---

[15] IF has been unclear as to why it cannot mitigate the losses through reimbursement from the Stop-Loss Insurer. IF does not allege that any Stop-Loss Insurer is insolvent. In its regular reports to the Court, IF alleges that the Stop-Loss Insurer is raising a privity objection to paying claims because the BPT is the sole insured. *See DOL Action,* (Dkt. 392) at 5. If so, that is apparently because of the failure of the Employer Trusts, the beneficiaries of the BPT, to have been formed, contrary to the LL Letters. IF also alleges that it cannot collect from the Stop-Loss Insurer because ERISA does not allow it to send cash ("plan assets") to Bermuda. ¶259. But, as discussed below at §II.C.1.iii, ERISA does not prohibit such transfers so long as "indicia of ownership" are retained here. Finally, IF also alleges that an "insolvency" requirement might be an obstacle, ¶¶260-61, but that allegedly applies to "reinsurance," and the Stop-Loss Policy was to be a primary policy. Whether viewed separately or together, none of these vague allegations establish a causal link to the assumptions in the LL Letters.

structural requirements and assumptions in the LL Letters. *See* §B above. IF alleges no specific facts supporting the conclusion that, had Locke Lord written a different opinion letter, the AEUH Defendants would have operated any differently. If they flouted Locke Lord's structure in the LL Letters, in the face of the Letters' admonition that its advice was strictly based on the assumptions within them, it is not reasonable to infer that they would have hewed to different legal advice. Rather, based on IF's own factual allegations, the alleged losses were caused by AEUH's *failure* to follow Locke Lord's advice, its operation of the AEU Plan in derogation of its intended structure.

Numerous cases in analogous contexts have dismissed similar claims. Courts have dismissed fraud or negligence claims that, like IF's, allege but-for or "transaction" causation, but fail to allege proximate or "loss causation." *See, e.g.*, *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 61-62 (1994) (holding plaintiff must prove that all of its losses foreseeably resulted from misrepresentation itself; the mere inducement to enter into the transaction is insufficient); *Maxwell v. KPMG, LLP*, No. 03 C 3524, 2007 WL 2091184, *4-5 (N.D. Ill. July 19, 2007) (holding that allegedly negligent audit that caused plaintiff to enter into a merger did not cause plaintiff's loss, which was caused by market events unforeseeable to accountants); *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495-96 (2d Cir. 1992) (collecting authorities, holding that bank, which alleged it would not have financed a transaction if cash holdings had not been misrepresented to it, failed to allege loss causation because it alleged no facts supporting connection between fraud alleged and subsequent loss suffered); *First Interstate Bank of Nevada, N.A., v. Chapman & Cutler*, 837 F.2d 775, 778-80 (7th Cir. 1988) (affirming dismissal because bond counsel's allegedly false opinion regarding the tax-exempt status of certain bonds was not the cause of bond investor's losses because actual cause of losses was the misuse of bond proceeds, not mere issuance of the bonds).

*Martin* explained why loss causation is required in addition to transaction causation:

> [L]oss causation ensures that defendants, even where an intentional tort is committed, do not become insurers of plaintiffs who make unwise investments. Without such a requirement, the law would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission.

*Martin*, 163 Ill. 2d at 62 (internal citation and quotation marks omitted).

These cases require dismissal. IF is improperly trying to leverage the LL Letters into an insurance policy for the AEU Plan's failure. As discussed above, IF has not plausibly alleged that the factual assumptions or legal conclusions in the LL Letter caused the AEU Plan to fail. And IF has not alleged that the alleged creation of a MEWA or the fact that state insurance regulations applied to the AEU Plan caused any of the Plans' losses. Rather, it has alleged particular facts that the Plan failed because AEUH and others administered the Plan in a fraudulent and/or negligent manner contrary to and independent of the assumptions in the LL Letters. The foregoing cases establish that such allegations fail. Locke Lord's alleged negligence did not proximately cause the alleged losses any more than, for example, bond counsel's negligent opinion in *First Interstate Bank* proximately caused the losses from the misuse of bond proceeds.

### C. Locke Lord Did Not Breach Any Duty of Care.

IF's negligence claim also fails because Locke Lord did not breach any alleged duty of care, if one was owed to any Plan. First, the conclusions set forth in the AEUH Letter were correct as a matter of law based on facts that Locke Lord expressly assumed. Second, Locke Lord had no duty to investigate or correct the accuracy of the factual assumptions underlying the LL Letter.

#### 1. Locke Lord's legal advice was correct.

According to IF, even under Locke Lord's assumed facts, and contrary to the conclusions in the LL Letters, the Transaction would: (i) create a MEWA, (ii) cause the unauthorized transaction of insurance in the United States by the BPT, the Employers, or their Trusts, and (iii) violate ERISA's asset requirements. ¶¶190-252. Contrary to IF's allegations, Locke Lord's

33

conclusions were correct as a matter of law based on the facts that it expressly assumed.[16]

### i. The MEWA advice was correct.

Based on assumed facts, Locke Lord concluded that the Transaction would not create a MEWA under §3(40) of ERISA "because the Transaction does not include any agreement under which any Employer or its Employer's Trust will agree to be liable to any or all of the other Employers or their respective Employer's Trusts . . . ." AEUH Letter at 7. Rather, as noted, each Employer's Trust would "serve as the self-insured funding mechanism for the health benefits provided by its Employer Plan[.]" *Id.* at 2.

IF alleges three ways in which a MEWA is allegedly created, but only the third of them is alleged to have been assumed in the LL Letters with regard to the BPT structure: "a MEWA is created where risk is shared . . . (c) by the purchase of insurance that reimburses employee benefit plans of multiple employers for the health claims against each of them." ¶195.[17]

The mere presence of stop-loss insurance does not create a MEWA. Unlike a group insurance policy, stop-loss policies do not pay benefit claims of participants. Thus, they do not offer or provide health benefits to employees within the statutory definition of a MEWA.[18] Rather, stop-loss policies reimburse an employer or its plan for the employer's obligations under ERISA to pay claims that it is obligated to pay above a specified attachment point.

---

[16] As shown in §II.B above, even if the advice was incorrect and IF had standing as a client or third-party beneficiary, lack of loss causation and reliance would defeat IF's claims.

[17] ¶195(a) & (b) also allege that a MEWA is created (a) by paying the health claims of multiple plans out of an undifferentiated pool of assets, or (b) by the purchase of insurance that covers the health claims of employees of multiple employers. The LL Letters assumed neither structure, and expressly assumed the opposite, as stated in the text and at §§B, F.2, & II.A.3.

[18] ERISA §3(40) defines a MEWA as "an employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1) to the employees of two or more employers." 29 U.S.C. §1002(40).

A self-funded plan like those assumed in the Letters, including a self-funded plan that purchases stop-loss insurance, is fundamentally different from a fully-insured plan. Thus, state insurance laws regulating group insurance policies have been held not to apply to self-funded plans with stop-loss insurance policies. For example, in *American Medical Security, Inc. v. Bartlett*, 111 F.3d 358, 364 (4th Cir. 1997), ERISA was held to preempt Maryland law deeming a stop-loss policy with a specific attachment point below $10,000 to be a group health insurance policy subject to Maryland's mandated benefits:

> Under a self-funded plan, the employer who promises the benefit incurs the liability defined by the plan's terms. That liability remains the employer's even if it has purchased stop-loss insurance and even if the stop-loss insurer becomes insolvent. Conversely, if the employer becomes insolvent, the solvency of the stop-loss insurer may not benefit plan participants and beneficiaries. This is because their claims against the insurer would be derivative of the plan's claim against the insurer, which arises only after the plan actually makes benefit payments beyond the agreed attachment point. In contrast, when a plan buys health insurance for participants and beneficiaries, the plan participants and beneficiaries have a legal claim directly against the insurance company, thereby securing the benefits even in the event of the plan's insolvency. Participants and beneficiaries in self-funded plans may not have the security of the insurance company's assets because stop-loss insurance insures the plan and not the participants.

> The state's regulations fail to recognize that in a self-funded plan, with or without stop-loss insurance and regardless of the attachment point, the provision of benefits depends on the plan's solvency, whereas the provision of benefits in an insured plan depends entirely on the insurer's solvency. It is this fundamental difference that precludes the Maryland Insurance Agency from regulating self-funded plans but permits them to regulate insurance companies that provide health benefits to plans for their participants.

Moreover, a stop-loss insurance policy itself does not constitute an employee welfare benefit plan under ERISA. *See Northern Kare Facilities v. Benefirst, LLC*, 344 F. Supp. 2d 283, 288-89 (D. Mass. 2004) (stop-loss policy is not an ERISA plan because it protects the employer, not the employees, against excess financial loss, and provides no benefits to the employees).

Under these authorities, the fact that the Stop-Loss Policy (via the Employer Trusts and the BPT) provided funds to backstop the respective *Employers'* obligations to the self-funded

Employer Plans (*see* §§A & B above), means that the Stop-Loss Policy provided no health benefit to any employee of any of the Employers. There can be no dispute that if each Employer Trust bought its own stop-loss insurance policy, no MEWA would have been created. Nor is one created if several Employer Trusts purchased a single stop-loss policy pursuant to an agreement that the claims experience of one Employer Plan will not affect the rights of any other Employer Plan to claim reimbursement under the policy, and each Employer remains solely liable for the claims of the participants in its own self-funded Employer Plan. Under either scenario, an Employer remains liable only for claims under its own self-funded Plan.

