### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RECEIVERSHIP MANAGEMENT,
INC., in its capacity as Independent
Fiduciary of the AEU Holdings, LLC
Employee Benefit Plan,

        Plaintiff,

    v.

LOCKE LORD LLP,

        Defendant.

No. 18-cv-8158

Judge John F. Kness

### MEMORANDUM OPINION AND ORDER

For all of its facial complexity, this case essentially concerns allegations that Defendant Locke Lord LLP, a law firm, provided faulty legal advice and services. Between 2013 and 2016, Defendant supplied legal advice in the form of opinion letters to, and services including drafting legal documents for, ALLInsurance Solutions Management, LLC (AISM) and, subsequently, AEU Holdings, LLC (AEUH) (which acquired AISM in 2016). AISM hoped to create a health benefit plan that would simultaneously comply with the Employee Retirement Income Security Act (ERISA) but that would not amount to a Multiple Employer Welfare Agreement (MEWA), which would then subject the plan to state insurance regulations. The resulting AISM Plan (later, the AEU Plan) is made up of hundreds of individual employer-sponsored employee benefit plans (the "Employer Plans").

After they were created, the AEU Plan and Employer Plans (collectively, the "Plans") were unable to pay all the insurance claims made against them—estimated at $60 million—by doctors, hospitals, and other medical providers. When the U.S. Secretary of Labor sued the Plans, another judge in this District appointed Plaintiff Receivership Management, Inc. as Independent Fiduciary (IF), and the Plans were terminated.

In December 2018, Plaintiff brought the present suit against Defendant for negligence (Count I) and negligent misrepresentation (Count II). Most concisely, Plaintiff alleges that the Defendant owed a variety of duties (competence, reasonable care, and good faith, to name a few) to AISM, AEUH, and the Plans, and that Defendant breached those duties by supplying "inaccurate information" and faulty legal advice and services. According to Plaintiff, the accrual of unpaid claims—and ultimately the Plans' insolvency—resulted from Defendant's breaches.

Now before the Court is Defendant's motion to dismiss (Dkt. 51), in which Defendant argues that Plaintiff's claims are barred by the statute of limitations and, alternatively, that Plaintiff fails to state claims for professional negligence or negligent misrepresentation.

For the reasons that follow, Defendant's motion is denied. A statute of limitations affirmative defense is, as here, ordinarily premature at the motion to dismiss stage. As long as there exists a "conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court

may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). Such a conceivable set of facts exists here, and Plaintiff has not "pleaded itself out of court" by alleging unambiguously that Plaintiff (or the Plans) knew or reasonably should have known about the injuries giving rise to this suit.

Defendant's other arguments in support of dismissal are similarly unavailing. At this stage, without the benefit of a developed factual record, the Court is obligated to take as true the allegations in the complaint and to draw reasonable inferences in Plaintiff's favor. Together, the allegations and reasonable inferences "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Read in such a light, and as explained more fully below, the complaint plausibly states claims against Defendant for negligence and negligent misrepresentation.

## I.    BACKGROUND

In 2011, ALLInsurance Solutions Management, LLC ("AISM") was founded to provide "self-insured benefit and workers compensation programs to small and medium-sized employers primarily through [Professional Employer Organization] aggregators of such employers." (Dkt. 44 ¶ 42.)

In 2013, AISM approached Brian Casey, a partner at Defendant Locke Lord LLP, for "advice in connection with a proposed employee health benefit plan intended to comply with ERISA and avoid state insurance regulation ('AISM Plan')." (*Id.* ¶ 43.) Defendant—primarily Casey and another partner, Laurence Hansen—thus began

providing legal services related to the AISM Plan, including by providing "substantial advice concerning [the AISM Plan's] structure and drafting most of the legal documents significant to the Plan." (*Id.*)

This case revolves principally around Defendant's legal advice and services. Between 2013 and 2016, Defendant provided "at least five opinion letters . . . attesting to the legality of the AEU Plan and its immediate predecessor." (*Id.* ¶ 26.) According to Plaintiff, each of Defendant's letters concluded, "under materially similar assumed facts, that the 'Transaction,' as Locke Lord referred to [the AEU Plan], would comply with ERISA, not result in the formation of a [Multiple Employer Welfare Agreement (MEWA)] subject to state insurance laws and regulations, and not constitute the transaction of insurance in any state." (*Id.*)[1] Defendant's description of the Transaction was "highly complex and relie[d] on perceived legal loopholes in the nature of a tax shelter." (*Id.* ¶ 27.) The letters were, in Plaintiff's words, "impenetrably dense and internally contradictory, redundant and disorganized." (*Id.*)

Under the facts assumed[2] in at least one of Defendant's letters (the AISM Letter), "individual employers would each establish separate employee benefit plans under ERISA for the purpose of providing health benefits solely to the employer's

---

[1] A MEWA is an " 'an employee welfare benefit plan or any other arrangement . . . which is established or maintained for the purpose of offering or providing [welfare plan benefits including health benefits] to the employees of two or more employers . . . .' Any structure that involves risk sharing across multiple employee benefit plans is a MEWA." (Dkt. 44 ¶¶ 1–2 (quoting 29 U.S.C. § 1002(40)).)

[2] Defendant was allegedly aware that the Plans were not operating in accordance with the facts assumed in Defendant's letters. (*See, e.g.*, *id.* ¶¶ 70, 104, 262–69.)

employees and their dependents." (*Id.* ¶ 50.) Each "Employer Plan" would "establish a trust to receive contributions and act as a funding source for the Employer Plan." (*Id.* ¶ 51.) Defendant further contemplated the creation of an offshore trust: the "Bermuda Purchasing Trust" (BPT). (*Id.* ¶ 52.) The BPT would be funded by contributions to the Employer Plans, and the beneficiaries of the trust would be the Employer Plans. (*Id.* ¶ 52.) The BPT was established to purchase a "stop-loss policy" for the benefit of the Employer Plans. (*Id.* ¶ 53.) Under that policy, "once an Employer Plan incurred and paid a claim in excess of $100,000, the stop-loss carrier would reimburse the amount of the claim in excess of $100,000." (*Id.* ¶¶ 54–55.)

Defendant also allegedly assisted in the drafting of materials in support of the Transaction. For example, Casey and Hansen "assisted in the drafting of enrollment forms for employee-participants in the Employer Plans"; "drafted a form [] recission letter for the Employer Plans to send to participants who had misrepresented their medical history in applications to join the Plans"; and "Locke Lord created a draft 'Health Benefits Program Management Agreement' . . . for AEU to govern [AEU's] relationship with each Employer Plan." (*Id.* ¶¶ 96, 108, 154; *see* Dkt. 44-3.)

