**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RECEIVERSHIP MANAGEMENT, INC. IN ITS CAPACITY AS INDEPENDENT FIDUCIARY OF THE AEU HOLDINGS, LLC EMPLOYEE BENEFIT PLAN, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 18-cv-08158 Hon. John F. Kness |
| LOCKE LORD, LLP, | ) ) | |
| Defendant. | ) | |

**ANSWER AND AFFIRMATIVE DEFENSES**
**OF LOCKE LORD, LLP TO FIRST AMENDED COMPLAINT**

**ANSWER**

Locke Lord, LLP ("Locke Lord"), by its undersigned counsel, answers the First Amended Complaint of Plaintiff Receivership Management, Inc. in its Capacity as Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan ("RMI") (as amended, the "Complaint"). Except as otherwise stated herein, Locke Lord expressly denies each and every allegation contained in the Complaint, including, without limitation, any allegations contained in the preamble, unnumbered paragraphs, headings, subheadings, table of contents, footnotes, and exhibits of the Complaint, and specifically denies any liability to RMI or any so-called AEU Holdings, LLC Employee Benefit Plan ("AEU Plan"), any employer or benefit plan allegedly participating in the "AEU Plan," or any medical provider, including any provider asserting a claim in relation to this matter or in any related litigation. Locke Lord reserves the right to amend and supplement this Answer as may be appropriate or necessary.

*This case is about the failure of a highly complex workplace health benefits plan artfully (but unsuccessfully) structured to avoid the consumer protections and attendant costs of multistate insurance regulation. The Defendant, a pre-eminent global law firm that holds itself out as having extensive experience in insurance transactions and regulation, negligently and incorrectly opined that the plan as structured would comply with federal law and be exempt from state insurance regulation. Defendant's negligence proximately caused harm to the plan and its constituent employee benefit plans ("Plan") for which Plaintiff, the Independent Fiduciary appointed to liquidate the Plan, seeks damages.*

ANSWER:

Locke Lord denies each and every allegation, except Locke Lord admits that (i) this action arises out of a failed self-insured employee benefits program managed and operated by AEU Holdings LLC ("AEUH"), (ii) Locke Lord is a premier full-service law firm with a global reach with experience involving insurance transactions and regulations, and (iii) RMI seeks to recover damages. Further answering, Locke Lord denies that it owed any duties to any Plan, denies that it was negligent in any way, and denies that it has any liability to RMI or any Plan.

1.      *The AEU Holdings, LLC Employee Benefit Plan ("AEU Plan" or "Plan") is and at all relevant times has been a Multiple Employer Welfare Arrangement ("MEWA") as defined under Section 3(40) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(40). The AEU Plan is referred to as the "Transaction" in several opinion letters authored by Defendant discussed herein.*

ANSWER:

Locke Lord denies the second sentence of Paragraph 1. The remainder of Paragraph 1 states legal conclusions to which no answer is required. To the extent an answer is required, Locke Lord denies each and every allegation set forth in Paragraph 1.

2.      *A MEWA is "an employee welfare benefit plan or any other arrangement which is established or maintained for the purpose of offering or providing [welfare plan benefits including health benefits] to the employees of two or more employers ...." 29 U.S.C. § 1002(40). Any structure that involves risk sharing across multiple employee benefit plans is a MEWA.*

ANSWER:

Paragraph 2 states legal conclusions to which no answer is required. To the extent an answer is required, Locke Lord denies each and every allegation set forth in Paragraph 2.

3. *The AEU Plan is comprised of hundreds of individual employer-sponsored employee benefit plans created pursuant to ERISA § 3(1), 29 U.S.C. § 1002(1) (collectively, the "Employer Plans"). Employers created the Employer Plans to provide health benefits to employee-participants and their dependents. The Employer Plans pooled insurance risks, resulting in the MEWA referred to herein as the AEU Plan.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 3. Further answering, Locke Lord affirmatively states that the so-called AEU Plan, as described in Paragraph 3, is contrary to the Transaction described ("Contemplated Transaction") and the assumptions set forth in Locke Lord's letters dated December 20, 2016 to AEUH (Ex. E to the Complaint) (the "AEUH Letter"), and December 15, 2016 to AEUH (Ex. D to the Complaint) (the "12/15/16 Letter"), and in its letter dated March 3, 2014 to ALLInsurance Solutions Management, LLC ("AISM") (Ex. A to the Complaint) (the "AISM Letter"), and in its prior letter to AISM dated December 12, 2013 (the "12/12/13 Letter") (collectively, the "Locke Lord Letters").

4. *The term "Employer Plans" as used herein is synonymous with the term "Participating Plans" used in the original Complaint in this matter and in related cases pending before this Court. Plaintiff is using the term "Employer Plans" here because Defendant uses that term (and sometimes the term "Employer Customer Plans," which also means the same thing) in its opinion letters discussed herein.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 4, except (i) Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding why RMI has defined any particular term, (ii) Locke Lord admits that the term "Employer Plan" is defined in the AEUH Letter and has the same meaning as "Employer Customer

3

Plan" as that term was used in the AISM Letter. Further answering, Locke Lord states that, as used in its Complaint, RMI has defined "Employer Plan" (a) to mean the employee benefit plans that RMI claims comprise the so-called "AEU Plan," Complaint, ¶3, and (b) to mean "Employer Plan" as defined in the AEUH Letter, Complaint, ¶4, and (c) inconsistent with the AEUH Letter and RMI's prior definitions, to mean collectively, both "Employer Plan" and "Employer Trusts," "unless the context requires otherwise," even though those terms are separately and differently defined in the AEUH Letter. *See* Complaint, ¶¶51, 146. Accordingly, for purposes of its Answer, Locke Lord assumes that RMI has defined "Employer Plan" to have the same meaning as defined in the AEUH Letter for all allegations asserted in Paragraphs 4 through 50, and to mean, collectively, both "Employer Plan" and "Employer Trust" for all allegations asserted after Paragraph 50.

5.     *At all relevant times the AEU Plan and the Employer Plans were transacting insurance in each of the states where the Employer Plans were located, and therefore were subject to the insurance laws and regulations in each of those states. Because the Employer Plans comprising the AEU Plan were a MEWA as defined under ERISA, state insurance laws and regulations applicable to them were not pre-empted by ERISA. See ERISA § 514(b)(6), 29 U.S.C. 1144(b)(6).*

ANSWER:

Paragraph 5 states legal conclusions to which no answer is required. To the extent an answer is required, Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 5, including whether any Employer Plans transacted insurance in its respective state, contrary to the facts assumed in the AEUH Letter. Locke Lord further denies any implication that if the assumptions set forth in the AEUH Letter regarding the Contemplated Transaction had been adhered to, then a MEWA would have resulted or the transaction of insurance in any state would have occurred, and denies all allegations contrary to relevant legal authority.

6.     *The AEU Plan was marketed and sold through "aggregators" who recruited employers to the Plan. Aggregators included Professional Employer Organizations ("PEOs") that marketed and sold the AEU Plan to employers and their Employer Plans. Non-party Veritas Benefits, LLC ("Veritas"), of Saratoga Springs, New York, was a PEO that was responsible for enlisting a significant number of Employer Plans in 2015 and 2016.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6, except Locke Lord admits that Casey believed that Veritas Benefits, LLC's ("Veritas") business was that of a PEO.

7.     *Aggregators also included entities that recruited brokers and insurance agencies to market and sell the AEU Plan to employers and their Employer Plans. Non-party Black Wolf Consulting, Inc. ("BWC"), of Monee and later Frankfort, Illinois, was an aggregator that recruited multiple brokers and their Employer Plan clients into the AEU Plan. BWC was by far the highest volume aggregator for the AEU Plan in 2017. As of mid-2017, 76 percent of the Employer Plans in the AEU Plan had been enrolled through BWC, many of them in Illinois. Illinois was the state with the largest number of Employer Plans.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 7, except Locke Lord admits that (i) on information and belief, AEUH marketed and sold services though Employer Aggregators, who, in turn, recruited brokers to market for AEUH, and (ii) non-party Black Wolf Consulting, Inc. ("BWC") provided services either as an aggregator or broker, or both, for AEUH.

8.     *The AEU Plan and the Employer Plans are insolvent and unable to pay an estimated $60 million of health insurance obligations rightfully owed pursuant to the Employer Plans' coverage terms. Claimants include hundreds of doctors, hospitals and other medical providers, as well as thousands of individual employee-participants and their dependents, many of whom had their medical care interrupted or terminated as a result of the AEU Plan's failure.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 8.

9.      *Plaintiff Receivership Management, Inc. ("Independent Fiduciary") is and has been since the filing of the initial complaint in this case a Tennessee corporation with its principal place of business in Tennessee. As such, it is a citizen of Tennessee.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in Paragraph 9.

10.     *On November 2, 2017, the Secretary of Labor filed suit against the AEU Plan and various entities in the case Acosta (now Pizzelle) v. AEU Benefits, LLC, et al., U.S. District Court for the Northern District of Illinois, Case Number 1: 17-cv-07931-JHL-SMF ("DOL Action").*

ANSWER:

Admitted, except Locke Lord states that the case name of the DOL Action is now *Walsh v.*

*AEU Benefits, LLC, et al.*

11.     *On November 3, 2017, the Court in the DOL Action entered an ex parte Temporary Restraining Order ("TRO"). The TRO ordered, in part, that Plaintiff Receivership Management, Inc., be appointed as the Independent Fiduciary of the AEU Plan and Employer Plans.*

ANSWER:

Locke Lord admits the allegations set forth in the first sentence of Paragraph 11 and denies

any remaining allegations to the extent they are inconsistent with the TRO.

12.     *On December 13, 2017, the Court in the DOL Action entered a Preliminary Injunction ordering, inter alia, that the Independent Fiduciary shall serve as the successor Trustee and Plan Administrator of the AEU Plan and Employer Plans, and shall have final and exclusive fiduciary authority over the AEU Plan's administration, management, and assets.*

ANSWER:

Locke Lord admits that the Court in the DOL Action entered a Preliminary Injunction

Order on or about December 13, 2017, and denies any remaining allegations set forth in Paragraph

12 to the extent they are inconsistent with that Order.

13.     *The Preliminary Injunction gave the Independent Fiduciary the "[a]uthority to identify and pursue claims on behalf of the [Employer] Plans and the AEU Plan[.]" Id. ¶ 14(j). Pursuant to that authority, the Independent Fiduciary brings this action.*

ANSWER:

Locke denies the allegations set forth in Paragraph 13 to the extent they are inconsistent with the Preliminary Injunction Order, except Locke Lord admits that RMI has filed this action against Locke Lord, citing the Preliminary Injunction Order as its authority to do so. Further answering, Locke Lord denies that RMI has authority to identify and pursue claims on behalf of medical providers, which RMI is pursuing in this action.

14. *Defendant Locke Lord, LLP ("Locke Lord") is a Delaware limited liability partnership of hundreds of attorneys practicing worldwide. Locke Lord has multiple United States offices, none of which is in Tennessee. Locke Lord has represented in this case that none of its partners is a citizen of Tennessee. (Dkt. 33, p. 10, n. 4).*

ANSWER:

Admitted.

15. *On its website, Locke Lord holds itself out as among The American Lawyer's top U.S. law firms, and that its "insurance and reinsurance practices are consistently recognized in national and international publications, earning the distinction of being named '2016 Law Firm of the Year in Insurance Law'" by U.S. News/Best Lawyers.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 15, except Locke Lord admits that it acknowledges on its website that the American Lawyer publication has identified Locke Lord as a top U.S. law firm and that U.S. News/Best Lawyers named Locke Lord as "2016 Law Firm of the Year in Insurance Law."

16. *Non-party Brain T. Casey ("Casey") is an attorney licensed to practice law solely in the State of Georgia. Casey is and at all relevant times has been a partner of Locke Lord in its Atlanta, Georgia office. At all relevant times, Casey was the agent of Locke Lord. Casey is the Co-Chair of Locke Lord's Regulatory and Transactional Insurance Practice Group. On his Locke Lord web page, Casey holds himself out as among "The Best Lawyers in America for Insurance." Casey's email signature displays the logo of the "Federation of Regulatory Counsel," of which he is a member.*

ANSWER:

Locke Lord admits the allegations set forth in the first, second, fourth, and sixth sentences of Paragraph 16. The third sentence of Paragraph 16 states a legal conclusion to which no answer is required, and to the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority. Locke Lord denies the allegations set forth in the fifth sentence of Paragraph 16, except Locke Lord admits that its web page for Brian T. Casey ("Casey") lists under "Awards & Recognitions" the following: "Named, The Best Lawyers in America®, Insurance Law, Mergers & Acquisitions Law (2018-2023)."

17. *Non-party Laurence A. Hansen ("Hansen") is an attorney licensed to practice law solely in the State of Illinois. Hansen is and at all relevant times has been a partner or of counsel in Locke Lord's Chicago, Illinois office. At all relevant times, Hansen was the agent of Locke Lord. Hansen practices in the area of taxation, with an emphasis on employee benefits.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 17, except (i) Locke Lord admits that Laurence A. Hansen ("Hansen") is not a party to this lawsuit, is an attorney licensed to practice law solely in the State of Illinois, and had been a partner and then of counsel in Locke Lord's Chicago office until his retirement on December 31, 2019, and (ii) the allegations in the third sentence state a legal conclusion to which no answer is required and, to the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

18. *Non-party AEU Holdings, LLC ("AEUH") is a Delaware holding company which at all relevant times had offices in Dallas, Texas and New York, New York. Non-party AEU Benefits, LLC ("AEUB") is a wholly-owned operating subsidiary of AEUH. AEUH and AEUB shared officers and offices. The names AEU Holdings, AEUH, AEU Benefits, and AEUB are used interchangeably on various AEU Plan-related documents, with the shortened form "AEU" also being used frequently in such documents and by Locke Lord as well as officers and employees of AEUH and AEUB. Therefore, the term "AEU" as used herein refers to both AEUH and AEUB.*

ANSWER:

Locke Lord lacks knowledge sufficient to form a belief as to the truth of the allegations set forth in Paragraph 18, except Locke Lord (i) admits that AEU Holdings, LLC ("AEUH") and AEU Benefits, LLC ("AEUB") are not parties to this lawsuit, and (ii) denies that Locke Lord used the terms AEU Holdings, AEUH, AEU Benefits, and AEUB interchangeably.

19.     *AEUH and AEUB provided sales, marketing, underwriting, rating, claims handling, program administration, and advisory services to the AEU Plan and its Employer Plans. At all relevant times, both AEUH and AEUB were agents and authorized representatives of the AEU Plan. At all relevant times, AEUH and AEUB exercised authority or control over management or disposition of Employer Plan assets, and were therefore fiduciaries of the Employer Plans. At all relevant times, AEUH and AEUB also exercised discretionary authority as a fiduciary over administration of the Employer Plans.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of Paragraph 19. The remaining allegations of Paragraph 19 state legal conclusions to which no answer is required and, to the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

20.     *Non-party S.D. Trust Advisors, LLC ("SD Trust Advisors") had its offices in Atlanta, Georgia at the relevant time. SD Trust Advisors was formed in December 2016 to serve as plan administrator for the Employer Plans. In December 2016, SD Trust Advisors created custodial and escrow accounts, in its name and over which it had control, to receive participant contributions from the Employer Plans.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20, except Locke Lord admits (i) S.D. Trust Advisors, LLC ("SD Trust Advisors") is not a party to this lawsuit, and (ii) SD Trust Advisors at all relevant times, had its offices in Atlanta, Georgia.

21.     *At the direction of AEU, SD Trust Advisors disbursed those funds to bank accounts in Bermuda and to pay service providers and administrative fees incurred by the Employer Plans. As a result, beginning no later than December 2016, SD Trust Advisors exercised authority or control over management or disposition of Employer Plan assets, and was therefore a fiduciary of*

*the Employer Plans. SD Trust also undertook to exercise discretionary authority as a fiduciary over administration of the Employer Plans.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21. To the extent Paragraph 21 states legal conclusions, no answer is required, and, to the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

22. *Non-party Thomas B. Stoughton ("Stoughton") is and was at all relevant times a resident of Atlanta, Georgia. Stoughton is an attorney licensed to practice law in Georgia. Stoughton was an officer and owner of the predecessor of AEU. Stoughton never served as an officer or employee of, or in any other capacity with, AEU. Stoughton was one of two members and owners of SD Trust Advisors. At all relevant times after its formation, Stoughton was an agent of SD Trust Advisors. Beginning no later than December 2016, Stoughton was a fiduciary of the Employer Plans.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 22, except (i) the last two sentences of Paragraph 22 state legal conclusions to which no answer is required, and, to the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority, and (ii) Locke Lord admits that (a) on information and belief, Thomas B. Stoughton ("Stoughton") at all relevant times was a resident of Atlanta, Georgia, and an attorney, (b) Stoughton is not a party to this lawsuit, (c) Stoughton had been an officer and owner of AISM, (d) on information and belief, Stoughton was not an officer or employee of AEUH or AEUB, and (e) Stoughton had been a member of SD Trust Advisors at all relevant times. Further answering, on information and belief, AEUH acquired certain assets from AISM and/or its affiliates as of April 2016.

23. *This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Locke Lord are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.*

ANSWER:

    Admitted.

    24.    *This Court has general personal jurisdiction over Locke Lord under 735 ILCS 5/2-209(b)(4) because Locke Lord does business and maintains an office of over 100 attorneys in Chicago, Illinois, and therefore continuously and systematically maintains contacts with Illinois.*

ANSWER:

    Admitted.

    25.    *Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(l) because Locke Lord is subject to this Court's personal jurisdiction with respect to this lawsuit and is therefore considered to reside in this judicial district under 28 U.S.C. § l39l(c)(2). Venue is also proper under 28 U.S.C. § l39l(b)(2) because a substantial part of the events or omissions giving rise to the Independent Fiduciary's claims occurred in this judicial district.*

ANSWER:

    Locke Lord does not contest venue but denies the second sentence of Paragraph 25.

    26.    *From 2013 to 2016, Locke Lord issued a series of at least five opinion letters -- which it styled as "comfort letters" -- attesting to the legality of the AEU Plan and its immediate predecessor. Each letter concludes, under materially similar assumed facts, that the "Transaction," as Locke Lord referred to it, would comply with ERISA, not result in the formation of a MEWA subject to state insurance laws and regulations, and not constitute the transaction of insurance in any state.*

ANSWER:

    Locke Lord denies each and every allegation set forth in Paragraph 26, except Locke Lord admits that in the AISM Letter and AEUH Letter, Locke Lord stated certain conclusions based on assumptions expressly stated in each letter, concerning the proposed transactions as described in each of those letters. Locke Lord denies all allegations inconsistent with the AISM Letter, the AEUH Letter and any other letter from Locke Lord that RMI describes generally in Paragraph 26 as the "five opinion letters."

    27.    *The "Transaction" Locke Lord describes in the assumed facts is highly complex and relies on perceived legal loopholes in the nature of a tax shelter. The comfort letters are*

*impenetrably dense and internally contradictory, redundant and disorganized. Locke Lord's major conclusions as to the legality of the "Transaction" are erroneous in ways that should have been obvious to self-proclaimed top lawyers in the field.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 27.

28.     *Locke Lord had an attorney-client relationship with the AEU Plan and its Employer Plans. As such, it owed them a duty to provide its legal services with the same level of competence, reasonable care, good faith, and ordinary diligence that similarly experienced lawyers in the highly specialized field of insurance transactions and regulation would exercise.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 28.

29.     *Locke Lord had a duty to inform the AEU Plan and the Employer Plans of all material facts within its knowledge that could affect the transactions within the scope of its representation or the subject matter of the attorney-client relationship.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 29, including any implication that it had an attorney-client relationship with or owed any duties to the so-called "AEU Plan" or any Employer Plan.

30.     *Locke Lord's duty of care and diligence to the AEU Plan and the Employer Plans included exercising an appropriate level of competence and understanding of the complex "Transaction" being marketed as the AEU Plan and the legal environment in which is operated.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 30, including any implication that it had an attorney-client relationship with or owed any duties to the so-called "AEU Plan" or any Employer Plan.

31.     *Because it knew its comfort letters were used in marketing the AEU Plan, Locke Lord had an obligation to investigate the legal standing of the AEU Plan and the Employer Plans if it knew, or in the exercise of reasonable diligence should have known, that they were not in compliance with legal requirements.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 31.

32. *Locke Lord had a duty to advise its clients upon gaining information that the AEU Plan and/or the Employer Plans may not be in compliance with legal requirements.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 32.

33. *As more fully alleged below, Locke Lord breached these duties in multiple ways. First, it erroneously opined that the AEU Plan "Transaction" as structured under Locke Lord's assumed facts would not result in the Employer Plans being a MEWA subject to state law.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 33.

34. *Second, it erroneously opined under the assumed facts that the Employer Plans would not be engaged in the transaction of insurance in any state by their participation in the AEU Plan "Transaction."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 34.

35. *Third, it erroneously opined that the AEU Plan "Transaction" as structured under Locke Lord's assumed facts would comply with ERISA's indicia-of-ownership and plan-asset laws and regulations.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 35.

36. *Fourth, it failed to act and advise the AEU Plan and the Employer Plans in the face of known facts indicating a duty to act, including but not limited to (a) advising the Employer Plans to obtain individual domestic stop-loss policies instead of a single, pooled policy from an offshore insurer, (b) withdrawing or correcting its comfort letters, (3) advising the Employer Plans and the AEU Plan that they were required to submit to state insurance regulation, and (4) advising the Employer Plans and the AEU Plan that they were not in compliance with federal and state laws and regulations and should cease accepting participant contributions and terminate the Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 36.

37.    *As a result of Locke Lord's erroneous opinions and conclusions and the Employer Plans' reasonable and justifiable reliance thereon, the Employer Plans and the AEU Plan they comprised were not subject to regulatory oversight or statutory restraints normally applicable to domestic and offshore insurance operations of their size and scope.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 37.

38.    *As a direct and proximate result of Locke Lord's breaches of duty, the unregulated Employer Plans joined or renewed enrollment in the AEU Plan, and their employee participants and medical providers have incurred claims for which the Employer Plans and the AEU Plan (as the MEWA it actually was) are obligated but unable to pay.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 38.

39.    *In addition, the Independent Fiduciary is unable to collect millions of dollars of stop-loss proceeds under foreign stop-loss policies.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in Paragraph 39.

40.    *Without Locke Lord's comfort letters as the AEU Plan's legal foundation and operational roadmap, the AEU Plan would not have been viable.  Locke Lord played a central role in the creation, development, marketing, and continued existence of the AEU Plan.  Locke Lord was well aware that its comfort letters were used to promote and market the AEU Plan to hundreds of Employer Plans in at least 35 states.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 40.  Further answering,

Locke Lord states that, if AEUH had operated consistent with the assumptions set forth in the

Locke Lord Letters, the so-called "AEU Plan" would not have existed.