IF tries to avoid this problem by arguing that the Employer Plans pooled risk in connection with the BPT premiums and this alleged risk-pooling sufficed to create a MEWA. ¶¶192, 197. (As noted, the LL Letters assumed the Employer Trusts, not the Employer Plans, were beneficiaries of and made trust contributions to the BPT for it to pay the premiums due to the Bermuda Insurer; we discuss IF's risk-pooling argument as if it had accurately pleaded this structure.) IF argues that the commingling of Employer Trusts' contributions in a single BPT bank account to "purchase a single Stop-Loss Policy covering all the Employer Plans [*sic*]" was "a form of risk sharing by the Employer Plans [*sic*]." ¶¶198, 200. This mischaracterizes the relationship expressly assumed in the LL Letters and misconstrues risk-sharing.

The predicate to IF's "risk-pooling" theory is wrong. The Stop-Loss Policy did not "cover" any Plan or "Covered Individual" of any Plan. The sole insured and owner of the Stop-Loss Policy was to be the BPT, in its capacity as trustee for the Employer Trusts. And "only the BPT Trustee, for the benefit of its beneficiaries, the Employer's Trusts, would have the right to make claims against the Bermuda Insurer . . . under the Stop-Loss Policy and the BPT is not formed or maintained for the purpose of providing health benefits to the Covered Individuals." AEUH Letter at 4. Moreover, "Covered Individuals will not be insureds, and will not have any contractual rights

36

or remedies, under or otherwise be a party to the Stop-Loss Policy or the BPT Trust Agreement." *Id.* at 5. "Each Employer would be solely liable for all the covered claims made by its Covered Individuals under its Employer Plan, including any covered claims not reimbursed" by insurance proceeds paid to the BPT from claims made by the BPT under the Stop-Loss Policy. *Id.* Thus, under the law discussed above, no claim of any employee under an Employer Plan was covered under the Stop-Loss Policy. The Policy simply backstopped each *Employer's* exclusive obligations under ERISA to its own self-funded Employer Plan.

IF's risk-sharing analysis is also wrong. It rests on another false predicate noted earlier: that Locke Lord assumed that "there was no separate underwriting of individual Employer Plans with respect to the Stop-Loss Policy. Each Employer Plan paid the same amount of premium per employee-participant and dependent, regardless of age or health status." ¶203. The LL Letters assumed no such thing. They assumed there would be some *pro rata* allocation among the Employer Trusts of their trust contributions made to the BPT to enable the BPT to pay the premium it owed to the Bermuda Insurer. But the Letters did not assume that this would be done in the manner IF alleges, nor did the Letters assume anything else regarding how the Bermuda Insurer would underwrite the Stop-Loss Policy. Thus, the hypothetical in ¶204, comparing two Plans with participants of different average ages, is irrelevant: Locke Lord made no assumptions in that regard and its assumptions did not require such a result.

But even if, as alleged, the LL Letters assumed that each Employer Trust paid the BPT same amount per employee/participant and dependent, regardless of age or health status, a MEWA would not be created thereby. IF's argument is, in essence, that some Trusts were charged too much for their contribution to the BPT. But that does not shift or share risk among Plans. There was no risk-shifting between Employer Plans because each Employer remained solely obligated for claims of its Plan's participants. *See American Medical Security, Inc.*, 111 F.3d at 364

37

("liability [for claims] remains the employer's even if it has purchased stop-loss insurance and even if the stop-loss insurer becomes insolvent"). IF's logic confuses premium-pricing with risk-sharing. Regardless of how the amount of the Employer Trusts' trust contributions to the BPT were determined, no risk regarding benefit *claims* incurred by the Employer Plans was shifted among any Employer Trust, Employer Plan, or Employer. Rather, those claims risks would be borne entirely by the Stop-Loss Insurer (which is not alleged to be insolvent), and each Employer would remain liable only for claims covered under its respective Employer Plan.

In short, the issue was not that stop-loss premium funds were pooled by the BPT, because that did not pool risk. What created the alleged MEWA was what AEUH did or allowed *contrary* to the assumptions of the LL Letters, including (i) failing to establish separate Employer Trusts for each Employer; (ii) failing to account separately for each Employer Trust's contributions and claims; (iii) instead pooling *all* Employer Trust contributions (not merely those intended to be contributed to the BPT to fund its Stop-Loss Policy premiums); and (iv) allowing those pooled funds to pay claims under any Employer Plan without regard to the source of the claims or the funds used to pay that claim, thereby pooling risk. *See* §§B & G above. This was completely different from the proposed Transaction *described in the LL Letters*.

### ii. The non-transaction of insurance advice was correct.

The LL Letters also advised that the BPT "should be able to purchase" the Stop-Loss Policy without being deemed to have transacted insurance in the United States because (a) the Stop-Loss Policy would be delivered by the Bermuda Broker to the BPT in Bermuda; (b) no part of the solicitation, negotiation, procurement, purchase, sale, issuance or delivery of the Stop-Loss Policy would occur in the United States; and (c) no Employer or Employer Trust would agree to be liable for the obligations of any Employer or Trust for the claims under any other Employer's Plan. ¶213 & AEUH Letter at 7. Contrary to ¶214, this conclusion was not "too narrow a view of

38

what constitutes 'transacting insurance' under state law" and did not "ignore[ ]" other assumed facts that resulted in such unlawful transaction of insurance in the United States.

IF quotes at length from Illinois's definition of "the transaction of an insurance business in this State," ¶217, and argues that such "transaction" occurred because Aggregators and TPAs acted as "agents" of the BPT, which was collecting funds to pay premiums, and the insurance policy was "delivered" to the United States. ¶¶226-36. These conclusions are wrong as a matter of law.

The notion that under the assumed facts, domestic Aggregators, TPAs, or others acted as "agents" of the BPT, turns the LL Letters on their head. A principal-agent relationship requires some sort of actual or implied agreement.[19] None is alleged in the FAC and none was assumed by the Letters. Moreover, IF badly mischaracterizes the assumed structure. The BPT was to be a *trust* for the benefit of the Employer Trusts, and was the sole named insured under the Stop-Loss Policy. As such, it was neither a "front" for the Bermuda Insurer, any more than any insured is a "front" for its insurer, nor an entity that "solicits" Employer Trusts. ¶¶226, 229(b). The BPT was not soliciting anyone. The Employer Trusts were to be the BPT's *beneficiaries*, not its customers, and the BPT was to be sent funds from and on behalf of its beneficiary Employer Trusts, not "on behalf of" the Bermuda Insurer. ¶229(a).

IF also misreads the concept of "delivery" of an insurance policy. ¶¶231-37. IF accuses the Letters of "inconsistency" because they assumed the "Bermuda Broker" would "deliver" the Stop-Loss Policy to the BPT in Bermuda, but also that the "original written contract embodying the Stop-Loss Policy" would be "maintained" within the United States. ¶231 & AEUH Letter at

---

[19] *See* Restatement (Second) of Agency §15 (1958) ("An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act."); *Id.* §1, cmt. a ("The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control."); *Gunther v. Commonwealth Edison Co.*, 126 Ill. App. 3d 595, 598 (1st Dist. 1984) ("It is well established that agency is a consensual, fiduciary relationship between two legal entities . . . .").

5, 7. IF alleges: "[O]bviously," the Policy could not be "maintained" in the United States unless it was "delivered" there. ¶232. IF conflates "delivery" with transfer of possession. "Delivery" with respect to an insurance policy has a particular meaning: the initial delivery of an insurance policy from the insurer to the insured, which completes the formation of the insurance contract and triggers the effectiveness of its coverage. *See* Franklin Best, Jr., 1 *Life & Health Insurance Law* §5:5 (2d ed.) ("The contractual requirement for delivery is satisfied when the evidence shows that the insurer has intentionally parted with control over the possession of the policy and has placed it with contractual intent in the control of the applicant or of some person acting for the applicant."); *accord Stramaglia v. Conservative Life Ins. Co. of Wheeling, W.Va.*, 319 Ill. App. 20, 27 (1st Dist. 1943); *Home Life & Acc. Co. v. Compton*, 222 S.W. 1063, 1064 (Ark. 1920). Forwarding the already-delivered policy by the insured to another party is not a new "delivery" and does not make the insured an insurer. In other words, there is *one* "delivery" of a policy, from insurer to insured, which here was to occur entirely in Bermuda.

Finally, IF alleges that the applicability of a federal Excise Tax to the assumed insurance transaction "was a dagger to the very heart of the 'Transaction' and its entire purpose – avoidance of state insurance laws and regulations." ¶224.[20] The analysis is flawed. IF argues that if the Excise Tax applied, "the funds transferred from the Employer Plans to the BPT could only have been for the purchase of insurance in the United States." *Id*. First, as noted before, IF again conflates the Plans with the Trusts. Only the latter transferred funds to the BPT. Second, that transfer did not "purchase . . . insurance in the United States." It contributed to the trust corpus.

---

[20] The relevant tax provision reads in relevant part: "There is hereby imposed, on each policy of insurance . . . issued by any foreign insurer or reinsurer, a tax at the following rates: . . . (2) Life insurance, sickness, and accident policies, and annuity contracts 1 cent on each dollar, or fractional part thereof, of the premium paid on the policy of life, sickness, or accident insurance, or annuity contract." 26 U.S.C. §4371.

Beneficiaries of a Bermuda trust were to transfer funds to the Bermuda trust for that trust to pay a premium to purchase insurance in Bermuda naming the Bermuda trust as the insured. No one was "selling insurance in the United States," ¶225, and no purchase of insurance occurred in the U.S.

### iii. The "indicia of ownership" advice was correct.

The LL Letters advised that the BPT's purchase of the Stop-Loss Policy from the Bermuda Insurer would not violate ERISA, provided that "the indicia of ownership by each Employer's Trust of all of its assets, including . . . the BPT Beneficiary Trust Certificate and . . . the original written contract embodying the Stop-Loss Policy, at all times must be maintained within the jurisdiction of a district court of the United States in accordance with 29 C.F.R. §2550.404b-1." AEUH Letter at 7. IF alleges that this advice was wrong because the assets of the BPT (consisting of cash and the Stop-Loss Policy) are deemed "'plan assets,'" and that "the indicia of ownership of those assets must at all times have been located in the United States, *see* 29 U.S.C. §1104(b), unless an exception in 29 C.F.R. §2550.404b-1 applies." ¶247.