In 2015, AISM contracted with AEU[3] "to manage the AISM Plan." (*Id.* ¶ 59.) Under the parties' contract, AEU "took over sales, marketing, underwriting, rating, claims handling, and program advisory functions for the AISM Plan." (*Id.* ¶ 59.) On

---

[3] According to Plaintiff, non-parties AEU Holdings, LLC and AEU Benefits, LLC were agents and authorized representatives of the AEU Plan. (*Id.* ¶¶ 18–19.) "The names AEU Holdings, AEUH, AEU Benefits, and AEUB are used interchangeably on various AEU Plan-related documents, with the shortened form 'AEU' also being used frequently in such documents and by Locke Lord as well as officers and employees of AEUH and AEUB." (*Id.* ¶ 18.)

April 26, 2016, AEU Holdings, LLC and AISM entered into an Asset Purchase Agreement "whereby AEUH acquired all of the assets of AISM, including the AISM Plan." (*Id.* ¶ 61.) After AEUH acquired the AISM Plan, the Employer Plans became part of the AEU Plan[4] and the BPT remained in existence for the Employer Plans' benefit. (*Id.* ¶ 66.)

At some point (it is not completely clear when), the U.S. Department of Labor (DOL) began investigating the AEU Plan. (*Id.* ¶ 186.) While the DOL's investigation was ongoing, the AEU Plan failed. (*Id.* ¶ 188.) According to Plaintiff, "the Employer Plans paid millions of dollars in stop-loss premiums to the BPT, and their employee-participants made millions of dollars of contributions and incurred millions of dollars of claims for which the Employer Plans and the AEU Plan are obligated but have insufficient funds to pay." (*Id.*) Saddled with obligations to "doctors, hospitals, and other medical providers" amounting to an estimated $60 million, the AEU Plan and the Employer Plans (collectively, "the Plans") became "insolvent and unable to pay." (*Id.* ¶ 8.)

On November 2, 2017, the Secretary of Labor filed suit against the AEU Plan and various other entities. (*Id.* ¶ 10); *see Walsh v. AEU Benefits, LLC*, No. 17-cv-07931 (N.D. Ill.).[5] On November 3, the Court entered a temporary restraining order (TRO) and ordered that Plaintiff Receivership Management, Inc. be appointed as the

---

[4] According to Plaintiff, the AEU Plan is "comprised of" the Employer Plans. (*Id.* ¶ 3.)

[5] Due to new individuals serving as Secretary of Labor while litigation in this case was pending, the case caption changed from *Acosta v. AEU Benefits LLC* to *Pizzella v. AEU Benefits, LLC* in 2019 and then to *Walsh v. AEU Benefits, LLC* in 2021. *Walsh v. AEU Benefits, LLC* remains the current case caption.

Independent Fiduciary (IF) of the AEU Plan and the Employer Plans. (Dkt. 44 ¶¶ 11, 189.) The court subsequently entered a preliminary injunction ordering Plaintiff to "serve as the successor Trustee and Plan Administrator of the AEU Plan and Employer Plans"; and the Court further ordered that Plaintiff "shall have final and exclusive fiduciary authority over the AEU Plan's administration, management, and assets." (*Id.* ¶ 12 (citing *Walsh*, No. 17-cv-07931, Dkt. 59 ¶ 4).) The Plans "were terminated shortly thereafter." (*Id.* ¶ 189.)

On December 12, 2018, Plaintiff filed suit against Defendant for negligence (Count I) and negligent misrepresentation (Count II). (Dkt. 1.) Plaintiff amended the complaint nine months later. (Dkt. 44.) According to Plaintiff, as a result of Defendant's attorney-client relationship with the AEU Plan, Defendant had a range duties to the Plans, including: "a duty to provide its legal services with the same level of competence, reasonable care, good faith, and ordinary diligence that similarly experienced lawyers in the highly specialized field of insurance transactions and regulation would exercise"; "a duty to inform the AEU Plan and the Employer Plans of all material facts within its knowledge that could affect the transactions within the scope of its representation or the subject matter of the attorney-client relationship"; a "duty of care and diligence to the AEU Plan and the Employer Plans [that] included exercising an appropriate level of competence and understanding of the complex 'Transaction' being marketed as the AEU Plan and the legal environment in which is operated"; a duty "to investigate the legal standing of the AEU Plan and the Employer Plans if it knew, or in the exercise of reasonable diligence should have known, that

they were not in compliance with legal requirements"; and "a duty to advise its clients upon gaining information that the AEU Plan and/or the Employer Plans may not be in compliance with legal requirements." (*Id.* ¶¶ 28–32.)

In turn, the Plans' failures and insolvency were allegedly the result of Defendant's "erroneous opinions and conclusions and the Employer Plans' reasonable and justifiable reliance thereon." (*Id.* ¶ 37.) Put another way, Defendant allegedly breached its duties:

> First, it erroneously opined that the AEU Plan "Transaction" as structured under Locke Lord's assumed facts would not result in the Employer Plans being a MEWA subject to state law. . . . Second, it erroneously opined under the assumed facts that the Employer Plans would not be engaged in the transaction of insurance in any state by their participation in the AEU Plan "Transaction." . . . Third, it erroneously opined that the AEU Plan "Transaction" as structured under Locke Lord's assumed facts would comply with ERISA's indicia-of-ownership and plan-asset laws and regulations. . . . Fourth, it failed to act and advise the AEU Plan and the Employer Plans in the face of known facts indicating a duty to act, including but not limited to (a) advising the Employer Plans to obtain individual domestic stop-loss policies instead of a single, pooled policy from an offshore insurer, (b) withdrawing or correcting its comfort letters, (3) [sic] advising the Employer Plans and the AEU Plan that they were required to submit to state insurance regulation, and (4) [sic] advising the Employer Plans and the AEU Plan that they were not in compliance with federal and state laws and regulations and should cease accepting participant contributions and terminate the Plans.

(*Id.* ¶¶ 33–36.)

As a "direct and proximate result" of Defendant's breaches of duty, "the unregulated Employer Plans joined or renewed enrollment in the AEU Plan, and their employee-participants and medical providers have incurred claims for which the Employer Plans and the AEU Plan (as the MEWA it actually was) are obligated

but unable to pay." (*Id.* ¶ 38.) Plaintiff is also "unable to collect millions of dollars of stop-loss proceeds under [the Plans'] foreign stop-loss policies." (*Id.* ¶ 39.)