41.    *The losses alleged here are exactly what highly experienced insurance regulatory attorneys such as Locke Lord should know and expect would result when health insurance is transacted as it was here:  on a national scale by an operation with inadequate resources to*

*undertake such an endeavor, with no financial or market conduct regulatory oversight, and no financial reserves. Locke Lord should be held to account for the debacle it was instrumental in creating and facilitating.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 41. Further answering, Locke Lord denies any assertion, express or implied, that Locke Lord created or facilitated or is liable in any way for any "debacle" involving AEUH, AEUB, the so-called "AEU Plan," or any Employer Plan.

42. *Founded in 2011, a company known as ALLInsurance Solutions Management, LLC ("AISM") provided self-insured benefit and workers compensation programs to small and medium-size employers primarily through PEO aggregators of such employers. AISM was a Georgia limited liability company with its sole office in Atlanta, Georgia.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 42.

43. *In 2013, AISM approached Casey in Locke Lord's Atlanta office seeking advice in connection with a proposed employee health benefit plan intended to comply with ERISA and avoid state insurance regulation ("AISM Plan"). AISM and Locke Lord, through Casey, agreed to terms and Locke Lord began providing legal services related to the AISM Plan. Those services included substantial advice concerning its structure and drafting most of the legal documents significant to the Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 43, except Locke Lord admits that in or about December 2013, pursuant to terms agreed upon by AISM and Locke Lord, AISM engaged Locke Lord to review and comment on a proposed transaction "in respect of certain matters related to (1) ERISA and (2) state insurance codes relevant to the Transaction regarding the transaction of insurance by unauthorized insurance companies, all as particularly described" and based on assumptions set forth in the AISM Letter.

44. *The AISM Plan was the predecessor of the AEU Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 44.

45. *On December 12, 2013, Locke Lord issued an opinion letter to AISM relating to the AISM Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 45, except Locke Lord admits that it sent a letter dated December 12, 2013, addressed to AISM, Attn. Steven Needle, and denies any allegations inconsistent with that letter.

46. *On March 3, 2014, Locke Lord issued a second opinion letter to AISM. (Exhibit A hereto). This second opinion letter ("AISM Letter") appears to be identical to the first except it is addressed to a different officer at AISM's office in Georgia.*

ANSWER:

Locke Lord denies each of the allegations set forth in Paragraph 46, except Locke Lord admits that it sent a letter dated March 3, 2014, to AISM (AISM Letter), which appears to be substantially identical to a previous letter dated December 12, 2013, that Locke Lord sent to AISM, except the AISM Letter was directed to the attention of David Dennett-Smith, not Steven Needle, and denies any allegations inconsistent with the AISM Letter.

47. *The AISM Letter was issued on Casey's personal Locke Lord Atlanta office letterhead and bears a network file path indicating it was prepared in that office. The AISM Letter is addressed to an officer of AISM at its office in Georgia. Casey signed the AISM Letter "For the Firm." The AISM Letter was cc'ed to Hansen.*

ANSWER:

Admitted, except Locke Lord denies (i) the AISM Letter was on Casey's "personal Locke Lord Atlanta office letterhead" and (ii) any implication that a document that bears any particular Locke Lord network file path indicates that such document was prepared in any particular office.

16

48.     *The AISM Letter concludes that, under the assumed facts in the letter, the AISM Plan would comply with ERISA, would not result in the formation of a MEWA subject to state insurance laws and regulations, and would not constitute the transaction of insurance in any state. (Exhibit A, pp. 6-7).*

ANSWER:

Locke Lord admits that a copy of the AISM Letter is attached as Exhibit A to the Complaint and denies any remaining allegations set forth in Paragraph 48 to the extent they are inconsistent with the AISM Letter.

49.     *Locke Lord knew that the purpose of the AISM Letter was to assure those marketing the AISM Plan and their employer customers that the AISM Plan complied with all applicable laws and regulations, including ERISA and state insurance laws and regulations.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 49.

50.     *Under the facts assumed in the AISM Letter, individual employers would each establish separate employee benefit plans under ERISA for the purpose of providing health benefits solely to the employer's employees and their dependents (referred to as "Employer Customer Plans" in the letter and "Employer Plans" here and in later Locke Lord comfort letters). (Id. at 1-2).*

ANSWER:

Locke Lord admits the AISM Letter set forth certain factual assumptions and denies any remaining allegations set forth in Paragraph 50 to the extent they are inconsistent with the AISM Letter.

51.     *Under the facts assumed in the AISM Letter, each Employer Plan was to establish a trust to receive contributions and act as a funding source for the Employer Plan. (Id. at 2). (The trusts are referred to in the AISM Letter as the "Employer Customer Trusts," and herein and in later Locke Lord comfort letters as the "Employer Trusts." For simplicity, hereafter both the Employer Plans and the Employer Trusts shall be referred to as the "Employer Plans" unless the context requires otherwise).*

ANSWER:

Locke Lord admits the AISM Letter set forth certain factual assumptions and denies any remaining allegations set forth in Paragraph 51 to the extent they are inconsistent with the AISM Letter. Locke Lord further denies that it is "simplicity" to refer to "Employer Plans" sometimes to mean both Employer Plans and Employer Trusts and sometimes to mean something else, particularly in light of the fact that RMI has differently defined "Employer Plan" in Paragraphs 3 and 4 of its Complaint. For purposes of its answer, Locke Lord will treat the term "Employer Plans" as used in RMI's allegations to mean both Employer Plans and Employer Trusts for all allegations asserted in and after Paragraph 51 and will treat the term "Employer Plan" as defined in Paragraph 4 for all allegations asserted in Paragraph 4 through Paragraph 50 (and the separate definition of "Employer Plans" as defined in Paragraph 3 for allegations in that Paragraph only).

52. *As further contemplated by the assumed facts in the AISM Letter, the AISM Plan was to involve the establishment of a single offshore trust domiciled in Bermuda, the beneficiaries of which would be the Employer Plans. The Bermuda trust would be funded with participant (i.e., employer and employee) contributions made to the Employer Plans. (Id. at 3-5).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 52, except Locke Lord admits the AISM Letter set forth certain factual assumptions and denies any allegations set forth in Paragraph 52 to the extent they are inconsistent with the AISM Letter.

53. *The Bermuda trust was to use those participant contributions to purchase primary and stop-loss insurance coverage for the benefit of the Employer Plans. (Id. at 3-4). Sometime in 2015, AISM abandoned the "primary coverage" element of the Bermuda trust referred to in the AISM Letter. Thereafter, the Bermuda trust was utilized solely for the purchase of stop-loss coverage.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 53, except (i) Locke Lord admits the AISM Letter set forth certain factual assumptions and denies any allegations set forth in Paragraph 53 to the extent they are inconsistent with the AISM Letter, and (ii) Locke Lord

18

lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second and third sentences of Paragraph 53, except it admits that at some point it was informed that either AEUH or AISM intended to use a Bermuda trust solely for the purchase of stop-loss coverage and not for primary coverage.

54.    *In general, stop-loss coverage provides reimbursement for catastrophic claims exceeding a predetermined level ("attachment point").  For example, stop-loss coverage may reimburse for a loss above a certain dollar amount paid to cover an extremely high medical claim. The stop-loss policies utilized here were "reimbursement" policies.  Under the facts assumed in the AISM Letter, the attachment point for stop-loss coverage was any claim in excess of $100,000. (Id. at 4).  This meant that once an Employer Plan incurred and paid a claim in excess of $100,000, the stop-loss carrier would reimburse the amount of the claim in excess of $100,000.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 54, except Locke Lord (i) admits that the AISM Letter set forth certain factual assumptions and denies any remaining allegations set forth in Paragraph 54 to the extent they are inconsistent with the AISM Letter; (ii) admits that stop-loss coverage may refer to an insurance policy that pays the insured for claims that exceed a certain pre-determined level, which may be referred to as an "attachment point," and that such coverage may apply to medical claims above a certain amount depending on the terms of the policy; and (iii) lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the third sentence of Paragraph 54.

55.    *On April 1, 2014, shortly after Locke Lord issued the AISM Letter, AISM caused a trust known as the Bermuda Purchasing Trust ("BPT") to be established to purchase a stop-loss policy ("Stop-Loss Policy") for the benefit of the Employer Plans associated with the AISM Plan.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 55.

56.    *Locke Lord created or was involved in creating the "Bermuda Purchasing Trust Formation Agreement" utilized to establish the BPT.  Locke Lord also created or was involved in*

*creating numerous other form documents fundamental to the structure of the AISM Plan. These included (a) other documents relating to the BPT and the Bermuda insurance coverage; (b) the Employer Trust agreement; and (c) agreements between the Employer Plans and those providing management, administrative, and third-party administrator ("TPA") services. Each of these form documents bears a Locke Lord network file path.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 56, including any implication that a document that bears a Locke Lord network file path indicates that Locke Lord had any role in the drafting or preparation of such document, except Locke Lord (i) admits that it reviewed and assisted in drafting certain documents related to the AISM program, including agreements related to the formation of a Bermuda Purchasing Trust, and (ii) lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the last sentence of Paragraph 56. Further answering, Locke Lord states that, as part of its document management system, documents that are saved on Locke Lord's system are assigned a document number and that such document number does not indicate that Locke Lord had any role in the drafting, reviewing, or preparing of such document.

57. *AISM and the Employer Plans caused the BPT to be established and operated in reliance on Locke Lord's advice in the AISM Letter that the establishment and operation of the BPT in a manner consistent with the facts assumed in the AISM Letter would comply with ERISA, would not result in the formation of a MEWA subject to state insurance laws and regulations, and would not constitute the transaction of insurance in any State.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 57. Further answering, Locke Lord affirmatively states that if any Employer Plan or Employer Trust relied on the AISM Letter, such reliance was unreasonable in light of the AISM Letter, which expressly stated that the AISM Letter was not rendered for the benefit of any person or entity other than AISM and that no other person or entity may use or rely

on the AISM Letter for any purpose whatsoever without the written permission of Locke Lord, which Locke Lord did not provide.

58.   *On March 11, 2015, an officer of AISM sent AEU's President, Stephen Satler ("Satler") a copy of the AISM Letter.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 58.

59.   *In July 2015, AISM contracted with AEU to manage the AISM Plan. Pursuant to that contract, AEU took over the sales, marketing, underwriting, rating, claims handling, and program advisory functions of the AISM Plan.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 59, except Locke Lord admits that AEUH agreed to assume certain day-to-day administrative operations of AISM pursuant to a Services Agreement dated June 1, 2015. Locke Lord denies all allegations set forth in Paragraph 59 to the extent they are inconsistent with any written agreement between AISM and AEUH.

60.   *In or about January 2016, Veritas, one of the principal PEO aggregators for the AISM Plan, engaged Locke Lord, through Casey, to provide legal services in connection with the AISM Plan. Locke Lord knew that Veritas was marketing the AISM Plan to a substantial trade association in California that had questions about the AISM Plan's legality under the California Insurance Code's stop-loss insurance statute. The engagement included Locke Lord drafting an opinion letter on that issue. Although Veritas engaged Locke Lord, Casey addressed the letter to AISM. The letter assumes substantially the same facts set forth in the AISM Letter and concludes that the AISM Plan did not violate the California statute. Locke Lord's attorney-client relationship with Veritas continued through at least July 2016.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 60, except Locke Lord admits that (i) Veritas retained Locke Lord to provide certain limited legal services pursuant to a written engagement letter dated January 6, 2016, and that Locke Lord provided certain legal

services to Veritas from time to time, including in July 2016, and denies any allegations inconsistent with the terms of the January 6, 2016, letter, and (ii) Veritas and AISM requested that Locke Lord address certain issues regarding a proposed transaction involving employer members of a California trade association, as described in and based on assumptions set forth in a draft letter dated January 27, 2016, addressed to Thomas Stoughton and AISM, "in respect of certain matters related to (1) the Employee Retirement Income Security Act of 1974 ('ERISA') and (2) state insurance codes relevant to the Transaction regarding the transaction of insurance by unauthorized insurance companies, all as more particularly described" in such letter, and denies all allegations set forth in Paragraph 60 to the extent they are inconsistent with such letter.

61.     *On April 26, 2016 AEUH and AISM entered into an Asset Purchase Agreement whereby AEUH acquired all of the assets of AISM, including the AISM Plan.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 61, except Locke Lord admits that it was advised that AISM and AEUH entered into an agreement in or about April 2016, pursuant to which AEUH acquired certain assets from AISM and/or certain of its affiliates.

62.     *AEU officers relied on the legality of the AISM Plan as confirmed in the Locke Lord AISM Letter in deciding to acquire the Plan.  Those officers also understood that one of the assets acquired was the AISM Letter.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 62, except Locke Lord denies that it confirmed the legality of the so-called AISM Plan.  Further answering, Locke Lord affirmatively states that (i) the AISM Letter expressly provided that the AISM Letter was rendered on behalf of AISM only and may not be used or relied upon by any other person or entity without the express written permission of

Locke Lord, and (ii) Locke Lord did not provide express written permission for AEUH to receive, use, or rely on the AISM Letter.

63.     *As a result of the Asset Purchase Agreement, AEU became the successor of AISM, including with respect to the AISM Plan.  Locke Lord knew and understood this and referred to AEU as the successor to AISM.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 63, except Locke Lord admits that Locke Lord referred to AEUH in the AEUH Letter "as the successor owner of certain assets previously owned by ALLinsurance Solutions Management, LLC and/or certain of its affiliates as of April 2016," and that Locke Lord may have referred to AEUH as the successor to AISM in other contexts, as a short hand reference to AEUH as the successor owner of certain assets of AISM and/or its affiliates.

64.     *As a result of the Asset Purchase Agreement, the AISM Plan became the AEU Plan. AEU became the sponsor of the Plan and continued in its role as manager and administrator of the Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 64.

65.     *As part of the Asset Purchase Agreement, AEU agreed to assume AISM's liability for Locke Lord's legal fees incurred for AISM but not yet paid.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 65, except Locke Lord admits that AEUH and/or AEUB paid certain fees incurred by AISM.

66.     *After AEUH's acquisition of the AISM Plan, the BPT remained in existence and all of the Employer Plans that were beneficiaries of the BPT became part of the AEU Plan.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 66. Further answering, under the Contemplated Transaction as described in the AISM Letter and AEUH Letter and based on the assumptions set forth in those letters, Employer Plans would not be beneficiaries of the BPT.

67.    *Locke Lord had an attorney-client relationship with the AEU Plan and the Employer Plans beginning no later than May 10, 2016. As alleged below, the AEU Plan and the Employer Plans entered into that relationship with Locke Lord:*

(a)    *Through AEUH as a fiduciary, agent, and authorized representative of the AEU Plan and the Employer Plans;*

(b)    *As direct, intended, third-party beneficiaries of an engagement agreement between Locke Lord and AEUH; and/or*

(c)    *Pursuant to an oral or implied-in-fact agreement.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 67.

68.    *At or around the time of the acquisition, officers of AEU and Locke Lord discussed Locke Lord continuing in its role as legal counsel to what would now be the AEU Plan. Locke Lord continued to seamlessly provide such advice and counsel.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 68, except Locke Lord admits that AEUH retained Locke Lord pursuant to an engagement letter dated May 18, 2016, ("AEUH Engagement Letter") to advise AEUH in connection with state insurance regulatory, Patient Protection and Affordable Care Act (PPACA), and ERISA compliance matters in connection with employee health benefits plans and products developed by AEUH, as may be requested by AEUH from time to time, and denies any allegations inconsistent with the AEUH Engagement Letter.

69.    *On May 10, 2016, two weeks after the acquisition, Casey had a conference call with Stoughton and AEU and AISM officers regarding "a professional employer organization's wrongful influence over the funds flow for the Bermuda program interfacing with the trustee of the [Employer Plans]." This related to the fact that Veritas, a PEO aggregator for what was now*

24

*the AEU Plan (and a Locke Lord client), was exercising improper control over Employer Plan assets. Locke Lord performed these legal services for the benefit of the AEU Plan and the Employer Plans. Locke Lord's initial invoice to AEUH billed for this conference call.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 69, except Locke Lord admits that (i) according to the time records for Brian Casey, on May 10, 2016, Mr. Casey had a telephone conference for 1.4 hours with "Tom Stoughton, Steve Satler, Fred Brasch and Steve Nigro" regarding, among other things, "a professional employer organization's [referring to Veritas] wrongful influence over the funds flow for the Bermuda program interfacing with the trustee of the VEBAs," and (ii) Locke Lord billed AEUH, and AEUH paid Locke Lord, for the time incurred on May 10, 2016.

70. *As a result of the conference call, Locke Lord was on notice that significant aspects of the assumed facts set forth in the AISM Letter were not being adhered to in practice.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 70.

71. *On May 18, 2016, Locke Lord and AEUH executed an engagement letter with the subject line "Agreement and Instructions for Legal Services" (Exhibit B hereto) ("Engagement Letter"). The Engagement Letter was issued on Casey's personal Locke Lord Atlanta office letterhead and bears a network file path indicating it was prepared in that office. Casey signed the Engagement Letter "For the Firm." The Engagement Letter contains a "Rate Sheet" listing the attorneys that would likely be working on the engagement as Casey, Hansen, and an associate in Locke Lord's Chicago office whose practice includes regulatory and health care matters.*

ANSWER:

Locke Lord admits that a copy of the AEUH Engagement Letter is attached to the Complaint as Exhibit B and denies any allegations inconsistent with that letter.

72. *The Engagement Letter defines the scope of the representation as "to advise [AEUH] in connection with state insurance regulatory, [Affordable Care Act], and [ERISA] compliance matters in connection with employee health benefits plans and products developed by [AEUH]." (Exhibit B, ¶ 1).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 72, except Locke Lord admits that a copy of the AEUH Engagement Letter is attached as Exhibit B to the Complaint and denies any allegations inconsistent with the AEUH Engagement Letter. Further answering, Locke Lord states that the AEUH Engagement Letter states in part as follows:

> Our client in this matter will be the Company [AEUH]. Our representation does not encompass any other individual or entity, including affiliates, officers, directors, employees, shareholders, or other stakeholders of the Company. We will be engaged to advise the Company in connection with state insurance regulatory, Patient Protection and Affordable Care Act (PPACA), and Employee Retirement Income Security Act (ERISA) compliance matters in connection with employee health benefits plans and products developed by the Company, as may be requested by the Company. The Company may limit or expand the scope of our representation from time to time, provided that any substantial expansion must be agreed to by us.

Ex. B to Complaint. Further answering, the AEUH Engagement Letter provided that AEUH's "Client Responsibilities" included, among other things, that AEUH agreed "to cooperate fully with [Locke Lord] and to provide promptly all information known or available to it relevant to our representation. Without such information, we may not be able to represent the Company adequately." To the extent AEUH operated its self-insured, stop-loss insurance program in a manner inconsistent with the assumptions set forth in the AISM Letter or the AEUH Letter, AEUH breached its obligations to Locke Lord under the AEUH Engagement Agreement.

73.     *The reference to "employee health benefits plans and products" in the Engagement Letter was intended to and did refer to the Employer Plans and the so-called "Transaction" constituting the AEU Plan, which Locke Lord knew was continuing to operate as a result of AEU's acquisition of AISM's assets, including the AISM Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 73.

74.     *Locke Lord knew that AEUH, as its name suggested, was a holding company with no operations of its own. It could therefore benefit only indirectly from the services Locke Lord would provide. Locke Lord knew the direct beneficiaries would be the Employer Plans and the*

*AEU Plan they comprised, and that AEUH's intent in entering the Engagement Agreement was to benefit them.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 74, except Locke Lord admits that AEUH has the term "Holdings" in its name, and Locke Lord lacks knowledge as to whether AEUH "was a holding company with no operations of its own."

75.    *Thus, the AEU Plan and its Employer Plans were the primary, intended, direct third-party beneficiaries of the Engagement Letter, and an attorney-client relationship was created between Locke Lord and the AEU Plan and Employer Plans by the Engagement Letter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 75.

76.    *When Casey executed the Engagement Letter, Locke Lord also knew that AEU was already sponsoring and administering the AEU Plan as the successor to the AISM Plan, on which Locke Lord had advised extensively.  Locke Lord further knew that the AEU Plan and its Employer Plans were AEU's only business at the time for which issues related to compliance with state insurance regulation, Affordable Care Act, and ERISA would be presented to Locke Lord.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 76, except that Locke Lord admits that AEUH was continuing certain activities it had been performing on behalf of AISM before the asset acquisition.

77.    *When Casey executed the Engagement Letter, Locke Lord knew and understood that AEUH was the sponsor, manager, administrator, and advisor, of the AEU Plan and the Employer Plans, and that, with respect to the subject matter of the engagement, AEUH had no purpose other than to serve the Employer Plans and the AEU Plan, including by engaging Locke Lord.  Locke Lord knew and understood that AEUH was entering into the Engagement Letter as a fiduciary, agent, and/or authorized representative of the Employer Plans and the AEU Plan they comprised.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 77, including any implication that AEUH entered into the AEUH Engagement Letter on behalf of, or as an agent, fiduciary and/or authorized agent of any "Employer Plan" and/or the so-called "AEU Plan."

78. *The Engagement Letter created an attorney-client relationship between Locke Lord and the AEU Plan and Employer Plans through AEUH as their fiduciary, agent, and/or authorized representative.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 78.

79. *The Engagement Letter identifies only AEUH as the client, and states that it "does not encompass any other individual or entity." (Exhibit B, ¶ 1). Regardless of that statement in the Engagement Letter, Locke Lord routinely provided legal services for the benefit of the AEU Plan, the Employer Plans, AEUB, and others related to the Employer Plans and the AEU Plan they comprised.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 79, except Locke Lord admits that the AEUH Engagement Letter identified AEUH as Locke Lord's only client in the matter described in the AEUH Engagement Letter and stated, in part, that Locke Lord's "representation does not encompass any other individual or entity, including affiliates, officers, directors, employees, shareholders, or other stakeholders of [AEUH]." Locke Lord denies any allegations inconsistent with the AEUH Engagement Letter.

80. *Casey created a single billing matter for all things related to the AEU Plan "Transaction" and the Employer Plans, which he aptly named the "Insurance Regulatory Compliance" matter. Casey chose that name because he knew the primary purpose of the engagement was to advise and opine on matters related to the AEU Plan "Transaction" and its compliance with ERISA and state insurance laws and regulations.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 80, except Locke Lord admits that the client matter for AEUH was described on Locke Lord's invoices to AEUH as

"Insurance Regulatory Compliance," and that a purpose of the engagement was to review and comment on AEUH's proposed transaction as described in and based on assumptions set forth in the AEUH Letter with respect to certain matters related to ERISA, the Internal Revenue Code of 1986, and state insurance codes regarding the transaction of insurance by unauthorized insurance companies, all as more particularly described in the AEUH Letter.

81.     *Locke Lord billed all of its time that was in any way related to the AEU Plan "Transaction" to the Insurance Regulatory Compliance matter, regardless of who requested the services -- whether AEUB, a Plan fiduciary, or even an aggregator, and regardless of whether those services related to administration of the AEU Plan (or its constituents plans), fiduciary activities, or plan design.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 81.