IF concedes that the LL Letters advised that the BPT Beneficiary Trust Certificate be maintained in the United States, and IF does not dispute that the Certificate is an indicia of ownership of each Trust regarding its beneficial interest in the BPT. But IF mistakenly alleges that "the Employer Plans were to receive no documentation from the BPT except the BPT Certificate." ¶243. IF ignores that the Plans were also required to maintain in the U.S. the original written contract embodying the Stop-Loss Policy, AEUH Letter at 7, and it does not allege that maintaining the Policy in the United States violates the asset regulation. Rather, its complaint is that the BPT Trust Certificate was allegedly an insufficient "indicia of ownership" of BPT's cash. ¶¶245, 248-50. That theory proves too much. Under their logic, if a plan owns stock in a foreign company, maintaining the shares of the company in the United States is insufficient, and it must somehow maintain indicia of ownership of every bank account or property owned by the company.

41

That is not the case. *See White v. Martin*, 286 F. Supp. 2d 1029, 1040-41 (D. Minn. 2003) (plan assets invested through a Canadian brokerage firm were not "outside the jurisdiction" of the federal courts, because "the Plan trust, which owns the assets, exists in the United States and is governed by Minnesota law" and "the trust *res* never left the United States"); Dept. of Labor Adv. Op. No. 75-80 (E.R.I.S.A), available at 1975 WL 4526 (Section 404(b) of ERISA "indicates only that the 'indicia of ownership', *i.e.* evidence of ownership of plan assets (such as bonds or stock certificates), may not be maintained outside the United States. It does not, however, proscribe the investment of employee benefit plan assets outside the United States").

### 2. Locke Lord had no duty to investigate the assumed facts in the LL Letter.

IF's claims are premised in part on the following: Locke Lord had "a duty to confirm that the AEU Plan was not being operated in violation of ERISA and state insurance laws before issuing the [AEUH] Letter and concluding that the plan was legal under a set of assumed facts Casey knew, or had reason to know, deviated from reality." ¶266. Locke Lord had no such duty.

As an initial matter, even assuming that Locke Lord knew and intended that the AEU Plan and Employer Plans would rely on its legal conclusions, lawyers have no ombudsman duty to investigate the accuracy of the assumptions on which they expressly base their legal conclusions:

> When a lawyer prepares legal opinions on the basis of assumed or hypothesized facts, she puts her client and anyone else reading the opinion on notice that she is not vouching for the veracity or accuracy of those facts. That is the point of warning the reader that the facts are assumed in the first place. No reasonable person could rely on such "facts."

*In re Greater Se. Cmty. Hosp. Corp. I*, 353 B.R. 324, 358 (Bankr. D.D.C. 2006). *See also McCamish, et al v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999) (risk of liability to nonclient may be avoided or minimized by setting forth "disclaimers as to the scope and accuracy of the factual investigation or assumptions forming the basis of the representation itself").

Where a lawyer has not been retained to investigate the underlying facts, and has not

vouched for the underlying facts, the lawyer has no duty to investigate. *See, e.g., Geaslen,* 220 Ill. App. 3d at 606-09. In *Geaslen*, the Appellate Court held that lawyers issuing an opinion letter did not have a duty to investigate matters beyond the scope of what they were required to represent in their letter and that the scope of their representation did not include investigating their client's creditworthiness. *Id.* "Defendants' only duty . . . was a duty of care as to the matters requested in the agreement and expressed in the opinion letter." *Id.* at 607.[21]

> Here, Locke Lord not only did not vouch for the assumed facts, it said exactly the opposite:
>
> [T]his letter is based solely on the accuracy of the facts and assumptions expressly stated herein, and the conclusions, statements and views expressed herein cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect.

AEUH Letter at 8; *see also* AISM Letter at 8. That language would have alerted any reasonable person that Locke Lord had not investigated the assumed facts or undertaken any duty to do so.

Moreover, there would have been no reason for Locke Lord to have investigated the assumed facts. Those facts were set forth in a letter to its clients. They concerned how the client, AISM or AEUH, intended to structure a proposed Transaction. If Locke Lord's assumptions were incorrect, the client would have known it. And, if AEUH operated the program in a manner contrary to Locke Lord's express assumptions, AEUH would have known that as well. In either case, AEUH also would have known that Locke Lord's conclusions could not be relied on.

IF alleges that Brian Casey became aware "[o]n at least three occasions prior to releasing the [LL Letters]" "that essential facts assumed in those Letters were not being adhered to in

---

[21] *See also Fortson v. Winstead, et al.,* 961 F.2d 469, 473-74 (4th Cir. 1992) (Texas law) (law firm that had prepared a tax opinion letter for its client's offering memorandum owed no duty to investigate or disclose information regarding the client's financial disclosures where the firm's opinion letter expressly stated that it had not "independently verified many of the representations, statements and assumptions" set forth in the offering memorandum); *cf. Brumley v. Touche, Ross & Co.,* 139 Ill. App. 3d 831, 836 (2d Dist. 1985) (finding that accountants' duty to nonclient arose only after audit reports were provided to plaintiff and accountants "verified their accuracy to plaintiff").

practice." ¶262. Although IF fails to distinguish among the LL Letters, all "three occasions" allegedly occurred between May 10, 2016 and July 2016. Therefore, IF presumably means that Locke Lord had a duty to investigate the facts before issuing the two LL Letters in December 2016. All "three occasions" related to the alleged conduct of Veritas in marketing the "AEU Plan" and in handling assets of the Employer Plans and whether that conduct meant that Veritas was acting as a MEWA. ¶¶263-65. IF claims that "[i]n the face of these known facts, Casey had a duty to confirm that the AEU Plan was not being operated in violation of ERISA and state insurance laws before issuing the AEU Letter and concluding that the plan was legal under a set of assumed facts Casey knew, or had reason to know, deviated from reality." ¶266.

Setting aside that Locke Lord had no duty to investigate the assumptions on which the LL Letters were based, IF fails to allege any facts that existed *in December 2016* when Locke Lord issued the last two LL Letters. IF alleges only that Veritas acted in *May-July 2016* contrary to Locke Lord's later assumptions. It does not allege that Veritas continued to so act in *December 2016* when Locke Lord issued the LL Letters and made its assumptions – or that Veritas continued to have any role in connection with the proposed Transaction in December 2016. Those omissions are glaring and likely not inadvertent. As DOL alleged, and Veritas admitted, AEUH terminated Veritas effective November 30, 2016, weeks before the 12/15/16 Letter and the AEUH Letter were issued. *See DOL Action,* DOL FAC (Dkt. 190), ¶¶58-59, 75; *DOL Action*, Veritas Ans. To DOL FAC (Dkt. 297), ¶45 (admitting that "Veritas PEO, LLC performed certain services for the AEU Plan (which some described as being an 'aggregator') for a certain period of time, which ended when AEU Holdings terminated Veritas PEO, LLC effective November 30, 2016").

Moreover, the allegations and the emails to which IF refers indicate that AEUH was taking steps in May-July 2016 to *stop* what Veritas was doing, and they asked Casey to revise a draft termination letter, which Casey declined due to a conflict. (Locke Lord had represented Veritas.)

44

¶¶69, 101-02. Thus, given Casey's limited involvement, the facts were not "known facts" to Casey, and, importantly, the information he was given indicated that AEUH was moving to correct an aberration and operate in a manner consistent with the assumptions of the LL Letters.

Finally, IF alleges that Locke Lord had a *post-hoc* duty to investigate based on information that Casey learned in February and March 2017, after the AEUH Letter was issued. ¶¶161-67. IF alleges that Casey advised AEUH concerning a federal excise tax issue in January or February 2017. *Id.* And IF alleges that Casey learned in March 2017 that another lawyer, representing a potential TPA, raised unspecified concerns that "put Casey on notice that the BPT was pooling risk and acting as an unauthorized insurer," and that Stoughton "suggested fixing the AEU Plan to eliminate the issues, but Casey persisted in contending the BPT did not pool risk or act as an unauthorized insurer, and no action was taken." ¶¶273, 275. According to IF, "Casey should have recognized he was wrong and that the BPT pooled risk and was an unauthorized insurer." ¶276. But none of IF's allegations suggests that Casey learned any fact inconsistent with the LL Letters. Its allegations suggest only that Casey continued to believe (correctly, as discussed in §II.C.1) in the accuracy of the legal conclusions set forth in the LL Letters.

## III.  COUNT II FAILS TO STATE A CLAIM.

IF's negligent misrepresentation claim fails for many of the same reasons as its negligence claim. IF cannot establish any of the critical elements of its claim:

> (1) [A] false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information.

*Auto-Owners Ins. Co. v. Konow*, 2016 IL App (2d) 150823, ¶7 (quoting *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 218 Ill.2d 326, 334-35 (2006)); *accord Blankinship v. Brown*, 399 S.W.3d 303, 308-10 (Tex. App. 2013).

Illinois generally follows the Restatement (Second) of Torts §552 (1977), which provides:

(1)  One who, in the course of his business, profession or employment, . . . ***supplies false information*** for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their ***justifiable reliance upon the information***, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3),[22] the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a ***limited group of persons for whose benefit and guidance he intends to supply the information*** or knows that the recipient intends to supply it; and

> (b) ***through reliance upon it*** in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Id.* (emphasis added).  *See also Greycas, Inc. v. Proud*, 826 F.2d 1560, 1565 (7th Cir. 1987) (collecting Illinois cases "influenced by" §552); *Blankinship*, 399 S.W.3d at 309 (applying §552 to claim against attorneys).