Presently before the Court is Defendant's motion to dismiss (Dkt. 51), in which Defendant argues that Plaintiff's claims are time-barred and, alternatively, that Plaintiff fails to state claims for either professional negligence or negligent misrepresentation (Dkt. 55).

## II. STANDARD OF REVIEW

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put another way, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (cleaned up). In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But even though factual allegations are entitled to the assumption of truth, mere legal conclusions are not. *Id.* at 678−79.

## III.   DISCUSSION

### A.   Preliminary Matters

Before the Court turns to the merits of Defendant's motion to dismiss, it must resolve several preliminary issues that bear on the resolution of the motion and the materials the Court can consider in its analysis. Those issues pertain to the law governing Defendant's motion and various materials beyond the pleadings that both parties have provided in support of their respective positions.

#### 1.   *Law Governing this Dispute*

The Court has diversity jurisdiction over this case under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000. (*See* Dkt. 44 ¶ 23.) Because jurisdiction is premised on diversity, "we must look to the law of the state in which the district court sits to determine the applicable governing law." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938)). Illinois law thus governs the Court's assessment of Plaintiff's claims.[6]

That conclusion is bolstered by application of Illinois's choice-of-law rules. *See Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006) ("When a district court sits in diversity, it must apply the choice of law principles of the forum state to determine which state's substantive law governs the proceeding." (citations omitted)). Under those rules, courts are directed to apply the "most significant relationship" test—determining "where the tort occurred"—and to apply the law of that state.

---

[6] The parties generally agree on this point. (*See* Dkt. 55 at 14–15; Dkt. 66 at 7–8.)

*Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844 (7th Cir. 1999). In turn, the place where the tort occurred

> is the place that has the greatest interest in striking a reasonable balance among safety, cost, and other factors pertinent to the design and administration of a system of tort law. Most people affected whether as victims or as injurers by accidents and other injury-causing events are residents of the jurisdiction in which the event takes place.

*Id.* at 845. Applied in this case, that "place" is Illinois. As alleged in the complaint, "Illinois was the state with the largest number of Employer Plans." (Dkt. 44 ¶ 7.) Accordingly, both under the law governing diversity jurisdiction in general and under Illinois's specific choice of law rules, the law applicable to the Court's interpretation of this case is that of Illinois.

### 2. *Consideration of Attached Materials*

Plaintiff attached a variety of exhibits to its complaint, including several of Defendant's opinion letters (Exhibits A and D) and Defendant's engagement letter (Exhibit B). (*See generally* Dkts. 44-1, 44-2, 44-3, 44-4, 44-5, 44-6.) In turn, Defendant attaches as an exhibit an amended complaint from a separate suit brought by Plaintiff against other defendants in *Receivership Mgmt., Inc. v. AEU Holdings, LLC*, No. 18-cv-8167 (filed N.D. Ill. Dec. 12, 2018). (*See* Dkt. 55 at 56−87 ("Def. Ex.").)[7] Before addressing the merits of Defendant's motion to dismiss, the Court must determine whether it may consider those attachments at this stage.

---

[7] Citations to Defendant's exhibit, which is appended to its complaint, are to the PDF page numbers.

The exhibits attached to Plaintiff's complaint are clearly ripe for the Court's consideration. Under Rule 10, "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see ADM All. Nutrition, Inc. v. SGA Pharm Lab, Inc.*, 877 F.3d 742, 745 (7th Cir. 2017). Accordingly, the exhibits that Plaintiff attached with its complaint are properly part of the complaint and may be considered by the Court in its evaluation of the motion to dismiss.

Whether the Court may consider the exhibit that Defendant attached to its motion to dismiss is less clear. There are several ways for the Court to consider an exhibit attached to a motion to dismiss. First, under some circumstances, attachment of "matters outside the pleadings" to a motion to dismiss requires the court to treat the motion "as one for summary judgment." Fed. R. Civ. P. 12(d). But for the Court to convert the motion to dismiss to one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* In turn, the Seventh Circuit has treated the "reasonable opportunity" requirement as requiring "[a]dequate notice" be given to the nonmoving party. Such notice is given, for example, when "moving party frames its motion in the alternative as one for summary judgment." *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Loc. 150, AFL-CIO*, 433 F.3d 1024, 1029 (7th Cir. 2006). No such notice was given here (Defendant's motion to dismiss is not framed as one for summary judgment), and Plaintiff has not otherwise been given a reasonable opportunity to present all the materials that would be pertinent to a motion for summary judgment. *See* Fed. R.

Civ. P. 12(d); *Squires-Cannon v. White*, 864 F.3d 515, 517 (7th Cir. 2017) (construing Rule 12 as requiring the court to give "all parties a reasonable opportunity *for discovery*" (emphasis added)). Accordingly, Defendant's attachment of materials to its motion does not require the Court to treat the motion as one for summary judgment under Rule 12(d), and the Court may not consider Defendant's exhibit under that Rule.

In the alternative, it is "well settled that in deciding a Rule 12(b)(6) motion, a court may consider documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quotation omitted). The incorporation-by-reference doctrine "provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment." *Id.* That rule prevents a plaintiff from "evad[ing] dismissal . . . simply by failing to attach to his complaint a document that proved that his claim had no merit." *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (citation omitted).

But Defendant's exhibit (again, an amended complaint in a separate action) is neither clearly "referred to in," nor "central to," Plaintiff's complaint in this case. Rather, Defendant purports to include the exhibit to contest Plaintiff's factual allegations. (*See, e.g.*, Dkt. 55 at 6, 17, 29, 31.) Such factual disputes are not a proper basis for the Court to consider Defendant's exhibit.

13

Finally, the Court may take judicial notice of "public court documents" in deciding motions to dismiss. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) ("Despite the express language of [Rule 12(d) of the Federal Rules of Civil Procedure], we recently held that '[t]he district court may also take judicial notice of matters of public record' without converting a 12(b)(6) motion into a motion for summary judgment." (quoting *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)). Defendant's exhibit is such a public court document. Under the judicial notice doctrine, the Court may thus consider Defendant's exhibit in its assessment of the pending motion to dismiss.

In short, although for different reasons, the exhibits attached to Plaintiff's complaint and the exhibit attached to Defendant's motion to dismiss are properly before the Court in its review of the pending motion to dismiss. It is to the merits of that motion that the Court now turns.