82.     *For example, even though Locke Lord had no written engagement agreement with AEUB (and AEUB as an affiliate was purportedly excluded from the Engagement Letter), it provided legal services in connection with a draft Management Agreement between AEUB and the individual Employer Plans.  Casey listed himself as counsel for AEUB in the Notice provision of the draft Agreement.  (Exhibit C hereto, Art. 12.1 (b)).  Casey billed this time to the Insurance Regulatory Compliance matter, even though the work was done for AEUB, not AEUH.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 82, including any implication that the draft agreement attached as Exhibit C to the Complaint contemplated an agreement between AEUB and "individual Employer Plans," except Locke Lord (i) admits that it did not have a written engagement agreement with AEUB and denies any implication that it provided any legal services for AEUB, as opposed to AEUH, and (ii) admits that the agreement attached as part of Exhibit C to the Complaint lists Locke Lord LLP, Attn: Brian T. Casey, to receive copies of any notice sent to AEUB pursuant to such agreement, and (iii) admits that Locke Lord billed AEUH for services provided in connection with such draft agreement.  Further answering, Locke Lord affirmatively states that the draft agreement attached as part of Exhibit C

was a draft agreement entitled "Health Benefits Program Management and Advisory Services Agreement," and was a draft agreement between AEUB and an unnamed voluntary employee benefits association, not any Employer Plan.

83.     *In addition, Locke Lord's bills were paid by AEUB, not AEUH, further demonstrating that AEUH was never intended to be, nor in practice was it, Locke Lord's only client.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 83, except Locke Lord admits that AEUB paid certain of its invoices.

84.     *AEUB's income consisted of fees paid by the Employer Plans.  Locke Lord, therefore, knew that it was being compensated indirectly by the Employer Plans.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of Paragraph 84 and denies the allegations set forth in the second sentence, including any implication that the Employer Plans or Trusts compensated Locke Lord.

85.     *As further alleged below, Locke Lord frequently provided legal services at Stoughton's or AEU's request for the benefit of the Employer Plans and the AEU Plan they comprised.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 85.

86.     *As a result, the Engagement Letter created an attorney client relationship, and/or there was an oral or implied-in-fact agreement that created an attorney-client relationship, between Locke Lord and the Employer Plans and the AEU Plan they comprised.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 86.

87.     *Five days after the Engagement Letter was executed, Stoughton forwarded several Locke Lord invoices to AEU. The invoices were for legal services Locke Lord had provided to AISM before the acquisition. Pursuant to the Asset Purchase Agreement, Stoughton requested that AEU as successor pay the invoices in a timely manner.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 87.

88.     *On May 26, 2016, an officer of AEU sent a large brokerage firm the AISM Letter to support the legality of what was now the AEU Plan.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 88.

89.     *After execution of the Engagement Letter, Locke Lord continued in its role providing legal advice and services for the benefit of what was now the AEU Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 89, including any implication that it provided legal advice or services at any time for the benefit of the so-called "AEU Plan."

90.     *On May 26, 2016, Casey sent AEU's general counsel, Billie Wray ("Wray") "Bermuda Transaction Documents" that Casey characterized as "the stash from my document system." That same day, Wray requested that Casey "send us a list naming the documents to be signed by each [Employer Plan]," because "[w]e want to ensure as we begin the management of the program previously known as AISM, we are gathering the proper documentation."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 90, except Locke Lord admits that (i) Casey sent to Wray an email dated May 26, 2016, with the subject line "Bermuda Transaction Documents," stating "Here is the stash from my document system," and attached ten

documents, and (ii) Wray sent to Casey an email in response, also dated May 26, 2016, which

stated, in part, as follows:

> Could you please send us a list naming the documents to be signed by each Veba?

> We want to ensure as we begin the management of the program previously known as AISM, we are gathering the proper documentation.

91. *Casey responded by sending Wray a document entitled "20140516 LEGAL Document Checklist- BC - LL," the name of which appears to indicate the document was first created on May 16, 2014 by Brian Casey of Locke Lord ("Checklist").*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the allegations

set forth in Paragraph 91, including what the name of an attached document may indicate to RMI,

except Locke Lord admits that by email dated May 26, 2016, Casey sent certain documents to

Wray, including an attachment named "20140516 LEGAL Document Checklist - BC-LL & TBS

Diagram Ver#14.xlsx."

92. *The Checklist lists all the documents necessary to the structure of the AISM Plan, which was now being sponsored, managed and administered by AEU as the AEU Plan. The majority of the documents on the Checklist are identified by their "Locke Lord Document Number," i.e., their Locke Lord network file path.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 92.

93. *The "Locke Lord Legal Opinion," i.e., the AISM Letter, is one of the documents listed on the Checklist. The checklist indicates the AISM Letter was to be included in "Packet 1," which was to be provided to "PEO and Association Producers." Thus, Locke Lord knew that, as was permitted under the AISM Letter, (see Exhibit A, p. 8), the AISM Letter and its conclusions regarding compliance with ERISA and state insurance laws was being provided to "producers" to market and sell the AISM Plan to Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 93.

94. *Casey also provided Wray a funds flow chart indicating that all participant contributions would first be collected by a PEO aggregator, then transferred to a TPA from which numerous fees would be deducted, including for the PEO, an actuary, the TPA, network providers, the plan administrator, and the plan manager (which was AEU beginning in July 2015 and at all relevant times thereafter). Thus, Casey and Locke Lord were aware of the number of fees being extracted from participant contributions. Only after the TPA deducted and paid all such fees were the net contributions then sent to the BPT.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 94.

95. *In June 2016, Casey met with Chris Festa ("Festa"), a business analyst in AEU's New York office, and two other AEU officers to discuss "the Bermuda purchasing stop loss insurance transaction structure."*

ANSWER:

Locke Lord denies each allegation set forth in Paragraph 95, except Locke Lord admits that Casey met with Chris Festa, Jim Kilduff, and Andy Nigro on June 24, 2016, regarding various questions concerning the Bermuda stop loss insurance transaction structure.

96. *In July 2016, Casey and Hansen assisted in the drafting of enrollment forms for employee-participants in the Employer Plans. Their communications regarding the forms are with officers of both AEU and Veritas, so it is unclear at whose direction these services were performed, although they were clearly intended to benefit the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 96, except Locke Lord admits that it had communications with officers of Veritas regarding enrollment forms in July 2016.

97. *Veritas's attorney commented that the term "home office" should be avoided in the form as it "makes it [the AEU Plan] sound like an insurance company," to which Casey replied: "Agreed." (Emphasis omitted).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 97, except Locke Lord admits that in a draft rider to a draft form "Employee Eligibility Statement," the following

statement appeared in the form – "As part of our routine underwriting procedure, you may receive a telephone call from the home office to obtain additional information" – to which Veritas's attorney, Paul Cardinal, commented: "Avoid "home office", makes it sound like an insurance company," to which Casey responded: "Agreed." Further answering, Locke Lord states that Veritas was not an insurance company, and it was, therefore, appropriate to clarify the language. As revised, Cardinal proposed the following replacement language, in relevant part: "As part of our routine underwriting procedure, you may receive a telephone call from the Trustee or its third party administrator."

98. *In June 2016, Stoughton received multiple inquiries from the DOL and a Market Conduct Investigator with the Florida Office of Insurance Regulation. The investigator was inquiring about a "group" plan being marketed in Florida as the "AEU Benefits" plan by Locke Lord's client Veritas.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 98, except Locke Lord admits that Stoughton received inquiries in or about June 2016 from the Department of Labor and Florida Office of Insurance Regulation concerning certain alleged conduct by Veritas in Florida, which AEUH and AISM claimed involved the use of AISM intellectual property without authorization but, to their knowledge, did not involve the marketing of a "group plan." Further answering, Locke Lord denies any implication that it represented Veritas in connection with such matters and affirmatively states, on information and belief, that AEUH terminated its relationship with Veritas in or about November 2016.

99. *Stoughton forwarded the investigator's emails to Satler, Casey and Hansen, along with a PDF document Veritas was apparently using to market the plan in Florida. The PDF consisted of a 2015 "AEU Benefits" marketing brochure. The brochure explained the medical benefit offerings available and contained contact information for salespeople at AEU. Locke Lord's AISM Letter was included as part of the PDF, as well as a form of "Joinder Agreement"*

*for the BPT and a related Limited Power of Attorney, each bearing a Locke Lord Atlanta network file path.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 99, except Locke Lord admits that Casey and Hansen received emails from Stoughton, and Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the alleged PDF document or its intended use.

100.    *Casey and Hansen had several teleconferences with Stoughton and were involved in drafting the response to the Florida Office of Insurance Regulation, which stated that AEU was unaware of any "group" coverage being sold.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 100, except Locke Lord admits that (i) Casey and Hansen spoke with Stoughton and others regarding the Department of Labor and Florida Office of Insurance Regulation inquiries, (ii) Casey reviewed and revised a draft written response from Stoughton to "Jan" at the Florida Office of Insurance Regulation, which Stoughton had sent Casey (and copied to Steven Nigro, Satler, and Goldberg) for his review, and (iii) the draft sent to Casey stated, in relevant part, that Stoughton did not believe that Veritas was offering "group" coverage and believed that Veritas "was offering access to the AISM IP, which is limited exclusively to self-funded ERISA plans."

101.    *The next month, Festa emailed Casey that AEU was "very concerned that Veritas is acting as a MEWA." Festa was referring to Veritas once again exercising improper control over Employer Plan assets and dictating when and how they could be utilized. Festa copied other AEU officers and Stoughton on the email.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 101, except Locke Lord admits that on July 20, 2016, Festa sent Casey and Stoughton an email, with copies to Wray and

Satler, which stated in part that "We [Satler and Festa] are very concerned that Veritas is acting as a MEWA," and Locke Lord denies any allegations inconsistent with that email. Further answering, Festa's draft letter to WBS, LLC, which he attached to his email, referred to Veritas HR, not Veritas.

102. *Festa's email included a draft letter to be sent to Wilson Benefit Services ("WBS"), the AEU Plan Administrator at the time, directing WBS to terminate Veritas as a PEO aggregator for the AEU Plan. Festa suggested Casey or Stoughton send the letter to WBS. The draft letter states that Veritas had been "acting as a multiple employer welfare arrangement, or MEWA, which are illegal in the states Veritas operates." The letter states that this was the result of "Veritas' refusal to allow [WBS] to transfer the necessary funds."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 102, except Locke Lord admits that (i) Festa stated in his cover email that Festa and Satler suggested that Stoughton or Casey should put Rick Wilson of WBS, LLC on notice of Festa's and Satler's concerns, and (ii) Festa attached to his email a draft letter to Rick Wilson as president of WBS, LLC, from Satler on behalf of AEUH.

103. *Based on this correspondence, Casey knew or should have known that AEU was monitoring, supervising, and enforcing the flow of Employer Plan assets, and was therefore exercising control or authority over plan management or assets as a fiduciary of the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 103.

104. *This was also at least the third time Casey learned that the AEU Plan was not operating in accordance with the assumed facts in the AISM Letter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 104.

105. *Casey replied that because Veritas was a Locke Lord client, he could not send the letter on behalf of "AEU (as successor to AISM)."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 105, except Locke Lord admits that, by email dated July 20, 2016, to Festa and Stoughton, with copies to Wray and Satler ("7/20/16 Casey email"), Casey stated that "LL cannot send this letter to Veritas," referring to a draft letter that Festa had attached to his email of the same date, and denies any allegations inconsistent with Casey's email.

106. *Casey also asked, "do we really want a letter from AEU floating around stating that it thinks a MEWA exists as I am afraid that if such a letter get sin [sic] the hands of thee [sic] DOL or any [Department of Insurance] it will do more damage than good to AEU." Thus, Casey suggested that AEU conceal its concern that the AEU Plan was operating as a MEWA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 106, except Locke Lord admits that a portion of the 7/20/16 Casey email is accurately quoted in Paragraph 106 and denies any allegations inconsistent with that email.

107. *The next day, Festa and the other AEU officers followed Casey's advice and decided to send the letter without mentioning any MEWA.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 107, except Locke Lord denies that Casey provided advice to AEUH regarding its draft letter to Rick Wilson of WBS, LLC.

108. *In early August 2016, at Festa's request, Casey and Hansen drafted a form of rescission letter for the Employer Plans to send to participants who had misrepresented their medical history in applications to join the Plans. This legal work was performed for the benefit and administration of the Employer Plans but like all similar work Locke Lord billed it through the AEUH "Insurance Regulatory Compliance" matter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 108, except Locke Lord admits that Casey and Hansen, on behalf of AEUH, drafted a template letter for notice of recission of participation in coverage to rescind coverage retroactively to the date of enrollment based on intentional, material misrepresentation or fraud by a participant in the participant's employee enrollment form, and that Locke Lord billed AEUH for its services under the matter name "Insurance Regulatory Compliance."

109. *In June 2016, AEU and Stoughton decided that for marketing purposes they needed Locke Lord to reissue its AISM Letter so it would be addressed directly to AEU. Shortly thereafter, Stoughton spoke to Casey about reissuing the AISM Letter to AEU (hereafter, the "AEU Letter").*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 109, except Locke Lord denies that the defined term "AEU Letter" refers to anything other than the letter ultimately issued on December 20, 2016, which Locke Lord refers to herein as the "AEUH Letter," and admits that, in or about June 2016, AEUH requested that Locke Lord update the AISM Letter to reflect the proposed "Transaction" in which AEUH intended to engage based on certain assumptions, all as described in the AEUH Letter.

110. *Casey started with the AISM Letter and edited it as appropriate for the AEU Plan. The AEU Letter went through several drafts, all prepared in Locke Lord's Atlanta office and bearing a Locke Lord Atlanta network file path.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 110, except Locke Lord admits that (i) the initial draft of the AEUH Letter used the AISM Letter as a template, but was revised to reflect certain facts and assumptions as provided to Locke Lord and confirmed by AEUH, (ii) before the AEUH Letter was finalized, Locke Lord prepared several draft iterations of the AEUH Letter, some of which were reviewed by AEUH to confirm the accuracy of the

description of the "Transaction" and the assumptions set forth in such AEUH Letter, among other

reasons, before the AEUH Letter was finalized, and (iii) some of the drafts were prepared by Casey

in Locke Lord's Atlanta office and included a footer that identified that the draft had been saved

initially on the document management system for Locke Lord's Atlanta office.  Further answering,

the draft AEUH Letter was reviewed by lawyers in other Locke Lord offices, including its Chicago

office.

111.    *The version entitled "Locke Lord Draft 07-08-2016," included a footnote stating that "[t]he BPT Trustee is probably an ERISA fiduciary."  This was an acknowledgement by Casey that the BPT would hold and have discretionary control over Employer Plan assets.  This footnote was deleted from later drafts of the letter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 111, except Locke Lord

admits (i) the allegations set forth in the first sentence of Paragraph 111, and (ii) that the footnote

quoted in Paragraph 111 does not appear in the final version of the AEUH Letter.

112.    *Another footnote recites that AEU had asked whether each Employer Plan should buy "its own medical stop-loss insurance policy from a U.S. insurer," rather than pooling funds in Bermuda to acquire a single policy.  Casey responded in the footnote that so long as each individual Employer Plan met its home-state statutory minimum stop-loss insurance attachment point, "I don't see any issue with this structure."  At significant expense, Casey then had an associate do a 50-state survey of minimum attachment points that he provided to Stoughton and AEU.  However, Casey failed to advise that individual domestic stop-loss policies should be used and therefore the pooled BPT structure was retained throughout the relevant time.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 112, except Locke Lord

admits that Paragraph 112 selectively quotes certain language from a draft AEUH Letter dated

July 8, 2016.  Further answering, Locke Lord denies any implication that individual domestic stop-

loss policies were required or that there was a "pooled BPT structure."

113.    *In a version of the draft AEU Letter entitled "Locke Lord Draft 10-24-16" (emphasis omitted), Casey interlineated the following comment immediately after a sentence*

*describing the transfer of cash by the Employer Plans to the BPT:* **"[inapplicability of IRC 4371 excise tax to be confirmed]"** *(Emphasis in original).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 113, except Locke Lord admits that the language quoted in Paragraph 113 appears in a draft of the AEUH Letter marked as "Locke Lord Draft 10-24-16," and denies any other allegations in Paragraph 113 inconsistent with that draft letter.

114.    *Casey's reference was to 26 U.S.C. § 4371 ("Excise Tax"), which imposes a one percent tax on premiums paid for any "policy of insurance ... or policy of reinsurance issued by any foreign insurer or reinsurer."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 114, except Locke Lord admits that language in the draft AEUH Letter referred to 26 U.S.C. §4371.

115.    *Thus, Casey recognized that he needed to determine whether the BPT would be a foreign insurer or reinsurer such that the Excise Tax would be owed on the amounts the Employer Plans paid to the BPT for stop-loss premiums.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 115.

116.    *At that time, Casey concluded the Excise Tax would not apply, and the interlineation was deleted from the final version of the AEU Letter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 116, except Locke Lord admits that the interlineation was deleted from the final version of the AEUH Letter.

117.    *In late 2016 or early 2017, a second Bermuda trust was formed ("BPT2") for use in connection with certain new Employer Plans. (The BPT and BPT2 are hereafter collectively referred to as the "BPT.")*

ANSWER:

40

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 117.

118.    *While it was in the process of drafting the AEU Letter, Locke Lord was asked to draft a second, more targeted opinion letter.  Stoughton was involved in requesting the letter in response to specific questions that had been raised about the AEU Plan.  AEU and Stoughton intended to benefit the Employer Plans and the AEU Plan in requesting the letter.  Locke Lord knew the purpose of the letter was to answer the questions that had been raised, and that the letter would be used to market and promote the "Transaction" to prospective Employer Plans and to provide comfort to existing Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 118, except Locke Lord admits that (i) Locke Lord  was asked to address certain questions that had been raised "regarding the above-referenced transaction ['Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchasing Trust and Stop-Loss Insurance Policy'] in which a Bermuda purchasing trust buys medical a [sic] stop-loss insurance policy sold and issued in Bermuda by an insurer domiciled outside the U.S. that transacts insurance in Bermuda the proceeds of which insurance the Bermuda purchasing trust distributes to its beneficiaries, which are voluntary employees' beneficiary associations formed by U.S. based small employers," and (ii) Stoughton was copied on emails regarding the request to Locke Lord and on Locke Lord's email sending the 12/15/16 Letter to AEUH.  Further answering, Locke Lord affirmatively states that the 12/15/16 Letter was "qualified in its entirety" by the AISM Letter.

119.    *On December 15, 2016, Locke Lord issued a formal opinion letter addressing the questions.  ("12/15/16 Letter") (Exhibit D hereto).  (The AEU Letter and the 12/15/16 letter are collectively referred to hereafter as the "Comfort Letters").*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 119, except Locke Lord admits that it sent the 12/15/16 Letter to AEUH by email dated December 15, 2016, and denies any allegations inconsistent with the 12/15/16 Letter.

120. *The 12/15/16 Letter was issued on Casey's personal Locke Lord Atlanta office letterhead and bears a network file path indicating it was prepared in that office. Casey signed the AEU Letter "For the Firm." Upon its completion, Casey emailed the 12/15/16 Letter to Stoughton and cc'ed it to AEU officers.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 120, except Locke Lord admits that (i) in response to an email from Stoughton, Casey emailed the 12/15/16 Letter to Stoughton, with copies to Steven Goldberg ("Goldberg"), Steven Nigro, Satler, and Festa, (ii) the 12/15/16 Letter was prepared on Locke Lord letterhead that included contact information for Casey, (iii) Casey signed the 12/15/16 Letter "For the Firm," and (iv) the 12/15/16 Letter includes a footer indicating that it was saved on the document management system for Locke Lord's Atlanta office.

121. *Locke Lord issued the 12/15/16 Letter to AEUH in its capacity as fiduciary, agent, and/or authorized representative of the Employer Plans and the AEU Plan they comprised. Locke Lord knew the 12/15/16 Letter was being issued for the benefit of the Employer Plans and the AEU Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 121.

122. *The subject line of the 12/15/16 Letter is "Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchasing Trust and Stop-Loss Insurance Policy." This is a reference to the Employer Plans and the AEU Plan, or the "transaction" as Locke Lord referred to it in this letter. Thus, the subject of the 12/15/16 Letter is the AEU Plan and the Employer Plans, and the purpose and intent of the letter was to influence prospective and existing Employer Plans and the AEU Plan by advising that they could operate under the assumed facts in compliance with ERISA and state insurance laws.*

ANSWER:

42

Locke Lord denies each and every allegation set forth in Paragraph 122, except Locke Lord admits that the subject line of the 12/15/16 Letter was "Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchasing Trust and Stop-Loss Insurance Policy." Further answering, Locke Lord affirmatively states that the 12/15/16 Letter was "qualified in its entirety by our prior [AISM Letter] regarding such transaction dated March 3, 2014 to the predecessor that designed such transaction certain assets of which AEU Holdings, LLC acquired."

123.    *The 12/15/16 Letter recites that it is intended "to address the following questions that AEU has encountered regarding the above referenced transaction ...."  The letter further recites that it is "qualified in its entirety by our [AISM Letter] to the predecessor" of AEU.  Thus, Locke Lord was aware that the AEU Plan had been operating as the successor to the AISM Plan since the time of the acquisition, and that a number of questions had arisen concerning those operations.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 123, except Locke Lord admits that the language quoted in Paragraph 123 appears in the 12/15/16 Letter.

124.    *The first question in the 12/15/16 letter addresses the issue of what types of employers may participate in the AEU Plan or "transaction."  Locke Lord's response was that "[a]ny employer approved by AEU" that meets the other listed criteria may participate.  (Exhibit D, p. 1, ¶ 1) (emphasis added).  Thus, Locke Lord knew AEU had the power to decide who could and could not join the AEU Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 124.  Further answering, Locke Lord affirmatively states that the Paragraph numbered 1 of the 12/15/16 Letter (i) addressed how a voluntary employee benefit association ("VEBA") is established and who can participate in a VEBA for purposes of the transaction described in the AISM Letter and the assumptions stated therein, and (ii) stated, among other things, that "[a]ny employer approved by AEU which is (a) an employer customer of a professional employer association ('PEO'), (b) an

employer member of a bona fide affinity group or (c) an employer customer of an insurance agency (each, an 'Employer Aggregator') may participate in the transaction. Thus, an employer does not have to be a contracted member of a PEO to participate in the transaction."