### A.    No Duty Was Owed Under *Pelham*'s 'Primary Intent to Benefit' Test.

Illinois law has "synthesize[d]" the requirements of negligent misrepresentation claims against lawyers with the requirements of a nonclient's negligence claim against a lawyer under *Pelham*.  *Auto-Owners*, 2016 IL App (2d) 150823, at ¶13; *Oakland Police*, 861 F.3d at 651-52. The Complaint fails to satisfy Illinois' 'primary intent to benefit' test for the same reasons discussed above in §II.A with respect to IF's negligence claim.

### B.    Locke Lord Made No Misrepresentation of Fact.

Locke Lord made no allegedly false statement of material fact.  On the contrary, it did not make any factual representations, false or otherwise, to the AEU Plan or Participating Plans in its

---

[22]  Subsection 3 addresses "[t]he liability of one who is under a public duty to give the information," which is not applicable here.

Letters. It merely provided its client, AEUH, with its legal conclusions based on expressly *assumed* facts about the Transaction. "While statements of opinion may be actionable, the opinion must relate to the falsity of a present or past fact, not a promise to be performed in the future." *Gold v. Vasileff*, 160 Ill. App. 3d 125, 128 (5th Dist. 1987).

A claim for negligent misrepresentation requires that the lawyer have "supplie[d] false information . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information." Restatement §552. For the reasons discussed above in connection with IF's negligence claim, the legal advice Locke Lord provided was not false or incorrect. §II.C. With respect to its factual assumptions, Locke Lord exercised reasonable care in obtaining and communicating the information. Locke Lord did not simply issue its Letters without any client review or input. Rather, as IF alleges, the LL Letters resulted from an extensive drafting process that included edits and comments by Stoughton, who was a familiar with the program as operated by AISM and, after AEUH took over the program, continued to be involved in those operations. *E.g.,* ¶¶109-10 (Stoughton asked Casey to reissue the AISM Letter for AEUH; AEUH Letter "went through several drafts"), ¶133 (Stoughton and Casey communicated about the form of the AEUH Letter, and "Stoughton provided edits and comments in his capacity as fiduciary"). In its Letters, Locke Lord also made clear that it was relying on assumed facts and assumptions about future conduct. It did not assume any obligation regarding the accuracy of the assumptions and expressly noted that its legal conclusions were dependent on those assumptions and should be disregarded if the assumed facts were not true.

### C. The Complaint Does Not Allege the Necessary Element of Reliance.

IF also fails to plausibly allege that Locke Lord intended for the "AEU Plan" or any Employer Plan to take any action in reliance on Locke Lord's representations. Actual and justifiable reliance is a necessary element of a negligent misrepresentation claim. *Cahill v. E. Ben.*

47

*Sys., Inc.*, 236 Ill. App. 3d 517, 521 (1st Dist. 1992); *Quinn v. McGraw-Hill Cos., Inc.*, 168 F.3d 331, 335 (7th Cir. 1999). IF alleges no fact showing that the AEU Plan or any Employer Plan actually and justifiably relied on the LL Letters or Locke Lord, either for its legal analysis or its description of the Transaction's assumed structure. As shown in §II.B.1, IF's conclusory assertions of reliance are insufficient.

Any alleged reliance by the AEU Plan or any Employer Plan was also unreasonable in light of Locke Lord's express disclaimers that only AEUH and AISM were entitled to rely on the LL Letters. *See* §II.B.1; AEUH Letter at 8; AISM Letter at 7-8; 12/15/16 Letter at 1. *See also SC&E Admin. Svcs., Inc. v. Deloitte*, No. A-05-CA-929-SS, 2006 WL 6747974, *10 (W.D. Tex. July 25, 2006) (dismissing claim by non-client against accountants where opinion expressly stated that it could only be relied upon by client).

### D. The Plans' Alleged Damages Were Not Caused by Locke Lord.

"Proximate causation and damages are required elements for a negligent misrepresentation claim." *Kirkland & Ellis v. CMI Corp.*, No. 95 C 7457, 1996 WL 559951, *14 (N.D. Ill. Sept. 30, 1996)) (citing *Martin*, 163 Ill. 2d at 59). As discussed in §II.B.2 above, IF has not alleged and cannot plausibly allege that Locke Lord caused the alleged damages. Its claim should be dismissed for this additional reason.

### CONCLUSION

For the above reasons, the Court should dismiss the Complaint with prejudice.

Dated: October 11, 2019                    Respectfully submitted,

                                           **LOCKE LORD, LLP,**

                                           By:___/s/ Edward W. Feldman_____
                                                 One of its Attorneys

# E X H I B I T   1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RECEIVERSHIP MANAGEMENT, INC.** | ) | |
| **IN ITS CAPACITY AS INDEPENDENT** | ) | |
| **FIDUCIARY OF THE AEU HOLDINGS,** | ) | |
| **LLC EMPLOYEE BENEFIT PLAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:18-cv-08167** |
| | ) | |
| **AEU HOLDINGS, LLC,** | ) | |
| **STEPHEN M. SATLER,** | ) | **JURY DEMAND** |
| **STEVEN GOLDBERG, and** | ) | |
| **BILLIE KATHRYN WHEELER WRAY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

This case is about a failed health benefits plan -- the AEU Holdings, LLC Employee Benefit Plan ("AEU Plan"), and its Participating Plans.[1] Plaintiff Receivership Management, Inc. is the court-appointed Independent Fiduciary of the AEU Plan and its Participating Plans ("Independent Fiduciary") and brings, in that capacity, the following claims against AEU Holdings, LLC, Stephen M. Satler, Steven Goldberg, and Billie Kathryn Wheeler Wray. In support thereof, the Independent Fiduciary alleges as follows.

---

[1] The AEU Plan is a named defendant in the related and pending case filed in this Court by the Secretary of the U.S. Department of Labor (Acosta v. AEU Benefits, LLC, et al., United States District Court for the Northern District of Illinois Case Number 1:17-cv-07931-JHL/SMF (hereinafter, the "DOL Action"). The "Participating Plans" are those failed health benefit plans that were part of the AEU Plan by virtue of their participation in the AEU Plan, as set forth in the Secretary's pleadings and in the orders issued by the Court in the DOL Action. (See, e.g., First Amended Complaint in DOL Action (D.E. #190) at ¶ 15 and Preliminary Injunction in DOL Action (D.E. #59) at pp. 1-2).

## PARTIES

1.     Independent Fiduciary is a Tennessee corporation with its principal place of business in Nashville, Tennessee.  Independent Fiduciary was appointed as such by the Court in the related and pending DOL Action.

2.     Defendant AEU Holdings, LLC ("AEUH") is a Delaware limited liability company with its principal place of business in Texas.  None of the members of AEUH is a citizen or resident of Tennessee.

3.     Defendant Stephen M. Satler ("Satler") is an individual who is a citizen of New Jersey.  At all times relevant to this Complaint, Satler was the Chief Executive Officer and significant owner (i.e., an approximate 22% owner) of AEUH, and a member of the Board of Managers of AEUH.

4.     Defendant Steven Goldberg ("Goldberg") is an individual who is a citizen of Texas. At all times relevant to this Complaint, Goldberg was the Chief Operating Officer and significant owner (i.e., an approximate 22% owner) of AEUH and a member of the Board of Managers of AEUH.

5.     Defendant Billie Kathryn Wheeler Wray ("Wray") is an individual who is a citizen of Louisiana.  At all times relevant to this Complaint, Wray was the in-house general counsel for AEUH and its subsidiaries.

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over this Complaint under 28 U.S.C. section 1332 because the parties are diverse since they are citizens of different states and the amount in controversy, i.e., the damages sought by the Independent Fiduciary exclusive of interest and costs are in excess of $75,000.00.

7.      This Court has personal jurisdiction over Defendants because Defendants have the requisite minimum contacts to subject themselves to jurisdiction in this Court.

8.      Venue is appropriate in the Northern District of Illinois pursuant to 28 U.S.C. section 1391(b)(2) because a substantial part of the events, acts, transactions and occurrences giving rise to the claims alleged in this Complaint occurred within the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

*Appointment and Authority of Independent Fiduciary*

9.      On November 2, 2017, the Secretary of Labor filed the DOL Action against various entities.

10.     On November 3, 2017, the court in the DOL Action entered an Ex Parte Temporary Restraining Order ("TRO").

11.     The TRO defined the AEU Holdings, LLC Employee Benefit Plan as the "AEU Plan" and further defined all health benefit plans that are part of or participate in the AEU Plan to be "Participating Plans."  The TRO ordered, in part, that Receivership Management, Inc., was appointed as the independent fiduciary to the AEU Plan and Participating Plans.

12.     On December 13, 2017, the court in the DOL Action entered a Preliminary Injunction ("Preliminary Injunction"; D.E.#59 in DOL Action).  The Preliminary Injunction ordered, in part, that the Independent Fiduciary shall remain as the Independent Fiduciary to the AEU Plan and Participating Plans, serve as the successor Trustee and Plan Administrator of the AEU Plan, and shall have full and exclusive fiduciary authority over the AEU Plan's administration, management, and control of the AEU Plan's assets.  Preliminary Injunction ¶ 4. The Preliminary Injunction further gave the Independent Fiduciary "[a]uthority to exercise all fiduciary responsibilities relating to the Participating Plans and the AEU Plan, including, but not

limited to, the responsibility to act as the administrator of the Participating Plans and the AEU Plan." Id. ¶ 14(a)

13.     The Preliminary Injunction gives the Independent Fiduciary, among other authorities, the "[a]uthority to identify and pursue claims on behalf of the Participating Plans and the AEU Plan[.]" Preliminary Injunction ¶ 14(j).