## B. Defendant's Motion to Dismiss

In its motion, Defendant carefully and thoroughly dissects the complaint and challenges the adequacy of each element of Plaintiff's claims. Such scrutiny and thoroughness reflect good advocacy, but Defendant's handiwork is premature at this stage. As explained below, many of Defendant's arguments would be more appropriately raised at the summary judgment stage. As the Seventh Circuit has explained,

> [P]leadings in federal court need not allege facts corresponding to each "element" of a statute. It is enough to state a claim for relief—and [Rule 8 of the Federal Rules of Civil Procedure] departs from the old code-pleading practice by enabling plaintiffs to dispense with the need to

> identify, and plead specifically to, each ingredient of a sound legal theory. . . . Plaintiffs need not plead facts; they need not plead law; they plead claims for relief. Usually they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of. . . . Any district judge (for that matter, any defendant) tempted to write "this complaint is deficient because it does not contain . . ." should stop and think: What rule of law *requires* a complaint to contain that allegation? . . . Complaints initiate the litigation but need not cover everything necessary for the plaintiff to win; factual details and legal arguments come later. A complaint suffices if any facts consistent with its allegations, and showing entitlement to prevail, could be established by affidavit or testimony at a trial.

*Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005) (cleaned up). In its motion, Defendant demands more of Plaintiff than does the governing legal standard. Indeed, many of the cases Defendant cites address the law governing later stages of litigation. Although Defendant's arguments may carry the day at those later stages, they are not enough to succeed on the present motion to dismiss.

Put another way, Plaintiff plausibly alleges both negligence and negligent misrepresentation. In Count I, Plaintiff alleges that, by virtue of Defendant's attorney-client relationship with the AEU Plan and the Employer Plans, Defendant owed duties to the Plans that Defendant breached when it supplied allegedly flawed legal advice and services.[8] (Dkt. 44 ¶¶ 28−36; 282−83.) Plaintiff plausibly alleges

---

[8] One of Defendant's arguments in support of dismissal is that Defendant "did not breach any alleged duty of care." (Dkt. 55 at 33.) Defendant's argument is that, on the merits, its legal advice was correct. (*See id.* at 33−45.) On the present motion, the Court will not evaluate the accuracy or quality of the legal advice and services Defendant provided. Such an evaluation would require the Court to review not only the legal conclusions and recommendations implicit and explicit in the opinion letters supplied to Plaintiff, but also the factual assumptions upon which Defendant was relying in reaching those conclusions. Such a fact-bound analysis would be premature. *See Peterson v. Katten Muchin Rosenman LLP*, 792 F.3d 789, 791 (7th Cir. 2015) (reversing district court's dismissal of suit against law firm that "rest[ed] on a factual view extrinsic to the complaint").

that, as a result of Defendant's breach, the Plans were unable to meet their claims obligations and were unable to collect millions of dollars of stop-loss proceeds. (*Id.* ¶¶ 37−41; 284−88.)

In Count II, Plaintiff likewise plausibly alleges that Defendant supplied "inaccurate information" and negligently misrepresented "that an employer-sponsored health benefit plan operated in accordance with Locke Lord's assumed facts would comply with ERISA and state insurance laws and would not be a MEWA." (*Id.* ¶ 291−93.) Plaintiff alleges that the Plans relied on Defendant's faulty advice in the Plans' operations and, as a result of that reliance, suffered the injuries described above. (*Id.* ¶¶ 292−303.)

Defendant disputes some of Plaintiff's characterizations of the facts. For example, Defendant's motion begins with the "caveat lector" that Plaintiff, in Defendant's view, "takes liberties with the documents it attaches and quotes." (Dkt. 55 at 4.) Defendant later asserts that the complaint "is schizophrenic about the discrepancies between the assumptions in the LL Letters and how the AEU Plan actually operated." (*Id.* at 6.) And, as already noted, Defendant attaches Plaintiff's amended complaint from a separate case, *Receivership Mgmt., Inc. v. AEU Holdings, LLC*, No. 18-cv-8167 (N.D. Ill.) (Dkt. 55 at 57−87) to contest Plaintiff's factual allegations here (*see, e.g.*, *id.* at 6, 17, 29, 31).

But factual disputes generally cannot be resolved, of course, on a motion to dismiss. At this stage, the Court must accept as true Plaintiff's factual allegations and draw reasonable inferences in Plaintiff's favor. *Iqbal*, 556 U.S. at 678. Any

"schizophreni[a]" or "discrepancies" are thus construed in Plaintiff's favor. *See id.*; *see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). So construed, the allegations in both counts are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### 1. *Statute of Limitations*

Defendant's first argument in its motion to dismiss is that Plaintiff's claims are barred by the statute of limitations. According to Defendant, Plaintiff's claims are untimely "because the AEU Plan and Employer Plans were on inquiry notice before December 12, 2016"—in other words, more than two years before Plaintiff brought this suit. (Dkt. 55 at 16.) Defendant also argues that Plaintiff "must have suffered actual damages to start the limitations period" and that "[t]he Plans incurred alleged damages before early December 2016." (*Id.* at 18.)

Under Illinois law, "[a]n action for damages . . . against an attorney arising out of an act or omission in the performance of professional services . . . must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b); *see, e.g.*, *Blue Water Partners, Inc. v. Edwin D. Mason, Foley and Lardner*, 975 N.E.2d 284, 297 (Ill. App. Ct. 2012) (applying the statute of limitations in 735 ILCS 5/13-214.3 to claims against a law firm). Accordingly, the relevant inquiry at this stage is whether Plaintiff "knew or reasonably should have known of"

its injuries more than two years before it filed this suit—in other words, before December 12, 2016.

But statute of limitations arguments are generally disfavored at the motion to dismiss stage. Because "complaints need not anticipate and attempt to plead around defenses, a motion to dismiss based on failure to comply with the statute of limitations should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613−14 (7th Cir. 2014) (cleaned up). In its assessment of Defendant's arguments, the Court "must indulge the readings and make the assumptions that favor the plaintiff," and "a prediction that the plaintiff will be unable to meet its challenges is not a good reason to dismiss a complaint under Rule 12(b)(6)." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004). Moreover, as long as there exists a "conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman Health Ctr. of Rochester*, 782 F.3d at 928.