125. *One of the questions posed in Locke Lord's 12/15/16 Letter is: "Does the transaction create a multiple employer welfare arrangement?" (Emphasis in original). Locke Lord's response was that "[t]he transaction is intended not to create a multiple employer welfare arrangement because no [Employer Plan] agrees to bear any risks of, or indemnify, any other [Employer Plan]" for claims of the other Employer Plan's employees, and "no [Employer Plan] provides any health benefits to the employees of any other participating employer." (Exhibit D, p. 2, ¶3) (emphasis added).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 125, except Locke Lord admits the allegations in the first sentence of Paragraph 125 and that a copy of the 12/15/16 Letter is attached to the Complaint as Exhibit D, and denies any allegations inconsistent with that letter. Further answering, Locke Lord affirmatively states that Paragraph numbered 3 of the 12/15/16 Letter stated in its entirety as follows:

> Does the transaction create a multiple employer welfare arrangement? The transaction is intended not to create a multiple employer welfare arrangement because no participating employer or its VEBA agrees to bear any risks of, or indemnify, any other participating employer or its VEBA for such other participating employer's or its VEBA's costs of paying claims for the health benefits made by such other participating employer's employees. Furthermore, no participating employer's VEBA provides any health benefits to the employees of any other participating employer.

126. *Locke Lord's response in substance incorrectly opined that the "transaction" as structured would not result in the formation of a MEWA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 126.

127. *Locke Lord's factual assertion that the "transaction" did not involve any Employer Plan agreeing to "bear any risks" of any other Employer Plan is incorrect, and Locke Lord was negligent in representing that such was the case.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 127.

128. *In fact, the Employer Plans shared risk at least in connection with the BPT structure, resulting in a MEWA. See infra Part VII A.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 128, except Locke Lord denies any implication that the "Transaction" as described in the AISM Letter, based on the assumptions set forth in that letter (and which qualified the 12/15/16 Letter) (i) contemplated Employer Plans sharing any risks, or (ii) would result in a MEWA.

129. *Locke Lord was asked to issue the letter in response to questions raised by prospective and/or existing Employer Plans or their aggregators or fiduciaries, and knew that prospective and/or existing Employer Plans would rely on the 12/15/16 Letter in deciding whether to participate or continue participating in the "transaction" (i.e., the AEU Plan).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 129.

130. *The Employer Plans and their administrators and fiduciaries relied on the 12/15/16 Letter.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 130. Further answering, Locke Lord affirmatively states that if any Employer Plan or its administrators or fiduciaries relied on the 12/15/16 Letter, such reliance was unreasonable in light of the AISM Letter, which expressly qualified the 12/15/16 Letter.

131. *Locke Lord was negligent in issuing the 12/15/16 Letter and allowing it to be disseminated, and should not have done so. Instead, it should have issued an accurate letter stating that risk was being shared under the BPT structure, and concluding that this resulted in the formation of a MEWA subject to state insurance laws.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 131, including any implication that its 12/15/16 Letter was inaccurate.

132. *Had it done so, the Employer Plans would not have enrolled or continued participating in the AEU Plan, or would have been forced to comply with state regulation, including, inter alia, the posting of adequate reserves. Either way, the losses sought herein would have been avoided.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 132, including any implication that its 12/15/16 Letter was inaccurate or any implication that any Employer Plan relied on or should have relied on the 12/15/16 Letter in deciding whether to enroll or continue to participate in any transaction or program involving AEUH.

133. *In the final process of drafting the AEU Letter, Stoughton and Casey communicated about the form of the letter, and Stoughton provided edits and comments in his capacity as fiduciary.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 133, except Locke Lord admits that Stoughton communicated with Casey concerning the AEUH Letter and provided edits and comments to the letter before it was finalized.

134. *One of the aggregators was anxious to get a final version of the letter for marketing purposes, and asked Festa several times about the status of the letter. On several occasions, Festa inquired of Casey about the status of the letter.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 134 but admits that Festa inquired on at least one occasion about the status of the AEUH Letter.

135.    *On December 20, 2016, Locke Lord issued the final AEU Letter. (Exhibit E hereto). The AEU Letter was issued on Casey's personal Locke Lord Atlanta office letterhead and bears a network file path indicating it was prepared in that office. Casey signed the AEU Letter "For the Firm." Casey emailed the letter to Festa of AEU's New York office and cc'ed Satler.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 135, except Locke Lord admits that (i) on December 20, 2016, Locke Lord issued the final AEUH Letter, a copy of which is attached as Exhibit E to the Complaint, and Locke Lord denies any allegations inconsistent with that letter, (ii) the AEUH Letter was issued on Locke Lord letterhead that contained contact information for Casey, (iii) the AEUH Letter contained a footer that indicated the letter had been saved to the document management system for Locke Lord's Atlanta office, (iv) the AEUH Letter was sent by email to Festa with a copy to Satler, and (v) Casey signed the AEUH Letter "For the Firm."

136.    *Locke Lord issued the AEU Letter to AEUH in its capacity as fiduciary, agent, and/or authorized representative of the Employer Plans and the AEU Plan they comprised. Locke Lord knew the letter was being issued for the benefit of the Employer Plans and the AEU Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 136.

137.    *Casey named the document the "AEU ERISA comfort letter" and issued it in PDF format.*

ANSWER:

Admitted.

138.    *In an effort to simplify citation to the AEU Letter, the Independent Fiduciary has created an alternative form of the letter attached as Exhibit F hereto. Exhibit F recreates the content of the AEU Letter and adds Paragraph and line numbers for ease of citation. In Exhibit F, each Paragraph of the AEU Letter is assigned a Paragraph number denoted as "¶__." Within each Paragraph, each sentence is broken out by adding a hard return to create a space between each sentence and bring the beginning of each sentence to the left margin. Within each sentence, each item in a list is broken out by a similar hard return. Only these changes to format, indications of typographical errors in the original by the designation "[sic]," and the Paragraph and line*

*numbers, have been added to the AEU Letter in Exhibit F. The content of the letter is intended and believed to be identical.*

ANSWER:

Locke Lord admits that Exhibit F to the Complaint purports to be an alternative form of the AEUH Letter, allegedly created by RMI, and that RMI claims that Exhibit F is intended to be otherwise identical to the AEUH Letter. Locke Lord denies any allegations inconsistent with the actual AEUH Letter, a copy of which is attached as Exhibit E to the Complaint.

139.    *Hereafter, references in this First Amended Complaint to "¶__" of "¶__, lines __," are to the Paragraph and line numbers of Exhibit F.*

ANSWER:

Admitted.

140.    *Like the 12/15/16 Letter, the subject line of the AEU Letter is "Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchasing Trust and Stop-Loss Insurance Policy." This is a reference to the Employer Plans and the AEU Plan, which Locke Lord defines as the "Transaction." Thus, like the 12/15/16 Letter, the subject of the AEU Letter is the AEU Plan and the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 140, except Locke Lord admits that the subject line of both the 12/15/16 Letter and the AEUH Letter is "Individual Employer Sponsored Self-Insured Employee Welfare Benefit Plans with Offshore Purchasing Trust and Stop-Loss Insurance Policy."

141.    *The AEU Letter states that Locke Lord was asked to "review and comment on the Transaction in respect of certain matters related to" ERISA, the IRC, and state insurance codes. (¶ 1, lines 20-30).*

ANSWER:

Locke Lord admits that Paragraph 141 selectively quotes certain language from the AEUH Letter but denies that the quotation is complete and denies any allegations inconsistent with the

AEUH Letter. Further answering, the AEUH Letter stated that AEUH had asked Locke Lord to "review and comment on the Transaction in respect of certain matters related to (1) the Employee Retirement Income Security Act of 1974, as amended ('ERISA'), (2) the Internal Revenue Code of 1986, as amended (the 'IRC'), and (3) state insurance codes relevant to the Transaction regarding the transaction of insurance by unauthorized insurance companies, all as more particularly described below [in the AEUH Letter]."

142. *AEU and Stoughton intended to benefit the Employer Plans and the AEU Plan in requesting the letter.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 142. Further answering, Locke Lord (i) denies any implication that Locke Lord intended that there be any intended beneficiaries of the AEUH Letter other than its client, AEUH, and (ii) affirmatively states that the AEUH Letter expressly stated that the AEUH Letter "is being rendered only to our client, [AEUH], and may not be used or relied upon by, or distributed to, any other person or entity for any purpose whatsoever without the written permission of Locke Lord LLP," and that Locke Lord did not give any such permission to any Employer Plan or to the so-called AEU Plan.

143. *The purpose and intent of the AEU Letter was to opine on the legality of the "Transaction" and thereby influence prospective and existing Employer Plans and the AEU Plan by advising that they could operate under the assumed facts in compliance with ERISA and state insurance laws.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 143.

144. *The AEU Letter refers to AEU as "the successor owner of certain assets previously owned by [AISM] as of April 2016." (¶ 1, lines 16-17).*

ANSWER:

49

Locke Lord admits that Paragraph 144 selectively quotes certain language from the AEUH Letter but denies that such quotation is complete or accurate. Further answering, Locke Lord states that the AEUH Letter referred to AEUH "as the successor owner of certain assets previously owned by [AISM] and/or certain of its affiliates as of April 2016."

145. *The AEU Letter concludes that, under a set of assumed facts recited in the letter, engaging in the "Transaction" would not cause the Employer Plans to become a MEWA or violate ERISA or state insurance laws. (¶¶ 14-16).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 145, including any allegations inconsistent with the AEUH Letter, except Locke Lord admits that the AEUH Letter concluded that, under a set of assumed facts set forth in that letter, "the Employer's Plan will be an 'employee welfare benefit plan' under ERISA and will not be a 'multiple employer welfare arrangement' under Section 3(40) of ERISA because the [Contemplated] Transaction does not include any agreement under which any Employer or its Employer's Trust will agree to be liable to any or all of the other Employers or their respective Employer's Trusts for its or their obligations to provide health benefits under its or their respective Employer Plans, and thus, in the Transaction, there would not be multiple employers sponsoring any single Employer Plan."

146. *Locke Lord's assumed facts to support its conclusions pertinent here were as follows:*

    (a)    *Each employer would establish an Employer Plan governed by ERISA solely for its own employees and their dependents. (¶ 2).*

    (b)    *Each employer would be the sole grantor of and form an Employer Trust to accept contributions and serve as a funding source solely for its own Employer Plan. (¶ 3). (For simplicity, hereafter both the Employer Plans and the Employer Trusts shall be referred to as the "Employer Plans" unless the context requires otherwise.)*

    (c)    *Each Employer Plan would enter an agreement with AEU to provide "certain advisory, administrative, underwriting, large case management and such other services as to which they may agree." (¶ 8(a)). Providing*

*advice or exercising discretion with respect to "large case management" is a fiduciary activity.*

(d) *AEU would be paid periodic fees from the Employer Trusts.  (¶ 8(b)).*

(e) *Each Employer Plan would enter an agreement with a TPA to provide a health care provider network and claims services.  (¶ 5).*

(f) *Each Employer Plan would enter an agreement with an aggregator to collect contributions from the employer and employee-participants and deposit such funds in an Employer Plan bank account, over which the TPA or other fiduciary would have authority to withdraw funds.  (¶ 6, lines 119-4 7).  (This provision is contradicted in the next Paragraph, which assumes that no "[a]ggregator will ... receive any funds from [any Employer Plan] ...."  (¶ 7, lines 172-74)).*

(g) *Each Employer Plan would be co-settlor and co-beneficiary of a single BPT.  The BPT would issue a written certificate to each Employer Plan evidencing its beneficial interest in the BPT.  The sole purpose of the BPT would be to purchase a single Stop-Loss Policy, solely in its name, for the benefit of all of its Employer Plan-beneficiaries collectively.  (¶ 9, lines 188-202).*

(h) *The Stop-Loss Policy would be issued by a Bermuda insurer.  (¶ 11, lines 259-61).  The Stop-Loss Policy would pay claims above specified attachment points for each qualifying employee-participant claim and his or her qualifying aggregate claims.  (¶ 10, lines 236-42).*

(i) *Each Employer Plan, through the TPA, would transfer funds to the BPT to pay its "pro rata portion of the total insurance premiums due" from the BPT to the Bermuda insurer.  (¶ 12, lines 267-72).*

(i) *The Bermuda insurer would pay any stop-loss proceeds to the BPT, which would in turn pay them to the TPA, which would in turn use them to pay claims.  (¶ 13, lines 292-97; ¶ 6, lines 149-166).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 146, including any implication that Paragraph 146 accurately or fully summarizes the assumptions set forth in the AEUH Letter, and denies any allegation inconsistent with the AEUH Letter.  Further answering, Locke Lord states that RMI's definition of "Employer Plan" is inconsistent with the AEUH Letter, which includes separate definitions for "Employer Plan" and "Employer's Trust."

147. *The AEU Letter states the "[t]he author of this letter [Casey] is licensed to practice law only in the State of Georgia ...."  (¶ 17, line 398).*

ANSWER:

Locke Lord admits that Paragraph 147 selectively quotes certain language from the AEUH Letter but denies that such quotation is complete. Further answering, Locke Lord states that the AEUH Letter further provides that "other lawyers that the firm employs are licensed in a number of jurisdictions in the United States, including California, District of Columbia, Florida, Illinois, Louisiana, New York and Texas."

148. *The AEU Letter states that it "is being rendered only to our client, AEU, and may not be used or relied upon by, or distributed to, any other person or entity for any purpose whatsoever without the written permission of Locke Lord LLP." (¶ 17, lines 406-09). AEUH was a known fiduciary, agent, and/or authorized representative of the Employer Plans, which collectively comprised the AEU Plan. Locke Lord knew that in seeking the letter AEUH was acting on behalf of the Employer Plans and the AEU Plan they comprised. As a result, the AEU Plan and the Employer Plans were Locke Lord's clients to whom, or for the benefit of whom, the AEU Letter was rendered as well.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 148, except Locke Lord admits that the language quoted in the first sentence of Paragraph 148 appears in the AEUH Letter. Further answering, the AEUH Letter made clear that "AEU" as used in the letter referred to AEUH.

149. *The AEU Letter further provides that "AEU may provide a copy of this letter (but without any reliance hereon) to" aggregators, employers, the TPA, the Bermuda insurer and related entities, the BPT, and insurance agents. (¶ 17, lines 409-29). The Employer Plans are omitted from this list, which includes virtually every other entity significant to the "Transaction."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 149, except Locke Lord admits that the language quoted in the first sentence of Paragraph 149 appears in the AEUH Letter.

150. *In fact, as Locke Lord knew and understood, the Employer Plans and their administrators and fiduciaries relied on the AEU Letter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 150. Further answering, Locke Lord affirmatively states if any Employer Plan or Employer's Trust or their

respective administrators or fiduciaries relied on the AEUH Letter, such reliance was unreasonable in light of the AEUH Letter, which expressly stated that the AEUH Letter was not rendered for the benefit of any person or entity other than AEUH and that no person or entity other than AEUH may use or rely on the AEUH Letter for any purpose without written permission from Locke Lord, which Locke Lord did not provide.

151. *Locke Lord was negligent in reaching its conclusions in the AEU Letter, and should not have issued it or allowed it to be disseminated. Instead, it should have issued an accurate letter concluding that the "Transaction" would result in a MEWA and continued operation would violate ERISA and state insurance laws.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 151.

152. *Had it done so, the Employer Plans, either would have not enrolled or would have ceased participating in the AEU Plan, or would have been forced to comply with state regulation, including, inter alia, the posting of adequate reserves. Either way, the losses sought herein would have been avoided.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 152, including any implication that Locke Lord was negligent.

153. *As Locke Lord knew and approved in the AEU Letter, (see ¶ 17, lines 408-15), just minutes after receiving the AEU Letter from Casey, Festa forwarded it to the principal aggregator for the AEU Plan (BWC), and to a TPA and one of the more substantial brokers marketing the Plan.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 153, except Locke Lord admits that the AEUH Letter expressly provided that AEUH could provide a copy of the AEUH Letter to certain persons or entities, including aggregators, TPAs, and certain duly licensed and qualified brokers, "without any reliance thereon."

154.    *On January 6, 2017, Locke Lord created a draft "Health Benefits Program Management Agreement" ("Management Agreement") (Exhibit C) for AEU to govern its relationship with each Employer Plan.  The draft Management Agreement was derived from a similar agreement Locke Lord had created for AISM.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 154, except Locke Lord admits that Exhibit C appears to be a draft document entitled "Health Benefits Program Management and Services Advisory Services Agreement" that Stoughton prepared on behalf of AEUH and that Casey incorporated "cleanup changes" into a draft that Casey sent by email on January 6, 2017, to Stoughton, Satler, Goldberg, Tim Scrantom ("Scrantom"), and Festa.

155.    *AEUB, not AEUH, was the contracting party with the Employer Plans in the draft Management Agreement.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 155.  Further answering, Exhibit C appears to be a draft form agreement between AEUB and unidentified VEBAs.

156.    *Locke Lord billed its time related to the draft Management Agreement to the sole matter Casey had created relating to the "Transaction": "Insurance Regulatory Compliance."  Locke Lord did so even though this work relating to plan administration was done for AEUB, not AEUH.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 156, except Locke Lord admits that it billed to AEUH time incurred to "Prepare cleanup changes to the revised health benefits program management and advisory services agreement received from Tom Stoughton" and that the related invoice identified the matter as "Insurance Regulatory Compliance."

157.    *The draft Management Agreement provides that AEUB shall invoice and be paid by each Employer Trust.  (Exhibit C, Art. 8.1).  The Employer Trusts' assets consisted of participant contributions.  Upon information and belief, AEUB had no other source of income*

*other than fees paid by the Employer Trusts. In addition, as Locke Lord knew, AEUB, not the holding company AEUH, paid Locke Lord's bills. Thus, Locke Lord knew that its fees incurred on the Insurance Regulatory Compliance matter would be paid indirectly from funds paid to AEUB by the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 157, except Locke Lord (i) admits that the draft Management Agreement attached as Exhibit C to the Complaint provides in Art. 8.1, in part, that AEUB shall invoice the Voluntary Employee Benefit Association Trust or VEBA for management services performed on a monthly basis and the VEBA shall pay such invoice within 30 days, and denies any allegations regarding the draft agreement that are inconsistent with Exhibit C, and (ii) lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the third sentence in Paragraph 156.

158. *Casey sent the draft Management Agreement to Stoughton and AEU officers. It includes a provision that the Employer Plan "irrevocably authorizes AEUB to take any and all appropriate action on behalf of the [Employer Plan]." (Id., Art. 2.1). Thus, Locke Lord knew AEUB, the operating subsidiary of AEUH, was an authorized representative of each Employer Plan.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 158, except Locke Lord admits that Casey sent to Stoughton, Satler, Goldberg, Scrantom, and Festa a draft Management Agreement, including a redlined draft that incorporated the changes from the draft that Stoughton had sent to Casey and the other email recipients on January 4, 2017.

159. *AEUB's advisory services included "[a]dvising the [Employer Plan] and others in the engagement of the services of such persons as may be deemed necessary by [the Employer Plan] or AEUB …." (Id. Art. 4.1.9). Thus, Locke Lord knew that the scope of the authorization included engaging necessary service providers such as Locke Lord, which AEUH did through the Engagement Letter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 159, including any implication that Locke Lord was retained to or agreed to provide legal services to any Employer Plan, VEBA, or any other person or entity other than AEUH.

160. *Casey's redline of the document from a prior draft deletes a provision that stated AEUB was not an agent or ERISA fiduciary of the Employer Plans. (Id., Art. 2; Redline p. 2). Thus, Casey recognized that AEUB, the operating subsidiary of AEUH, was, in fact, an agent and fiduciary of the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 160.

161. *On January 4, 2017, Stoughton, acting on behalf of the AEU Plan and the Employer Plans, emailed Casey and asked him to revisit the issue of whether the Employer Plans owed the Excise Tax on premiums paid to the BPT.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 161, except Locke Lord admits that, by email dated January 4, 2017, Stoughton asked Casey, among other things, the following question: "Also, for clarification of an issue that we looked at a while back, didn't we conclude that we did NOT have to pay the 1% excise tax on insurance premiums paid offshore?"

162. *Casey responded that the Excise Tax issue was "a bit murky." He stated that Locke Lord's position was that funds the Employer Plans paid to the BPT were not premiums because the Employer Plans were not parties to or insureds under the Stop-Loss Policy.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 162, except Locke Lord admits that, by email dated January 10, 2017, Casey wrote, among other things, that "[a]s for the applicability of the IRC 4371 federal excise tax, this issue is a bit murky."

163. *Despite his question about the issue noted in a draft of the AEU Letter (as alleged previously), Casey apparently had not researched or analyzed it too deeply before issuing the letter. He told Stoughton "I don't think there is much relevant law, IRS pronouncements, etc." and offered to "go deeper on the issue if you'd like." Stoughton asked him to do so.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 163, except Locke Lord admits that (i) by email dated January 10, 2017 to Stoughton, Casey wrote, among other things, "I don't think there is much relevant law, IRS pronouncements, etc., but I can go deeper on the issue if you'd like," and (ii) by email dated January 16, 2017 to Casey, Stoughton wrote "please do go a bit deeper, Brian."

164. *Casey consulted with Christopher Flanagan ("Flanagan"), a partner in Locke Lord's Boston office with extensive experience in taxation of insurance companies and insurance products. On information and belief, Casey had not consulted regarding this issue with Flanagan before issuing the AEU Letter.*

ANSWER:

Locke Lord admits the allegations of Paragraph 164 but denies that the excise tax issue was relevant to the conclusions described in the AEUH Letter. Further answering, Casey also has experience regarding taxation issues.

165. *Flanagan apparently did not find the issue murky because after only a 36-minute telephone call with Casey he concluded the Excise Tax was owed. Flanagan concluded the BPT was acting as a "nominee" for the Employer Plans in their relationship with the Bermuda insurer.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 165, except Locke Lord admits that, by email dated February 7, 2017, Casey wrote, among other things, that "his insurance tax partner," referring to Flanagan, "thinks the BPP [*sic*] will be viewed as a nominee for the VEBAs for US income tax purposes and thus that the IRC 4371 tax will apply to the payments made by the VEBAs to the BPT."

166. *Casey told Stoughton he thought "we can still have the BPT pay the IRC 4371 tax, rather than having the [Employer Plans] do that." Thus, he suggested the BPT pay the tax collectively for all of the Employer Plans, rather than have each Employer Plan pay individually.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 166, except Locke Lord admits that, by email dated February 7, 2017, Casey wrote, among other things, that "I think we can still have the BPT pay the IRC 4371 tax, rather than having the VEBAs do that."

167.    *All of the Locke Lord lawyers time relating to the Excise Tax matter, which was incurred for the benefit of the Employer Plans at Stoughton's request, was billed to the "Insurance Regulatory Compliance" matter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 167, except Locke Lord admits that time incurred by its lawyers related to addressing the issue of the excise tax in response to Stoughton's email of January 4, 2017, was recorded and billed to AEUH under the matter name "Insurance Regulatory Compliance matter."

168.    *In March 2017, questions about the legality of the AEU Plan "Transaction" were raised by a TPA. The University of Utah Health Plans ("UUHP"), which was considering serving as a TPA for certain Employer Plans, became concerned that the AEU Plan might constitute unauthorized insurance under state law.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 168.

169.    *UUHP retained Foley & Lardner ("Foley") to review the AEU Plan and advise it.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 169, except Locke Lord admits that Kevin Fitzgerald of Foley & Lardner contacted Casey on behalf of the University of Utah Health Plans ("UUHP") concerning certain questions he had about the program operated by AEUH.