14.     The related DOL Action remains pending before the U.S. District Court for the Northern District of Illinois.

15.     AEU Benefits, LLC ("AEUB") is a wholly-owned subsidiary of AEUH. The names AEU Holdings and AEU Benefits are used interchangeably on various AEU Plan documents, with the shortened form "AEU" also being used frequently in documents and by the Defendants themselves as well as other officers and employees of AEUH and AEUB. Accordingly, unless specifically denoted otherwise, the term "AEU" used in this Complaint refers to AEUH and AEUB collectively.

***General Features and Structure of the AEU Program***

16.     Prior to 2015, a company named ALLInsurance Solutions Management, LLC ("AISM"), operated and administered a self-funded health benefits program platform. The AISM program platform focused on providing health benefits coverage for professional employer organizations ("PEOs") and Administrative Services Only ("ASO") arrangements.

17.     In July 2015, AISM engaged AEU to manage the AISM program platform. AEU managed that program platform from July 2015 to late-April 2016 and was paid fees for such services.

18.     In late-April 2016, AEU acquired the AISM program platform pursuant to an Asset Purchase Agreement dated April 26, 2016. Under the Asset Purchase Agreement, AEU purchased

AISM's business, assets, and property. AISM's assets included the AISM program platform. Via the Asset Purchase Agreement, AEU purchased the assets associated with the AISM program platform and took over the sales, marketing, underwriting, rating, claims handling, and program administration and advisory functions. This self-funded health benefits program platform is referred to herein as the "AEU Program."

19.     Defendants negligently failed to take action to ensure the viability of the AEU Program. Defendants purported to establish the AEU Program as a health benefits plan for the Participating Plans, but negligently failed to do the necessary steps to correct the problems discussed below.

20.     The AEU Program engaged aggregators and brokers to market, recruit, and enroll participating employers in the AEU Program.

21.     Under the AEU Program, each participating employer was to provide health benefits solely for its own employees and, if any, their respective spouses and dependents.

22.     The employer health benefit programs participating in the AEU Program are referred to herein as the "Participating Plans."

23.     Defendants knew or should have known that each participating employer was to establish a voluntary employees' beneficiary association ("VEBA") trust for its specific Participating Plan. The Defendants knew or should have known that each trust was to become a tax-exempt organization as a "voluntary employees' beneficiary association" under Section 501(c)(9) of the Internal Revenue Code (IRC), 26 U.S.C. section 501(c)(9). Defendants knew or should have known that the participating employer's VEBA trust was to serve as that employer's health benefits program.

24.     Defendants knew or should have known that to become a lawful and authorized VEBA trust under Section 501(c)(9) of the IRC, each employer had to satisfy the following requirements:

- The assets must be held in trust for the "members" of the trust, i.e., there must be separate accounts for each VEBA.

- There must be an organization of associated employees.  Eligibility for membership must be defined by reference to objective standards that constitute an employment-related common bond among such individuals.  Employees of one or more unaffiliated employers engaged in the same line of business "in the same geographic locale" would be considered as having an employment-related common bond.

- None of the benefits can inure to private shareholders or individuals.

- The VEBA must file a Form 1024 notice with the IRS and then receive a determination from the IRS that the entity is qualified under IRC § 501(c)(9).

- The association of employees must be made up of no more than 10 percent ownership. Thus, if there are nine or less participants in the alleged VEBA, if one of them is the owner, it cannot be a VEBA.

25.     Defendants provided to each employer documents which Defendants knew or should have known were required to be completed, executed, and/or received by each Participating Plan to be in the AEU Program.  The documents were as follows:

- VEBA Trust Agreement
- Program Advisory Services Agreement
- Collection Agreement with aggregator
- Certificate from Bermuda purchasing trust
- Plan Administrator Services Agreement

26.     But as Defendants knew or should have known, many employers never signed/executed/received the required documents related to the AEU Program.

27.     Defendants were to manage administrative functions for the AEU Program, provide underwriting for the AEU Program, and provide overall management to the AEU Program.

28.    The sales and marketing of the AEU Program was centralized at AEU so that all marketing material could be controlled by AEU to ensure that accurate information was provided to employers by aggregators and brokers.  AEU directed marketing of the AEU Program toward distribution points where a large number of employers could be accessed at one time, e.g., PEOs, associations, and other aggregators, although the AEU Program was also marketed and sold to individual employers.

29.    AEU provided a "VEBA Tool Kit Presentation" to aggregators and brokers to provide to employers describing the VEBA product, how premium equivalents (employer/ employee contributions) are collected, how claims are paid, and the benefits versus fully insured plans.  The toolkit included a power point presentation which stated that the Program was a "Self-Funded Health Benefits" plan, that "Each employer client has their own self funded plan to deliver medical and prescription drug benefits to employees," and that the Program was "Not insurance" but was "A self funded trust program with secure stop loss in Bermuda."

30.    Defendants prepared and used "Underwriting Guidelines" for the AEU Program. The Underwriting Guidelines stated as follows regarding minimum participation by employers: "Minimum of 5 active full time employees needed to provide a proposal."  The Underwriting Guidelines also stated that participation requirements were based on the size, i.e., number of full-time employees, in the group.  For groups in which employees contributed toward the cost of the coverage, the document required 100 percent participation for groups of 5 lives, "100 less one" percent for groups of 6 to 9 lives, and 75 percent participation for groups of 10 and over.

31.    The AEU Program was marketed by Defendants as including the purchase of insurance via a Bermuda insurance captive.  Each Participating Plan was to join a Bermuda purchasing trust ("BPT") located in and formed under the laws of Bermuda, which trust was to

indemnify and stand behind each Participating Plan's claim obligations. The BPT was to produce

a certificate to each Participating Plan evidencing such indemnity obligation. The BPT was to

purchase insurance coverage to back its indemnity obligations to each Participating Plan. Under

the AEU Program's intended structure, Participating Plans would be co-beneficiaries of a single

BPT. The specific BPT, in turn, was to purchase a Primary Policy and an Excess Stop-Loss Policy

with the BPT listed as the named insured for the benefit of each of its beneficiaries. This

arrangement was to give each Participating Plan the right to receive payments from claims made

against the Primary and Excess Stop-Loss policies for health care costs of the Participating Plan's

covered employees. The AEU Program's designated administrative representative used a portion

of the contributions collected from the Participating Plans to fund the purchase of insurance by the

BPT.

      32.     The VEBA Trust Agreement for each specific VEBA Trust stated, in part, as

follows related to contributions by the employer and employees:

> RECEIPT OF FUNDS. All monetary employee and dependent contributions
> received by the Trust shall be deposited through the Plan Administrator in a bank
> or banks located in the jurisdiction of the Sponsor's, the Plan Administrator's
> principal place of business or the District of Columbia as agreed by the Trustee(s)
> . . . .

* * * *

> COLLECTION OF CONTRIBUTIONS.
>
>     (a)    ***All Sponsor contributions and all Employee Participants'
> contributions shall be deposited in the bank accounts for the Trust, which may
> be an escrow account maintained by the Plan Administrator***. All contributions
> so received, together with the income therefore shall be held, and may be invested
> and reinvested, and shall be administered by the Trustees pursuant to the terms of
> this Agreement.
>
>     (b)    The Trustee(s) and the actuaries providing services relating to the
> Plan shall determine the expected costs of the benefits provided under the Plan and
> the administration of the Trust. The Trustee(s) or the Plan Administrator as

8

designee and its agents shall fix the amount of contributions for the costs of benefits provided under the Plan for eligible employees and their eligible dependents and the administration costs and expenses of the Plan. . . .

* * * *

(d)     The Trustee(s), or the Plan Administrator as designee, are specifically authorized to determine the required amount of contributions to pay the expected cost of benefit provided under the Plan and the cost of administration of the Trust and Plan based on the number of eligible employee and dependent, and any other relevant factors.  . . . .

VEBA Trust Agreement Art. II §4 & Art. IV § 2(a), (d) (emphasis added).

33.     None of the Defendants were a party to any VEBA Trust Agreement, but Defendants owed duties to the AEU Program to ensure that its structure was consistent with the requirements in the VEBA Trust Agreement.

***Defendants' Negligent Actions and Inactions Caused the Failure of the AEU Program***

34.     AEUH managed and administered the AEU Program and, at all relevant times, owed a duty of care to the AEU Program.

35.     As the Chief Executive Officer and shareholder of AEUH and a member of the Board of Managers of AEUH, Satler, at all relevant times, owed a duty of care to the AEU Program.

36.     As the Chief Operating Officer and shareholder of AEUH and a member of the Board of Managers of AEUH, Goldberg, at all relevant times, owed a duty of care to the AEU Program.

37.     Wray was in-house general counsel for AEUH at all relevant times beginning no later than June 2015 and continuing through when she left her employment at AEUH on July 1, 2017.  Wray, at all relevant times, owed a duty of care to the AEU Program.

38. Wray was first licensed to practice law in 2014 and became general counsel for AEUH less than a year after first being licensed to practice law. Wray's duties, as stated by her in a document entitled "General Counsel Position Description," included the following duties:

- "[E]nsure the company is operating legally at all times."

- "[B]e aware of all transactions of the company from the beginning as this will limit the Company's legal risk."

- "Work with the executive team to ensure that the company is always in compliance with industry employment and business process law."

- "Provide accurate legal guidance to the executive staff on all matter[s]."