Dismissal of a complaint on statute of limitations grounds is especially difficult in cases such as this one. As another judge in this District explained in the legal malpractice context, the "discovery date is a question of fact." *Valukas v. Marinaccio*, No. 12-cv-2876, 2012 WL 5877554, at *1 (N.D. Ill. Nov. 20, 2012) (citing *Morris v.*

*Margulis*, 754 N.E.2d 314, 318 (Ill. 2001)). That date would "be a question for the court where it is apparent from the undisputed facts that *only* one conclusion can be drawn." *Id.* (emphasis added). As long as the Court "can 'imagine' a scenario in which the claim is timely, it is improper to dismiss it on the pleadings." *Nasrabadi v. Kameli*, No. 18-cv-8514, 2019 WL 2173791, at \*4 (N.D. Ill. May 20, 2019).

When Plaintiff "knew or reasonably should have known," 735 ILCS 5/13-214.3(b), of its alleged injuries is not clearly alleged in the complaint.[9] Indeed, as Defendant recognizes, the injuries alleged in the complaint are multifaceted, and there are numerous instances when Plaintiff might have known about those injuries. In January 2016, for example, a third party, Veritas, "had questions about the AISM Plan's legality under the California Insurance Code's stop-loss insurance statute." (Dkt. 44 ¶ 60.) Separately, in June 2016, another third party, Thomas Stoughton ("an officer and owner of the predecessor of AEU"), "received multiple inquiries from the DOL and a Market Conduct Investigator with the Florida Office of Insurance Regulation . . . about a 'group' plan being marketed in Florida as the 'AEU Benefits' plan by Locke Lord's client Veritas." (*Id.* ¶¶ 22, 98.) According to Defendant, such allegations "establish that the Plans, both directly and indirectly through AEUH,

---

[9] Some of Plaintiff's injuries plainly occurred inside the statute of limitations period. For example, Plaintiff alleges that "[i]n 2017, after Locke Lord issued its Comfort Letters, the Employer Plans paid millions of dollars in stop-loss premiums to the BPT, and their employee-participants made millions of dollars of contributions and incurred millions of dollars of claims for which the Employer Plans and the AEU Plan are obligated but have insufficient funds to pay." (Dkt. 44 ¶ 188.) Plaintiff filed the present suit in December 2018, less than two years later.

knew or reasonably should have known of their injury and its wrongful cause, and thus had an obligation to inquire, before December [] 2016." (Dkt. 55 at 17.)

But such allegations about the knowledge of third parties or the commencement of investigations do not unambiguously mean that the Plans were aware of any related injuries. To the extent that the injuries in Plaintiff's complaint are principally (1) the Plans' claims that the Plans were unable to pay; and (2) the stop-loss proceeds that the Plans were unable to collect (*e.g.*, Dkt. 44 ¶¶ 38–39)—the incursion of those claims being the points at which the Plans suffered monetary losses as a result of Defendant's alleged negligence and negligent misrepresentation— Plaintiff does not supply specific dates when the injuries became (or should have become) apparent. Without such specific dates, the Court cannot conclude that Plaintiff has "plead[ed] itself out of court." *Xechem*, 372 F.3d at 901.

In support of its motion, Defendant cites *City National Bank of Florida v. Checkers, Simon & Rosner*. (*See* Dkt. 55 at 17 (citing 32 F.3d 277, 283–84 (7th Cir. 1994)). In that case, a debtor's "repeated inability to repay [his] loan" and his resulting default put an accounting firm "on notice of a need to investigate why an individual with such a substantial net worth (as reported by the accounting firm) defaulted and whether, and against whom, the [plaintiff] bank may have had causes of action." *City Nat. Bank of Fla.*, 32 F.3d at 284. Applying Illinois law, the Seventh Circuit set the debtor's default date as the accrual date for purposes of calculating the statute of limitations, concluding that the bank should have known about—or had reason to investigate—its potential injuries at that point. The *Checkers* court also

cited to an earlier decision in which the Seventh Circuit offered another example of a date on which a potential plaintiff's claims would begin to accrue:

> [I]n *Navco* we presented the hypothetical situation in which a shell corporation, C, operated by shareholder, S, without observing the corporate forms, defrauds victim, V. "Correctly believing that C is insolvent, V does not explore the possibility of piercing the corporate veil. Does V's neglect [in failing to investigate S's possible liability] extend the time to make a claim against S? We could not find any case so holding. Plenty of cases reject contentions that particular claims do not accrue until the victim finds out who can be obliged to pay."

*Id.* (quoting *Central States Pension Fund v. Navco*, 3 F.3d 167, 171 (7th Cir. 1993)). But in the present case, no clear correlate exists to the default date in *Checkers* or the fraud date in *Navco*. (If any date exists, it is not clearly alleged in the complaint.) Rather, "there is simply not enough information in the record to determine when even a sophisticated [plaintiff] should have uncovered its injuries from" the allegedly illegal conduct. *Sidney Hillman Health Ctr. of Rochester*, 782 F.3d at 929.

Defendant's citations to Plaintiff's amended complaint in *Receivership Mgmt., Inc. v. AEU Holdings, LLC*, No. 18-cv-8167 (N.D. Ill.), similarly do not support its position. (Dkt. 55 at 57−87.) Defendant argues that the allegations in Plaintiff's separate suit confirm that "the unpaid claims were a known problem *before* December 2016, placing the Plans on inquiry notice." (*Id.* at 17.) In the separate action, for example, Plaintiff alleged that the Plans had accrued millions of dollars of unpaid claims by late 2016. (*Id.* at 82 (Def. Ex.).) But, as Defendant acknowledges, the reports documenting the extent of the Plans' unpaid claims were prepared in 2017. (*Id.* (Def. Ex.); *see id.* at 17.) Those allegations thus do not clearly support the finding that Plaintiff knew or should have known about its injuries before December 12, 2016.

Even taking judicial notice of Plaintiff's allegations in that other case (*see supra* Part III.A.2), it is still remains premature to dismiss this case on statute of limitations grounds.

To repeat: Defendant's statute of limitations argument might carry the day at a later stage. It is possible that the Plans "knew or should have known" about the alleged injuries at issue in this case long before December 12, 2016. But on the present motion, and given the undeveloped factual record available for the Court's review of that motion, the Court cannot make that finding now.