170.    *Kevin Fitzgerald ("Fitzgerald") of Foley communicated with Casey about UUHP's concerns.  Fitzgerald viewed the BPT as an unauthorized insurer providing stop-loss coverage to the Employer Plans in the United States, which was then reinsured by the Bermuda insurer.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 170, except (i) Locke Lord lacks knowledge or information sufficient to form a belief as to Fitzgerald's views, other than as described in their email and phone communications; and (ii) Locke Lord admits that Fitzgerald raised certain issues regarding the program operated by AEUH, as described in his emails dated March 26, 2017, and April 12, 2017, and stated in his April 12, 2017 email that "[w]e continue to view the Bermuda trust and Bermuda insurance portion of the agreement as likely constituting unauthorized insurance."  Further answering, Locke Lord states that Casey disagreed with Fitzgerald and believed that Fitzgerald misunderstood how the program was intended to operate.

171.    *Fitzgerald was concerned that if the BPT was an unauthorized insurer, then under state law UUHP as the TPA could be liable for any claims that ultimately went unpaid.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 171, except Locke Lord admits that Fitzgerald, in an email dated April 12, 2017, stated that if unauthorized insurance was being sold and certain other conditions were met, UUHP's activities as a TPA could constitute transacting insurance "and make you [UUHP] liable for amounts not paid by the BPT."  Further answering, Locke Lord states that Casey disagreed with Fitzgerald's conclusions based on the assumptions set forth in the AEUH Letter, and that, on information and belief, AEUH retained Daly D.E. Temchine in or about May 2017 to do "a complete analysis of the VEBA product and structure."

172.    *Fitzgerald told Casey that if the BPT was an unauthorized insurer, "[t]his creates an immediate compliance risk for the BPT and its promoters in the US."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 172, except Locke Lord admits that, by email dated March 26, 2017, to Casey, among others, Fitzgerald stated, among other things, as follows:

> If the insurance provided by the BPT to the VEBA trusts is unauthorized insurance under the laws of all US states, how is this issue addressed?
> - The risk of the BPT as an unauthorized insurer is not addressed in the Locke Lord comfort letter; we would like to discuss their view on the call.
> - This creates an immediate compliance risk for the BPT and its promoters in the US.
> - Agents and TPAs are often required by state law to make good on unauthorized insurance that they sell or administer. This means UUHP could, as TPA, be required to make stop loss/first-dollar insurance payments to VEBA trusts for which it is the administrator if the BPT does not make the required payments.

173. *Casey's [sic] responded that "[t]he BPT does not indemnify any person and this [sic] is not an insurer."*

ANSWER:

Locke Lord admits that Casey's email dated March 26, 2017, and sent to Fitzgerald, among others, contained the language quoted in Paragraph 173.

174. *A few days later, Casey and Hansen had a conference call with Stoughton, Fitzgerald, and a UUHP representative about "state insurance regulatory compliance issues." Casey continued to insist the BPT was not an unauthorized insurer.*

ANSWER:

Locke Lord admits the allegations set forth in the first sentence of Paragraph 174 and denies the allegations set forth in the second sentence. Further answering, Locke Lord states that on the conference call referenced in Paragraph 174, Casey expressed his opinion that, based on the assumptions set forth in the AEUH Letter, the BPT would not be engaged in the unauthorized transaction of insurance under state insurance laws.

175. *After the call, Stoughton reported to Satler that "Brian [Casey] is the only, and best, third-party big-firm voice that we have to advocate legally for us. He did a phenomenal job with U of Utah in a call this week, for example, and constantly comes to our assistance in such a fashion." Stoughton was speaking in his capacity as a fiduciary of the AEU Plan and Employer Plans in making these comments.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first two sentences of Paragraph 175 and, to the extent such statements were made, denies the allegations set forth in the last sentence of Paragraph 175.

176. *Stoughton was sent and reviewed several Colorado Insurance Department advisory opinions concerning MEWAs that had been provided by UUHP. Again demonstrating his reliance on Locke Lord's opinions, Stoughton responded to AEU officers and an aggregator that "[w]e have repeatedly said that our counsel opines that we are NOT a MEWA…" (Emphasis in original).*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 176.

177. *Fitzgerald prepared a more detailed analysis of the unauthorized insurance issue, which was sent to Stoughton and AEU officers. Fitzgerald stated:*

*We continue to view the Bermuda trust and Bermuda insurance portion of the agreement as likely constituting unauthorized insurance, as we have discussed and described in writing. Specifically, we view the Bermuda Purchasing Trust (BPT) as likely being an unauthorized insurer, because it pools risks and collects payments for such risk pooling. We have not been convinced otherwise by the arguments Brian Casey has advanced; while the BPT may be an insurance company with little or no capital, it is nevertheless engaged in the business of insurance in the US (i.e., it sells insurance to the [Employer Plans]).*

ANSWER:

Locke Lord denies the allegations set forth in Paragraph 177, except Locke Lord admits that an email dated April 12, 2017 from Fitzgerald was forwarded to Satler, among others, and contained, in part, the language quoted in Paragraph 177 but denies that Paragraph 177 accurately quotes the language in the April 12, 2017 email.

61

178.    *If, as Fitzgerald stated (and as was the case), the BPT was pooling risk, then the Employer Plans were a MEWA in addition to the BPT being an unauthorized insurer.*

ANSWER:

Paragraph 178 states legal conclusions to which no answer is required and, to the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

179.    *Stoughton forwarded Fitzgerald's analysis to Casey and voiced his own concerns about the issue. Stoughton told Casey: "I think that we should discuss whether it is time to tweak this structure to meet these objections? Maybe there are structural alternatives to this?" Casey's response was to deny there was risk pooling by the BPT or that it was selling insurance to the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 179, except Locke Lord admits that (i) Stoughton, by email dated April 13, 2017, forwarded an email chain to Casey and Satler, which included Fitzgerald's email of April 12, 2017;  (ii) in his April 13, 2017 email, Stoughton stated, among other things: "I am not surprised that U of Utah is taking a conservative approach. I think that we should discuss whether it is time to tweak this structure to meet these objections? Maybe there are structural alternatives to this?"; and (iii) Casey responded by email dated April 14, 2017, to Stoughton and Satler, and Locke Lord denies any allegations inconsistent with such emails.  Further answering, Locke Lord states that in an email dated April 14, 2017, to Stoughton and Satler, Casey offered times to discuss the matter and stated, in part:

> Where is the risk pooling by the BPT? It is akin to a purchasing agent for multiple parties, i.e., the VEBAs, both not exactly as the VEBAs are not parties to or insureds under the insurance policy issued in Bermuda to the BPT, and the BPT is not the agent of the VEBAs. The BPT does not agree to indemnify the VEBAs or assume any of their risks, and the VEBAs do not agree to indemnify each other or otherwise assume risk from each other. How is the BPT selling insurance to the VEBAs? The VEBAs are not parties to or insureds under the insurance policy issued in Bermuda to the BPT?

180.    *Casey drafted a response to Foley that continued to deny the BPT pooled risk or sold insurance to the Employer Plans, which he sent to Stoughton, Satler, and an aggregator.  It is unclear whether the response was sent to Foley.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 180, except Locke Lord (i) admits that by email dated April 24, 2017, Casey sent draft language to Stoughton, Satler, Andy Nigro, and Mark Wade in response to Foley, which stated, among other things, that "[w]hile we appreciate the views of Foley & Lardner, we disagree that the BPT pools risk and that the VEBAs buy insurance from the BPT" for the reasons set forth in such draft response, and (ii) lacks knowledge or information sufficient to form a belief as to whether AEUH sent any response to Foley, including any response that included any of the draft language contained in Casey's email of April 24, 2017.

181.    *Casey was negligent in refusing to concede that the BPT pooled risk and acted as an unauthorized insurer.  Locke Lord had an ongoing duty to withdraw or amend its Comfort Letters to correct them if information came to the firm's attention indicating the Letters were inaccurate.  Even when confronted with Foley's (correct) conclusions alleged above, Locke Lord failed to do so and therefore breached its duty.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 181, including any implication that the BPT pooled risk and acted as an unauthorized insurer based on the assumed facts set forth in the AEUH Letter.

182.    *Upon seeing Casey's response to Foley, Steven Goldberg, AEU's Chief Risk and Operating Officer, commented to Satler that, while they had to write off UUHP as "totally skeptical now ... For our general program [i.e., the AEU Plan as a whole], Brian's response is a good one."  Thereafter, they continued to rely on the Comfort Letters in their capacity as fiduciaries of the AEU Plan and Employer Plans.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 182.

183.    *Fitzgerald also expressed concern about how "Premium Equivalents" were collected from the Employer Plans:*

> *It is unclear who is responsible for collecting the Premium Equivalent from the [Employer Plans] and paying it to the BPT; if University of Utah is involved, then it will almost certainly be deemed to have been "transacting" unauthorized insurance.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 183, except Locke Lord admits that some of the language quoted in Paragraph 183 appears in an email dated April 12, 2017, from Fitzgerald to, among others, Gigi Parke.

184.    *In response, Casey stated that, "as a factual correction, the trust contributions that [an Employer Plan] makes to the BPT are made directly by [an Employer Plan] and no third party handles those trust contributions." This supposed "correction" was directly contradicted by the assumed facts in the AEU Letter, which state that the aggregators and TPAs would handle Employer Plan funds and send them to the BPT. (¶ 6, lines 119-47; ¶ 12, lines 267-72).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 184.

185.    *All of Locke Lord's attorney time relating to the unauthorized insurance issue, which was incurred for the benefit of the Employer Plans, was billed to the "Insurance Regulatory Compliance" matter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 185, except Locke Lord admits that time incurred on behalf of AEUH was billed to a matter called "Insurance Regulatory Compliance."

186.    *In July 2017, the DOL was investigating the AEU Plan. As part of that investigation, the DOL communicated with counsel for BWC. BWC requested that Wray provide its counsel a copy of the Locke Lord AISM Letter "ASAP." Wray provided it a few minutes later.*

*Upon information and belief, BWC relied on the Locke Lord Comfort Letters to defend the legality of the AEU Plan to the DOL.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 186. Further answering, Locke Lord affirmatively states that the AEUH Letter expressly provided that third parties, like BWC, could not rely on the AEUH Letter.

187.　*A few days later, Casey emailed Satler with the subject line: "You alive? How is business?" Casey's email then asked: "Is Chicago DOL inquiry still persisting?" It was.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 187, except Locke Lord admits that on July 12, 2017, Casey sent Satler an email with the subject line "You alive? How is business?" that asked "Is Chicago DOL inquiry still persisting?"

188.　*In 2017, after Locke Lord issued its Comfort Letters, the Employer Plans paid millions of dollars in stop-loss premiums to the BPT, and their employee-participants made millions of dollars of contributions and incurred millions of dollars of claims for which the Employer Plans and the AEU Plan are obligated but have insufficient funds to pay. But for Locke Lord's negligence, this would not have occurred.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 188, except Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the amounts paid or incurred, as alleged in the first sentence of Paragraph 188.

189.　*In November 2017, the DOL moved to appoint the Independent Fiduciary and the AEU Plan and its Employer Plans were terminated shortly thereafter.*

ANSWER:

Admitted.

65

190.     *Locke Lord owed duties of care and competence regarding the accuracy of the opinions expressed and the advice given in the Comfort Letters.  Locke Lord's duties of competence and ordinary diligence also required that it know and understand the federal and state laws and regulations implicated by and referred to in the Comfort Letters.  Locke Lord breached these duties because the conclusions reached in both letters were erroneous.*

ANSWER:

Paragraph 190 states legal conclusions to which no answer is required.  To the extent an answer is required, Locke Lord denies that it breached any duties or that the conclusions set forth in the 12/15/16 Letter and the AEUH Letter (or any other Locke Lord Letter) were erroneous in light of the assumptions on which those letters were expressly based and denies all allegations contrary to relevant legal authority.

191.     *Locke Lord incorrectly represented in the 12/15/16 Letter that no Employer Plan agreed to "bear any risks" of the other Employer Plans, and that the "transaction" would not result in the formation of a MEWA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 191.

192.     *Locke Lord's conclusion was incorrect because, as demonstrated below, the Employer Plans shared risk in connection with the BPT.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 192.

193.     *In the AEU Letter, Locke Lord concluded that, under the assumed facts, the Employer Plans would not be a MEWA because:*

> *[T]he Transaction does not include any agreement under which any Employer or its Employer's Trust will agree to be liable to any or all of the other Employers or their respective Employer's Trusts for its or their obligations to provide health benefits under its or their respective Employer Plans, and thus, in the Transaction, there would not be multiple employers sponsoring any single Employer Plan.*

*(¶ 15, lines 348-53).*

ANSWER:

66

Admitted.

194.     *Locke Lord was negligent in reaching this conclusion because the Employer Plans could become a MEWA in many ways other than by having an agreement to be liable for each other's obligations to provide health benefits under their respective Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 194.

195.     *For example, a MEWA is created where risk is shared (a) by paying the health claims of multiple plans out of an undifferentiated pool of assets, or (b) by the purchase of insurance that covers the health claims of employees of multiple employers, or (c) by the purchase of insurance that reimburses employee benefit plans of multiple employers for the health claims filed against each of them.  Any arrangement that includes such attributes or otherwise involves risk sharing across multiple employee benefit plans is a MEWA.*

ANSWER:

Paragraph 195 states legal conclusions to which no answer is required.  To the extent an

answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

196.     *Under Locke Lord's assumed facts, the BPT structure involved just such an arrangement.  Locke Lord was negligent in not recognizing and opining that the BPT structure resulted in the Employer Plans becoming a MEWA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 196.

197.     *Locke Lord assumed the BPT structure would operate (and it did, in fact, operate), in pertinent part, as follows:*

> (a)     *A single BPT would be established.  (¶ 9, lines 188-89 (Employer Plans co-settlors and co-beneficiaries of "a single Bermuda Purchasing Trust")).*
> (b)     *All Employer Plans would send plan assets in the form of cash to a single bank account of the BPT.  (¶ 6, lines 135-36, 145-47; ¶12, lines 267-69 (Employer Plans' accounts containing "contributions," i.e., plan assets, used to fund "a bank account of the BPT") (emphasis added)).*
> (c)     *The BPT would purchase a single Stop-Loss Policy to cover all of its Employer Plan beneficiaries "collectively."  (¶ 9, lines 197-202; ¶ 10, lines 236-42 ("The Stop-Loss Policy that would be procured ... would be an insurance policy" covering all the Employer Plans) (emphasis added)).*

> (d)     Each Employer Plan would pay a "pro rata portion of the total insurance premiums due" from the BPT to the Bermuda insurers. (¶ 12, lines 267-72).

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 197 and denies any allegations inconsistent with the AEUH Letter.

> 198.    Under Locke Lord's assumed facts, therefore, plan assets would be commingled and pooled in a single Bermuda bank account of a single BPT, which would purchase a single Stop-Loss Policy covering all the Employer Plans, for which the Employer Plans would pay premiums on a pro rata basis.

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 198.

> 199.    In reliance on and in accordance with the Comfort Letters, the Employer Plans transacted with the BPT as follows:

> (a)     Plan assets in the form of contributions were sent to the BPT's bank account in Bermuda to fund the premiums for a single Stop-Loss Policy.
> (b)     The BPT procured a single Stop-Loss Policy from a Bermuda insurer for the benefit of the Employer Plans.
> (c)     The Employer Plans were assessed the stop-loss premiums on a pro rata basis according to the number of employees and dependents in each Employer Plan.

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 199. Further answering, Locke Lord affirmatively states that (i) the AEUH Letter expressly provided that the AEUH Letter was being rendered only for Locke Lord's client, AEUH, and that "no other person or entity may use or rely on the AEUH Letter for any purpose whatsoever without the written permission of Locke Lord LLP," (ii) Locke Lord did not provide written permission to any Employer, Employer Trust (VEBA), or Employer Plan to use or rely on the AEUH Letter, and

(iii) therefore, any such alleged reliance by the "Employer Plans" on the AEUH Letter was unreasonable.

200. *This pooling and commingling of plan assets for the purpose of buying a single Stop-Loss Policy was a form of risk sharing by the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 200.

201. *An internal inconsistency in the AEU Letter highlights this point. One of Locke Lord's assumed facts is that "no assets of any Employer Plan ... will be co-mingled [with] the assets of any other Employer Plan," (¶ 3, lines 80-82), presumably because such commingling often leads to risk sharing and the creation of a MEWA. Yet the BPT structure in Locke Lord's assumed facts clearly involves such commingling.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 201, including any allegations inconsistent with the AEUH Letter.

202. *Casey had also been provided a draft Plan Administrator Agreement to be executed by S.D. Trust Advisors and each Employer Trust. Casey commented on the draft at Stoughton's request just a few weeks after issuing the AEU Letter. Article l(A)(l) of the draft characterizes the BPT as having been formed "for the purpose of the [BPT] purchasing insurance collectively for the risks of the [Employer] Trust under the [Employer] Plan and the risks of similar trusts ... under their respective [Employer Plans]."*

ANSWER:

Admitted, except Locke Lord denies the second sentence of Paragraph 202 and any allegations concerning the draft Plan Administrator Agreement inconsistent with that draft.

203. *In addition, under Locke Lord's assumed facts, and in practice, there was no separate underwriting of individual Employer Plans with respect to the Stop-Loss Policy. Each Employer Plan paid the same amount of premium per employee-participant and dependent, regardless of age or health status.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 203, except Locke Lord denies that under Locke Lord's assumed

facts there was no separate underwriting of individual Employer Plans with respect to the Stop-Loss Policy.

204.    *As a result, for example, a hypothetical Employer Plan sponsored by a law firm comprised solely of senior attorneys and staff over age 60 would pay the same amount per capita for stop-loss insurance as a technology firm comprised entirely of twenty-something millennials.*

ANSWER:

To the extent Paragraph 204 is intended to allege what facts were assumed in the AEUH Letter, Locke Lord denies each and every allegation. To the extent Paragraph 204 is intended to allege facts describing a hypothetical consistent with how AEUH and others actually operated the program, Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 204.

205.    *This is risk sharing on fundamental level. As a result of the BPT structure Locke Lord approved, each Employer Plan became part of a MEWA (referred to herein as the AEU Plan and in Locke Lord's Comfort Letters as the "Transaction," although Casey repeatedly, and negligently, refused to recognize it as the MEWA it was).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 205, including any implication that Locke Lord was negligent or that the Transaction as described in the AEUH Letter and based on the assumptions set forth in that letter would have constituted a MEWA, except Locke Lord lacks knowledge or information sufficient to form a belief as to whether AEUH and others operated the program contrary to the assumptions set forth in the AEUH Letter and, if so, whether such operations constituted a MEWA.

206.    *By definition, this type of risk sharing automatically resulted in some Employer Plans paying more for stop-loss coverage than they would have paid had individual stop-loss policies been obtained. It also resulted in risk-sharing related to payment of the Excise Tax to the extent Stoughton and the Employer Plans followed Casey's advice to have the BPT pay the tax collectively, presumably on the same pro rata basis as the stop-loss premiums were paid.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 206.

207.    *Locke Lord was negligent in concluding in its Comfort Letters that, under its assumed facts, the Employer Plans would not be a MEWA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 207.

208.    *Because the Employer Plans were a MEWA, they were required but failed to comply with state insurance laws and regulations in each of the states where the Employer Plans were located.*

ANSWER:

Paragraph 208 states legal conclusions to which no answer is required, except Locke Lord

denies each and every allegation of Paragraph 208 (i) to the extent Paragraph 208 is intended to

allege a conclusion based on facts that were assumed in the AEUH Letter, and (ii) to the extent the

allegations in Paragraph 208 are contrary to relevant legal authority.

209.    *Instead of pooling their funds and collectively purchasing a single Stop-Loss Policy, Locke Lord should have advised the Employer Plans to purchase individual stop-loss policies in the United States, as AEU had inquired about during the drafting process of the AEU Letter.  Locke Lord's failure to so advise was a breach of duty.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 209, including any

implication that any Employer Plan, as opposed to the VEBA or Employer Trust, was to have

contributed to the purchase of a stop-loss policy.

210.    *Alternatively, Locke Lord's Comfort Letters should have concluded that the BPT structure that it knew had been implemented was in fact a MEWA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 210, including any implication that Locke Lord knew that the program, as actually operated by AEUH and others, constituted a MEWA.

211.    *Locke Lord should also have advised the Employer Plans and other recipients of its Comfort Letters that the Employer Plans were operating as a MEWA and needed to comply with state insurance laws or terminate operations.*

ANSWER:

Lord denies each and every allegation set forth in Paragraph 211, including any implication that Locke Lord owed duties to any Employer Plan, Employer Trust, or others who may have received the AEUH Letter or any other Locke Lord Letter.  Further answering, Locke Lord affirmatively states that (i) the AEUH Letter expressly provided that the AEUH Letter was being rendered only for Locke Lord's client, AEUH, and that "no other person or entity may use or rely on the AEUH Letter for any purpose whatsoever without the written permission of Locke Lord LLP," and (ii) Locke Lord did not provide written permission to any Employer, Employer Trust (VEBA) or Employer Plan to use or rely on the AEUH Letter.

212.    *Locke Lord concludes in the AEU Letter that, under the facts assumed therein, the BPT should be able to obtain stop-loss coverage in Bermuda, "without any Employer, its Employer's Trust, or the BPT being an insurance company transacting business in any state or the District of Columbia as an unauthorized insurance company ..."  (¶ 16, lines 372-74).*

ANSWER:

Locke Lord denies the allegations set forth in Paragraph 212, except Locke Lord admits that the language quoted in Paragraph 212 is contained in the AEUH Letter and denies any allegations inconsistent with the AEUH Letter.

213.    *Locke Lord reached this conclusion based primarily on the following assumed facts set forth in the AEU Letter:*

> (a)     *"the Stop-Loss Policy would be delivered by the Bermuda Broker to the BPT in Bermuda;"*

72

(b)     *"no part of the solicitation negotiation, procurement, purchase, sale, issuance or delivery of the Stop-Loss Policy would occur in the United States;" and*

(c)     *the Employer Plans would not agree to be liable for each other's obligations.*

*(¶ 16, lines 366-81).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 213, except Locke Lord admits that the language quoted in Paragraph 213 appears in the AEUH Letter and denies any allegations inconsistent with the AEUH Letter.

214.    *In reaching this conclusion, Locke Lord negligently took too narrow a view of what constitutes "transacting insurance" under state law, and ignored other assumed facts in its letter that were followed by the BPT and the Employer Plans and that resulted in them illegally transacting insurance business in each of the states where the Employer Plans were located.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 214.

215.    *Having undertaken to opine on the insurance codes in all of the states where the Employer Plans were located, (see ¶ 14, n. 1; ¶ 16, lines 372-74), Locke Lord had an obligation to know and understand what each of those state codes provides, including in Illinois, where the largest number of Employer Plans was located, and to have a reasonable level of competence in construing and applying them.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 215.