39. At the time Wray became the general counsel for AEUH, Wray had no experience regarding advising and structuring a health benefits program and no experience regarding compliance related to VEBAs under Section 501(c)(9) of the Internal Revenue Code (IRC). Wray admitted she knew little, if anything, about VEBAs in an email on October 3, 2016, in which she asked Tom Stoughton at S.D. Trust Advisers (an entity involved in the AEU Program), "Where would you suggest I begin/continue my legal VEBA education?"

40. Defendants committed numerous acts of negligence which breached general duties of care owed by Defendants to the AEU Program.

41. Defendants failed to operate the AEU Program in accordance with the documents and requirements associated with the AEU Program. As the problems discussed below became evident to Defendants, they failed to take action to fix and correct the problems.

**A. Defendants Negligently Failed to Ensure the Proper Set Up of the AEU Program and/or to Correct Matters Regarding the Set Up of the AEU Program.**

42. The Defendants did not ensure that the structural requirements in the VEBA Trust Agreement were met.

10

43. Each Participating Plan's VEBA trust was required to complete certain documentation, obtain an employer identification number, and obtain a certificate from their respective BPT, but almost none of them did so.

44. As of March 2017, Defendants had learned sufficient information such that they knew or should have known that the AEU Program was being operated improperly without the requirements being met. Defendants failed to take actions to correct the problems. Had Defendants taken action to correct the problems, the AEU Program would not have incurred the millions of dollars of unpaid claims that it incurred which are presently outstanding.

45. In or around March 2017, Wray began to set up the onboarding process for new employers to follow. Wray set up the onboarding process so that employers could complete the required documents in order to be a VEBA trust in the AEU Program:

- Program Advisory Services Agreement

- Collection Agreement with Aggregator

- Certificate from BPT

- Plan Administrator Services Agreement

- Small Employers Business Trust Agreement Form

Defendants, however, failed to ensure that the AEU Program had all required documents completed for each Participating Plan. Defendants also failed to ensure that each Participating Plan completed and filed a Form 1024 with the IRS and obtained IRS approval of such Participating Plan's status as a VEBA under IRC Section 501(c)(9).

46. Defendants failed to take action on behalf of the AEU Program to ensure that the Participating Plans set up separate bank accounts, issued and obtained certificates from the Bermuda purchasing trust, filed IRS Form 1024s, and obtained approvals from the IRS that

specific VEBAs qualified as such. Wray worked on automating the completion of the documents by each Participating Plan, but Defendants did not do anything regarding requiring separate bank accounts/accounting by each Participating Plan, ensuring each Participating Plan submitted a Form 1024 to the IRS and obtained approval of the VEBA trust from the IRS, or ensuring that Bermuda certificates were issued and delivered to each Participating Plan.

47.     There are numerous instances documented in emails where Defendants admitted knowing that the Participating Plans were not in compliance with the AEU Program's structural requirements. Notwithstanding such knowledge, Defendants negligently failed to take action to ensure compliance with the structural requirements, and improperly continued accepting employer contributions and allowing Participant Plans to incur claims.

48.     Defendants knew that each Participating Plan's VEBA trust needed to obtain a certificate from its respective BPT, but failed to ensure that the certificates were issued. An email to Wray on April 14, 2017 from Tom Stoughton (forwarding an email from the Bermuda firm that issued such certificates) confirmed Wray's failure to ensure that the Participating Plans obtained certificates issued by the Bermuda trusts:

> I haven't heard from you in awhile and I still haven't received anymore certificates which were promised in October 2016.
> **The last certificates that I received were for January 2016** and I'm sure that more Veba Trust certificates have been issued since January 2016.
> It is of paramount importance that we receive the certificates.
> Do not hesitate to contact me should you have any questions. (emphasis added)

That email was copied to Satler and forwarded to Goldberg. Defendants, therefore, knew in April 2017 that no certificates had been provided to any purported VEBA trust since **_January 2016_**. Wray never ensured that the AEU Program had received the certificates issued for the purported VEBA trusts in the AEU Program.

49.     Defendants knew, in April 2017, that the AEU Program's structure suffered from the lack of having proper documentation regarding the purported VEBA trusts.

50.     Wray's reaction to this knowledge was to email Defendant Satler and Tom Stoughton at S.D. Trust Advisors, on April 11, 2017, that "***while this documentation is absolutely important it is not the end of the world if its not completed***."  Wray was negligent in making this statement; the documentation was essential for the proper operation of the AEU Program and employer/employee contributions should not have been accepted without the proper documentation being completed and received by the Participating Plans.

51.     Wray realized a day later that her statement quoted in the paragraph above was incorrect.  On April 12, 2017, she drafted an email to go to Participating Plans asking them to complete the required documentation.  She sent that draft email to Rod and Anna Maynor at aggregator Black Wolf Consulting, Inc. ("BWC"), asking them to review the draft letter and send Wray the email addresses for the Participating Plans.

52.     Defendants knew and understood the importance of having the documents completed, but still failed to ensure that the required trust documents were completed, the certificates from the respective BPT were received, the IRS Form 1024s were submitted, and IRS approvals of the VEBA trusts were obtained.

53.     None of the Participating Plans' purported VEBA trusts filed a Form 1024 notice with the IRS and, therefore, none received any determination from the IRS that the entity was qualified under IRC § 501(c)(9).

54.     Tom Stoughton reaffirmed to Defendants the requirement that the proper documentation and underwriting be done.  In an email to Defendants on April 24, 2017, Stoughton

made clear that the AEU Program structure was not complied with and that no plan existed until it was fully underwritten and documented, stating:

> NO PLAN EXISTS AND YOU SHOULD NOT BE TAKING ANY FUNDS FROM ANY PLAN UNTIL IT IS FULLY UNDERWRITTEN, AND FULLY DOCUMENTED AND ALL DOCUMENTS, INCLUDING PLAN DOCUMENTS, SPD'S AND SBC'S ARE COMPLETED AND ON FILE FOR REVIEW.  (emphasis in original)

55.     Defendants knew that hundreds of employers had failed to complete the proper documents.  But even though the paperwork of many employers was not done and even though Defendants had been advised by Tom Stoughton that the AEU Program should not be accepting contributions from employers until the required documentation was completed, Defendants continued to allow contributions into the AEU Program from the Participating Plans.  Wray believed that it was permitted for the AEU Program to continue taking the money of those employers as shown by her statement in a May 2, 2017 email copied to Satler and Goldberg that, "***I do not believe we should not take money because paperwork is not done.***" (emphasis added).

56.     In August 2017, Tom Stoughton confirmed in an email to new AEU general counsel Sandie Darling that it was Wray who was responsible for getting all the required documentation done:

> . . . ***Billie was responsible for documentation and started the process but I don't know what she completed and what she did not.***  I think that we should discuss, as I am not aware of ANY process by which documents are executed or how/when groups are added.  (bold and italics added; caps in original)

57.     The vast majority of the Participating Plans had not completed and obtained the required documents to be set up in the AEU Program.  Soon after Wray left her employment with AEUH, Wray reported the following information in an email to new AEU general counsel Sandie Darling:  BPT1 had 683 sponsor companies of which only 128 had signed trust documents, and 574 had employer identification numbers (EINs); and BPT2 had 220 sponsor companies of which

only 14 had signed trust documents and none had EINs. Thus, even though Defendants were responsible to ensure that the AEU Program was properly set up including that Participating Plans were properly documented, Defendants failed to do so. The Participating Plans did not establish lawful VEBA trusts. The Defendants should have never allowed the AEU Program to accept employer/employee contributions or incur claims related to such Participating Plans.

**B.     Defendants Were Negligent in Allowing/Not Prohibiting the Improper Commingling of the Participating Plans' Funds.**

58.     Defendants knew from the VEBA Trust Agreement that each Participating Plan's contributions were to be separated or, at a minimum, accounted for separately. The VEBA Trust Agreement required that each employer set up a separate VEBA trust with separate accounts and accounting.

59.     Defendants also knew that the AEU Program was not in compliance with the VEBA Trust Agreement if contributions from Participating Plans were commingled and pooled together instead of being maintained and accounted for separately.

60.     Defendants knew that each Participating Plan was to set up and have its own accounting and that each Participating Plan was to deposit its contributions into its own account. Even so, Defendants knew of, approved, and enabled the AEU Program's commingling and pooling of all of the Participating Plans' contributions and further approved the use of the commingled and pooled funds to pay claims of all Participating Plans together and collectively without differentiation by Participating Plan.

61.     Contrary to the requirements in the VEBA Trust Agreement, there were no separate accounts for each purported Participating Plan. Instead, (i) aggregators invoiced the employers, (ii) aggregators received employer contribution payments into the aggregators' bank accounts and not a bank account for each trust, (iii) aggregators took a portion of the employer contributions to

pay themselves and their brokers, and (iv) aggregators sent the remainder to the AEU Program's designated administrative representative's bank account.

62. Thus, in the AEU Program, as operated by Defendants, contributions from Participating Plans were commingled and pooled with funds from other Participating Plans. The contributions from employer Participating Plans were first commingled and pooled in aggregator bank accounts where the aggregators deducted their own fees and broker commissions. The remaining contribution amounts were then commingled and pooled in the bank accounts of the AEU Program's designated administrative representative from which fees were withdrawn for AEU, the designated administrative representative, and the TPAs. The remaining contributions were then commingled and pooled in the Bermuda accounts.

63. The Defendants knew that claims were not paid by TPAs solely for each separate purported VEBA trust, but were paid from commingled and pooled funds by TPAs based on which providers or claimants were complaining the loudest about claims not being paid, including threatening or filing litigation.

64. By April 2017, Defendants knew of the commingling and pooling of the contributions from Participating Plans. Defendants did not take any corrective actions even though this was not allowed under the AEU Program.