## 2. *Plaintiff's Negligence Claim (Count I)*

In the alternative, Defendant argues that Plaintiff fails to state claims for negligence or negligent misrepresentation. Before the Court turns to the merits of Defendant's argument, it bears note that Defendant frames Plaintiff's first claim as one for "legal malpractice." (*See* Dkt. 55 at 20.) Plaintiff alleges, to be sure, that Defendant "Locke Lord had an attorney-client relationship with the AEU Plan and the Employer Plans." (*E.g.*, Dkt. 44 ¶ 67.) But Plaintiff also alleges that Defendant owed duties to the Plans as "third-party beneficiaries" of the Engagement Letter. (*See, e.g.*, *id.* ¶ 75 ("[T]he AEU Plan and its Employer Plans were the primary, intended, direct third-party beneficiaries of the Engagement Letter[.] . . ."); Dkt. 66 at 11.) The duties allegedly owed to the Plans and breached by Defendant are thus more nuanced than those in the traditional legal malpractice context, in which "counsel's negligence . . . result[s] in the loss of an underlying cause of action, or the loss of a meritorious defense." *Nelson v. Quarles & Brady, LLP*, 997 N.E.2d 872, 880

(Ill. App. Ct. 2013). Because the Court's task at this stage is to draw reasonable inferences in Plaintiff's favor, *Iqbal*, 556 U.S. at 678, and because Plaintiff characterizes its claim as one for negligence (Dkt. 44 at 54 ("Count I: Negligence")), the Court treats Plaintiff's claim as such.[10]

To state a claim for negligence under Illinois law, a plaintiff must establish: "(1) a duty of care owed by the defendant; (2) a breach of that duty; (3) an injury proximately caused by that breach; and (4) damages." *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 992 (N.D. Ill. 2010). At the pleading stage, Plaintiff must "give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Put another way, the Court must "ask itself *could* these things have happened, not *did* they happen." *Schumacher*, 844 F.3d at 676 (emphasis in original).

Plaintiff plausibly pleads such a negligence claim. Most concisely, Plaintiff alleges that, as a result of Defendant's attorney-client relationship with the AEU Plan and Employer Plans, Defendant owed a variety of duties (competence, reasonable care, good faith, and ordinary diligence) that it breached when it dispensed faulty

---

[10] Construing Plaintiff's claim as one for legal malpractice or professional negligence would not yield a different outcome. Under Illinois law, a cause of action for legal malpractice includes the following elements: "(1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney, (2) a negligent act or omission constituting a breach of that duty, (3) proximate cause of injury, and (4) actual damages." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016) (citing *Sexton v. Smith*, 492 N.E.2d 1284, 1286−87 (Ill. 1986)); *see N. Ill. Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 837 N.E.2d 99, 106−07 (Ill. 2005) ("The injury in a legal malpractice action is not a personal injury . . . nor is it the attorney's negligent act itself . . . . Rather, it is a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission."). The elements are similar to those of a negligence claim. (*See infra*.) Just as Plaintiff plausibly alleges a claim for negligence, Plaintiff plausibly alleges a claim for legal malpractice.

legal advice. (*See* Dkt. 44 ¶¶ 281−84.) As a result of Defendant's allegedly faulty advice upon which the Employer Plans and the AEU Plan relied, the Plans were unable to pay some claims obligations. (*Id.* ¶¶ 284−85.) So read in the context of the complaint, Count I adequately presents a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski*, 23 F.4th at 777 (cleaned up).

Defendant nonetheless argues that Plaintiff fails to state a claim for negligence because (1) there was no attorney-client relationship between Defendant and any of the Plans; (2) Plaintiff fails to plausibly allege causation; and (3) Defendant did not breach any duty of care. (Dkt. 55 at 20−45.)

a.    *Attorney-Client Relationship*

Defendant first argues that it owed no duty to the AEU Plan or the Employer Plans. (Dkt. 55 at 21.) Instead, Defendant contends that its "sole relevant clients were AISM and AEUH." (*Id.*) Plaintiff counters that no direct attorney-client relationship is necessary because "the Plans were third-party beneficiaries of the Engagement Letter and Comfort Letters" and that such a relationship is sufficient to create the duties allegedly breached here. (Dkt. 66 at 11.)

It is true that, in general, attorneys owe duties only to their clients. *Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644, 651 (7th Cir. 2017). But as the Illinois Supreme Court has long recognized, a nonclient may succeed in a negligence suit against an attorney where the nonclient proves "the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the

third party." *Pelham v. Griesheimer*, 440 N.E.2d 96, 100 (1982). Examples of third parties to whom attorneys may owe duties "include third-party beneficiaries of wills, third-party beneficiaries of wrongful death actions, and third-party recipients of formal opinion letters." *Oakland Police & Fire Ret. Sys.*, 861 F.3d at 650. Status as a third-party beneficiary is even "easier to establish when the scope of the attorney's representation involves matters that are nonadversarial." *Jewish Hosp. of St. Louis v. Boatmen's Nat. Bank of Belleville*, 633 N.E.2d 1267, 1276 (Ill. App. Ct. 1994).

Although the question whether one party owes a duty to another is generally one of law, *see id.* at 1275, that inquiry "can depend on facts," *Oakland Police & Fire Ret. Sys.*, 861 F.3d at 649. Plaintiff plausibly alleges that Defendant owed a duty to the plans as nonclient beneficiaries. Plaintiff alleges that Defendant "knew that AEUH . . . was a holding company with no operations of its own" and that "the direct beneficiaries would be the Employer Plans and the AEU Plan they comprised, and that AEUH's intent in entering the Engagement Agreement was to benefit them." (Dkt. 44 ¶ 74.) Plaintiff also alleges that Casey "created a single billing matter for all things related to the AEU Plan" because he "knew the primary purpose of the engagement was to advise and opine on matters related to the AEU Plan 'Transaction' and its compliance with ERISA and state insurance laws and regulations." (*Id.* ¶ 80.) And Plaintiff alleges that Defendant specifically issued several of the letters with the knowledge that those letters were benefiting the Employer Plans and the AEU Plan. (*See, e.g.*, *id.* ¶¶ 121, 136.)

Defendant argues that "the LL Letters make . . . clear that no person or entity, other than AEUH (and AISM before it) could rely on the LL Letters." (Dkt. 55 at 26.) In the AISM letter (attached to the complaint), Casey explains that

> [t]he opinion is being rendered on behalf of our client, AISM, only to the person to which it is addressed on the first page hereof and may not be used or relied upon by, or distributed to, any other person or entity for any purpose whatsoever without the written permission of Locke Lord LLP.

(Dkt. 44-1 at 8–9.) The AEUH letter contains a similar limitation. (Dkt. 44-5 at 11.)