216.    *The concept of "transacting insurance" is broad under state law. Generally, if an insurer in any manner transacts any aspect of the business of insurance in any state, it must be licensed by that state and submit to the full panoply of state regulation. See, e.g., 215 ILCS 5/121-2. One of the Illinois Legislature's stated purposes in codifying such a broad definition of "transacting insurance" is to "protect[] against the evasion of the insurance regulatory laws of this State." 215 ILCS 5/212-1.*

ANSWER:

Paragraph 216 states legal conclusions to which no answer is required. To the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

217. *In Illinois, any of the following acts (and others not listed here) "by or on behalf of an unauthorized insurer, constitutes the transaction of an insurance business in this State." 215 ILCS 5/121-3.*

> (a) *"The making of or proposing to make, as an insurer, an insurance contract." Id. § 121-3(a).*
> (b) *"The taking or receiving of any application for insurance." Id.§ 121-3(c).*
> (c) *"The receiving or collection of any premium ..." Id.§ 121-3(d).*
> (d) *"The issuance or delivery of contracts of insurance to residents of this State ...." Id.§ 121-3(e).*
> (e) *"Directly or indirectly acting as an agent for or otherwise representing or aiding on behalf of another any person or insurer*
>> [i] *in the solicitation, negotiation, procurement, or effectuation of insurance or renewals thereof or*
>> [ii] *in the dissemination of information as to coverage or rates, or ... delivery of policies or contracts, or ...*
>> [iii] *in the transaction of matters subsequent to effectuation of the contract and arising out of that contract, or*
>> [iv] *in any other manner representing or assisting a person or insurer in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this State." Id.§ 121-3(t).*
> (e) *"The transacting or proposing to transact any insurance business in substance equivalent to any of the foregoing in a manner designed to evade this Act." Id. § 121-3(h).*

ANSWER:

Paragraph 217 states legal conclusions to which no answer is required. To the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

218. *Other states where Employer Plans were located have similar laws.*

ANSWER:

Paragraph 219 states legal conclusions to which no answer is required. To the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority

219. *The unlicensed Employer Plans were providing health insurance coverage to employee-participants, and were transacting many aspects of the insurance business as defined in the above-quoted statute and similar statutes in other states.*

ANSWER:

Paragraph 219 states legal conclusions to which no answer is required, except Locke Lord denies each and every allegation (i) to the extent Paragraph 219 is intended to allege conclusions based on facts assumed in the AEUH Letter, and (ii) to the extent the allegations in Paragraph 219 are contrary to relevant legal authority.

220. *Because each Employer Plan offered coverage through an ERISA health benefit plan, such state laws would be federally pre-empted, but only if the plan was not a MEWA. See ERISA § 514(a), 29 U.S.C. § 1144(a) (ERISA generally pre-empts state insurance laws), and ERISA § 514(b)(6), 29 U.S.C. § 1144(b)(6) (exception to pre-emption for MEWAs -state law applies). Under the assumed facts discussed in Part VII A above, the Employer Plans would be a MEWA, and the Employer Plans did, in fact, operate according to those assumed facts. Therefore, state insurance laws applied to them and because they were not licensed, they were operating as unauthorized insurers. Locke Lord was negligent in concluding otherwise.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 220, except (i) Locke Lord lacks knowledge or information sufficient to form a belief as to how AEUH and others actually operated the program, and (ii) Paragraph 220 states legal conclusions to which no answer is required and, to the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

221. *Whether or not the Employer Plans were a MEWA, Locke Lord was also negligent in concluding under the assumed facts that the BPT would not be an insurer transacting insurance in any state.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 221.

222. *In his response to UUHP's concern that the BPT was transacting insurance without a license, Casey stated that "[t]he BPT does not indemnify any person and this [sic] is not an insurer."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 222, except Locke Lord admits that, in response to an email dated March 26, 2017, from Fitzgerald to Casey, among others, raising questions about whether the BPT was an insurer and if so, whether the stop-loss insurance was unauthorized under state law, Casey stated: "The BPT does not indemnify any person and this [sic] is not an insurer."

223. *This takes too narrow a view of the undefined term "insurer" as used in the unauthorized insurer statute, at least in Illinois, the state with the largest number of Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 223.

224. *Casey's tax partner concluded the BPT was a "nominee" for the Employer Plans. Casey knew or should have known Flanagan's conclusion was a dagger to the very heart of the "Transaction" and its entire purpose -- avoidance of state insurance laws and regulation. If subject to the Excise Tax, the funds transferred from the Employer Plans to the BPT could only have been for the purchase of insurance in the United States.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 224, except Locke Lord admits that, by email dated February 7, 2017, Casey wrote, among other things, that "his insurance tax partner," referring to Flanagan, "thinks the BPP [sic] will be viewed as a nominee for the VEBAs for US income tax purposes and thus that the IRC 4371 tax will apply to the payments made by the VEBAs to the BPT."

225. *Liability for the Excise Tax was an objective indication that insurance was being transacted in the United States. Upon obtaining Flanagan's opinion that the BPT was a nominee and the tax was owed, Casey should have immediately concluded the "Transaction" involved an unauthorized insurer selling insurance in the United States, and taken appropriate steps to advise his clients of the consequences. Instead, he simply told Stoughton the tax was owed but the BPT could pay it.*

ANSWER:

76

Locke Lord denies each and every allegation set forth in Paragraph 225. Further answering, by email dated February 7, 2017, to Stoughton, Scrantom, Satler, and Goldberg, Casey stated as follows:

Circling back on the IRC 4371 excise tax issue.

My insurance tax partner thinks the BPP will be viewed as a nominee for the VEBAs for US income tax purposes and thus that the IRC 4371 tax will apply to the payments made by the VEBAs to the BPT. This conclusion makes sense to me because the BPT does not have an insurable interest in the VEBAs health costs expenses and therefore has no risk to shift to the Bermuda insurer since the BPT has not agreed to indemnify the VEBAs (which we don't want to occur for many reasons), which basically means the insurance policy issued to the BPT is not really an insurance policy for US income tax purposes even though it is an insurance policy for Bermuda insurance law purposes. I think we can still have the BPT pay the IRC 4371 tax, rather than having the VEBAs do that.

Please let me know if we need a huddle call to discuss.

226. *The BPT operated in a similar manner with respect to the Bermuda insurer. The BPT was a "front" for the Bermuda insurer -- collecting premiums, distributing stop-loss proceeds, and generally administering the Stop-Loss Policy. The only thing the BPT offloaded was the indemnity aspect of the arrangement, in the nature of a 100 percent reinsurance contract.*

ANSWER:

Paragraph 226 states legal conclusions to which no answer is required, except Locke Lord denies each and every allegation (i) to the extent Paragraph 226 is intended to allege conclusions based on facts that were assumed in the AEUH Letter, and (ii) to the extent the allegations in Paragraph 226 are contrary to relevant legal authority. To the extent Paragraph 226 is intended to allege facts describing how the BPT actually operated, Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 226.

227. *As already demonstrated, the BPT collected premiums, compensated itself, pooled risk, and distributed claims payments. This looks suspiciously like an insurer, or at least an entity impersonating an insurer while attempting to evade state unauthorized insurer statutes.*

ANSWER:

To the extent Paragraph 227 is intended to allege what facts were assumed in the AEUH Letter concerning the BPT, Locke Lord denies each and every allegation. To the extent Paragraph 227 is intended to allege facts describing how the BPT actually operated, Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 227.

228. *Casey reflected his understanding that the BPT was an insurer in his time records, where in relating a discussion with Hansen, Stoughton, and an aggregator about whether the "transaction structure" was a MEWA, he referred to "the stop loss insurance policy issued by the Bermuda Purchasing Trust."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 228, except Locke Lord admits that Casey's time entry on March 1, 2017, contains a typographical error (in bold) in referring to "the stop loss insurance policy issued **by** the Bermuda Purchasing Trust," rather than "issued **to** the Bermuda Purchasing Trust." Further answering, Casey's time entry on July 13, 2016, correctly refers to the stop loss insurance policy issued "to" the BPT.

229. *Under the assumed facts in the AEU Letter, the BPT would, and in fact did, engage in at least the following acts from the statutory categories set out above:*

  (a) *The BPT collected premiums on behalf of the unauthorized Bermuda stop-loss insurer. 215 ILCS 5/121-3(d); (¶ 6, lines 135-40, 145-47; ¶ 12, lines 267-72).*

  (b) (i) *Aggregators, including PEOs and insurance agencies, directly or Indirectly acted as agents for or otherwise aided the BPT in soliciting the Employer Plans, or the TPAs on behalf of the Employers Plans, to procure and effectuate stop-loss coverage through the BPT. 215 ILCS 5/121-3(f); (¶ 6, lines 119-47;¶ 12, lines 267-72).*

    (ii) *Aggregators, including PEOs and insurance agencies, directly or indirectly acted as agents for or otherwise aided the BPT in disseminating information as to coverage and rates. 215 ILCS 5/121-3(f) (¶ 12, lines 267-72).*

    (iii) *The TPAs directly or indirectly acted as agents for or aided the BPT in the transaction of matters subsequent to the effectuation and arising out of the Bermuda Stop-Loss Policies by receiving proceeds*

> *from those policies from the BPT for the Employer Plans.  215 ILCS 5/121-3(t); (¶ 6, lines 149-66; ¶ 9, lines 204-08).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 229, except Locke Lord lacks knowledge or information sufficient to form a belief as to how the BPT actually operated.

230.    *As such, the BPT was unlawfully transacting insurance business without a license in the states where the Employer Plans were located.*

ANSWER:

Paragraph 230 states legal conclusions to which no answer is required, except (i) to the extent Paragraph 230 is intended to allege a conclusion based on facts that were assumed in the AEUH Letter concerning the BPT, Locke Lord denies each and every allegation, and (ii) Locke Lord denies all allegations to the extent they are contrary to applicable law

231.    *That the BPT was transacting insurance in the United States is evidenced by another inconsistency in the AEU Letter:  In the Paragraph immediately preceding Locke Lord's conclusion that the BPT would not be transacting insurance in any state, it concluded that the BPT structure would not violate ERISA, in part because "the original written contract embodying the Stop-Loss Policy at all times must be maintained within the [U.S.] in accordance with 29 C.F.R. § 2550.404b-1."  (¶ 15, lines 360-62).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 231, including any implication that the AEUH Letter was inconsistent, except Locke Lord admits that the language quoted in Paragraph 231 appears in the AEUH Letter but denies that it is accurately quoted in context and denies any allegations inconsistent with the AEUH Letter.  Further answering, Locke Lord affirmatively states that the AEUH Letter states in relevant part as follows, emphasis added:

> The purchase by the BPT of the Stop-Loss Policy from the Bermuda Insurer should not cause an Employer or its Employer's Trust to violate ERISA; **provided, that** the indicia of ownership by each Employer's Trust of all its assets, including without limitation, the BPT Beneficiary Trust Certificate **and, following the solicitation, negotiation, procurement, purchase, sale, issuance or delivery of**

**the Stop-Loss Policy occurring in Bermuda, the original written contract embodying the Stop-Loss Policy, at all times must be maintained within the jurisdiction of a district court of the United States in accordance with 29 C.F.R. §2550.404b-1**.

Locke Lord further states that maintaining the original contract of insurance in the United States for purposes of ERISA does not constitute transacting insurance in the United State for purposes of state insurance laws.

232. *For the original Stop-Loss Policy to be "maintained" in the U.S. in compliance with ERISA, however, the BPT would obviously have to deliver it there. Thus, Locke Lord was wrong to conclude that, under the assumed facts, "no part of the ... delivery of the Stop-loss Policy would occur in the United States ..." (¶ 16, lines 368-69, emphasis added).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 232, including that maintaining the original contract of insurance in the United States constitutes the delivery of insurance in the United States within the meaning of state insurance laws, except Locke Lord admits that the AEUH Letter contains the words quoted in Paragraph 232.

233. *Delivery of an insurance policy is transacting insurance business. See, e.g., 215 ILCS 5/121-3(e). Under the assumed facts the BPT would have to deliver the Stop-Loss Policy to the United States. In doing so, the BPT would be transacting insurance business in the United States, and Locke Lord was negligent in concluding otherwise.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 233.

234. *It is also clear that the Bermuda insurer was acting as an unauthorized insurer in the United States, utilizing the BPT as its agent, inter alia, to disseminate rate information, collect premiums, and handle the distribution of stop-loss proceeds. See, e.g., 215 ILCS 5/121-3(f).*

ANSWER:

Paragraph 234 states legal conclusions to which no answer is required, except Locke Lord denies each and every allegation (i) to the extent Paragraph 234 is intended to allege a conclusion

based on facts that were assumed in the AEUH Letter, and (ii) to the extent the allegations in Paragraph 234 are contrary to relevant legal authority.

235.    *The Bermuda insurer's status as an unauthorized insurer would also be established once the BPT, as its agent, delivered the original Stop-Loss Policy to the United States "in accordance with 29 C.F.R. § 2550.404b-1," as required under Locke Lord's assumed facts. See, e.g., 215 ILCS 5/121-3(e), (t).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 235.

236.    *Locke Lord's opinion was limited to whether the BPT and the Employer Plans were unauthorized insurers. (¶ 16, lines 372-74). It did not opine on whether the Bermuda insurer would be an unauthorized insurer under the assumed facts. Nevertheless, the status of the Bermuda insurer as an unauthorized insurer is another significant legal flaw in the "Transaction" and renders the conclusions reached in the AEU Letter inaccurate or at best misleading.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 236, except Locke Lord admits that it did not offer an express opinion in the AEUH Letter as to whether the Bermuda insurer would be an unauthorized insurer under the assumed facts described in the AEUH Letter and denies any implication that such an opinion was required. Further answering, Locke Lord affirmatively states that such an opinion was implied in the AEUH Letter under the assumed facts, "and in particular, the assumptions that the Stop-Loss Policy would be delivered by the Bermuda Broker to the BPT in Bermuda and no part of the solicitation, negotiation, procurement, purchase, sale, issuance or delivery of the Stop-Loss Policy would occur within the United States."

237.    *Locke Lord's failure to advise that under the assumed facts the Bermuda insurer would be an unauthorized insurer was a violation of its duty to disclose all facts material to the "Transaction" in rendering its opinions in the AEU Letter.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 237, including any implication that the Bermuda insurer would be an unauthorized insurer under the assumptions set forth in the AEUH Letter.

238. *Finally, in Illinois and other states, the unlawful transaction of insurance business is deemed to occur by, without a license, "transacting or proposing to transact any insurance business in substance equivalent to any of the foregoing [activities in § 121-3(a)-(g)] in a manner designed to evade this Act." See, e.g., id. § 121-3(h). It simply cannot be denied that the entire intent and purpose of the convoluted, seven-page, single-spaced "Transaction" described in Locke Lord's AEU Letter, and particularly its offshore elements, was to evade the unauthorized insurer statutes and insurance laws generally in each of the states where the Employer Plans were located. In fact, it would be difficult to imagine a plan more explicitly "designed to evade" such laws.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 238, including the allegation that Locke Lord cannot deny the allegation as to its purported intent, except the first sentence of Paragraph 238 states a legal conclusion to which no answer is required and, to the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

239. *As a result, the BPT and Employer Plans were transacting insurance without authority in each of the states where the Employer Plans were located, and Locke Lord was negligent in concluding otherwise.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 239.

240. *The Employer Plans and the AEU Plan could not have met the requirements of state insurance laws and regulations in the 35 states in which they operated. Had Locke Lord not issued its inaccurate Comfort Letters, the Employer Plans and the AEU Plan would have been obligated to cease operations, or the Employer Plans would have been obligated to purchase individual stop-loss policies in the U.S. In either case, substantial losses would have been avoided. Alternatively, had the Plans been properly advised and submitted to state regulation, one of these outcomes, and other regulatory requirements, would have been expeditiously imposed upon them by state regulators, also avoiding the losses.*

ANSWER:

Locke Lord denies each and every allegation in Paragraph 240. Further answering, Locke Lord affirmatively states that for the reasons previously stated, no person or entity, including the Employer Plans, the Employer Trusts (VEBAs), or the so-called AEU Plan were entitled to receive, use, or rely on the Locke Lord Letters for any purpose without express written permission from Locke Lord, which Locke Lord did not provide, and, accordingly, any use or reliance by any Employer Plan or the so-called AEU Plan on the Locke Lord Letters was expressly not permitted and unreasonable.

241. *Under the assumed facts in the AEU Letter, Locke Lord concluded that "[t]he purchase by the BPT of the Stop-Loss Policy from the Bermuda Insurer should not cause an Employer or its Employer's Trust to violate ERISA ...." (¶ 15, lines 355-56).*

ANSWER:

Locke Lord admits that the words quoted in Paragraph 241 are contained in the AEUH Letter but denies any implication that the language accurately quotes Locke Lord's conclusions or the reasons therefor and denies any allegations inconsistent with the AEUH Letter.

242. *Locke Lord opined that this would be the case provided that, inter alia, "the indicia of ownership by each Employer's Trust of all its assets, including without limitation, the BPT Beneficiary Trust Certificate ["BPT Certificate"] ... at all times must be maintained within the ... United States in accordance with 29 C.F.R. § 2550.404b-l." (¶ 15, lines 356-62).*

ANSWER:

Assuming that "this" refers to the allegations in Paragraph 241, Locke Lord admits that the words quoted in Paragraph 242 are contained in the AEUH Letter but denies any implication that the language is quoted in context and denies any allegations inconsistent with the AEUH Letter.

243. *Under Locke Lord's assumed facts, and in practice, plan assets in the form of participant contributions would be transferred to the BPT. (¶ 6, lines 135-40, 145-47; ¶ 12, lines 267-72). The BPT would also hold plan assets in the form of the Stop-Loss Policy and all proceeds received thereunder. The Employer Plans were to receive no documentation from the BPT except the BPT Certificate. (See ¶ 9, lines 192-93).*

ANSWER:

Locke Lord denies each and every allegation in Paragraph 243, except Locke Lord lacks

knowledge or information sufficient to form a belief as to what was done "in practice."

244.   *Locke Lord was negligent in concluding that, under these assumed facts, there would be no violation of ERISA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 244.

245.   *Under such assumed facts and pursuant to ERISA's Plan Asset Regulation, the underlying (cash) assets of the BPT (as well as the Stop-Loss Policy and its proceeds) remained plan assets of the Employer Plans.  See 29 C.F.R. § 2510.3-101(a)(2).*

ANSWER:

Paragraph 245 states legal conclusions to which no answer is required.  To the extent an

answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

246.   *Casey himself recognized that the BPT would be holding plan assets as evidenced by his admission in the footnotes of a draft of the AEU Letter that "[t]he BPT Trustee is probably an ERISA fiduciary."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 246, except Locke Lord

admits that Casey added a footnote to the July 8, 2016 draft of the AEUH Letter that stated as

follows:  "The BPT is probably an ERISA fiduciary."  Further answering, Locke Lord states that

that footnote did not appear in the final AEUH Letter.

247.   *Because the underlying assets at [sic] the BPT were plan assets, the indicia of ownership of those assets must at all times have been located in the United States, see 29 U.S.C. § 1104(b), unless an exception in 29 C.F.R. § 2550.404b-1 applies.  No such exception applies here.*

ANSWER:

Paragraph 247 states legal conclusions to which no answer is required.  To the extent an

answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

248.    *The BPT Certificate was not a compliant indicia of ownership of the cash assets held by the BPT.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 248.

249.    *Under Locke Lord's assumed facts, the BPT Certificate was to be nothing more than "a written certificate to each Employer's Trust evidencing its beneficial interest in the BPT." (¶ 9, lines 192-93).*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 249, including the argumentative "nothing more than," except it admits, under the facts assumed in the AEUH Letter, that "[t]he BPT would issue a written certificate to each Employer's Trust evidencing its beneficial interest in the BPT."

250.    *Considering that under Locke Lord's assumed facts plan assets of multiple Employer Plans were to be pooled in the BPT, a mere certificate evidencing ownership of an unspecified beneficial interest in the BPT could not satisfy ERISA's indicia-of-ownership requirements for each Employer Plan's individual cash assets the BPT held.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 250, including any allegations inconsistent with the AEUH Letter.  Further answering, Locke Lord affirmatively states that, as expressly stated in the AEUH Letter, indicia of ownership by each Employer's Trust of all of its assets was to be maintained in the United States, "*including without limitation*," the BPT Certificate, *and,* "following the solicitation, negotiation, procurement, purchase, sale, issuance or delivery of the Stop-Loss Policy occurring in Bermuda, the original written contract embodying the Stop-Loss Policy" (emphasis added).

251.    *The Employer Plans' cash was held in the bank account of the BPT in Bermuda, and there was no indicia of the Employer Plans' ownership of such assets contemplated by the assumed facts (nor in practice) to be held in the United States.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 251, except Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether, in practice, the Employer Plans' cash was held in the bank account of the BPT and whether, in practice, any indicia of ownership of such cash was held in the United States.

252. *No reasonably competent attorney would have concluded that, under the assumed facts in Locke Lord's AEU Letter, a violation of ERISA would not result.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 252.

253. *Locke Lord knew or should have known that, under the assumed facts in the AEU Letter, (a) the pooling of funds and sharing of risks in the BPT created a MEWA; (b) the BPT was acting as an unauthorized insurer in the United States; and (c) holding plan assets offshore in the BPT violated ERISA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 253, including any implication that the AEUH Letter was inaccurate based on the assumed facts set forth therein.

254. *While Locke Lord was in the process of drafting the AEU Letter, AEU, as plan fiduciary, sponsor, administrator, and advisor, and on behalf of the Employer Plans, asked Locke Lord for advice on whether each individual Employer Plan should obtain its own stop loss policy from a domestic carrier in the United States, rather than a pooled policy in Bermuda.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 254.

255. *Casey concluded that such a plan was viable and Locke Lord conducted a 50-state survey of minimum attachment points for domestic stop-loss policies, at significant expense.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 255, except Locke Lord admits that, in or around February 2017, it conducted a 50-state survey of minimum attachment points related to stop-loss coverage.

256. *Locke Lord should have advised that the use of individual domestic stop-loss policies would be superior to the BPT because (a) it would not result in pooling funds or sharing risk; (b) coverage could be obtained from licensed insurers in the United States; and (c) all plan assets would remain in the United States so no indicia-of-ownership issues would arise. Such an approach would also have been far simpler and cheaper for the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 256.

257. *Locke Lord breached its duties of care, competence, and diligence in failing to so advise the Employer Plans and the AEU Plan they comprised.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 257.

258. *In reliance on Locke Lord's erroneous conclusions in the AEU Letter, the Employer Plans retained the BPT structure and sent millions of dollars of plan assets in the form of participant contributions to Bermuda for stop-loss premiums.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 258, except that Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegation that any Employer Plan or Employer Trust received or relied on the AEUH Letter. Further answering, Locke Lord affirmatively states that if any Employer Plan or Employer's Trust relied on the AEUH Letter, such reliance was unreasonable in light of the AEUH Letter, which expressly stated that the AEUH Letter was not rendered for the benefit of any person or entity other than AEUH and that no person or entity other than AEUH may use or rely on the AEUH Letter for any purpose without written permission from Locke Lord, which Locke Lord did not provide.