65. The pooling of contributions and collective payment of claims meant that the AEU Program, as operated by Defendants, and contrary to the VEBA Trust Agreement and AEU Program documents, functioned more like traditional health insurance than a self-funded plan under which the individual employer remains liable for claims in excess of contribution amounts and stop-loss payments. But the Defendants had not had the AEU Program underwritten or rated like traditional health insurance. Defendants failed to properly underwrite the AEU Program or

16

have sufficient rates charged, especially considering the excessive fees deducted from employer contributions at every stage of the process. As a result, the AEU Program was grossly underfunded and incurred millions of dollars of claims which it is unable to pay, all as a result of the Defendants' negligent actions and inactions.

### C. Defendants Negligently Allowed Aggregators to Deduct Their Fees From Participating Plan Contributions.

66. Defendants knew that **all** contributions from each employer were required to go to the Participating Plan's separate account, but knew that was not how the AEU Program was being operated. When Anna Maynor of BWC asked Wray in an email on June 20, 2017 if they needed to give each employer its own loss run, Wray responded as follows:

> Technically yes.
> This is one of the things I spoke to Rod about.
> ***The Plan Administrator is supposed to have an accounting of each trust.***
> ***All the money collected (yes All) should be deposited in the trust.***
> (emphasis added)

67. Despite knowing that "All" money collected was to be placed in the separate purported VEBA trusts' accounts, Defendants knew that aggregators were routinely, if not without exception, deducting fees from the employer contributions and that what was being contributed were employer contribution amounts net of the aggregators' fees and commissions. Accordingly, Defendants knew that, contrary to the way in which the AEU Program was to operate, not "All" of the employer contributions were being submitted for each purported VEBA trust.

68. The Defendants' allowance of the aggregators' withdrawal of fees and commissions from employer contributions resulted in such contributions not being available for the payment of medical claims as was required. Had those funds been available for the payment of medical claims, the AEU Program would not have suffered much of the losses and damages related to the AEU Program's unpaid and outstanding claims.

17

### D. Defendants Negligently Allowed Associations and One-Person Groups to be Participating Plans.

69.    Many of the purported VEBA trusts were not organizations of associated employees as required to be a legitimate VEBA under the AEU Program.

70.    Wray said in an email to Tom Stoughton on March 7, 2017 as follows:

> ***It is my understanding that each Sponsor Company must have its individual Veba, TIN, and bank account etc. and that an Association is not a Sponsor Company.***  (emphasis added)

Stoughton responded that Wray understood correctly.  That email from Stoughton was forwarded to Satler and Goldberg.

71.    Defendants knew that each employer needed to set up its own Participating Plan with its own VEBA trust and that groups of employers could not set up a single Participating Plan. But Defendants also knew as of that time that there were a number of associations in the AEU Program which were, in fact, set up as single purported Participating Plans.

72.    Defendants, therefore, knew that if groups, i.e., associations, of employers had been set up as purported Participating Plans, each such group was not a proper VEBA trust under the AEU Program.

73.    To add insult to injury, even the purported association "plans" were not properly documented because such associations in the AEU Program did not have the required documentation completed.

74.    Defendants also knew that the AEU Program was not allowed to have one-person "groups" as Participating Plans, and for good reason.  Covering single individuals is inherently risky, and the AEU Program was rated and underwritten for group, rather than individual, coverage.  Nevertheless, Defendants knew that many such one-person employer "groups" were enrolled as Participating Plans.  Defendants worked with others at AEU to send a letter to one-

person employer groups informing them that they did not meet the AEU Program's underwriting guidelines and that they were terminated from the AEU Plan. The letter was sent to VEBAs with less than five employee lives enrolled. The letter stated, in part:

> The reason for our action is that, (i) under our new underwriting guidelines, effective January 1, 2017, we require each Plan to have a minimum of five employee lives participating, and (ii) our records indicate that the Cancelled Plans each have fewer than five employee lives participating.

75.     Notwithstanding that letter and Defendants' knowledge that one-person employer groups were not allowed in the AEU Program, Defendants never took action to ensure that one-person groups were removed from the AEU Program.

76.     In late February 2017, a broker in Bermuda named Simon Logue, who was the intermediary between the AEU Program and Lloyds of London as the stop-loss insurance carrier for BPT1, sent AEUH and S.D. Trust Advisors a list of one-person groups in BPT1. Logue sent that list because one-person groups were not allowed under the stop-loss insurance policy underwriting criteria. After getting that list, Tom Stoughton at S.D. Trust Advisors asked that AEU "get these people out of the program." Although Wray sent emails saying that she was looking for a place to send one-person groups, Defendants never had the AEU Program take action to have such one-person groups removed from the AEU Program as had been required by the stop loss insurance policy and carrier.

77.     Simon Logue followed up in an email sent on March 30, 2017 noting the requirements related to underwriting from the stop-loss insurance carrier. The list of requirements from the stop-loss carrier stated: "Removing single insureds. Please confirm this has been done." That list of requirements from the stop-loss insurance carrier also stated that "Any business that falls out of these underwriting parameters is not [to] be covered under the placement."

78.     Instead of removing one-person groups from the AEU Program, Defendants allowed the existing one-person groups to remain in the AEU Program and allowed aggregators and brokers to continue placing such one-person groups in the AEU Program, even though stop-loss coverage would be not be available for those plans, contrary to how the AEU Program was marketed.

79.     On April 10, 2017, Steven Nigro, an individual who was an AEUH Board member and was at the time its temporary CFO, emailed Tom Stoughton that 105 of 300 new groups had to be canceled because they were one-person groups.  Instead of acting on this information, Wray rejected taking action, stating to Satler and Goldberg that Nigro's "requests fall outside of his authority" as temporary CFO and board member and "who we cancel or write is absolutely outside of [Nigro's] role and responsibilities."  Thus, instead of removing one-person groups, Defendants merely discussed Nigro's role and responsibilities.

80.     Defendants failed to ensure that the AEU Program complied with the stop-loss insurance underwriting policy criteria related to one-person groups, which was a requirement based on underwriting principles and based on the AEU Program's Underwriting Guidelines. Inclusions of such risky one-person groups in contravention of the AEU Program's Underwriting Guidelines resulted in the AEU Program incurring medical claims that the AEU Program should not have incurred, thereby damaging the AEU Program through such additional medical claims, many of which remain outstanding and unpaid.

**E.     Defendants Negligently Allowed the AEU Program To Be Marketed Improperly.**

81.     Participating Plans were told by Defendants that the AEU Program was a self-funded health benefit program but were also told that the employer's monthly contribution/premium payment was the maximum cost to a Participating Plan and its employees.

Each Participating Plan was supposed to be self-funded regarding all claims associated with that Participating Plan, but employers were told that all that they were required to pay was their monthly contributions, which were expressly called "premiums" even though the AEU Program was a self-funded program with stop-loss insurance. In fact, under a proper "self-funded" plan, the employer is responsible for all claims incurred in excess of the employer/employee contributions and stop-loss payments.

82. AEU approved the marketing materials for the AEU Program. The official marketing materials for the AEU Program, approved by AEU, state that plans under the AEU Program were self-funded. The materials state that the AEU Program was a "Self-Funded Health Benefits" plan, that "Each employer client has their own self funded plan to deliver medical and prescription drug benefits to employees," and that the AEU Program was "Not insurance" but was "A self funded trust program with secure stop loss in Bermuda." However, Defendants allowed the AEU Program to be marketed as insurance that would pay all covered claims in exchange for payment of monthly insurance premiums by Participating Plans. The AEU Program should not have accepted employer/employee contributions or allowed the Participating Plans to incur claims under these circumstances.

83. Defendants also failed to ensure that the AEU Program had an up-to-date and accurate plan document and summary plan description. In April 2016, AEU issued a Plan Document/Summary Plan Description dated January 1, 2016 entitled the "AEU Holdings, LLC Plan Document and Summary Plan Description Employee Benefit Medical Plan Effective January 1, 2016" (the "1/1/16 AEU PD/SPD"). The document was signed by Satler, dated April 15, 2016, on behalf of AEU, but had the same address as had been used for an aggregator called Veritas Benefits, LLC, in an SPD purportedly used for the AISM program.

84.     For 2016 and 2017, the AEU Program used the 1/1/16 AEU PD/SPD signed by Satler on April 15, 2016 as the PD/SPD for the AEU Plan even though it had inaccurate information set forth therein.  No plan document or summary plan description had been prepared or distributed for 2017.  In or about March 2017, Defendants learned that this was the PD/SPD being used by the AEU Program and knew that it was out-of-date and incorrect, but did not stop it from being used.  Defendants failed to take action to replace the 1/1/16 AEU PD/SPD with a 2017 PD/SPD for the AEU Program.  Instead, with Defendants' knowledge and assent, all persons in the AEU Program kept using the 1/1/16 AEU Holdings SPD or nothing at all.

**F.    Defendants Negligently Failed To Ensure That the Plans in the AEU Program Were Properly Underwritten.**

85.     Defendants negligently failed to ensure that the Participating Plans who joined the AEU Program were properly underwritten and that rates were properly set.  Defendants did not underwrite every individual coming into the AEU Program.  Companies were underwritten as a group and then additional employees were accepted regardless of health status.  This form of underwriting was negligent in that it failed to ensure that the appropriate and necessary rates were charged for each Participating Plan.

86.     As operated by Defendants, the AEU Program was to charge "sufficient" premiums from Participating Plans and to pool those premium contributions in order that the total would be sufficient to cover all medical claims for all Participating Plans.  This model was used because Participating Plans were not established as separate accounts where each Participating Plan's contributions would be used solely for that Participating Plan's covered individuals.  To successfully implement this model, premium rates had to be sufficient to cover all claims of all Participating Plans.  However, the rates charged were not sufficient because of Defendants' negligence.