But the Court cannot read those limitations in isolation. In the context of the complaint—including Plaintiff's allegations that Defendant "knew that AEUH . . . was a holding company with no operations of its own" and that "the AEU Plan and its Employer Plans were the primary, intended, direct third-party beneficiaries" of Defendant's legal services (Dkt. 44 ¶¶ 74–75)—it is plausible that the parties' relationship is more nuanced than the limitations suggest.

Even if the Court took those limitations in isolation, the AISM and AEUH letters only comprise some of the legal advice and services Defendant allegedly performed for the Plans. Beyond supplying "substantial advice concerning [the AISM Plan's] structure," Plaintiff alleges that Defendant "draft[ed] most of the legal documents significant to the Plan." (*Id.* ¶ 43.) According to Plaintiff, "Casey and Hansen assisted in the drafting of enrollment forms for employee-participants in the Employer Plans," and those drafts "were clearly intended to benefit the Employer Plans." (*Id.* ¶ 96.) Casey and Hansen also "drafted a form [] recission letter for the Employer Plans to send to participants who had misrepresented their medical history

in applications to join the Plans," which Plaintiff asserts was "legal work . . . performed for the benefit and administration of the Employer Plans." (*Id.* ¶ 108.) And, after issuing the AEU Letter, "Locke Lord created a draft 'Health Benefits Program Management Agreement' . . . for AEU to govern [AEU's] relationship with each Employer Plan." (*Id.* ¶ 154; *see* Dkt. 44-3.) Even accepting the limitations in the AEUH and AISM letters as absolving Defendant of liability for the allegedly faulty advice in those letters, the Court could not dismiss Plaintiff's claims in the light of the various other bases for negligence and negligent misrepresentation alleged in the complaint.

Defendant also argues that Plaintiff has not adequately alleged that Defendant's legal services were intended for the benefit of the Plans, as required by *Pelham*. (*See* Dkt. 55 at 24−25; Dkt. 75 at 6; Dkt. 79-1 at 1−2.) Under *Pelham*, "[t]he making of a contract with an attorney for the benefit of a third party does not necessarily create an attorney-client relationship between the attorney and the third-party beneficiary." 440 N.E.2d at 98. Accordingly, *Pelham* affirmed the trial court's dismissal of a complaint that failed to allege the contract at issue "was entered into for the direct benefit of the [third-party beneficiary] plaintiffs." *Id.*

But Plaintiff has properly alleged such intent to benefit the Plans, even if Defendant disagrees that such intent existed. (*See, e.g.*, Dkt. 44 ¶¶ 69, 74, 79, 85, 96, 108.) For example, as noted, Plaintiff alleges that Defendant "knew that AEUH . . . was a holding company with no operations of its own" and thus that Defendant "knew the direct beneficiaries [of its services] would be the Employer Plans and the

27

AEU Plan they comprised." (*Id.* ¶ 74.) That allegation and others are not mere "regurgitat[ions]" of the *Pelham* standard, as Defendant claims. (Dkt. 55 at 25.)

Ultimately, the precise contours of Defendant's relationship to Plaintiff and the Plans, and Defendant's duties (if any), turn on facts not properly before the Court at this stage. For the purposes of resolving the present motion to dismiss, reading the complaint in the light most favorable to Plaintiff, *see Iqbal*, 556 U.S. at 678, Plaintiff plausibly alleges that Defendant owed duties to the Plans that Defendant breached when it supplied allegedly faulty advice and services.

### b. Causation

Defendant next argues that Plaintiff "cannot establish . . . that any alleged breach of duty proximately caused the Plans' alleged damages." (Dkt. 55 at 28.) According to Defendant, Plaintiff's allegations "here and in related cases make clear that (1) no Plan relied on the Locke Lord Letters; and (2) any alleged losses by the Plans proximately resulted from their operation in derogation of the facts that Locke Lord assumed, and not from Locke Lord's allegedly erroneous advice." (*Id.*)

The existence of proximate cause is ordinarily a "fact-laden issue that must be decided by the trier of fact." *Sobilo v. Manassa*, 479 F. Supp. 2d 805, 814 (N.D. Ill. 2007); *see Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 748 (7th Cir. 2006) ("[I]n the normal course, the issue of causation is one for the jury."). At the outset of a case, plaintiffs "are not required to plead proximate cause with any particular degree of specificity." *Daniels v. Bursey*, No. 03-cv-1550, 2003 WL 22053580, at *3 (N.D. Ill. Sept. 3, 2003).

Plaintiff plausibly alleges causation. Among other things, Plaintiff alleges that the Plans relied on Defendant's advice when they "joined or renewed enrollment in the AEU Plan." (Dkt. 44 ¶¶ 37−38; *see also id.* ¶¶ 130−32, 150−52, 199, 258, 295−301.) Plaintiff also alleges that, in "reliance on the Comfort Letters, the Employer Plans continued to operate, make contributions, incur claims and related expenses, and send millions of dollars offshore to purchase stop-loss insurance coverage." (*Id.* ¶ 297.) According to Plaintiff, when "doubts were raised about the legality of the 'Transaction,'" Casey allegedly "urged further reliance by insisting (incorrectly) that the Employer Plans were operating lawfully." (*Id.* ¶ 298.) Plaintiff plausibly alleges that Defendant's negligence and negligent misrepresentations proximately caused the Plans to accrue claims that the Plans could not pay and to suffer related losses. (*See, e.g.*, *id.* ¶¶ 132, 152, 240, 285, 299−300.)

Defendant acknowledges these allegations but argues that they are "conclusory" and insufficiently "*factual.*" (Dkt. 55 at 28 (emphasis in original).) Moreover, according to Defendant, Plaintiff has "pleaded itself out of court because [Plaintiff's] allegations clearly show AEUH knew Locke Lord's factual assumptions were wrong." (*Id.* at 29 (cleaned up).) Defendant cites to *Roppo v. Travelers Commercial Ins. Co.* (Dkt. 55 at 29), in which the Seventh Circuit affirmed the dismissal of fraud and negligent misrepresentation claims when the complaint alleged that the plaintiff's attorney "repeatedly expressed uncertainty" about the plaintiff's insurance policy. 869 F.3d 568, 591 (7th Cir. 2017). According to the Seventh Circuit, a plaintiff "must believe the alleged misrepresentation to be true in

order to state reliance," and the plaintiff "pleaded herself out of court" by alleging her lawyer's uncertainty about the policy. *Id.* at 591−92.