259. *The Independent Fiduciary is unable to collect stop loss proceeds in Bermuda because to do so would require transferring plan assets to the BPT in Bermuda in violation of ERISA.*

ANSWER:

Paragraph 259 states legal conclusions to which no answer is required. To the extent an answer is required, Locke Lord denies each and every allegation set forth in Paragraph 259, including all allegations contrary to relevant legal authority.

260. *In addition, state law generally requires domestic stop-loss policies to contain what is known as an "insolvency clause." See, e.g., 215 ILCS 5/173.2. Under the insolvency clause, when the primary insurer becomes insolvent and is unable to meet its retention (as has occurred here), a reinsurer must nevertheless pay adjudicated claims above the attachment point.*

ANSWER:

Paragraph 260 states legal conclusions to which no answer is required. To the extent an answer is required, Locke Lord denies all allegations contrary to relevant legal authority.

261. *One of the Bermuda Stop-Loss Policies here does not contain an insolvency clause. This has prevented the Independent Fiduciary from collecting under the Stop-Loss Policy because paying the large individual claims necessary to trigger the reimbursement obligation would, among other things, create preferences inconsistent with the Court-approved Liquidation Plan.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 261 but denies any implication that Locke Lord is liable for the alleged inability of or failure of RMI to recover any assets under any applicable stop-loss policy.

262. *On at least three occasions prior to releasing the Comfort Letters, Casey became aware that essential facts assumed in those Letters were not being adhered to in practice.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 262.

263. *On May 10, 2016, as its [sic] first act representing AEU, Casey had a conference call in which it was disclosed that Veritas, a Locke Lord client and one of the principal PEO aggregators for the AEU Plan, was improperly exercising control over Employer Plan assets.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 263, except Locke Lord admits that Casey had a conference call on May 10, 2016 with Stoughton, Satler, Fred Brasch, and Steven Nigro and that one of the topics discussed during the conference call was a PEO's influence over certain funds.

264.    *In June 2016, Stoughton received an inquiry from a Florida Department of Insurance Regulation investigator relating to Veritas's activities in Florida, including whether it was marketing the AEU Plan as "group" coverage.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 264, except Locke Lord admits that Stoughton received inquiries in or about June 2016 from the Florida Office of Insurance Regulation concerning certain alleged conduct by Veritas in Florida, which AEUH and AISM claimed involved the use of AISM's intellectual property without authorization but, to their knowledge, did not involve the marketing of a "group plan." Further answering, Locke Lord denies any implication that it represented Veritas in connection with such matters and affirmatively states, on information and belief, that AEUH terminated its relationship with Veritas in or about November 2016.

265.    *In July 2016, after he had already begun working on the AEU Letter, AEU told Casey that it was "very concerned that Veritas is acting as a MEWA" based on how it was handling and directing Employer Plan assets. Casey's response was to ask whether "we really want a letter from AEU floating around stating that it thinks a MEWA exists."*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 265, except Locke Lord admits that (i) on July 20, 2016, Chris Festa sent Casey and Stoughton an email, with copies to Wray and Satler, which stated in part that "We [Satler and Festa] are very concerned that Veritas

is acting as a MEWA," and (ii) a portion of Casey's July 20, 2016 email is accurately quoted in

Paragraph 265, and Locke Lord denies any allegations inconsistent with such emails.  Further

answering, Locke Lord affirmatively states that Festa's draft letter to WBS, LLC, which he

attached to his email, referred to Veritas HR, not Veritas Benefits, LLC.

266.     *In the face of these known facts, Casey had a duty to confirm that the AEU Plan was not being operated in violation of ERISA and state insurance laws before issuing the AEU Letter and concluding that the plan was legal under a set of assumed facts Casey knew, or had reason to know, deviated from reality.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 266, including any

implication that the so-called "AEU Plan" existed in July 2016.

267.     *Casey knew or should have known that, if the AEU Plan was operating as a MEWA, then each new Employer Plan that enrolled in the AEU Plan for its health benefit coverage, and each existing Employer Plan, would be in violation of the law from the moment it collected any participant contributions.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 267.

268.     *In the exercise of reasonable diligence, Locke Lord should have confirmed that the AEU Plan was being operated in accordance with the assumed facts in the AEU Letter before issuing it.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 268, including any

implication that Locke Lord had any obligation to conduct any due diligence in connection with

the AEUH Letter, and affirmatively states that it was entitled to rely and did rely on the

assumptions set forth the AEUH Letter as confirmed by its client, AEUH.

269.     *Had it sought to do so, it would have determined that the AEU Plan was not operating in accordance with the assumed facts, and Locke Lord would have been obligated not to release the AEU Letter and/or issue an adverse opinion, and the Employer Plans would not*

*have joined the AEU Plan, paid contributions, transferred funds to Bermuda, or incurred claims obligations.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 269. Further answering, Locke Lord affirmatively states if any Employer Plan or Employer's Trust relied on the AEUH Letter, such reliance was unreasonable in light of the AEUH Letter, which expressly stated that the AEUH Letter was not rendered for the benefit of any person or entity other than AEUH and that no person or entity other than AEUH may use or rely on the AEUH Letter for any purpose without written permission from Locke Lord, which Locke Lord did not provide.

270.    *Locke Lord made no attempt to so confirm and as a result breached its duty of ordinary diligence it owed to the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 270.

271.    *As already alleged, Casey failed to properly advise his clients after determining based on Flanagan's analysis that the BPT was a nominee for the Employer Plans such that the Excise Tax was owed.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 271, except Locke Lord admits that RMI previously alleged the inaccurate allegation.

272.    *In addition, just one month later, Casey was again put on notice that Locke Lord's assumed facts in the AEU Letter would result in the transaction of unauthorized insurance in the United States.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 272.

273.    *In March 2017, counsel to UUHP, an experienced insurance regulatory attorney and Casey's peer, raised concerns that put Casey on notice that the BPT was pooling risk and acting as an unauthorized insurer.*

91

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 273.

274.    *Stoughton, an attorney experienced in ERISA matters, in his capacity as plan fiduciary, voiced similar concerns about Locke Lord's "Transaction" structure to Casey.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 274, except that Locke

Lord admits that, on information and belief, Stoughton at all relevant times was an attorney.

275.    *Stoughton suggested fixing the AEU Plan to eliminate the issues, but Casey persisted in contending the BPT did not pool risk or act as an unauthorized insurer, and no action was taken.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 275.

276.    *Rather than doubling and tripling down in the face of valid concerns raised by UUHP and Stoughton, Casey should have recognized he was wrong and that the BPT pooled risk and was an unauthorized insurer.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 276.

277.    *Casey knew that Stoughton, as a fiduciary of the Employer Plans, was relying on the representations in the Comfort Letters as to the legality of the Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 277.  Further

answering, Locke Lord affirmatively states if Stoughton relied on the AEUH Letter, such reliance

was unreasonable in light of the AEUH Letter, which expressly stated that the AEUH Letter was

not rendered for the benefit of any person or entity other than AEUH and that no person or entity

other than AEUH may use or rely on the AEUH Letter for any purpose without written permission

from Locke Lord, which Locke Lord did not provide.

278.     *Locke Lord had an attorney-client relationship with the Employer Plans either through the AEUH Engagement Letter or implied-in-fact from, inter alia, the course of conduct involving Casey and Stoughton as plan fiduciary.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 278.

279.     *Casey should have immediately advised Stoughton, the Employer Plans and the AEU Plan they comprised to submit to state insurance regulation, cease relying on the Comfort Letters, cease accepting participant contributions, cease sending money to Bermuda for stop-loss premiums, and terminate the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 279, including any implication that Locke Lord owed any duties to Stoughton individually, the Employer Plans, or the so-called AEU Plan.

280.     *Casey breached his duties of competence, care, and diligence in failing to so advise, and as a result the Employer Plans and the AEU Plan continued to rely on the inaccurate Comfort Letters.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 280, including any implication that Locke Lord owed any duties to the Employer Plans or the so-called AEU Plan.

*Count I:  Alleged Negligence*

281.     *Independent Fiduciary realleges and incorporates all of the allegations set forth above.*

ANSWER:

Locke Lord realleges and incorporates by reference its answers to all of the allegations set forth above.

282.     *Locke Lord owed duties of competence, reasonable care, good faith, and ordinary diligence, as alleged above, to the AEU Plan and to the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 282.

283. *Locke Lord breached those duties by its improper actions and inactions alleged herein.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 283, including any implication that Locke Lord owed any duties to the Employer Plans or the so-called AEU Plan.

284. *Locke Lord's breaches of duty were the proximate cause of the losses the Independent Fiduciary alleges, including the claims obligations of the Employer Plans and the AEU Plan that they are unable to pay, and losses associated with the Stop-Loss Policies in Bermuda, including stop-loss proceeds that the Independent Fiduciary has been unable to collect.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 284, including any implication that Locke Lord owed any duties to the Employer Plans or the so-called AEU Plan.

285. *Had Locke Lord properly fulfilled its duties and properly advised the AEU Plan and Employer Plans, they would not have operated or continued to operate in violation of ERISA and state insurance laws and would not have been caused to incur claims obligations and related expenses for which they have insufficient assets to pay.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 285, including any implication that Locke Lord owed any duties to the Employer Plans or the so-called AEU Plan or has liability to them, except Locke Lord lacks knowledge or information sufficient to form a belief as to whether the Employer Plans and so-called AEU Plan operated in violation of ERISA or state insurance laws or whether they have incurred any alleged damages.

286. *Had Locke Lord properly fulfilled its duties and properly advised the Employer Plans, they would have ceased accepting participant contributions, would not have transferred millions of dollars offshore to purchase stop-loss coverage, and would not have incurred the increased costs and expenses associated with an offshore stop-loss structure.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 286, including any implication that Locke Lord owed any duties to the Employer Plans or the so-called AEU Plan or has liability to them, except Locke Lord lacks knowledge or information sufficient to form a belief as to whether the Employer Plans and so-called AEU Plan accepted participant contributions, transferred any funds, or incurred any alleged increased costs or expenses.

287.    *The Employer Plans and the AEU Plan they comprised were insurance entities operating in at least 35 states utilizing a structure with both domestic and offshore components. Locke Lord's Comfort Letters advised that, under the assumed facts, this highly complex insurance company structure was not subject to regulatory oversight or statutory constraints that, for sound policy and prophylactic reasons, would normally apply to such insurance company structures. It was foreseeable to Locke Lord as attorneys experienced in the field of insurance transactions and regulation that, without such oversight or constraints, losses such as the Independent Fiduciary alleges here, including unpaid claims and the inability to collect stop-loss proceeds from offshore insurers, would result.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 287, except Locke Lord lacks knowledge or information sufficient to form a belief as to whether the Employer Plans or so-called AEU Plan operated in a manner inconsistent with the assumptions set forth in the AEUH Letter, 12/15/16 Letter, or any other Locke Lord Letter so that they constituted insurance entities, as alleged in the first sentence of Paragraph 287.

288.    *Locke Lord also advised under the assumed facts in its AEU Letter that no indicia of ownership of each Employer Plan's assets held in Bermuda other than the BPT Certificate would be necessary. It was foreseeable to Locke Lord that, without any indicia of ownership of each Employer Plan's individual assets held in the BPT's Bermuda bank account, the Employer Plans would be unable to recover funds from the BPT.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 288.

289.    *Locke Lord is liable for all damages to the AEU Plan and Employer Plans caused by its negligence.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 289.

*Count II: Alleged Negligent Misrepresentation*

290.     *Independent Fiduciary realleges and incorporates the allegations set forth above.*

ANSWER:

Locke Lord realleges and incorporates by reference its answers to the allegations set forth

above.

291.     *Locke Lord negligently misrepresented that an employer-sponsored health benefit plan operated in accordance with Locke Lord's assumed facts would comply with ERISA and state insurance laws and would not be a MEWA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 291.

292.     *Locke Lord, in the course of its business and profession, and Casey, in the course of his employment at Locke Lord, supplied inaccurate information in the 12/15/16 Letter for the guidance of the AEU Plan and Employer Plans, namely, that no Employer Plan agreed to "bear any risks" of any other Employer Plan, and that the "transaction" referred to in the 12/15/16 Letter would not result in the creation of a MEWA.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 292.

293.     *Locke Lord, in the course of its business and profession, and Casey, in the course of his employment at Locke Lord, supplied inaccurate information in the AEU Letter for the guidance of the AEU Plan and Employer Plans, namely, that the "Transaction" as set forth under the assumed facts in the AEU Letter would not result in risk sharing by the Employer Plans, would not result in the Employer Plans becoming a MEWA, would not result in the BPT or the Employer Plans transacting insurance in the United States, and that the BPT Certificate would be sufficient indicia of ownership of assets held by the BPT.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 293.

294.    *The Employer Plans were entities Locke Lord knew existed because they were referred to in its Comfort Letters.   Locke Lord further knew the Employer Plans were contemplating a specific commercial transaction about which Locke Lord was aware, i.e., the "Transaction" as described in the AEU Letter and referred to in the 12/15/16 Letter.  Locke Lord intended to influence the Employer Plans and the AEU Plan to engage in the "Transaction" based on the information in those Comfort Letters.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 294, except Locke Lord admits that it was aware that AEUH intended to enter into Transactions, as described in the AEUH Letter based on the assumptions set forth in such letter.

295.    *The Employer Plans and the AEU Plan they comprised, as well as their administrators and fiduciaries, were known and intended recipients of the Comfort Letters, and Locke Lord knew they would rely on the contents of those letters.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 295.

296.    *The AEU Plan and the Employer Plans justifiably relied on the contents of the Comfort Letters, inter alia, based on Locke Lord's representations that they are top lawyers in the field of insurance transactions and regulation.  The AEU Plan and the Employer Plans operated in accordance with the assumed facts in the Comfort Letters as alleged herein.*

ANSWER:

Locke Lord denies each and every allegation set forth in the first sentence of Paragraph 296 and lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of Paragraph 296.  Further answering, Locke Lord affirmatively states that RMI has made numerous judicial and evidentiary admissions in related litigation that the so-called AEU Plan and the Employer Plans were NOT operated in accordance with the assumed facts in the AEUH Letter and AISM Letter and that such deviations from the assumed facts were the proximate causes of the failure of the alleged "AEU Plan."  Further answering, Locke Lord affirmatively states that if any Employer Plan, Employer's Trust, or the so-called AEU

Plan relied on the 12/15/16 Letter or the AEUH Letter, such reliance was unreasonable because, as stated in the AEUH Letter and in the AISM Letter, which was incorporated into the 12/15/16 Letter, neither the AEUH Letter nor the 12/15/16 Letter were rendered for the benefit of any person or entity other than AEUH, and no person or entity other than AEUH may use or rely on such letters for any purpose without written permission from Locke Lord, which Locke Lord did not provide.

297. *In reliance on the Comfort Letters, the Employer Plans continued to operate, make contributions, incur claims and related expenses, and send millions of dollars offshore to purchase stop-loss insurance coverage.*

ANSWER:

Locke Lord lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 297. Further answering, Locke Lord affirmatively states that if any Employer Plan or Employer's Trust relied on the 12/15/16 Letter or the AEUH Letter, such reliance was unreasonable because, as stated in the AEUH Letter and in the AISM Letter, which was incorporated into the 12/15/16 Letter, neither the AEUH Letter nor the 12/15/16 Letter were rendered for the benefit of any person or entity other than AEUH, and no person or entity other than AEUH may use or rely on such letters for any purpose without written permission from Locke Lord, which Locke Lord did not provide.

298. *When doubts were raised about the legality of the "Transaction" discussed in Locke Lord's AEU Letter, rather than withdraw the letter or properly advise the Employer Plans to terminate the Plans, Locke Lord, through Casey, urged further reliance by insisting (incorrectly) that the Employer Plans were operating lawfully. The Employer Plans and the AEU Plan continued to rely on Locke Lord's advice, to their detriment, until this Court terminated the AEU Plan and the Employer Plans.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 298. Further answering, Locke Lord affirmatively states that if any Employer Plan, Employer's Trust, or the

so-called AEU Plan relied on the AEUH Letter, such reliance was unreasonable in light of the AEUH Letter, which expressly stated that the AEUH Letter was not rendered for the benefit of any person or entity other than AEUH and that no person or entity other than AEUH may use or rely on the AEUH Letter for any purpose without written permission from Locke Lord, which Locke Lord did not provide.

299. *Had Locke Lord properly advised the AEU Plan and the Employer Plans, AEU would not have continued sponsoring the AEU Plan, and the Employer Plans would not have joined or continued enrollment in the AEU Plan, would have ceased accepting employee participant and employer contributions, would not have transferred millions of dollars offshore to purchase stop-loss coverage, would not have incurred the increased costs and expenses associated with offshore stop-loss coverage, and the employee-participants would not have incurred claims.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 299, including any implication that Locke Lord owed any duties to the Employer Plans or the so-called AEU Plan or has liability to them, except Locke Lord lacks knowledge or information sufficient to form a belief as to whether the Employer Plans and so-called AEU Plan engaged in the conduct alleged in Paragraph 299 or incurred any alleged increased costs or expenses.

300. *Had Locke Lord properly fulfilled its duties and properly advised the AEU Plan and Employer Plans, they would not have continued to operate in violation of ERISA and state insurance laws and would have terminated the Plans, and would not have been caused to incur claims obligations and related expenses for which they have insufficient assets to pay.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 300, including any implication that Locke Lord owed any duties to the Employer Plans or the so-called AEU Plan or has liability to them, except Locke Lord lacks knowledge or information sufficient to form a belief as to whether the Employer Plans and so-called AEU Plan operated in violation of ERISA or state insurance laws or whether they have incurred any alleged damages.

301.     *The AEU Plan's and the Employer Plans' justifiable reliance on the erroneous conclusions reached in the Comfort Letters was the proximate cause of the losses the Independent Fiduciary alleges, including the claims obligations of the Employer Plans and the AEU Plan that they are unable to pay, and losses associated with the Stop-Loss Policies in Bermuda, including stop-loss proceeds that the Independent Fiduciary has been unable to collect.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 301.

302.     *The Employer Plans and the AEU Plan they comprised were insurance entities operating in at least 35 states utilizing a structure with both domestic and offshore components. Locke Lord's Comfort Letters negligently misrepresented that, under the assumed facts, this highly complex insurance company structure was not subject to regulatory oversight or statutory constraints that, for sound policy and prophylactic reasons, would normally apply to such insurance company structures.  It was foreseeable to Locke Lord as attorneys experienced in the field of insurance transactions and regulation that, without such oversight or constraints, losses such as the Independent Fiduciary alleges here, including unpaid claims and the inability to collect stop-loss proceeds from offshore insurers, would result.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 302, except Locke Lord

lacks knowledge or information sufficient to form a belief as to whether the Employer Plans or so-

called AEU Plan operated in a manner inconsistent with the assumptions set forth in the AEUH

Letter so that they constituted insurance entities, as alleged in the first sentence of Paragraph 302.

303.     *Locke Lord also advised under the assumed facts in its AEU Letter that no indicia of ownership of each Employer Plan's assets held in Bermuda other than the BPT Certificate would be necessary.  It was foreseeable to Locke Lord that, without any indicia of ownership of each Employer Plan's individual assets held in the BPT's Bermuda bank account, the Employer Plans would be unable to recover funds from the BPT.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 303.

304.     *Locke Lord is liable for all damages to the AEU Plan and Employer Plans caused by its negligent misrepresentations.*

ANSWER:

Locke Lord denies each and every allegation set forth in Paragraph 304.

## **AFFIRMATIVE DEFENSES**

Pursuant to Fed. R. Civ. P. 8(c), and pending further investigation and discovery, Defendant Locke Lord alleges the following Affirmative Defenses to the Complaint. Locke Lord's investigation continues, and Locke Lord reserves the right to amend or supplement its Answer to add any additional Affirmative Defenses or other defenses as additional information becomes available. (Unless otherwise defined in these Affirmative Defenses, capitalized terms are as defined in the foregoing Answer.)

Where these Affirmative Defenses refer to or assume the truth of certain allegations made by RMI, Locke Lord does not admit or waive its right to contest those allegations. Moreover, for purposes of these Affirmative Defenses, Locke Lord uses the terms "AEU Plan" and "Participating Plans" to be co-extensive with their meaning in the December 13, 2017 Order entering a preliminary injunction in the DOL Action (the "December 13, 2017 Order") and without admitting that the so-called "AEU Plan" existed in fact or that it was intended to exist under the assumptions set forth in the Locke Lord Letters referenced in the Complaint. Also for purposes of these Affirmative Defenses, Locke Lord uses the terms "Employer Plan" and "Employer's Trust" to be co-extensive with their meaning in the AEUH Letter.

Without assuming the burden of proof where it otherwise rests with RMI, Locke Lord pleads the following Affirmative Defenses to RMI's Complaint:

**First Affirmative Defense**
**(Statute of Limitations)**

1.      The applicable statute of limitations to RMI's claims is two years. 735 ILCS 5/13-214.3(b).  *See* Dkt. 96 (Sept. 29, 2022 Mem. Op. and Order) at 17.[1]

2.      Under Illinois law, the limitations period begins once the plaintiff knows, or reasonably should know, both of its injury and that the injury was wrongfully caused, at which point the injured party has the burden to inquire further as to the existence of a cause of action.

3.      For claims against attorneys, the plaintiff need not know that an attorney caused the injury; the action accrues when the plaintiff reasonably should know that it suffered an injury that was wrongfully caused, placing it on inquiry notice to investigate.  A plaintiff's identification of one wrongful cause of its injuries initiates its limitations period as to all other causes.

4.      The two-year limitations period applies to claims against attorneys arising out of the attorney's legal services, regardless of the legal theory on which the claim is based and regardless of whether the claim is brought against the attorney by a client or a third party.

5.      RMI alleges in Paragraph 12 of its Complaint that pursuant to the December 13, 2017 Order, the Court in the DOL Action confirmed the appointment of RMI "as the successor Trustee and Plan Administrator of the AEU Plan and Employer Plans, and [it] shall have final and exclusive fiduciary authority over the AEU Plan's administration, management, and assets."

6.      Paragraph 4 of the December 13, 2017 Order, in fact, provides as follows:

> [RMI] was appointed under the Temporary Restraining Order and shall remain the independent fiduciary to the AEU Plan and the Participating Plans. The Independent Fiduciary shall also serve as the successor Trustee and Plan Administrator of the AEU Plan and shall have full and exclusive fiduciary authority over the AEU Plan's administration, management, and control of the AEU Plan's assets.

---

[1]      If another state's law applies, Locke Lord reserves its right to amend this defense to assert a statute of limitations defense under such other state's laws.

*Walsh v. AEU Benefits, LLC, et al.*, No. 17-cv-07931 ("DOL Action"), Dkt. 59, ¶4.