87. Instead of Participating Plans being limited to a minimum of five active full-time employees, there were numerous one-person "groups" in the AEU Program, which abrogated the underwriting principles of the AEU Program. Although Defendants knew that such one-person groups were in the AEU program, Defendants failed to take action to remove all such one-person groups from the AEU Program.

88. The premium rates charged to Participating Plans, at the direction of Defendants, were insufficient to generate the funds needed to pay the expected (and later, actual) claims costs associated with the Participating Plans in the AEU Program.

89. Other than monthly premium payments, no additional funding was ever sought from Participating Plans to generate funds for the payment of claims even though Defendants marketed the AEU Program as a self-funded program.

***Defendants' Actions Caused Substantial Injuries in Illinois and A Substantial Part of the Events Giving Rise to the Claims Against Defendants Occurred in This District***

90. The actions and inactions of Defendants described above harmed numerous persons who reside in Illinois.

91. Numerous Participating Plans harmed by Defendants' actions and inactions described above are located in Illinois.

92. Defendants marketed the AEU Program to employers in Illinois.

93. Medical benefits coverage was provided to Participating Plans covering individuals in Illinois.

94. Claims were paid for or denied to participants and beneficiaries in Illinois.

95. As of October 18, 2017, participants and beneficiaries in the AEU Program included at least 1,697 Illinois residents, 229 of them being residents of Chicago.

96.     As of October 18, 2017, Illinois residents were approximately 23 percent of the participants in the AEU Program and approximately 28% of the unpaid claims. Of all the states with residents in the AEU Program, Illinois had the largest percentage of residents in that program.

97.     Aggregator BWC was, by far, the main aggregator for the AEU Program. The vast majority of Participating Plans in the AEU Program were enrolled by aggregator BWC. BWC is located in and operated from Frankfort, Illinois.

98.     As of April 24, 2017, of the approximately 683 Participating Plans that aggregator BWC had enrolled in the AEU Program, 266 Participating Plans, or 39 percent, were located in Illinois with at least 62 Participating Plans located in the Chicago area.

99.     Each Defendant sent and received numerous communications (mostly emails and phone calls) directly to/from persons in Illinois regarding the actions and inactions described above. The persons in Illinois with whom Defendants communicated were Rod and Anna Maynor at BWC as well as brokers working for the AEU Program who are located in Illinois. Hundreds, if not thousands, of emails exist between BWC and Defendants regarding the AEU Program, a large percentage of which originated in Illinois.

100.    Defendants, primarily Wray, sent documents to BWC for execution by Participating Plans enrolled by BWC including the Participating Plans located in Illinois.

101.    Defendants also sent communications directly to Participating Plans located in Illinois.

102.    Satler and Goldberg traveled to Frankfort, Illinois in late 2016 to meet with BWC and discuss the AEU Program. Satler traveled to Illinois twice in 2017 regarding the AEU Program. On information and belief, Goldberg traveled to Illinois in 2017 regarding the AEU Program.

103.    Defendants' actions and inactions, as described above, adversely affected numerous Illinois residents who were covered individuals in the Participating Plans through, among other things, non-payment of medical claims of many such individuals, increases in the premium rates charged to such Illinois residents, and termination from the AEU Program regarding many such Illinois residents.

104.    In doing the actions and inactions described above, Defendants communicated numerous times with AEU Program brokers located in Illinois about issues related to the Participating Plans enrolled into the AEU Program by such brokers.

105.    Defendants prepared and sent documents to Illinois aggregator BWC regarding the operations and requirements of the AEU Program which directly affected and impacted individuals in Participating Plans located in Illinois.

106.    Defendants' actions and inactions described above were undertaken in their capacities as the principal officers of AEUH, through which they exercised discretionary control over the AEU Program.  By virtue of their positions, Defendants had the power to decide whether to undertake such actions in and affecting the State of Illinois, and voluntarily chose to do so. Defendants Satler and Goldberg, as substantial shareholders of AEUH, were also motivated by their personal interest in preserving their investments in those entities in undertaking the acts and omissions in and affecting the State of Illinois alleged above.

107.    Defendants' actions and inactions described above were the direct and proximate cause of injuries suffered by the individuals in Participating Plans located in Illinois which include, without limitation, failure of the AEU Program to pay covered medical claims even though such Participating Plans had paid all amounts invoiced to them by the AEU Program through Illinois-aggregator BWC.

*Damages Suffered Because of Defendants' Negligence*

108.     Defendants knew that the AEU Program was not in compliance with the structural requirements for the AEU Program.  Defendants failed to take the necessary actions to correct and fix such problems.  Defendants knew that required documents were not completed and obtained and failed to correct such.  Defendants knew that minimum participation requirements were not being followed and failed to correct such.  Defendants knew that associations could not be a single Participating Plan, but also knew that the AEU Program had many such associations as purported Participating Plans and failed to correct such.

109.     Because the AEU Program was not in compliance with its required structural requirements including those from the AEU Program documents, Defendants should not have allowed the AEU Program to continue to operate, and should have ceased accepting employer contributions and allowing the AEU Program to incur claims.

110.     The December 2016 AEU Benefits, LLC Annual Financial Review and Analysis states that the Accumulated Program Deficit for the AEU Program as of the end of 2016 was $20,257,208.

111.     On August 28, 2017, Windsor Strategy Partners, Inc., issued an Actuarial Opinion to AEU regarding the financial status of the AEU Program associated with BPT1.  That opinion found that BPT1 had unpaid claims in the amount of $15,364,233 as of December 31, 2016.

112.     As of May 12, 2017, BPT2 had unpaid claims in the amount of $2,084,375.77.

113.     On June 29, 2017, BPA reported that BPT2 had unpaid claims totaling $3,196,940.66.

114.     Because the pooled and commingled funds were insufficient to pay claims associated with BPT1 and BPT2, many claims were not paid.

115. As time passed and more and more claims were not paid (due to insufficient funding), employers and employees made numerous communications to their brokers and aggregators as well as to AEU and the TPAs involved that claims were not being paid.

116. The failure of the AEU Program was so bad that complaints were being made to the Department of Labor, state insurance regulators, and state attorneys general.

## COUNT

### Count I:  Negligence

117. Independent Fiduciary realleges and incorporates all of the allegations above as if set forth fully herein.

118. Defendants owed duties to the AEU Program to take actions to ensure the AEU Program complied with the VEBA Trust Agreement, IRC requirements, and the AEU Program documents.  Defendants, however, breached their duties by failing to ensure that the AEU Program complied with all such requirements in the specific ways alleged above.

119. As AEU's in-house general counsel, Wray gave negligent advice and failed to give proper or accurate advice and take proper actions regarding the AEU Program in the specific ways alleged above.

120. Defendants knew or should have known that the AEU Program was not being operated in accordance with its requirements and should have taken action to correct such problems, but failed to do so.

121. Defendants also knew or should have known that the AEU Program was not being properly marketed or underwritten, and that employer/employee contributions and stop-loss payments were inadequate to cover the claims being incurred.

122.    Defendants should have shut down the AEU Program's operations, ceased accepting employer/employee contributions from Participating Plans, and ceased allowing Participating Plans to incur claims.

123.    Had it done so, the AEU Program would not have incurred the tens of millions of dollars in claims it is currently unable to pay.

124.    The actions and inactions of Defendants are the proximate and actual cause of the damages suffered by the AEU Program.

125.    Defendants, therefore, are liable for all damages to the AEU Program caused by their negligence.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Independent Fiduciary respectfully prays:

1.    That the Court award the Independent Fiduciary a judgment against Defendants, jointly and severally, in an amount to be proven at trial, including the amount of all claims that cannot be paid by the AEU Program because of insufficient funds, which damages are in the tens of millions of dollars, plus pre- and post-judgment interest;

2.    That the Court award the Independent Fiduciary its costs and expenses;

3.    That the Court award the Independent Fiduciary such other, further, and general relief to which it may be entitled and to which this Court shall deem to be just and equitable; and

4.    That a jury be empaneled to hear all issues triable to a jury in this case.

Respectfully Submitted,

**Receivership Management, Inc. In Its Capacity As the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan**

By:    /s/ Alan F. Curley                           
           One of Its Attorneys

Alan F. Curley (6190685)
Sam G. Royko (6325838)
Robinson Curley P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
acurley@robinsoncurley.com
sroyco@robinsoncurley.com

J. Graham Matherne
Andrew J. Pulliam
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1400
Nashville, Tennessee 37201
(615) 244-0020
gmatherne@wyattfirm.com
apulliam@wyattfirm.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused the foregoing **FIRST AMENDED COMPLAINT** to be filed with the Clerk of the Court for the United States District Court, Northern District of Illinois, Eastern Division, using the Court's ECF filing system and served copies of same on the parties listed below by depositing same in the United States First Class Mail, at 300 South Wacker Drive, Chicago, Illinois, this 3rd day of January 2019.

> AEU Holdings, LLC
> c/o Steven Goldberg
> 8131 Lyndon B. Johnson Freeway
> Dallas, Texas 75251
>
> Steven Goldberg
> 8131 Lyndon B. Johnson Freeway
> Suite 750
> Dallas, Texas 75251
>
> Stephen M. Satler
> 130 Sayre Drive
> Princeton, New Jersey 08540-5809
>
> Billie Kathryn Wheeler Wray
> 6579 Canal Blvd.
> New Orleans, Louisiana 70124

> /s/ Alan F. Curley

**<u>Certificate of Service</u>**

The undersigned attorney hereby certifies that on October 15, 2019, he caused the

foregoing **LOCKE LORD, LLP'S MEMORANDUM OF LAW IN SUPPORT OF**

**MOTION TO DISMISS IF'S FIRST AMENDED COMPLAINT** to be filed with the Clerk of

the Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF

system which shall notify all counsel of record.


          /s/ Edward  W. Feldman