Defendant again demands more of Plaintiff than does the law. Plaintiff's allegation that the AEU Plan "was not operating in accordance with the assumed facts" (Dkt. 44 ¶ 269) does not amount to a "repeated[] express[ion of] uncertainty" about the validity or accuracy of Defendant's advice. *See Roppo*, 869 F.3d at 591. Indeed, that allegation does not even amount to a single expression that Plaintiff or the Plans were aware that "not operating in accordance with the assumed facts" was itself unlawful. (Dkt. 55 at 29.) At most, Plaintiff's allegation supports the inference that the AEU Plan was poorly executed; such an inference might be an affirmative defense, if anything.[11] But at this stage, accepting as true the complaint's factual allegations and drawing reasonable inferences in the Plaintiff's favor, *Iqbal*, 556 U.S. at 678,[12] the Court cannot conclude that Plaintiff knew (or even believed) that Defendant's advice was flawed. Plaintiff plausibly alleges proximate causation "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

---

[11] Whether Defendant's argument that "AEUH and the individuals who operated AEUH . . . operated in a manner contract to Locke Lord's assumptions" (Dkt. 55 at 29) is a valid affirmative defense is not an issue presently before the Court.

[12] Defendant mistakenly cites to cases such as *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734 (Ill. 1994) and *Maxwell v. KPMG, LLP*, No. 03 C 3524, 2007 WL 2091184, at *1 (N.D. Ill. July 19, 2007), *aff'd,* 520 F.3d 713 (7th Cir. 2008) that address causation at the summary judgment stage. (Dkt. 55 at 32−33.)

c.      *Breach of Duty of Care*

Defendant finally argues that the complaint should be dismissed because Defendant "did not breach any alleged duty of care." (Dkt. 55 at 33.) Defendant argues that (1) "the conclusions set forth in the AEUH Letters were correct as a matter of law based on facts that Locke Lord expressly assumed"; and (2) "Locke Lord had no duty to investigate or correct the accuracy of the factual assumptions underlying the LL Letter." (*Id.*)

But a proper assessment of Defendant's arguments would require the Court to wade into the merits of Plaintiff's claims. Those arguments are better reserved for summary judgment—or even trial. At the present stage, the Court's obligation is to assess whether Plaintiff has "give[n] enough details" about the allegedly tortious conduct "to present a story that holds together." *Swanson*, 614 F.3d at 404. Plaintiff has more than adequately done so by alleging, among other things, that Defendant breached its duties by "erroneously opin[ing] that the AEU Plan 'Transaction' . . . would not result in the Employer Plans being a MEWA subject to state law," that "under assumed facts . . . the Employer Plans would not be engaged in the transaction of insurance in any state by their participation in the AEU Plan 'Transaction,'" and that "the AEU Plan 'Transaction' as structured under Locke Lord's assumed facts would comply with ERISA." (Dkt. 44 ¶¶ 33−35.) Plaintiff further alleges that Defendant breached its duty by

> fail[ing] to act and advise the AEU Plan and the Employer Plans in the face of known facts indicating a duty to act, including but not limited to (a) advising the Employer Plans to obtain individual domestic stop-loss policies instead of a single, pooled policy from an offshore insurer,

(b) withdrawing or correcting its comfort letters, (3) [sic] advising the Employer Plans and the AEU Plan that they were required to submit to state insurance regulation, and (4) [sic] advising the Employer Plans and the AEU Plan that they were not in compliance with federal and state laws and regulations and should cease accepting participant contributions and terminate the Plans.

(*Id.* ¶ 36.)

Whether, and if so how, Defendant actually breached its duties will turn on facts not yet developed in the record. The accuracy of Defendant's legal advice, as well as the reasonableness of Defendant's assumptions and how those assumptions were conveyed to and implemented by the Plans, turn on facts and inferences not properly considered at this stage. Read in the light most favorable to Plaintiff, the complaint supplies more than enough information to "to raise [Plaintiff's] right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### 3. *Plaintiff's Negligent Misrepresentation Claim (Count II)*

Plaintiff also adequately pleads Count II. To bring a claim for negligent misrepresentation, Plaintiff must allege

(1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information.

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 332 (Ill. 2006) (citations omitted).

Plaintiff alleges that Defendant supplied "inaccurate information" to the AEU Plan and Employer Plans, including "negligently misrepresent[ing] that an employer-sponsored health benefit plan operated in accordance with Lock Lord's assumed facts

would comply with ERISA and state insurance laws and would not be a MEWA."
(Dkt. 44 ¶¶ 291−93.) The AEU Plan and the Employer Plans relied on Defendant's
allegedly inaccurate information and advice and, as a result of the operations the
Plans undertook and continued in reliance on that advice, the Plans were unable to
pay certain claims. (*Id.* ¶¶ 294−303.)

Defendant argues that it "made no allegedly false statements of material fact"
and, to the contrary, that "it did not make any factual representations, false or
otherwise, to the AEU Plan or Participating Plans in its Letters." (Dkt. 55 at 46−47.)
But as Defendant notes (*id.*), Illinois courts generally follow the Restatement (Second)
of Torts § 552. *See, e.g.*, *Greycas, Inc. v. Proud*, 826 F.2d 1560, 1565 (7th Cir. 1987)
(collecting Illinois cases "influenced by section 552"). Under that section of the
Restatement, a "[m]isrepresentation" may "denote not only words spoken or written
but also any other conduct that amounts to an assertion not in accordance with the
truth," and "words or conduct asserting the existence of a fact constitute a
misrepresentation if the fact does not exist." Restatement (Second) of Torts § 525
(1977). Plaintiff's allegations about the "inaccurate information" supplied by
Defendant—including "that the 'transaction' referred to in the 12/15/16 Letter would
not result in the creation of a MEWA" and "that the 'Transaction' as set forth under
the assumed facts in the AEU Letter would not result in risk sharing by the Employer
Plans, would not result in the Employer Plans becoming a MEWA, would not result
in the BPT or the Employer Plans transacting insurance in the United States, and
that the BPT Certificate would be sufficient indicia of ownership of assets held by the

BPT" (Dkt. 44 ¶¶ 292−93)—are enough to plausibly state a claim under that standard.

Defendant also repeats, and refers back to, many of the same arguments for dismissal of Count I. (*See* Dkt. 55 at 45−48.) For the same reasons given above (*see* Part III.B.2 above), those arguments fail to defeat Count II.

## IV.    CONCLUSION

Defendant's motion to dismiss (Dkt. 51) is denied.

SO ORDERED in No. 18-cv-8158.

Date: September 29, 2022

_____
JOHN F. KNESS
United States District Judge