7.     RMI alleges that Locke Lord owed duties to the AEU Plan and Participating Plans through AEUH, either because AEUH allegedly was a fiduciary of or agent to the AEU Plan and Participating Plans or because the Plans allegedly were third-party beneficiaries of the Locke Lord/AEUH lawyer-client relationship.  RMI has also alleged that other persons and entities, such as BWC, were agents or fiduciaries of the Plans ("Other Fiduciaries or Agents") and may have received and relied on one or more of the Locke Lord Letters.  Taking those allegations at face value and assuming their correctness solely for purposes of these Affirmative Defenses, the AEU Plan and Participating Plans were on inquiry notice when AEUH or Other Fiduciaries or Agents were on inquiry notice.

8.     RMI sued Locke Lord on December 12, 2018.  Accordingly, the relevant inquiry is whether AEUH or any Other Fiduciary or Agent was on inquiry notice before December 12, 2016.  They were.

9.     RMI has alleged that each of the Locke Lord Letters was wrong as a matter of law on its face, even if the assumptions within them were correct.  Assuming solely for purposes of this Affirmative Defense that this legal conclusion is correct, any recipient has sufficient information within the four corners of each Letter to be put on notice of the supposed legal errors upon receipt of the Locke Lord Letter, and, therefore, on inquiry notice as soon as it incurred an injury.

10.     RMI has also alleged facts establishing that the AEU Plan and the Participating Plans, either directly or through AEUH, knew well before December 12, 2016, that issues had been raised about the validity of the AEU Plan.  These alleged facts include but are not limited to the following:

a.  Locke Lord was asked to prepare the 12/15/16 Letter "in response to specific questions that had been raised about the AEU Plan," and "to provide comfort to existing Employer Plans." ¶118; *see also* ¶129 (12/15/16 Letter was drafted "in response to questions raised by prospective and/or existing Employer Plans").

b.  "In or about January 2016," a trade association "had questions about the AISM Plan's legality" under the California Insurance Code. ¶60.

c.  In June 2016, the DOL and Florida's Office of Insurance Regulation had allegedly started to investigate issues with the AEU Plan. ¶98.

11.  Questions about the AEU Plan were allegedly raised by early 2016 and continued through the fall of 2016. ¶¶60, 69-70, 95-108, 118, 123, 129.

12.  RMI's allegations, and other facts that discovery may reveal, establish that the AEU Plan and Participating Plans, both directly and indirectly through AEUH or Other Fiduciaries or Agents, knew or reasonably should have known *before* December 12, 2016, of their alleged injury and that it was wrongfully caused, and thus had an obligation to inquire as to potential claims more than two years before RMI filed its claims against Locke Lord.

13.  Before December 12, 2016, the AEU Plans and Participating Plans knew or should have known, directly or through AEUH or the Other Fiduciaries or Agents, that the AEU Plan was not managed, structured, or operated consistent with the assumptions in the AISM Letter or subsequent Locke Lord Letters.

14.  In RMI's lawsuit against AEUH, *Receivership Management, Inc. v. AEU Holdings et. Al*, No. 18-cv-08167 ("*RMI v. AEUH*"), RMI has alleged numerous instances that, according to RMI, established that AEUH was aware of issues before December 12, 2016, concerning problems paying claims and that AEUH or others, including Other Fiduciaries or Agents, were operating the

AEU Plan and Participating Plans contrary to the assumptions in the Locke Lord Letters. For example:

    a.    Since at least January 2016, no trust certificates had been "provided to any purported VEBA trust." *RMI v. AEUH*, Dkt. 8, Am. Cpt., ¶48.

    b.    By no later than April 26, 2016, AEUH had been operating the prior AISM program for nearly a year and knew or reasonably should have known that the program had been structured and operated *contrary* to Locke Lord's critical assumptions in the AISM Letter. *Id.* ¶¶17-18.

    c.    Similarly, upon information and belief, any Other Fiduciaries or Agents who had received any of the Locke Lord Letters knew or reasonably should have known well before December 12, 2016, that the AISM program had been structured and operated *contrary* to Locke Lord's critical assumptions in the AISM Letter.

15. Although discovery is needed to flesh out the full extent of these issues, these examples demonstrate that, *before* December 12, 2016, unpaid claims were a problem known to the AEU Plan and the Participating Plans, both directly and indirectly through AEUH or Other Fiduciaries or Agents, thus placing the AEU Plan and the Participating Plans on inquiry notice.

16. RMI's allegations against AEUH in *RMI v. AEUH* further establish that the AEU Plan and relevant Participating Plans, both directly and indirectly through AEUH or Other Fiduciaries or Agents, had notice before December 12, 2016, that the AEU Plan and Participating Plans had incurred injury. For example, as RMI alleged, AEUH reported that the "Accumulated Program Deficit for the AEU Program as of the end of 2016 was $20,257,208." *RMI v. AEUH*, Dkt. 8, Am. Cpt., ¶110; *see also id.* at ¶111 (August 2017 report found that the first Bermuda Purchasing Trust established pursuant to the AISM program "had unpaid claims in the amount of

$15,364,233 as of December 31, 2016"). Although these reports were allegedly prepared in 2017, upon information and belief, the AEU Plan and relevant Participating Plans, both directly and indirectly through AEUH or Other Fiduciaries or Agents, were informed and aware well before December 12, 2016, that numerous claims were unpaid.

17. Similarly, RMI alleges in its Complaint that Participating Plans incurred losses related to "unpaid claims and the inability to collect stop-loss proceeds from offshore insurers." ¶287; *see also* ¶302. RMI also alleges that "fees [were] being extracted from participant contributions" by May 2016. ¶94; *see also* ¶157. RMI claims that those fees were improper and excessive. ¶94; *see also RMI v. AEUH*, Dkt. 8, Am. Cpt., ¶¶65, 68; *Receivership Mgt., Inc. v. A.J. Corso & Assoc., Inc., et al.*, No. 19-cv-01385 (*"RMI v. Corso Brokers"*), Dkt. 224, Third Am. Cpt., ¶¶175, 177, 189, 202-03. Participating Plans incurred those damages before December 2016.

18. The foregoing allegations, and additional facts that may be developed through discovery, will establish that RMI's claims are barred in whole or substantial part by the statute of limitations.

## Second Affirmative Defense
### (Lack of Standing)

19. Locke Lord incorporates Paragraphs 1-18 above of its Affirmative Defenses.

20. By definition, RMI's fiduciary duties as successor Trustee and Plan Administrator to the AEU Plan and as independent fiduciary to the AEU Plan and the Participating Plans are limited to the duties ERISA imposes.

21. RMI has not sued Locke Lord under ERISA, nor could it do so. RMI has not alleged that Locke Lord was an ERISA fiduciary to the AEU Plan or any Participating Plan. Locke Lord was not an ERISA fiduciary to the AEU Plan or any Participating Plan.

22. ERISA authorizes an ERISA fiduciary to bring actions for violations of ERISA. *See* 29 U.S.C. §§1132(a)(2)-(3).

23. However, ERISA does not expressly authorize an ERISA fiduciary to bring a state law claim against a non-ERISA fiduciary.

24. The December 13, 2017 Order grants RMI "[a]uthority to identify and pursue claims on behalf of the Participating Plans and the AEU Plan," DOL Action, Dkt. 59, December 13, 2017 Order, ¶14(j).

25. Even if the December 13, 2017 Order is construed as authorizing RMI to bring state law claims, such claims are necessarily limited to state law claims that the AEU Plan or Participating Plans have standing to pursue under state law.

26. RMI lacks standing to bring state law claims against Locke Lord because Locke Lord was never an attorney for the AEU Plan or Participating Plans, and said Plans were not primary intended beneficiaries of the services Locke Lord provided for its actual clients, AISM and AEUH.

27. Additionally, RMI lacks standing to the extent it is seeking as damages unpaid claims of medical providers.

28. Medical providers are not ERISA beneficiaries. RMI owes no fiduciary duties under ERISA to medical providers.

29. RMI has filed a plan of distribution in the DOL Action that provides for the ERISA participants, to whom RMI owes fiduciary duties, to be fully reimbursed to the extent of the claims those participants have submitted pursuant to the plan of distribution with respect to amounts they paid their medical providers.

30.     RMI's plan of distribution also provides for full reimbursement of employers to the extent such employers submitted claims seeking reimbursement of amounts paid by the employers to providers or individual participants.

31.     RMI has not alleged that any individual participants in the AEU Plan or any Participating Plan ("Individual Participants") or employer continues to have any exposure or liability to any of the allegedly unpaid medical providers.

32.     RMI has more than adequate funds to pay the submitted claims of ERISA participants and employers.

33.     RMI's plan of distribution also proposes to pay claims submitted by medical providers.  The amount of such claims far exceeds the submitted claims of employers or the Individual Participants to whom RMI, as the independent fiduciary of the AEU Plan and Participating Plans, owes fiduciary duties under ERISA.

34.     RMI proposes to pay the claims of medical providers without regard to whether any Individual Participant to whom RMI has fiduciary duties submitted a claim to recover those amounts or has any remaining exposure to the pertinent providers five or more years after medical services were provided.

35.     To that extent, RMI has assumed the role of collection agent for medical providers. In so doing, RMI exceeds its authority under ERISA and under the December 13, 2017 Order.

36.     Locke Lord owed no duty to medical providers.  RMI is suing Locke Lord in this action to recover monies for alleged breaches of duty to the AEU Plan and Participating Plans, solely for the benefit of medical providers to whom the Individual Participants may no longer have any liability and, accordingly, to whom RMI owes no duties.

37.     RMI lacks standing to recover for the benefit of medical providers any unpaid medical claim as to which an Individual Participant has no current liability.

**Third Affirmative Defense**
**(Comparative Negligence and/or Assumption of Risk)**

38.     Locke Lord incorporates Paragraphs 1-37 above of its Affirmative Defenses.

39.     RMI's claims are barred in whole or in part by the doctrines of comparative negligence and/or assumption of risk by the AEU Plan and the Participating Plans, both directly and indirectly through AEUH or Other Fiduciaries or Agents.

*Negligence and Assumption of Risk by the AEU Plan's and*
*Participating Plans' Alleged Reliance on the Locke Lord Letters*

40.     If the AEU Plan or any Participating Plan received any Locke Lord Letter, and if any such Plan relied upon such Letter in deciding whether to participate in the alleged AEU Plan, its decision to so rely was negligent in light of the disclaimers stated in (or incorporated into) each of the Locke Lord Letters ("Disclaimers"). The Disclaimers stated that no recipient other than AISM or AEUH could rely upon the Locke Lord Letters without Locke Lord's written permission, which Locke Lord never provided.

41.     The Disclaimers put each recipient of any Locke Lord Letter on notice that it should obtain independent legal advice regarding the conclusions of the Letter based on the assumptions set forth therein.

42.     Any decision by the AEU Plan or any Participating Plan to rely upon the Letter(s) without procuring independent legal advice was negligent and assumed the risk that Locke Lord's conclusions might have been incorrect.

*Negligence and Assumption of Risk by the AEU Plan's and Participating Plans' Alleged*
*Imputed Reliance on the Locke Lord Letters Through Alleged Agency or Fiduciary*
*Relationship*

43.     The doctrines of comparative negligence and assumption of risk also reduce or bar RMI's claims to the extent they seek to impute to the AEU Plan's and Participating Plans' alleged reliance on the Locke Lord Letters by AEUH or Other Fiduciaries or Agents in their alleged capacity as fiduciaries or agents to the AEU Plan and Participating Plans.

44.     For purposes of this and other Affirmative Defenses, Locke Lord assumes, without admitting or waiving its right to dispute, that the knowledge, acts, and omissions of AEUH or Other Fiduciaries or Agents may be imputed to the AEU Plan and Participating Plans.

45.     RMI alleges in the Complaint that "the AEU Plan was *not* operating in accordance with the assumed facts [in the Locke Lord Letters]." ¶269 (emphasis added); *see also* ¶¶70, 104, 262-68.

46.     As for AEUH, RMI has pleaded detailed factual allegations that, if true, establish many differences between Locke Lord's factual assumptions about the structure of the Transaction in its Letters and how AEUH caused or permitted the actual AEU Plan to be operated.

47.     As for any Other Fiduciaries or Agents who received any Locke Lord Letter, RMI has pleaded detailed factual allegations in its Complaint in this action and in the *RMI v. AEUH* and *RMI v. Corso Brokers* actions that, if true, likewise establish many differences between Locke Lord's factual assumptions about the structure of the Transaction in its Letters and how AEUH and Other Fiduciaries or Agents caused or permitted the actual AEU Plan to be operated.

48.     RMI previously described numerous discrepancies between Locke Lord's assumed facts and the actual operations of the AEU Plan in its initial Complaint in this action.

49.     For example, RMI alleged in its initial Complaint in this Lawsuit that, contrary to Locke Lord's assumptions, employers failed to establish required Employer Trusts or to qualify

those Trusts as VEBAs, and funds intended to pay claims related to various Participating Plans were used to pay claims of other Plans. Dkt. 1 at ¶¶29, 55, 57.

50. The Transaction structure Locke Lord described in its Letters was, in actuality and unbeknownst to Locke Lord, so mismanaged by AEUH that RMI alleged in its initial Complaint: "This was not only a MEWA, but a Ponzi scheme as well." *Id.* ¶50.

51. Similarly, in *RMI v. AEUH*, RMI alleged: "[t]here are numerous instances documented in emails where [AEUH] admitted knowing that the Participating Plans *were not in compliance with the AEU Program's structural requirements*." *RMI v. AEUH*, Dkt. 8, Am. Cpt., ¶47 (emphasis added).

52. The phrase "structural requirements," quoted in paragraph 51 above refers to the structure that Locke Lord assumed and on which it based its advice in the Locke Lord Letters. For example:

a. The Locke Lord Letters assumed that each employer would establish an Employer's Trust that would qualify as a VEBA. RMI alleges that this did not occur, and AEUH knew it. Additionally, each Participating Plan, if any, that received and relied upon any Locke Lord Letter yet failed to establish a VEBA trust would or should have known that it had not established such a trust.

b. The Locke Lord Letters assumed that each Employer's Trust (*i.e.*, VEBA trust) or its Third-Party Administrator would obtain and hold in the United States certificates from the BPT, evidencing the VEBA trust's beneficiary interest in the BPT. RMI alleges that this did not occur and that AEUH knew it. Additionally, each Participating Plan, if any, that received and relied upon any Locke Lord Letter yet

failed to obtain and hold certificates from the BPT would or should have known that it had not done so.

c.     The Locke Lord Letters assumed that each Employer Plan and Employer's Trust would be accounted for separately, such that no assets of any Employer Plan or Trust would be used to pay claims against any other Employer Plan or Trust. RMI alleges that such commingling occurred commonly, and AEUH knew it. Indeed, RMI alleges that AEUH was robbing Peter to pay Paul, using assets of Participating Plans to pay claims of other Participating Plans, in violation of the separateness requirements of the Locke Lord Letters.

*RMI v. AEUH*, Dkt. 8, Am. Cpt., ¶¶42-68.

53.     The Locke Lord Letters contained a disclaimer stating that its conclusions are "based solely on the accuracy of the facts and assumptions expressly stated herein, and the conclusions, statements and views expressed herein cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect." Ex. A, AISM Letter, at 8; Ex. E, AEUH Letter, at 8; *see also* Ex. D, 12/15/16 Letter (incorporating the AISM Letter by reference).

54.     Because AEUH and any Other Fiduciaries or Agents who received the Locke Lord Letters allegedly knew of many respects in which the assumptions and facts set forth in the Locke Lord letters were inaccurate, they could not reasonably rely upon the Locke Lord Letters. Any such reliance was negligent and/or assumed the risk that Locke Lord's conclusions, which were based on contrary assumed facts, might have been incorrect.

55.     To the extent RMI is seeking to impute the reliance of AEUH or Other Fiduciaries or Agents to the AEU Plan and Participating Plans, such imputation is defeated because (i) AEUH or Other Fiduciaries or Agents were, in fact, not relying on the Locke Lord Letters due to their

knowledge of the inaccuracy of the assumed facts in the Letters, and/or (ii) if they did rely on the Locke Lord Letters notwithstanding the inaccuracies, their negligence and assumption of risk in doing so as agents and/or fiduciaries is imputed to the AEU Plan and Participating Plans.

> *Negligence and Assumption of Risk by the AEU Plan and Participating Plans Based on the Acts and Omissions of AEUH and the Other Fiduciaries or Agents*

56.     The many differences RMI has alleged between the assumptions in the Locke Lord Letters and the actual operation and administration of the AEU Plan and Participating Plans were the result of negligence by persons or entities other than Locke Lord and that RMI itself has alleged caused the program to collapse.

57.     The Court in *RMI v. AEUH* has already found that RMI alleged "multiple failings in the implementation of the Program that ultimately led to there being insufficient funds to pay all claims." *See RMI v. AEUH*, Dkt. 53 at 5 (denying AEUH's motion to dismiss).

58.     Additionally, RMI has alleged in *RMI v. AEUH* that AEUH oversaw a systemic failure to properly underwrite the Participating Plans below the attachment point. *See RMI v. AEUH*, Dkt. 8, Am. Cpt., ¶¶85-89. These underwriting problems—non-legal matters on which the Locke Lord Letters did not opine nor make assumptions about—were extreme, as RMI alleges in the *RMI v. AEUH* amended complaint, and as summarized by the Court. *See RMI v. AEUH*, Dkt. 53 at 5-7.

59.     In *RMI v. AEUH*, RMI sued both AEUH and the individuals who operated AEUH precisely because they allegedly acted as agents and fiduciaries for the AEU Plan in a manner contrary to Locke Lord's assumptions. *RMI v. AEUH*, Dkt. 8, Am. Cpt., ¶¶42-68.

60.     RMI sued Other Fiduciaries or Agents in *RMI v. Corso Brokers* precisely because they allegedly acted as agents and fiduciaries for the AEU Plan in a manner contrary to Locke Lord's assumptions. *RMI v. Corso,* Dkt. 8, Am. Cpt., ¶¶68-71, 75, 78-80, 85-86, 91. Other parties,

including the DOL, also sued Other Fiduciaries or Agents because they allegedly acted as agents and fiduciaries for the AEU Plan in a manner contrary to Locke Lord's assumptions. *See*, *e.g.*, DOL Action, Dkt. 190, Am. Cpt., ¶¶39, 72-78, 80, 88, 93, 115; *see also* DOL Action, Dkt. 225, AEUH and AEUB's Am. Cross-Claim and Third-Party Cpt., ¶¶32, 42-43, 48, 52-53.

61.    The acts and omissions of AEUH as agents and fiduciaries of the AEU Plan and Participating Plans contrary to Locke Lord's assumptions and advice were negligent and assumed the risk that injury might result.

62.    The acts and omissions of Other Fiduciaries and Agents of the AEU Plan and Participating Plans in a manner contrary to Locke Lord's assumptions and advice were negligent and assumed the risk that injury might result.

63.    To the extent RMI is alleging that Locke Lord owed duties to the AEU Plan and Participating Plans *via* the alleged agency or fiduciary relationship between such Plans and AEUH or Other Fiduciaries or Agents, the foregoing negligence and assumption of risk by AEUH and the Other Fiduciaries or Agents is imputed to the AEU Plan and Participating Plans.

64.    To the extent RMI is alleging that Locke Lord owed duties to the AEU Plan and Participating Plans via their alleged status as third-party beneficiaries of Locke Lord's attorney-client relationship with AEUH, the foregoing negligence and assumption of risk by AEUH is imputed to the AEU Plan and Participating Plans.

65.    The foregoing negligence and assumption of risk by the AEU Plan and Participating Plans, both directly and indirectly through AEUH or Other Fiduciaries or Agents, proximately caused the injuries RMI alleges in its Complaint against Locke Lord.

66.    Liability of Locke Lord is defeated in whole or part by the foregoing comparative negligence or assumption of risk.

**Fourth Affirmative Defense**
**(Superseding or Intervening Cause)**

67.     Locke Lord incorporates Paragraphs 1-66 above of its Affirmative Defenses.

68.     Whether done negligently, recklessly, or intentionally, the acts and omissions of the AEUH Defendants and/or Other Fiduciaries or Agents described above, allegedly as agents or fiduciaries of the AEU Plan and Participating Plans, constituted superseding or intervening causes of the injuries RMI alleges.

69.     Similarly, whether done negligently, recklessly, or intentionally, the decision of the AEU Plan or any Participating Plan to rely upon the conclusions in any Locke Lord Letter notwithstanding the Disclaimers without obtaining independent legal advice constituted a superseding or intervening cause of the injuries RMI alleges.

70.     Alternatively, if the AEU Plan or any Participating Plan obtained independent legal advice in lieu of relying upon any Locke Lord Letter, such a decision would not only defeat the elements of reliance and proximate causation, but such advice by independent counsel would constitute a superseding or intervening cause of the injuries RMI alleges.

71.     Upon information and belief, AEUH retained attorney Daly Temchine in or about May 2017 to advise it with respect to the structure and operations of the transaction contemplated under the AEUH Letter and the operations of AEUH.  Discovery is needed to determine the scope and extent of Mr. Temchine's advice.  Locke Lord reserves the right to amend these Affirmative Defenses to add allegations that Mr. Temchine's advice was negligent and an intervening or superseding cause of the injuries RMI alleges.

72.     The foregoing intervening and superseding causes of the injuries RMI alleges defeat any liability of Locke Lord for such alleged injuries.

**Fifth Affirmative Defense**
**(Mitigation of Damages)**

73.     Locke Lord incorporates Paragraphs 1-72 above of its Affirmative Defenses.

74.     RMI has alleged that there are potentially several million dollars of unpaid claims that were potentially covered under one or more of the stop-loss policies procured by a BPT pursuant to the AEU Plan.

75.     Although RMI claims it is prevented from recovering against such stop-loss policies due to factual and/or legal impediments, discovery is needed to determine the accuracy of such assertions.  If and to the extent that RMI could reasonably have made and recovered (or still can make and recover) insured claims pursuant to stop-loss policies, it has failed to mitigate damages and its recovery, if any, should be reduced by that amount.

WHEREFORE, Locke Lord respectfully requests that this Court enter judgment in its favor and against RMI and grant such other relief as the Court deems just and proper.

Respectfully submitted,

Dated:  December 1, 2022                    **LOCKE LORD, LLP**

By:     /s/ Edward W. Feldman

One of Its Attorneys

Edward W. Feldman (6187541)
Diane F. Klotnia (6202609)
Kay L. Dawson (6312631)
Miller Shakman Levine & Feldman LLP
30 West Monroe Street, Suite 1900
Chicago, Illinois 60603
(312) 263-3700
efeldman@millershakman.com
dklotnia@millershakman.com
kdawson@millershman.com

**<u>Certificate of Service</u>**

The undersigned attorney hereby certifies that on December 1, 2022, he caused the foregoing **ANSWER AND AFFIRMATIVE DEFENSES OF LOCKE LORD, LLP TO FIRST AMENDED COMPLAINT** to be filed with the Clerk of the Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system, which shall send notification of such filing to all counsel of record.


           /s/ Edward W. Feldman

117